UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
Pittsburgh Division

ERNEST LEE DUNCAN, JR.,

      Plaintiff,

v.                                                                    CIVIL ACTION NO. 2:22-cv-1717

PNC BANK, N.A.;
EXPERIAN INFORMATION SOLUTIONS, INC.;
TRANS UNION, LLC; and
EQUIFAX INFORMATION SERVICES, LLC,

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **ERNEST LEE DUNCAN, JR.**, by and through his undersigned counsel, alleges the following against Defendants PNC BANK, N.A., EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC, and EQUIFAX INFORMATION SERVICES, LLC.

## PRELIMINARY STATEMENT

1.      This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FCRA").

2.      Today in America there are three major consumer reporting agencies, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC. These agencies are also referred to collectively as the "CRAs."

3.      The FCRA demands the CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report pursuant to 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the

information cannot be verified, delete it pursuant to 15 U.S.C. § 1681i.

4.      Consumer reporting agencies that create consumer reports, like the CRA Defendants, are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like PNC, particularly where a consumer makes a dispute about information reported.

5.      Also, when a consumer like Plaintiff disputes the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here PNC. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      When such dispute investigations are ongoing and credit reporting of the subject account is also taking place, the furnisher of information must note that the consumer has disputed the information when transmitting account data to CRAs.

7.      Plaintiff brings claims under Section 1681e(b) against all three CRAs because each reported about Plaintiff inaccurate information regarding a PNC line of credit account. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

8.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued by consumers, sanctioned by regulators and reprimanded by both District and Appellate courts to do

more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

9. Likewise, PNC violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and thereafter failed to reasonably investigate those disputes. Instead, discovery will show all that PNC did was consult its own records about the account and confirm to the CRAs the inaccurate information it was already reporting.

## JURISDICTION AND VENUE

10. The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p.

11. Venue is proper in this District and Division because events giving rise to this Complaint occurred in this District and Division, Defendant PNC Bank, N.A. maintains its principal place of business in this District and Division, and each of the Defendants transact business within this District and Division.

## PARTIES

12. Plaintiff, ERNEST LEE DUNCAN, JR. ("Mr. Duncan") is a natural person and "consumer" as defined by § 1681a(c).

13. PNC BANK, N.A. is a national banking association which maintains its principal place of business in Pittsburgh, Pennsylvania.

14. PNC is a "furnisher' of information as defined and governed by 15 U.S.C. § 1681s-2.

15. Defendant Experian Information Solutions, Inc. is headquartered in California and does business in this District and Division through its registered agent.

16. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

17.     Defendant Trans Union LLC is headquartered in Illinois and does business in this District and Division through its registered agent.

18.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

19.     Defendant Equifax Information Services, LLC is headquartered in Georgia and does business in this District and Division through its registered agent.

20.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

21.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

22.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23.     Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

24.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

25.     It has long been the law that a CRA, such as Experian, Trans Union and Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781

F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

26.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

27.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

28.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that the CRA Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

29.     It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. T. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

30.     Today, furnishers such as PNC and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much more recent, enacted only in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### Plaintiff Discovers the CRA Defendants Were Inaccurately Reporting the PNC Account as belonging to the Plaintiff

31.      Sometime in 2020, Plaintiff discovered that one or more CRA Defendants were reporting a derogatory PNC account as belonging to Plaintiff.

32.     The PNC account was a line of credit account which had been opened by Plaintiff's late father, Ernest Lee Duncan, Sr., and Plaintiff's late stepmother, Betty F. Duncan, in February 1976.

33.     Plaintiff never opened the PNC account.

34.     But for the PNC account, Plaintiff has at all relevant times herein, had excellent credit.

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

35. Just prior to when the PNC account began reporting on Plaintiff's credit in August or September 2020, Plaintiff's credit score was in the 800s.

36. Between 2020 and February 2022, Plaintiff tried disputing the PNC account directly with PNC, to no avail.

37. In November 2021, in response to one of Plaintiff's dispute letters to PNC, PNC even went so far as to request Plaintiff's deceased father and stepmother to execute an authorization and return it to PNC to allow PNC to be able to investigate Plaintiff's dispute.

### *Plaintiff Disputes The Inaccuracies With The CRAs*

38. In March 2021, Plaintiff disputed the PNC Account to one or more CRA Defendants, including Experian and Trans Union.

39. In its dispute response, Experian verified the PNC account as belonging to Plaintiff and continued to report the account as 30 days or more past due for the month of August 2020.

40. In its response to Plaintiff's March 2021 dispute, Trans Union verified the PNC account as belonging to Plaintiff and continued to report the account as 30 days or more past due for the month of August 2020.

41. In August 2021, Plaintiff disputed the PNC Account to one or more CRA Defendants, including Trans Union.

42. In its response to Plaintiff's August 2021 dispute, Trans Union verified the PNC account as belonging to Plaintiff.

43. In April 2022, the CRA Defendants were still reporting the PNC account as belonging to Plaintiff.

44. On May 10, 2022, Plaintiff sent written disputes by certified mail to all three CRA Defendants, disputing the PNC account as belonging to Plaintiff.

45.    All three CRA Defendants verified the PNC account as belonging to Plaintiff and continued to report it.

46.    Defendants had actual knowledge of these inaccuracies and deliberately chose to ignore and permit the reporting of the PNC account on Plaintiff's credit files.

47.    Upon information and belief, Plaintiff alleges that on one or more occasions within the past two years Experian, Trans Union and Equifax forwarded Plaintiff's disputes to PNC. Upon information and belief, within the past two years, PNC was provided notice of Plaintiff's disputes, and, despite this notice, failed and refused to investigate and correct its inaccurate reporting.

48.    Experian, Trans Union and Equifax received the Plaintiff's disputes, but in each case wholly and entirely failed to conduct the reinvestigations required by law.  Instead, Experian, Trans Union and Equifax merely "parroted" the information dictated to it by PNC.

49.    Upon information and belief, Experian, Trans Union and Equifax prepared and published to third-parties multiple inaccurate consumer reports about Plaintiff that reflected the PNC account which did not belong to Plaintiff.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

50.    Unknown to the Plaintiff until this lawsuit, it has long been the practice of the CRA Defendants to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Both Equifax and Trans Union use the same vendor, previously known as Intelenet Global Services and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mailed disputes.

51.     These dispute processing vendors are not hired to perform an actual FCRA investigation. Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

52.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian. It gets sent to the CRA Defendants' creditor customer (such as PNC) for its sole review and consideration.

53.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes, scans them into a batch of other disputes.

54.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

55.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

56.    Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

57.    Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court in 2020, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

58.    Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in this District with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and Trans Union for their farming-out of investigations to Teleperformance.

59.     Regardless of whether these statements are correct, Equifax, Trans Union, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

60.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *The CRA Defendants Forwarded Plaintiff's Disputes To PNC, Who Did Nothing*

61.     In each instance in which Plaintiff disputed the PNC account with the CRAs, the CRAs forwarded Plaintiff's disputes to PNC using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

62.     e-Oscar is also the system by which PNC has agreed it will accept such consumer disputes from the CRAs.

63.     Under such circumstances, PNC became obligated under the FCRA to investigate Plaintiff's disputes.

64.     Discovery will show that PNC received notice from the CRA Defendants of Plaintiff's disputes.

65.     The information furnished by PNC to Equifax, Experian and Trans Union was at all times inaccurate.

66.     PNC failed to reasonably reinvestigate Plaintiff's disputes that it received in violation of § 1681s-2(b)(1)(A) of the FCRA.

67.     Defendant PNC further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from PNC and prior to the commencement of this action.

*Plaintiff Suffered Actual Harm*

68.     Defendants have continued to report the PNC account on the Plaintiff's credit report, despite being notified that this information was false.

69.     Plaintiff has been attempting to resolve these matters with Defendants and his credit was significantly damaged by Defendants' failure to correct the inaccurate reporting.

70.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

a.   Stress associated with a less favorable mortgage refinancing terms and decreased credit scores because of the false, derogatory reporting of the PNC account on Plaintiff's credit reports;

b.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

c.   Loss of time attempting to cure the error;

d.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; and

e.   Stress associated with attempting to resolve this matter in the last year.

*Defendants' Conduct Was Willful*

71.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

72.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction

right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

73.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

74.    The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

75.    Just in federal court alone, during the last decade the creditor-furnisher disputed by Plaintiff has had to defend dozens of consumer lawsuits.

76.    In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

77.    The CRA Defendants knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

78.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

79.    Each Defendant regularly receives unredacted consumer dispute details from this database.

80.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

81.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

82.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

83.     Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against Trans Union were based largely on their failure to reasonably investigate consumer disputes.

84.     PNC has approximately 784 such consumer credit complaints against it.

85.     Just in the last 12 months alone, Experian, Equifax, and Trans Union have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

86.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

87.     Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting

agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

88.    Equifax has even been warned by one of its home state District Courts, the Southern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

89.    Trans Union has long been on even clearer notice. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer

was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).  Trans

Union's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

90.     Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

91.     In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

92.     The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

93.     Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten*

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

*Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*,

National Consumer Law Center, February 2019. ("NCLC Report").[4]

94.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

*Id.* at 2.

95.    Among many of the CRA Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

---

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

*Id.* at 6.

96. Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

97. Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA – against Experian, Trans Union and Equifax

98. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

99. Defendants Experian, Trans Union and Equifax willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

100. As a result of this conduct, action and inaction of Experian, Trans Union and Equifax, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

101.    Further, after the Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Trans Union and Equifax ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

102.    Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

103.    As a result of Experian, Trans Union and Equifax's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

104.    Experian, Trans Union and Equifax's conduct, action and inaction were willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

105.    The Plaintiff is entitled to recover his costs and attorney's fees from Experian, Trans Union and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**Violation of § 1681i of the FCRA – against Experian, Trans Union and Experian**

106.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

107.    Experian, Trans Union and Equifax willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant

information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

108.    Further, Experian, Trans Union and Equifax violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Experian, Trans Union and Equifax conducting the investigation.

109.    Yet, both Equifax and Trans Union used an unrelated third party, Teleperformance, over which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

110.    Furthermore, Experian used an unrelated third party, Experian Chile, over which Experian has no direct control, to conduct its investigations. Experian Chile is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Experian therefore violated 1681i on this basis because it sent Plaintiff's disputes away to acompany that was not its controlled agent rather than investigating them as required.

111.    As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

112.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the

Court pursuant to 15 U.S.C. § 1681n.

113.    The Plaintiff is entitled to recover his costs and attorneys' fees from Experian, Trans Union and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### Violation of § 1681s-2(b)(1)(A) and (B) of the FCRA – against PNC

114.    The Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

115.    Defendant PNC violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after said disputes were furnished to PNC by Experian, Trans Union and Equifax.

116.    On one or more occasions within the past two years, by example only and without limitation, PNC violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided to it by Experian, Trans Union and Equifax.

117.    Based on the way Experian, Trans Union and Equifax responded to—or did not respond to—Plaintiff's disputes, representing that PNC had verified the supposed accuracy of its reporting, Plaintiff alleges that Experian, Trans Union and Equifax did in fact forward the Plaintiff's dispute via ACDV to PNC.

118.    PNC understood the nature of Plaintiff's disputes when it received the ACDVs from Experian, Trans Union and Equifax.

119.    Notwithstanding the above, PNC follows a systematically unlawful process when it receives an ACDV dispute.  Basically, all PNC does is review its own internal computer screens for the account and repeat back to the ACDV system the same information it already has reporting to Experian, Trans Union and Equifax.

120.    When PNC receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether the information already in its computer system itself is inaccurate.

121.    As a result of PNC's violations of 15 U.S.C. § 1681s-2(b)(1)(A) and (B),  Plaintiff suffered actual damages including but not limited to less favorable credit terms, decreased credit scores, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

122.    As a result of PNC's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

123.    PNC's conduct, action and inaction was willful and it is liable for actual, statutory and punitive damages in an amount to be determined by the Court, pursuant to15 U.S.C. § 1681n. In the alternative PNC was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

124.    The Plaintiff is entitled to recover his costs and attorneys' fees from PNC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**Violation of § 1681s-2(b)(1)(C) and (D) of the FCRA – against PNC**

125.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

126.    On one or more occasions within the past two years, by example only and without limitation, PNC violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with Experian, Trans Union and Equifax in response to his disputes without also including a notation that the debt was disputed and by failing to correctly report results of an accurate investigation to Experian, Trans Union and Equifax.

127.    On information and belief, Plaintiff alleges that PNC rarely if ever adds the notation

that the account is disputed when it responds to the e-Oscar ACDVs.

128.    Plaintiff's disputes were, at minimum, bona fide.

129.    As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to:  less favorable credit terms, decreased credit scores, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

130.    As a result of PNC's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

131.    PNC's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, PNC was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

132.    PNC was aware of the *Saunders v. Branch Banking & Trust* and *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009) FCRA decisions by the Fourth Circuit and Ninth Circuit, respectively, when it followed the ACDV procedures used regarding Plaintiff's disputes.

133.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that PNC intended its employees or agents to follow.

134.    On information and belief, Plaintiff alleges that PNC's employees or agents did not make a mistake in the way they followed PNC's procedures when they received, processed and responded to Experian, Trans Union and Equifax's ACDVs and did not include any notation that the account was disputed.

135.    On information and belief, the Plaintiff alleges that PNC has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

136.    PNC's conduct, action and inaction was willful and it is liable for actual, statutory and punitive damages in an amount to be determined by the Court, pursuant to15 U.S.C. § 1681n. In the alternative PNC was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

137.    The Plaintiff is entitled to recover his costs and attorneys' fees from PNC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT V**
**<u>Violation of § 1681s-2(b)(E) of the FCRA – against PNC</u>**

138.    The Plaintiff realleges and incorporates the foregoing paragraphs as it fully set out herein.

139.    Defendant PNC violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian, Trans Union and Equifax and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from PNC's failure to investigate as articulated herein,after PNC received notice of Plaintiff's disputes from Experian, Trans Union and Equifax.

140.    As a result of this conduct, action and inaction of PNC, the Plaintiff suffered actual damages, including but not limited to: less favorable credit terms, decreased credit scores, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

141.    As a result of PNC's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

142.     PNC's conduct, action and inaction was willful, it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

143.     The Plaintiff is entitled to recover his costs and attorneys' fees from PNC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY DEMAND

142.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for his attorneys' fees and costs; for prejudgment and postjudgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

December 2, 2022

Respectfully Submitted,
**ERNEST LEE DUNCAN, JR.**

By:____*/s/ Drew D. Sarrett*____
Drew D. Sarrett, Esq.
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
(804) 905-9900 - Telephone
(757)930-3662 - Facsimile
drew@clalegal.com