IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
Pittsburgh Division

**ERNEST LEE DUNCAN, JR.,**

      **Plaintiff,**

v.                                                                                  Civil Action No. 2:22-cv-01717-PLD

**PNC BANK, N.A. et al.,**

      **Defendants.**

### PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS

Pursuant to LCvR 56(B)(1), Plaintiff Ernest Lee Duncan, Jr. ("Plaintiff" or "Mr. Duncan") submits the following concise statement of material facts on which there is no genuine issue to be tried.

1.    Sometime in 1976, Mr. Duncan's late father and stepmother, Ernest Lee Duncan, Sr. ("Senior") and Betty Duncan ("Betty"), opened a checking account (the "Checking Account"). (Ex. 1, PNC 1-2, 181–82; Ex. 2, PNC 30(b)(6) Dep. Tr. 13:9–11 (pertinent excerpts).)

2.    The only document containing Plaintiff's signature that relates to the Checking Account is a signature card dated August 25, 2007 (the "Signature Card"), which makes no mention of a credit line. (Ex. 1, PNC 1-2.)

3.    Defendant, PNC Bank, N.A. ("PNC"), has no documents pertaining to the Checking Account which predate the Signature Card. (Ex. 2, PNC 30(b)(6) Dep. Tr. 17:8–18:3.)

4.    There would have been at least one signature card prior to the Signature Card. (Ex 2, PNC 30(b)(6) Dep. Tr. 17:19–22.)

5.    PNC has no documents that might have been provided to Mr. Duncan with the Signature Card. (Ex. 2, PNC 30(b)(6) Dep. Tr. 35:6–36:19.)

6. PNC produced a document titled "Cash Reserve Line Agreement" which states "Effective 1/2/08" but has no internal reference to this document or record of its mailing. (Ex. 1, PNC 181–82; Ex. 2, PNC 30(b)(6) Dep. Tr. 32:25–33:20, 37:10–39:2.)

7. There is no documentation reflecting that the Checking Account included a line of credit. (Ex. 2, 18:22–25, 34:2–36:19, 39:3–12.)

8. Mr. Duncan does not recall whether he was provided any documents referenced in the Signature Card on August 25, 2007. (Ex. 3, Plaintiff's Dep. Tr. 23:15–21 (pertinent excerpts).)

9. Senior passed in 2010, and Betty in 2009. (Ex. 4, PNC 37–38.)

10. PNC produced a payment history for the line of credit it reported to consumer reporting agencies (CRAs) (the "Disputed Line of Credit") titled "History Card Report" with a "Loan Num 2944." (Ex. 5, PNC 169–80.)

11. This payment history shows that the Disputed Line of Credit was paid in full in December 2010, leaving a $0 balance. (Ex. 5, PNC 173; Ex. 2, PNC 30(b)(6) Dep. Tr. 67:11–68:11.)

12. In fact, there was an overpayment on the Disputed Line of Credit, resulting in "$36.72 being deposited to the" Checking Account. (Ex. 5, PNC 173; Ex. 2, PNC 30(b)(6) Dep. Tr. 67:21–68:2.)

13. The "History Card Report" shows "Statement Produced" on December 24, 2010 and January 25, 2011. (Ex. 5, PNC 173.)

14. These statements show an overpayment of $36.72 on the Disputed Line of Credit in December 2010, which was then transferred out by the end of December 2010. (Ex. 6, PNC 137–40.)

15. The "History Card Report" shows no payment or debit activity or issuance of a

statement on the Disputed Line of Credit from February 28, 2011 through October 28, 2019. (Ex. 5, PNC 173–77.)

16. When PNC questioned Plaintiff about whether he closed the Checking Account after Senior and Betty died, he testified unequivocally that he had done so:

> **Q.** So looking back at Exhibit C[1], looking at the section titled summary of account activity, does this account statement dated for late 2010, reflect that the balance owed on this account was paid off?
> **A.** Yes.
> **Q.** And that nothing was due at that point?
> **A.** Yes.
> **Q.** Do you have any recollection of closing any bank accounts that your father and stepmother had after [they died]?
> **A.** Yes.
> **Q.** And you had mentioned to me that you were just aware of the one bank account; correct?
> **A.** Yes.
> **Q.** So it's your recollection, as you sit here today, that you closed out the account that they held with National City that became PNC?
> **A.** Yes.
> **Q.** When do you recall doing that, sir?
> **A.** It was several months after the fact. After my dad had, after he died.
> **Q.** So several months, early 2011? Is your recollection?
> **A.** Yes.

(Ex. 3, Pl's Dep. Tr. 33:15–34:17.)

17. There was no activity on the Checking Account from March 17, 2016 through September 18, 2019. (Ex. 7, PNC 183–203; Ex. 2, PNC 30(b)(6) Dep. Tr. 64:9–18.)

18. PNC produced a letter dated February 5, 2010 addressed only to Senior and Betty, the latter having passed a year earlier, advising that the "transfer of your National City Cash Reserve Line to PNC Bank" would be "effective February 22, 2010.") (Ex. 8, PNC 219–20.) This letter also advised of a "change in terms." (*Id.*)

19. National City merged into PNC Bank, effective November 6, 2009. (Ex. 9, FDIC

---

[1] Referring to PNC 137 of Exhibit 12 to this filing.

Merger Info, available via search at https://banks.data.fdic.gov/bankfind-suite/.)

20. PNC produced "PNC Smart Checking" statements for the Checking Account. (Ex. 7, PNC 183–203.) These statements show no activity——no balance, no debits, no credits. (*Id.*)

21. The "PNC Smart Checking Statements" reflect "RETRN MAIL" above the name and address lines, so they were designated as being returned to sender by USPS, at least as early as the June 2016 statement:



(Ex. 7, PNC 183 (highlighting added).)

22. The "RETRN MAIL" notation means that at some point prior to this statement, PNC had received returned mail of a statement. (Ex. 2, PNC 30(b)(6) Dep. Tr. 53:14–54:18.)

23. PNC claims its practice would have been to continue to send statements to the wrong address "until a current address or—or a correct address is provided." (Ex. 2, PNC 30(b)(6) Dep. Tr. 54:19–25.)

24. The Checking Account and Disputed Line of Credit Account only stayed open for years following December 2010 because "of the linking of the two accounts . . . . the [Disputed Line of Credit] account is basically what—the link to that account is what kept it outside of the—the normal closed process." (Ex. 2, PNC 30(b)(6) Dep. Tr. 50:18–52:6.)

25. In 2019, PNC converted the Checking Account from a "Smart Account" into a "Standard Account" and began charging service fees. (Ex. 10, PNC 221–255.) PNC testified about this change as follows:

> Q. Why was the account changed from smart checking to standard checking?

> A. It was an internal PNC project. I believe it was deemed a simplification project where the company reviewed the needs of the customers and revamped the products that were offered—or actually, on the on the books and going forward then, felt the—the business decision better suited moving to a—from the smart account to the standard checking account.
>
> Q. Okay. And—and the smart checking account, did—well, what was the difference in fees between smart checking and standard check?
>
> A. Well, this account being a smart checking account had some built in waivers for fees. So this account was not, actually, generating any fees because it had the built-in fee waivers. And one of the differences was that the standard checking no longer had some of the fee waivers.

(Ex. 2, PNC 30(b)(6) Dep. Tr. 52:20–53:13.)

26. PNC's letter regarding the change to "Standard Checking," dated August 5, 2019, is addressed to the same address noted by PNC as resulting in returned mail for at least three years, i.e., 4656 English Oak Ct., Mason, OH, 45040-2570 ("4656 English Oak Ct"). (Ex. 7, PNC 183; Ex. 10, 221; Ex. 2, PNC 30(b)(6) Dep. Tr. 53:14–54:18, 57:1–7, 57:20–24.)

27. PNC then assessed fees on the Checking Account but not because of any activity by Mr. Duncan. (Ex. 2, PNC 30(b)(6) Dep. Tr. 63:5–15, 64:1–8.)

28. There were no checks written on the Checking Account, but PNC charged $3.00 for "Check Images in Statement Fee" on November 19, 2019 and again on December 17, 2019. (Ex. 11, PNC 204–205.)

29. All statements for the Disputed Line of Credit only listed Senior and Betty and were addressed to 4656 English Oak Ct. (Ex. 12, PNC 127–162; Ex. 7, PNC 183.)

30. A letter providing "Important information regarding your PNC Bank Personal Line of Credit Account Number ▮▮▮▮▮▮2944" only listed Senior and Betty and was addressed to 4656 English Oak Ct. (Ex. 13, PNC 4.)

31. A PNC letter dated July 22, 2020 regarding a "returned payment" and removal of

automatic payment deduction on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (Ex. 14, PNC 10.)

32. A PNC dunning letter dated August 25, 2020 regarding two "missed payments" on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (Ex. 15, PNC 12–13.)

33. Another PNC dunning letter dated August 10, 2020 regarding a past due payment on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (Ex. 16, PNC 14–15.)

34. Another letter PNC produced, dated September 1, 2020, stated that the Disputed Line of Credit "is no longer linked to an active deposit account" and only listed Senior and Betty and was addressed to 4656 English Oak Ct. (Ex. 17, PNC 16–17.)

35. Plaintiff learned of derogatory credit reporting about the Disputed Line of Credit in September 2020 while seeking to refinance his mortgage. (Ex. 18, PNC 45.)

36. Plaintiff learned in his communications with PNC that the Disputed Line of Credit belonged to his deceased parents, and although he was under no obligation to do so, he paid the $38.25 on the Disputed Line of Credit in an effort to resolve the issue and proceed with his mortgage refinance. (Ex. 19, PNC 27-28; Ex. 20, 1354–55.) The receipt for this payment lists the customer as "Duncan Sr." (Ex. 20, PNC 1354.)

37. Plaintiff then repeatedly disputed the credit reporting of the Disputed Line of Credit to PNC directly, including with the assistance of an attorney, and through the CRAs. (Ex. 21, PNC 20–28, 30–41, 43–46, 54–55, 72–90, 92–121, 125–26.)

38. PNC repeatedly refused to cease reporting the Disputed Line of Credit as Mr. Duncan's responsibility. (Ex. 22, PNC 19, 52, 66, 80–83, 92–101, 125–26, 1338–39.)

39. PNC consistently reported the Disputed Line of Credit as opened on February 23, 1976. (Ex. 22, PNC 19, 52, 66, 80–83, 92–101, 125–26, 1338–39.)

40. PNC reported the account status and history differently in response to different disputes[2]:

| Response Date | PNC ACDV Processor | CRA | Furnisher Response re: Account Type, Status, and Payment History | Compliance Condition Code | Bates Nos. |
|---|---|---|---|---|---|
| Mar. 2, 2021 | Valerie Brooks | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 80–81 |
| Mar. 11, 2021 | Derek Geraci | Experian | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 82–83 |
| Apr. 1, 2021 | Milton Azeem | Experian | Line of credit (account type) paid or closed/zero balance as of September | None | PNC 92–93 |

---

[2] Accompanying this filing as Exhibit 23 are pertinent excerpts of the *Credit Reporting Resource Guide* (PNC 381–83, 422–27, 435–38, 454–56) published by the Consumer Data Industry Association (CDIA), which define the codes used by PNC in its dispute responses in Exhibit 22. CDIA describes itself as the "voice of the consumer reporting industry, representing consumer reporting agencies including the nationwide credit bureaus, regional and specialized credit bureaus, background check companies, and others." CDIA, *About CDIA*, available at https://www.cdiaonline.org/about/about-cdia/ (last accessed on Oct. 15, 2024.)

| | | | | | |
|---|---|---|---|---|---|
| | | | 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | | |
| Aug. 27, 2021 | Sharon Karpinski | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 94–95 |
| Sept. 13, 2021 | Valerie Brooks | Equifax | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 96–97 |
| May 20, 2022 | Milton Azeem | Equifax | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 (and all other months in payment history profile) | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 98–99 |
| May 20, 2022 | Milton Azeem | Experian | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of | XH (account previously in dispute; the data furnisher has completed | PNC 100–101 |

Page 8 of 12

| | | | | | |
|---|---|---|---|---|---|
| | | | September 11, 2020 and payment rating of current and account current in August 2020 | its investigation) | |
| May 20, 2022 | Milton Azeem | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 125–26 |
| Mar. 21, 2023 | Daniel Mackanick | Experian | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of 30–59 days delinquent and account delinquent by 30–59 days in August 2020 but no payment history reported/available for September 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 1338–39 |

41. In September 2021, PNC did, however, update its credit reporting to remove any delinquency reporting for the Disputed Line of Credit. (Ex. 22, PNC 19.) This update provided that the account was closed on September 11, 2020 and was current in August 2020 and no payment history/reported available for September 2020. (Ex. 22, PNC 19.)

42. After Mr. Duncan filed suit against PNC, Equifax, Experian, and Trans Union, Experian sent an electronic Automated Consumer Dispute Verification form (ACDV) to PNC, which contained the following dispute information:

| Dispute Code 1: | 002:Belongs to another individual with the same/similar name. Provide or confirm complete ID. |
|---|---|
| Dispute Code 2: | |
| FCRA Relevant Information: | INVOLVED IN LITIGATION CONS CLAIMS THIS BELONGS TO HIS LATE FATHER ERNEST LEE DUNCAN SR |

(Ex. 22, PNC 1338 (highlighting added).)

43. PNC responded by reinserting delinquency reporting for the month of August 2020 and listing the payment rating of the Disputed Line of Credit as 30–59 days delinquent when it was closed on September 11, 2020. (Ex. 22, PNC 1338–39.)

44. The 2021 *Credit Reporting Resource Guide* describes the ACDV process as follows:

> In compliance with FCRA section 611 (a) (5) (D)[3], the consumer credit reporting industry maintains an automated dispute resolution system. This system, called e-OSCAR®, is available for use by all data furnishers. . . . Each consumer reporting agency and data furnisher has its own access to e-OSCAR®. When a consumer contacts a consumer reporting agency with a dispute, the agency transmits the disputed information and, if applicable, one or more images of relevant, consumer-provided documentation through e-OSCAR®. The data furnisher accesses e-OSCAR® and retrieves the disputed data and any associated document image(s). . . . The data furnisher researches the disputed account and transmits a response back to the originating consumer reporting agency via e-OSCAR®.

(Ex. 24, PNC 665–66.)

45. When Plaintiff's attorney disputed PNC's reporting directly, PNC responded with correspondence dated November 1, 2021 stating, in part:

> We have reviewed your dispute on behalf of Ernest L. Duncan & Betty F. Duncan and determined that you have failed to provide a sufficient authorization for us to

---

[3] I.e., 15 U.S.C. § 1681i(a)(5)(D), which provides:

> Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

*Id*.

be able to investigate and provide you adequate information with regard to this dispute.

Please have your client(s), Ernest L. Duncan & Betty F. Duncan, execute the enclosed Authorization and return it to PNC Bank, N.A. . . . .

### AUTHORIZATION

I, Ernest L. Duncan & Betty F. Duncan, herby authorize PNC Bank, N.A. to disclose, inspect, copy and deliver any and all records, information and reports, concerning my PNC Bank, N.A. Account Number . . . to The Massaro Legal Group, LLC, 2050 E. 96th Street,
Indianapolis, IN 46240.

(Ex. 25, PNC 29.)

46. PNC produced a document from its internal systems identifying only Senior and Betty as borrowers on the Disputed Line of Credit. (Ex. 2, PNC 30(b)(6) Dep. Tr. 26:17–27:2; Ex. 26, PNC 1358–73 at 1371–73.)

Dated: October 15, 2024                    Respectfully submitted,

**ERNEST LEE DUNCAN, JR.**

By   */s/ Drew D. Sarrett*
Drew D. Sarrett (*Pro Hac Vice*)
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
(804)-905-9900 - Telephone
(804) 905-9902 - Facsimile
Email: drew@clalegal.com

Leonard A. Bennett (*Pro Hac Vice*)
Adam Short (*Pro Hac Vice)*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbenett@clalegal.com
Email: adam@clalegal.com

*Counsel for the Plaintiff*