**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**Pittsburgh Division**

**ERNEST LEE DUNCAN, JR.,**

  **Plaintiff,**

v.                                    **Civil Action No. 2:22-cv-01717-PLD**

**PNC BANK, N.A. et al.,**

  **Defendants.**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE AND STATEMENT**
**OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF HIS OPPOSITION**

Pursuant to Local Civil Rules of Court 56, Plaintiff, Ernest Lee Duncan, Jr. ("Plaintiff" or

"Mr. Duncan") submits the following Response to Defendant PNC Bank, N.A.'s Statement of

Material Facts Not in Dispute and Statement of Additional Material Facts in Support of His

Opposition, filed contemporaneously with Plaintiff's Opposition to Defendant PNC Bank, N.A.'s

Motion for Summary Judgment.

**RESPONSES TO DEFENDANT'S STATEMENT OF FACTS**

1.      On February 1, 1976, the Plaintiff's father and stepmother, Ernest Duncan Sr. and

Betty Duncan ("the Duncans") opened a National City Preferred 50+ Interest Checking Account

(the "Checking Account"), which included overdraft protection. A true and correct copy of the

History Card Report for the Checking Account and corresponding Cash Reserve Line Agreement

are attached hereto as **Exhibit A** and **Exhibit B**, respectively; *See also,* Evan Hendricks Depo.

Excerpt, 73:1–4; attached hereto as **Exhibit C**.

**RESPONSE:** Denied. No evidence exists establishing the account type at the opening of

the Checking Account. The "History Card Report," which PNC attached as **Exhibit A**, originated

from PNC, not National City, and PNC has no documents which predate a National City

"Consumer Signature Card" (the "Signature Card") included in PNC's **Exhibit D**. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8–18:3, 67:9–20, Ex. 24.) The document titled "Cash Reserve Line Agreement," which PNC attached as **Exhibit B**, was dredged up from PNC's computer system. **Exhibit B** contains no account number or signature, and PNC has no internal reference to this document or record of its mailing.   No evidence connects PNC's **Exhibit B** to the Checking Account or Plaintiff. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:12-18:9, 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19 37:10-39:24, 43:10-45:9, 95:1-96:3 (pertinent excerpts)); **Ex. 28**, Duncan Decl. ¶¶ 3-4 (Nov. 12, 2024).

2.       On August 25, 2007, the Duncans' son, Ernest Duncan Jr. ("Plaintiff" or "Mr. Duncan") accompanied the Duncans to a National City Bank Branch where he became a Joint Owner/Depositor of the Duncans' Checking Account. A true and correct copy of the Consumer Signature Card is attached hereto **Exhibit D;** *See also*, **Ex. 29**, Duncan Dep. Tr. 19:15–18; 21:5–8, attached hereto as **Exhibit E.**

**RESPONSE:** Mr. Duncan admits that he accompanied his late father, Ernest Lee Duncan Sr. ("Senior") and stepmother, Betty Duncan ("Betty"), to a National City Bank Branch and signed the Signature Card included in PNC's **Exhibit D** on August 25, 2007 (ECF 112-4 at 2 (using CM/ECF pagination)). PNC has no documents that might have been provided to Mr. Duncan with the Signature Card. Further, the August 17, 2015 letter that is part of PNC's **Exhibit D** is addressed to Ernest Duncan, Sr. and Betty Duncan, but not to Plaintiff. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 19:11-20:1, 21:5-21:21 (pertinent excerpts)).

3.      By signing the Signature Card, Plaintiff acknowledged that he received and would be bound by pertinent terms and conditions of the applicable Account Agreements and subsequent amendments thereto. *See,* **Exhibit D.**

**RESPONSE:** Denied. The Signature Card states that Plaintiff acknowledged receipt of "the Personal Account Agreement, Pricing Schedule, Receipt and Rate Sheet, as applicable, completed, relative to the Account," and that he agreed "to be bound thereby and by any amendments hereafter made." PNC has no documents that might have been provided to Mr. Duncan with the Signature Card. The Signature Card says nothing about overdraft protection or a line of credit. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 45:5-45:9, 46:2-46:17,  95:1-96:3).

4.      The National City Cash Reserve Line Agreement that was in effect in 2008 stated in relevant part, "you and your joint account owners promise to pay and are jointly and individually responsible for all amounts due on the Line. 'You' means all joint account owners of the Checking Account." **Exhibit B** at PNC 182**.**

**RESPONSE:** Denied. No evidence exists establishing that the Cash Reserve Line Agreement attached as PNC's **Exhibit B** was provided to, mailed to, or otherwise agreed to by Plaintiff, Senior, or Betty. No evidence exists obligating Plaintiff to PNC's **Exhibit B** or any overdraft line of credit (the "Disputed Line of Credit"). (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 45:5-45:9, 46:2-46:17, 95:1-96:3).

5.      In addition, the Agreement explicitly cautioned that "a negative credit report reflecting on your credit record may be submitted to a consumer (credit) reporting agency if you fail to fulfill the terms of your credit obligations. **Exhibit B** at PNC 181.

**RESPONSE:** Denied. No evidence exists establishing that the Cash Reserve Line Agreement attached as PNC's **Exhibit B** was provided to, mailed to, or otherwise agreed to by Plaintiff, Senior, or Betty. No evidence exists obligating Plaintiff to the Disputed Line of Credit, including PNC's **Exhibit B**. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35-10, 35:18-36:19, 37:10-39:24, 45:5-45:9, 46:2-46:17, 95:1-96:3).

6.    At the time Plaintiff became a Joint Owner/Depositor of the Checking Account, Mr. Duncan's address was 4656 English Oak Court, Mason, Ohio 45040, which was updated as the address of record for the Checking Account to ensure all correspondence concerning the Checking Account would be received by the Plaintiff. *See,* **Exhibit E**, at 31–32:10–4.

**RESPONSE:**  Admitted that Mr. Duncan's address was 4656 English Oak Court, Mason, Ohio 45040 ("4656 English Oak Ct") when he signed the Signature Card on August 25, 2007 because he lived at that address from 2007 until 2013. (**Ex. 29**, Duncan Dep. Tr. 9:19–10:2). Denied that "the 'address of record' was updated for the Checking Account to ensure all correspondence concerning the Checking Account would be received by the Plaintiff." PNC's referenced excerpt of Plaintiff's deposition does not substantiate its assertion, and the statements for the Checking Account produced by PNC only begin in mid-2016. (**Ex. 30**, PNC 183–218.)

7.    Between August of 2007 and February of 2010, the Plaintiff and/or the Duncans regularly used the Checking Account, including relying on the overdraft protection provided and paying down the balance when used. *See,* **Exhibit A** at PNC 169.

**RESPONSE:** Denied in part. Plaintiff admits that Senior and Betty used the Checking Account between August 2007 and January 25, 2009, and Senior used the Checking Account between August 2007 and February 2010. Betty died on January 25, 2009. (**Ex. 4**, PNC 38.) Plaintiff never used the Checking Account for his own personal spending but only used it to assist

his Senior and Betty in paying their bills. (**Ex. 29,** Duncan Dep. Tr. 22:9-12; **Ex. 28,** Duncan Decl. ¶¶ 2, 5.)

8.      In October of 2008, National City Bank was acquired by PNC. As part of this acquisition, National City accounts were subsequently transferred to PNC and became PNC accounts. PNC advised Plaintiff and the Duncans of this change on February 5, 2010, when PNC sent a letter titled "Important Change in Terms Information Regarding Your Cash Reserve Line account" to Plaintiff's address[1] in Mason, Ohio stating that effective February 22, 2010, the Checking Account would be transferred to PNC, identified the new PNC account number for the Account, and included a Notice of Change in Terms which specified that, among other things, defaults on the Account would be reported to Credit Reporting Agencies. A true and correct copy of the correspondence is attached hereto as **Exhibit F**.

**RESPONSE:**  Denied. National City merged into PNC Bank, effective November 6, 2009. (**Ex. 9**, FDIC Merger Info, available via search at https://banks.data.fdic.gov/bankfind-suite/.) PNC's **Exhibit F** is addressed only to the Duncans and not Plaintiff. (ECF 112-6 at 2). No evidence exists establishing that PNC's **Exhibit F** provided to, mailed to, or otherwise agreed to by Plaintiff or Senior. Betty died on January 25, 2009. (**Ex. 4**, PNC 38.) Nothing in PNC's CSMF or the accompanying appendix substantiates its claim that PNC sent **Exhibit F** to anyone.  No evidence connects PNC's **Exhibit B** to Plaintiff. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 95:1-96:3); **Ex. 29**, Duncan Dep. Tr. 60:1-61:6, 61:19-62:15.)

---

[1] The correspondence was addressed to the Duncans. This was consistent with the National City Cash Reserve Line  Agreement, which dictated that account notices were only mailed to the primary depositors listed on the account.  **Exhibit B** at PNC 182.

9. While National City Bank maintained the Checking Account and the cash reserve line as features within one account, PNC separated the checking account and overdraft protections into two accounts within their system. After the account was transferred, the Account received its own PNC account number and two separate statements were sent, both acknowledging the existence and the obligation under for the overdraft protection. *See,* M. Bevins Depo., 16:11–3; 47–48, attached hereto as **Exhibit G**; PNC Account Statements, attached hereto as **Exhibit H**.

**RESPONSE:** Denied. No evidence has been produced establishing that National City Bank maintained the Checking Account and a cash reserve line as a single account. The statements relating to the Disputed Line of Credit were addressed solely to Senior and Betty, but not to Plaintiff, even though the Checking Account statements were addressed to Senior, Betty, and Plaintiff. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9; **Ex. 29**, Duncan Dep. Tr. 60:1-61:6, 61:19-62:15.)

10. At the time the Checking Account transferred to PNC, more than $600 was owed under the Account for overdraft advances. *See,* **Exhibit A** at PNC 169.

**RESPONSE:** Plaintiff disputes the materiality of this fact because no evidence exists obligating Plaintiff to the Disputed Line of Credit. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 45:5-45:9, 46:2-46:17, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 60:1-61:6, 61:19-62:15.)

11. The overdraft advances and charges continued into December 2010 as evidenced by the Line of Credit Account Statements sent to the Plaintiff's address. A true and correct copy of various PNC Line of Credit Account Statement is attached hereto as **Exhibit H,** at PNC 127-162**.**

**RESPONSE:** Disputed as immaterial. The statements relating to Disputed Line of Credit were addressed solely to Senior and Betty, and PNC has offered no evidence of their mailing. Further, no evidence exists obligating Plaintiff to the Disputed Line of Credit. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 53:14-17, 95:1-96:3, 118:15–120:19.)

12.     Ernest Duncan, Sr. died in December 2010. Following his death, the Plaintiff paid the amounts due and owing under the Account, however, neither the Account nor the Checking Account was closed. **Exhibit A** at PNC 173.

**RESPONSE:** Denied. Plaintiff closed the Checking Account several months after Senior died. PNC inexplicably kept the Checking Account and Disputed Line of Credit open because of its unproven assertion of a connection between these two accounts. Again, Plaintiff disputes that PNC has shown any evidence that the two accounts were linked. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 35:6-35:10, 35:18-36:19, 51:16-52:6, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 33:15–34:17.)

13.     Accordingly, PNC continued to send account correspondences to the Plaintiff's Mason, Ohio address, identifying Plaintiff as an account holder, and noting the overdraft protections afforded under the Checking Account. A true and correct copy of various correspondences is attached hereto as **Exhibit H,** at PNC 183-218.

**RESPONSE:** Denied. The "History Card Report" shows no payment or debit activity or issuance of a statement on the Disputed Line of Credit from February 28, 2011 through October 28, 2019, and PNC's corporate designee confirmed this fact in his deposition. No evidence exists that PNC mailed any statements for the Checking Account or Disputed Line of Credit. Even if PNC had adduced evidence of statement mailing, those statements would have been mailed to 4656 English

Oak Ct, where PNC knew prior mail had not been delivered. For example, in August 2019, PNC had known for three years that its mail was not being received at 4656 English Oak Ct. Further, all statements relating to the Disputed Line of Credit were not addressed to Plaintiff but, instead, to Senior and Betty. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 53:14-17; 53:22-54:25, 55:3-56:25, 57:1-57:7, 67:16-68:11, 68:24-69:12, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 34:2-17, 60:1-61:6, 61:19-62:15; **Ex. 5**, PNC 173–77.)

14.     In or around 2014, the Plaintiff moved from the Mason, Ohio address, but did not notify PNC nor provide any forwarding information. **Exhibit E,** at 61:7–18.

**RESPONSE:** Denied and disputed as immaterial. Plaintiff was never obligated on the Disputed Line of Credit and had no obligation to update his address with PNC and, second, he had closed the accounts before this time and had no reason to update his address with PNC. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 35:6-35:10, 35:18-36:19, 51:16-52:6, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 34:2-17.)

15.     On June 18, 2019, PNC sent notice to Plaintiff's Mason Ohio address that the Checking Account was being updated from a Smart Checking Account (which included fee waivers for certain account fees) to a Standard Checking Account (for which normally applicable fees would apply). A true and correct copy of the Updated Account Agreement is attached hereto as **Exhibit I**.

**RESPONSE:** Denied. Plaintiff denies ever receiving or agreeing to the supposed "Updated Account Agreement." Indeed, there is no evidence that the purported "Updated Account Agreement" attached as PNC's **Exhibit I** was mailed to 4656 English Oak Ct (or anywhere). Even if PNC had adduced evidence of mailing, PNC's **Exhibit I** would have been mailed to 4656 English Oak Ct, where PNC knew prior mail had not been delivered. Plaintiff closed the Checking

Account several months after Senior died in December 2010. PNC inexplicably kept the Checking Account and Disputed Line of Credit open because of its unproven assertion of a connection between these two accounts. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 51:16-52:6, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 67:16-68:11, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 33:15–34:17, 60:1-61:6, 61:19-62:15.)

16.    Among other items, the Updated Account Agreement correspondence made clear that fees would be imposed on the Checking Account and specifically addressed the overdraft protections afforded to the Checking Account and specifically stated:

> At such time or times that PNC Bank determines that the PROTECTED ACCOUNT has insufficient funds, PNC Bank will transfer to the PROTECTED ACCOUNT an amount sufficient to pay all items creating the insufficient balance…

*See* **Exhibit I** at PNC 248.

**RESPONSE:** Denied. Plaintiff denies ever receiving or agreeing to the supposed "Updated Account Agreement." Indeed, there is no record in the evidence that the purported "Updated Account Agreement" attached as PNC's **Exhibit I** was mailed to 4656 English Oak Ct (or anywhere). Even if PNC had adduced evidence of statement mailing, PNC's **Exhibit I** would have been mailed to 4656 English Oak Ct, where PNC knew prior mail had not been delivered. Plaintiff closed the Checking Account several months after Senior died in December 2010. PNC inexplicably kept the Checking Account and Disputed Line of Credit open because of its unproven assertion of a connection between these two accounts. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 67:16-68:11, 95:1-96:3); **Ex. 29**, Duncan Dep. Tr. 33:15–34:17, 60:1-61:6, 61:19-62:15.)

17.     Pursuant to the Updated Account Agreement, fees were charged to the Checking Account in November 2019. Because there was no money in the Checking Account to cover the fees, the overdraft protection kicked in to pay the charges. This cycle continued until September 2020 when the Checking Account was closed. *See,* **Exhibit A** at PNC 179; a true and exact copy of the Checking Account payoff is attached hereto as **Exhibit J**.

**RESPONSE:** Denied. Plaintiff denies ever receiving or agreeing to the supposed "Updated Account Agreement." Indeed, there is no record in the evidence that the purported "Updated Account Agreement" attached as PNC's **Exhibit I** was mailed to 4656 English Oak Ct (or anywhere). Even if PNC had adduced evidence of statement mailing, PNC's **Exhibit I** would have been mailed to 4656 English Oak Ct, where PNC knew prior mail had not been delivered. PNC's **Exhibit J** lists the customer as "Duncan Sr.," not Plaintiff. Plaintiff closed the Checking Account several months after Senior died in December 2010. PNC inexplicably kept the Checking Account and Disputed Line of Credit open because of its unproven assertion of a connection between these two accounts. There were no checks written on the Checking Account, but PNC charged $3.00 for "Check Images in Statement Fee" on November 19, 2019 and again on December 17, 2019.  (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 95:1-96:3).; **Ex. 29**, Duncan Dep. Tr. 33:15–34:17, 60:1-61:6, 61:19-62:15; **Ex. 11**, PNC 204–205.)

18.     In December of 2019, due to the amounts owed on the PNC checking account, the reporting of the Account reflected account activity. Almost immediately, on or about December 20, 2019, the Plaintiff initiated an indirect credit dispute claiming the Account should be  reporting

as closed. *See,* **Exhibit K.** The Plaintiff did not suggest that the Account was not his or otherwise contest ownership of the Account at that time.

  **RESPONSE:** Denied in part and admitted in part. Denied that Plaintiff "owed" anything on the Checking Account. Admitted that Plaintiff submitted an indirect credit dispute in December 2019 because he mistakenly believe that PNC was reporting an old motor vehicle lease from the 1980s. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 95:1-96:3).; **Ex. 28**, Duncan Decl. ¶¶ 8–11.)

  19. PNC assigned a member of its Credit Bureau Investigation Team to investigate the December, 2019 indirect dispute. The investigator reviewed the information provided, PNC's records, and source documents to find the Account was reporting accurately. A true copy of the PNC system notes is attached hereto as **Exhibit L**, at PNC 1353**;** *see also,* V. Brooks Depo. Excerpt, 11-13:13-5, attached hereto as **Exhibit M.**

  **RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. PNC's dispute agent, Valerie Brooks, never reviewed any document, screen, or system demonstrating that Plaintiff was obligated on the Disputed Line of Credit, because none exists. Ms. Brooks stated that her training for evaluating a dispute over whether a borrower is liable on an overdraft account was to verify "demographics" (meaning matching the personally identifying information) and, potentially, to look for a signature card and no other documents. (**Ex. 31**, V. Brooks Dep. Tr. 14:11–15:22, 18:2–19:5 (pertinent excerpts). Here, however, the Signature Card in no way demonstrates Plaintiff's liability on the Disputed Line of Credit. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1,

21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10,   35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 55:3-56:25, 63:5-15, 64:19-65:24, 67:16-68:11, 95:1-96:3)).

20.    On March 21, 2020, the Plaintiff initiated a second indirect dispute related to the Checking Account again disputing the account balance and stating "[t]his account should be zero I have not used it in decades." *See,* **Exhibit N.**

**RESPONSE:** Denied in part and admitted in part. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Admitted that Plaintiff submitted an indirect credit dispute in March 2020 because he mistakenly believe that PNC was reporting an old motor vehicle lease from the 1980s. (**Ex. 27,** PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10,   35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 68:24-69:12, 95:1-96:3).; **Ex. 29,** Duncan Dep. Tr. 60:1-61:6, 61:19-62:15; **Ex. 28,** Duncan Decl. ¶¶ 8–11.)

21.    PNC assigned a different member of its Credit Bureau Investigation Team to investigate the Plaintiff's March, 2020 dispute. This investigator also reviewed the dispute information provided, PNC's internal records, and source documents concerning the account and again found the reporting to be accurate as reported. *See,* M. Azeem, Depo. Excerpt, 29–30:19–22, attached hereto as **Exhibit O;** *see also,* **Exhibit L** at PNC 1352.

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Further, Plaintiff disputes that the PNC dispute agent reviewed any document, screen, or system demonstrating that Plaintiff was obligated on the Disputed Line of Credit, because none exists. (**Ex. 27,** PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-

19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10,  35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 55:3-56:25, 63:5-15, 64:19-65:24, 67:16-68:11, 87:1-96:3, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 60:1-61:6, 61:19-62:15). The deposition testimony pages referenced by PNC relate to a dispute Mr. Azeem processed on or about April 1, 2021, not the dispute Mr. Azeem processed in March 2020. (**Ex. 32**, M. Azeem Dep. Tr. 27:16–31:21, Ex. 1 (pertinent excerpts)). Additionally, Mr. Azeem's notes provide no indication that he looked at any "source documents concerning the account." (**PNC Ex. L** (ECF 113-5), at PNC 1352) These notes state "REVWD ACLS, CACS, LIS." (*Id*. at PNC 1352). ACLS is PNC's "system of record" containing "demographics," i.e., "name, address, phone number, Social Security number, and date of birth" for account holders. (**Ex. 31**, V. Brooks Dep. Tr., 11:10–25). "CACS" is PNC's "Computer Assisted Collection System," i.e., "[i]t's the collection system." (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 49:1–8). No screenshots from CACS have been produced in this case. (*Id*. 49:9–17). "CACS" only "shows timelines, history of [PNC] account[s]." (**Ex. 32**, M. Azeem Dep. Tr. 15:19–24). Dispute processors like Mr. Azeem solely use information in CACS to obtain delinquency status information about PNC accounts. (*Id*. 15:25–16:11). According to Mr. Azeem, "LIS contains some of the documents to basically establish the loan or the history of the loan," including account agreements and outgoing and incoming correspondence. (*Id*. 13:12–14:10). LIS only listed Senior and Betty as borrowers on the Disputed Line of Credit, and Mr. Azeem uses LIS to "verify[] the name on there, the address on there, the ZIP code, state, the city, whether it's open/closed account, the account number, and the product, the type of account that it is, verification purposes." (*Id*. 32:23–33:2, 33:17–22, Ex. 2). Mr. Azeem testified that LIS will show all borrowers on a particular account. (*Id*. 39:13–15). Mr. Azeem only recalled ever looking at "[r]ight-to-cure letters[,]" "[p]romissory notes to verify signatures, names[,]" and PNC dispute

processor comment sheets in LIS. (*Id.* 33:23–34:13, Ex. 2). LIS contains no reference to the Signature Card, much less provides a link to access that document. (*Id.* 36:5–37:5, 39:3–15, Ex. 2; *see also* **Ex. 27**, PNC 30(b)(6) Dep. Tr. 105:24–106:6 (second set of screenshots in PNC 259, i.e., "Search Results Maintenance of Records" originated from LIS). Signature cards are in "a different file within the system of the bank" in a "sig file"—entirely separate from ACLS, LIS, or RMS. (**Ex. 31**,V. Brooks Dep. Tr. 15:23–16:23.)

22.     On July 19, 2020, the Account became delinquent, because no payments were made on the balance of the Account. Plaintiff paid the Account in full and closed the Account on September 11, 2020. A true and accurate copy of delinquency correspondence is attached hereto as **Exhibit P;** *see also*, **Exhibit J**.

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Further, the Disputed Line of Credit was closed in 2011, and, accordingly, there was no basis upon which that account could become delinquent. Plaintiff denies ever receiving or agreeing to the supposed "Updated Account Agreement." Indeed, there is no record in the evidence that the purported "Updated Account Agreement" attached as PNC's **Exhibit I** was mailed to 4656 English Oak Ct (or anywhere). Even if PNC had adduced evidence of statement mailing, PNC's **Exhibit I** would have been mailed to 4656 English Oak Ct, where PNC knew prior mail had not been delivered. Plaintiff closed the Checking Account several months after Senior died in December 2010. PNC inexplicably kept the Checking Account and Disputed Line of Credit open because of its unproven assertion of a connection between these two accounts. There were no checks written on the Checking Account, but PNC charged $3.00 for "Check Images in Statement Fee" on November 19, 2019 and again on December 17, 2019. PNC's **Exhibit J** lists the customer as "Duncan Sr.," not Plaintiff. The "delinquency correspondence"

attached as PNC's **Exhibit P** identify its customers as Senior and Betty—they do not identify Plaintiff as its customer or as a person responsible for the alleged delinquency. PNC lacks any evidence that it mailed any of the "delinquency correspondence" included in **Exhibit P.** (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 68:24-69:12, 95:1-96:3, 106:9–107:10, 118:15–120:19, Exs. 32–34; **Ex. 29**, Duncan Dep. Tr. 34:2-17, 60:1-61:6, 61:19-62:15; **Ex. 28**, Duncan Decl. ¶¶ 3, 4, 7.)

23.    When the Account became delinquent, PNC began reporting the delinquency to the CRAs. *See,* **Exhibit R,** at PNC 74.

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Plaintiff closed the Checking Account several months after Senior died. PNC inexplicably kept the Checking Account and Disputed Line of Credit open because of its unproven assertion of a connection between these two accounts.  Also, PNC's **Exhibit R** at PNC 74 does not show when PNC began reporting the alleged delinquency to the CRAs. Instead, PNC 74 only shows when PNC reported this particular status (i.e., "Paid, Closed") to Experian. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 68:24-69:12, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 33:15–34:17.)

24.     On February 28, 2021, the Plaintiff initiated a third indirect dispute concerning the reporting of the Account.[2] Unlike the prior disputes, Plaintiff claimed for the first time that the Account did not belong to him and it should not be reporting on his credit at all. *See,* **Exhibit Q.**

**RESPONSE:** Admitted in part and denied in part. Admitted that Plaintiff initiated a dispute of PNC's credit reporting with Trans Union on February 27, 2021, which Trans Union forwarded to PNC via ACDV.[3] (**Ex. 33**, TU-000092–98.) Plaintiff denies the characterization of his prior indirect credit disputes, because these disputes were based upon Plaintiff's mistaken belief that the account reported on his credit was an old lease account that had been closed. As of his third dispute, Plaintiff was aware that PNC's reporting of the Disputed Line of Credit was not related to any account he had ever authorized. (**Ex. 28**, Duncan Decl. ¶¶ 8–11.)

25.     PNC assigned a Credit Bureau Investigation Team investigator to investigate this February, 2021 dispute. The investigator the information provided with the dispute, PNC's

---

[2] Plaintiff pursues liability and damages for this dispute. ECF 1, Compl. ¶¶ 47, 115–143.

[3] The 2021 *Credit Reporting Resource Guide* describes the ACDV process as follows:

> In compliance with FCRA section 611 (a) (5) (D), the consumer credit reporting industry maintains an automated dispute resolution system. This system, called e-OSCAR®, is available for use by all data furnishers. . . . Each consumer reporting agency and data furnisher has its own access to e-OSCAR®. When a consumer contacts a consumer reporting agency with a dispute, the agency transmits the disputed information and, if applicable, one or more images of relevant, consumer-provided documentation through e-OSCAR®. The data furnisher accesses e-OSCAR® and retrieves the disputed data and any associated document image(s). . . . The data furnisher researches the disputed account and transmits a response back to the originating consumer reporting agency via e-OSCAR®.

(**Ex. 24**, PNC 665–66.) In this excerpt of the *Credit Report Resource Guide*, FCRA section 611 (a) (5) (D) refers to 15 U.S.C. § 1681i(a)(5)(D), which requires Equifax, Experian, and Trans Union (collectively, the "CRAs") to "implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies." *Id.*

records, and PNC's source documents and confirmed that the Account did in fact belong to the Plaintiff. As a result, PNC's investigators found the Account was reporting accurately. **Exhibit M**, at 15:2-22; **Exhibit L** at PNC 1351.

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Plaintiff closed the Checking Account several months after Senior died. Further, Plaintiff disputes that the PNC dispute agent reviewed any document, screen, or system demonstrating that Plaintiff was obligated on the overdraft line of credit account, because none exists. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 68:24-69:12, 95:1-96:3; **Ex. 29**, Duncan Dep. Tr. 33:15–34:17, 60:1-61:6, 61:19-62:15, 99:18–23.) PNC's dispute agent, Valerie Brooks, responded to an ACDV forwarded by Trans Union on March 2, 2021. (**Ex. 21**, PNC 80–81.) The ACDV contained the following dispute code: "002:Belongs to another individual with the same/similar name. Provide or confirm complete ID." (*Id*. PNC 80.)  Ms. Brooks stated that her training for evaluating a dispute over whether a borrower is liable on an overdraft account was to verify "demographics" (meaning matching the personally identifying information) and, potentially, to look for a signature card and no other documents. (**Ex. 31**, V. Brooks Dep. Tr., 11:10–25, 14:11–15:22.) Ms. Brooks testified that she would look at ACLS or RMS and would verify the account as belonging to Mr. Duncan if either system showed demographic information relating to him. (*Id*. 11:10–25, 14:11–15:22, Exs. 2, 5) If demographics matched in ACLS, she would not look for a signature card. (*Id*. 18:2–20:15, 21:14–22:16, Exs. 2, 5) Ms. Brooks's notes regarding her processing of the dispute confirm

she compared demographic information and payment history from PNC's internal systems and then regurgitated that same information in verifying PNC's reporting:

```
Comments: 2021-03-02 13:35:46 BROOKS,VALERIE A
          RECD E OSCAR FROM ERNEST DISPTUING BELONGS TO ANOTHER NO IMA
          GES REVWD LIS CACS ACLS ACCT IS REPORTING ACC AS PD CLSOED WITH
0 BAL
          UPDATED DOAI FDOD SMP DEMOS MATCH GRID ACC ( TU)
```

**Ex. 34**, PNC 1351. ACLS is PNC's "system of record" containing "demographics," i.e., "name, address, phone number, Social Security number, and date of birth" for account holders. (**Ex. 31**, V. Brooks Dep. Tr., 11:10–25). According to PNC, RMS (recovery management system) would not contain any information about the Disputed Line of Credit because it contains information about "charged off accounts." (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 99:18–23). "CACS" is PNC's "Computer Assisted Collection System," i.e., "[i]t's the collection system." (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 49:1–8). No screenshots from CACS have been produced in this case. (*Id*. 49:9–17). "CACS" only "shows timelines, history of [PNC] account[s]." (**Ex. 32**, M. Azeem Dep. Tr. 15:19–24). Dispute processors like Mr. Azeem (and Ms. Brooks) solely use information in CACS to obtain delinquency status information about PNC accounts. (*Id*. 15:25–16:11). Signature cards are in "a different file within the system of the bank" in a "sig file"—entirely separate from ACLS, LIS, or RMS. (**Ex. 31**,V. Brooks Dep. Tr. 15:23–16:23). Here, the Signature Card refutes any assertion of Plaintiff's liability on the Disputed Line of Credit. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 45:5-45:9, 46:2-46:17,  95:1-96:3).

26.    Plaintiff initiated a number of subsequent indirect disputes throughout 2021 and into 2022. In these disputes, Plaintiff disputed ownership of the Account. In two disputes initiated in March of 2021, which are the subject of this lawsuit, the Plaintiff stated the Checking Account "[b]elongs to another individual with the same/similar name." *See*, **Exhibit R**, at PNC 82, 92.

**RESPONSE:** Admitted that Plaintiff initiated multiple indirect disputes in 2021 and 2022. Plaintiff pursues liability and damages for these disputes. ECF 1, Compl. ¶¶ 47, 115–143.

27.     Two different Credit Bureau Investigation Team investigators reviewed the March 2021 disputes, evaluated PNC's internal records and source documents, and again  confirmed that the Account belonged to the Plaintiff. As a result, PNC's investigators found the Account was reporting accurately. **Exhibit O**, at 29–30:19–22; *see also,* D. Geraci, Depo. Excerpt, 15–16:18–25, attached hereto as **Exhibit S; Exhibit L** at PNC 1350**.**

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Plaintiff closed the Checking Account several months after Senior died. Further, Plaintiff disputes that the PNC dispute agent reviewed any document, screen, or system demonstrating that Plaintiff was obligated on the overdraft line of credit account, because none exists. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35:10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 53:14-17, 53:22-54:25, 55:3-56:25, 57:1-57:7, 63:5-15, 64:19-65:24, 67:16-68:11, 68:24-69:12, 95:1-96:3; **Ex. 28**, Duncan Decl. ¶¶ 4-6, **Ex. 29**, Duncan Dep. Tr. 33:15–34:17, 60:1-61:6, 61:19-62:15, 99:18–23) PNC's dispute agent, Derek Geraci, responded to an ACDV forwarded by Experian on March 11, 2021. (**Ex. 21**, PNC 82–83.) Plaintiff had again disputed his ownership of the Disputed Line of Credit but also disputed activity on that account years after Senior's death. *Id*. The letter Mr. Duncan submitted to Experian to lodge his dispute was appended to the ACDV, but the ACDV indicates Mr. Geraci never accessed the letter. (*Id*., PNC 72–79, 83.) Mr. Duncan stated in his letter:

By the way, there is one error in this credit report: you have a PNC account belonged to my deceased father who died over 10 years ago, and it has activity showing 10 years after his death, AND IT'S NOT MINE!!!!! Why did you put this on my credit report?!?!? What a scam!!!!!



Ernest L. Duncan, Jr., CPA

(*Id.*, PNC 72. Mr. Duncan excerpted PNC's reporting on an Experian credit report and noted additional information on the excerpt related to his dispute:



(*Id.*, PNC 74.) Mr. Geraci's notes regarding his processing of the dispute confirm he compared demographic information and payment history from PNC's internal systems and then regurgitated that same information in verifying PNC's reporting:

```
Comments: 2021-03-11 09:58:35 GERACI,DEREK
          RCVD EOSCAR DISPUTE FROM ERNEST DISPUTES NOT THEIRS WITH IMA
          GES RVWD CACS LIS ACLS ACCOUNT IS ACCURATE PAID CLOSED UPDATED
DOAI
          SCHED AMOUNT GRID IS ACCURATE DEMS MATCH ACCURATE IS THEIRS EXP
DISP
```

(**Ex. 35**, PNC 1350.) These notes state "RVWD ACLS, CACS, LIS." (*Id.*) ACLS, CACS, and LIS only contain "demographic" information, not account signature cards. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 49:1–8, 99:18–23; **Ex. 31**,V. Brooks Dep. Tr., 11:10–25, 15:23–16:23; **Ex. 32**, M. Azeem Dep. Tr. 15:19–16:11.) When asked if he knew what an overdraft line of credit was, Mr. Geraci responded, "not exactly." (**Ex. 36**, D. Geraci Dep. Tr. 15:6–12 (pertinent excerpts).) He could not recall any training specific to overdraft lines of credit. (*Id.* 15:6–12). Mr. Geraci was trained to look for a checking or savings account signature card to verify account ownership for an overdraft line of credit. (*Id.* 15:18–16:14, 16:22–17:4.)  PNC's dispute agent, Milton Azeem, responded to an ACDV forwarded by Experian on April 1, 2021. (**Ex. 21**, PNC 92–93.) Plaintiff had again disputed his ownership of the Disputed Line of Credit. *Id.* The letter Mr. Duncan submitted to Experian to lodge his dispute was appended to the ACDV. (**Ex. 21**, PNC 84–90, 93.) Mr. Duncan again stated in his letter:

> By the way, there is one error in this credit report: you have a PNC account belonged to my deceased father who died over 10 years ago, and it has activity showing 10 years after his death, AND IT'S NOT MINE!!!!! Why did you put this on my credit report?!?!? What a scam!!!!!
>
> Ernest L. Duncan, Jr., CPA

(*Id.*, PNC 84.) His frustration and anger were evident. *Id.* He had (again) excerpted PNC's inaccurate reporting and highlighted that he was not responsible for the Disputed Line of Credit because he was "Ernest L. Duncan, Jr. not Sr." (*Id.*, PNC 85–87.) Mr. Azeem's notes regarding his processing of the dispute confirm he compared demographic information and payment history from PNC's internal systems and then regurgitated that same information in verifying PNC's reporting:

> **COMMENT**: <u>Recvd eoscar from</u> Ernest disp Belongs to another individual with the same/similar name. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, pymt rating, cond stat, port type, int type, terms, date clsd, act pymt. Grid accur. acct pif. 0 bal. exp.

(**Ex. 37**, PNC 91.) ACLS, CACS, and LIS only contain "demographic" information, not account signature cards. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 49:1–8, 99:18–23; **Ex. 31**,V. Brooks Dep. Tr., 11:10–25, 15:23–16:23; **Ex. 32**, M. Azeem Dep. Tr. 15:19–16:11.) XNET contains nothing other than "payment history" for loans. (**Ex. 32**, M. Azeem Dep. Tr. 31:2–10.) Mr. Azeem reviewed none of the documents listed in XNET, i.e., "History Card Report," "Loan Master File Display," "Reg Z Statements," or "Second Late Notice Cust." (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 105:14–105:23 ("Global Index Result" originated from XNET); Ex. 32, M. Azeem Dep. Tr. 33:2–16.)

28.    Plaintiff initiated additional indirect disputes between August of 2021 and May of 2022. In the August 2021 disputes, he stated, "[t]his account belonged to my deceased parents yet there is apparent fraudulent activity not initiated by my deceased parents AFTER THEY WERE DECEASED." **Exhibit T,** at PNC 94.

**RESPONSE:** Admitted that Plaintiff disputed PNC's reporting of the Disputed Line of Credit with Trans Union as set forth in this paragraph. Plaintiff also disputed with Equifax in September 2021 as set forth in more detail in response to PNC's CSMF ¶ 29 below. (**Ex. 21**, PNC 96–97.)

29.    PNC's Credit Bureau Investigation Team investigators reviewed the August 2021 disputes, evaluated PNC's internal records and source documents, and again confirmed that the Account belonged to the Plaintiff. As a result, PNC's investigators found the Credit Account was reporting accurately. *See,* **Exhibit L** at PNC 1349**.**

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Plaintiff closed the Checking Account several

months after Senior died. Further, Plaintiff disputes that the PNC dispute agent reviewed any document, screen, or system demonstrating that Plaintiff was obligated on the overdraft line of credit account, because none exists. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10,   35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 55:3-56:25, 63:5-15, 64:19-65:24, 67:16-68:11, 87:1-96:3, 95:1-96:3; **Ex. 28**, Duncan Decl. ¶¶ 4-6; **Ex. 29**, Duncan Dep. Tr. 33:15–34:17, 60:1-61:6, 61:19-62:15.) PNC's dispute agent, Sharon Karpinski, responded to an ACDV forwarded by Trans Union on August 27, 2021. (**Ex. 21**, PNC 94–95). The ACDV contained the following dispute code: "002:Belongs to another individual with the same/similar name. Provide or confirm complete ID." (*Id*. PNC 94.) The ACDV also contained a narrative statement from Plaintiff: "[t]his account belong to my deceased parents yet there is apparent fraudulent activity not initiated by my deceased parents AFTER THEY WERE DECEASED." (*Id*.)  In her deposition, Mr. Karpinski confirmed she compared demographic information and payment history from PNC's internal systems and then regurgitated that same information in verifying PNC's reporting and *never* looks for signature cards when processing credit reporting disputes for lines of credit. (**Ex. 38**, S. Karpinski Dep. Tr. 11:4–15:12, Exs. 1–3.) Her notes regarding processing of this ACDV also confirm she only compared demographic information from PNC's internal systems to the ACDV to "verify" PNC's reporting that Plaintiff was responsible for the Disputed Line of Credit. (**Ex. 39**, PNC 1349.)

Ms. Brooks responded to an ACDV forwarded by Equifax on September 13, 2021. (**Ex. 21**, PNC 96–97.) The ACDV contained the following dispute code: "002:Belongs to another individual with the same/similar name. Provide or confirm complete ID." (*Id*. PNC 96.)  Ms. Brooks stated that her training for evaluating a dispute over whether a borrower is liable on an

overdraft account was to verify "demographics" (meaning matching the personally identifying information) and, potentially, to look for a signature card and no other documents. **(Ex. 31**, V. Brooks Dep. Tr., 11:10–25, 14:11–15:22.) Ms. Brooks testified that she would look at ACLS or RMS and would verify the account as belonging to Mr. Duncan if either system showed demographic information relating to him. (*Id.* 11:10–25, 14:11–15:22, Exs. 2, 5) If demographics matched in ACLS, she would not look for a signature card. (*Id.* 18:2–20:15, 21:14–22:16, Ex. 5) Ms. Brooks's notes regarding her processing of the dispute confirm she compared demographic information and payment history from PNC's internal systems and then regurgitated that same information in verifying PNC's reporting:

```
Comments: 2021-09-13 08:51:10 BROOKS,VALERIE A
          RECD E OSCAR FROM ERNEST DISPUTING BELONGS TO ANOTHER NO IMA
          BES REVWD LIS CASC ACLS ACCT IS REPORTING ACC AS PD CLOSED WITH
0 BAL
          UPDATED DOAI DOLP DATE LCOSED DEMOS MATCH GRID UPDATED ( EQU)
```

**(Ex. 40**, PNC 1346.)

30.     In the May 2022 disputes, Plaintiff again disputed ownership of the Checking Account, "I did not authorize this account, and have no responsibility for said account as it belonged to my deceased father and step mother." **Exhibit U,** at PNC 106; 110; 117.

**RESPONSE:** Admitted subject to the additional details set forth in response to PNC's CSMF ¶ 31 below.

31.     PNC's Credit Bureau Investigation Team investigators continued to investigate these disputes when received, reviewing the materials submitted by the Plaintiff, PNC's records, and original account documents. As a result, PNC's investigators found the Account was reporting accurately.

**RESPONSE:** Denied. Plaintiff never owed any money on the Disputed Line of Credit because he was never obligated on that account. Plaintiff closed the Checking Account several

months after Senior died. Further, Plaintiff disputes that the PNC dispute agent reviewed any document, screen, or system demonstrating that Plaintiff was obligated on the overdraft line of credit account, because none exists. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 17:8-18:9, 18:12-19:19, 20:14-21:1, 21:16-23:17, 25:7-27:2, 32:22-35:5, 35:6-35-10, 35:18-36:19, 37:10-39:24, 43:10-45:9, 45:5-45:9, 46:2-46:17, 51:16-52:6, 52:17-53:13, 55:3-56:25, 63:5-15, 64:19-65:24, 67:16-68:11, 87:1-96:3, 95:1-96:3; **Ex. 28**, Duncan Decl. ¶¶ 4-6; **Ex. 29**, Duncan Dep. Tr. 60:1-61:6, 61:19-62:15.)

Mr. Azeem processed ACDVs from Equifax, Experian, and Trans Union on May 20, 2022. (Ex. 21, PNC 98–101, 125–26.) The letters Mr. Duncan submitted to Equifax, Experian, and Trans Union to lodge his disputes were appended to the respective ACDVs forwarded by Equifax, Experian, and Trans Union, and the ACDVs indicate Mr. Azeem accessed the letters. (**Ex. 21**, PNC 98–121, 125–26) These dispute letters were sworn under oath before a notary public and stated, in part:

> After review of my credit report, I send this letter to formally dispute the following account that appears on my credit report as follows:
>
> - PNC BANK # ████████ **** - You are incorrectly reporting an account on behalf of PNC Bank. I did not authorize this account, and have no responsibility for said account as it belonged to my deceased father and step-mother.
>
> I have included a copy of my identification to verify my identity and address.
>
> An attorney has provided me with this letter to formally dispute the inaccurate account information on my credit report. I demand that you investigate my credit file, and immediately delete the account from my credit report that I have noted above. When you have completed your investigation, please send me a copy of my credit report that shows the exact information that you would give to someone who was considering me for a loan.
>
> Please forward a copy of this letter to your customers when you convey my dispute. If you are not willing to do so, please immediately provide me the names, addresses, and telephone numbers of the people you deal with at these companies so that I can send them a dispute myself.
>
> Also, please call or email me immediately if you need or will accept additional information to support my dispute. My daytime phone number is 513-550-1596, and my email address is edunc2@gmail.com.

(**Ex. 21**, PNC 102–109 (Equifax dispute letter), 110–16 (Experian dispute letter), 117–21 (Trans Union dispute letter). The ACDVs from Experian and Trans Union contained the following dispute code: "002:Belongs to another individual with the same/similar name. Provide or confirm complete ID." (*Id*. PNC 100 (Experian), 125 (Trans Union). The ACDV from Equifax contained the following dispute code: "101:Not liable for account (e.g., ex-spouse, business). If liable, provide or confirm complete ID." (*Id*. PNC 98.) Mr. Azeem's notes regarding his processing of these disputes confirm he compared demographic information from PNC's internal systems and then regurgitated that same information in verifying PNC's reporting:

**COMMENT**: Recvd eoscar from Ernest disp Not liable for account. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, manner of pymt, int type, doai, dolp, date clsd. Grid accur. acct pif. efx.

**COMMENT**: Recvd eoscar from Ernest disp Belongs to another individual with the same/similar name. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, pymt rating, cond stat, port type, int type, terms, date clsd, act pymt. Grid accur. acct pif. exp.

**COMMENT**: Recvd eoscar from Ernest disp Belongs to another individual with the same/similar name. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, comp code, int type. Grid accur. acct pif. tun.

(**Ex. 41,** PNC 122–24.) Mr. Azeem reviewed nothing more than "demographic" information in PNC's systems, i.e., CACS, LIS, and XNET, to "verify" PNC's reporting that Plaintiff was responsible for the Disputed Line of Credit. (**Ex. 27**, PNC 30(b)(6) Dep. Tr. 49:1–8, 99:18–23; 105:14–105:23, Ex. 32; **Ex. 31**, V. Brooks Dep. Tr., 11:10–25, 15:23–16:23; **Ex. 32**, M. Azeem Dep. Tr. 15:19–16:11, Tr. 31:2–10, 33:2–16.) Mr. Azeem's training at PNC does not require him to "find a signed account agreement by the disputing individual before verifying that individual's responsibility for the account[.]" (**Ex. 32**, M. Azeem Dep. Tr. 49:16-22.)

### <u>Plaintiff's Statement Of Additional Facts In Support Of His Opposition</u>

1.      Sometime in 1976, Senior and Betty opened the Checking Account. (**Ex. 1**, PNC 1-2, 181–82; **Ex. 2**, PNC 30(b)(6) Dep. Tr. 13:9–11 (pertinent excerpts).)

2.      The only document containing Plaintiff's signature that relates to the Checking Account is the Signature Card, which makes no mention of a credit line. (**Ex. 1**, PNC 1-2.)

3.      PNC has no documents pertaining to the Checking Account which predate the Signature Card. (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 17:8–18:3.)

4.      There would have been at least one signature card prior to the Signature Card. (**Ex 2**, PNC 30(b)(6) Dep. Tr. 17:19–22.)

5.      PNC has no documents that might have been provided to Mr. Duncan with the Signature Card. (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 35:6–36:19.)

6.      PNC produced a document titled "Cash Reserve Line Agreement" which states "Effective 1/2/08" but has no internal reference to this document or record of its mailing. (**Ex. 1**, PNC 181–82; Ex. 2, PNC 30(b)(6) Dep. Tr. 32:25–33:20, 37:10–39:2.)

7.      There is no documentation reflecting that the Checking Account included a line of credit. (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 18:22–25, 34:2–36:19, 39:3–12.)

8.      Mr. Duncan does not recall whether he was provided any documents referenced in the Signature Card on August 25, 2007. (**Ex. 3**, Plaintiff's Dep. Tr. 23:15–21 (pertinent excerpts).)

9.      Senior passed on October 25, 2010, and Betty predeceased him on January 25, 2009. (**Ex. 4**, PNC 37–38.)

10.     PNC produced a payment history for the line of credit it reported to consumer reporting agencies (CRAs) (the "Disputed Line of Credit") titled "History Card Report" with a "Loan Num ███████2944." (**Ex. 5**, PNC 169–80.)

11.     This payment history shows that the Disputed Line of Credit was paid in full in

December 2010, leaving a $0 balance. (**Ex. 5**, PNC 173; Ex. 2, PNC 30(b)(6) Dep. Tr. 67:11–68:11.)

12.     In fact, there was an overpayment on the Disputed Line of Credit, resulting in "$36.72 being deposited to the" Checking Account. (**Ex. 5**, PNC 173; **Ex. 2**, PNC 30(b)(6) Dep. Tr. 67:21–68:2.)

13.     The "History Card Report" shows "Statement Produced" on December 24, 2010 and January 25, 2011. (**Ex. 5**, PNC 173.)

14.     These statements show an overpayment of $36.72 on the Disputed Line of Credit in December 2010, which was then transferred out by the end of December 2010. (**Ex. 6**, PNC 137–40.)

15.     The "History Card Report" shows no payment or debit activity or issuance of a statement on the Disputed Line of Credit from February 28, 2011 through October 28, 2019. (**Ex. 5**, PNC 173–77.)

16.     When PNC questioned Plaintiff about whether he closed the Checking Account after Senior and Betty died, he testified unequivocally that he had done so:

> **Q.** So looking back at Exhibit C[4], looking at the section titled summary of account activity, does this account statement dated for late 2010, reflect that the balance owed on this account was paid off?
> **A.** Yes.
> **Q.** And that nothing was due at that point?
> **A.** Yes.
> **Q.** Do you have any recollection of closing any bank accounts that your father and stepmother had after [they died]?
> **A.** Yes.
> **Q.** And you had mentioned to me that you were just aware of the one bank account; correct?
> **A.** Yes.
> **Q.** So it's your recollection, as you sit here today, that you closed out the account that they held with National City that became PNC?

---

[4] Referring to PNC 137 of **Exhibit 12** to this filing.

**A.** Yes.
**Q.** When do you recall doing that, sir?
**A.** It was several months after the fact. After my dad had, after he died.
**Q.** So several months, early 2011? Is your recollection?
**A.** Yes.

(**Ex. 3**, Pl's Dep. Tr. 33:15–34:17.)

17.    There was no activity on the Checking Account from March 17, 2016 through September 18, 2019. (**Ex. 7**, PNC 183–203; **Ex. 2**, PNC 30(b)(6) Dep. Tr. 64:9–18.)

18.    PNC produced a letter dated February 5, 2010 addressed only to Senior and Betty, the latter having passed a year earlier, advising that the "transfer of your National City Cash Reserve Line to PNC Bank" would be "effective February 22, 2010.") (**Ex. 8**, PNC 219–20.) This letter also advised of a "change in terms." (*Id.*)

19.    National City merged into PNC Bank, effective November 6, 2009. (**Ex. 9**, FDIC Merger Info, available via search at https://banks.data.fdic.gov/bankfind-suite/.)

20.    PNC produced "PNC Smart Checking" statements for the Checking Account. (**Ex. 7**, PNC 183–203.) These statements show no activity——no balance, no debits, no credits. (*Id.*)

21.    The "PNC Smart Checking Statements" reflect "RETRN MAIL" above the name and address lines, so they were designated as being returned to sender by USPS, at least as early as the June 2016 statement:



(**Ex. 7**, PNC 183 (highlighting added).)

22.    The "RETRN MAIL" notation means that at some point prior to this statement, PNC had received returned mail of a statement. (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 53:14–54:18.)

23.    PNC claims its practice would have been to continue to send statements to the wrong address "until a current address or—or a correct address is provided." (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 54:19–25.)

24.    The Checking Account and Disputed Line of Credit Account only stayed open for years following December 2010 because "of the linking of the two accounts . . . . the [Disputed Line of Credit] account is basically what—the link to that account is what kept it outside of the—the normal closed process." (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 50:18–52:6.)

25.    In 2019, PNC converted the Checking Account from a "Smart Account" into a "Standard Account" and began charging service fees. (**Ex. 10**, PNC 221–255.) PNC testified about this change as follows:

> Q. Why was the account changed from smart checking to standard checking?
>
> A. It was an internal PNC project. I believe it was deemed a simplification project where the company reviewed the needs of the customers and revamped the products that were offered—or actually, on the on the books and going forward then, felt the—the business decision better suited moving to a—from the smart account to the standard checking account.
>
> Q. Okay. And—and the smart checking account, did—well, what was the difference in fees between smart checking and standard check?
>
> A. Well, this account being a smart checking account had some built in waivers for fees. So this account was not, actually, generating any fees because it had the built-in fee waivers. And one of the differences was that the standard checking no longer had some of the fee waivers.

(**Ex. 2**, PNC 30(b)(6) Dep. Tr. 52:20–53:13.)

26.    PNC's letter regarding the change to "Standard Checking," dated August 5, 2019, is addressed to the same address noted by PNC as resulting in returned mail for at least three years, i.e., 4656 English Oak Ct., Mason, OH, 45040-2570 ("4656 English Oak Ct"). (**Ex. 7**, PNC 183; **Ex. 10**, PNC 221; **Ex. 2**, PNC 30(b)(6) Dep. Tr. 53:14–54:18, 57:1–7, 57:20–24.)

27.     PNC then assessed fees on the Checking Account but not because of any activity by Mr. Duncan. (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 63:5–15, 64:1–8.)

28.     There were no checks written on the Checking Account, but PNC charged $3.00 for "Check Images in Statement Fee" on November 19, 2019 and again on December 17, 2019. (**Ex. 11**, PNC 204–205.)

29.     All statements for the Disputed Line of Credit only listed Senior and Betty and were addressed to 4656 English Oak Ct. (**Ex. 12**, PNC 127–162; **Ex. 7**, PNC 183.)

30.     A letter providing "Important information regarding your PNC Bank Personal Line of Credit Account Number ████████ 2944" only listed Senior and Betty and was addressed to 4656 English Oak Ct. (**Ex. 13**, PNC 4.)

31.     A PNC letter dated July 22, 2020 regarding a "returned payment" and removal of automatic payment deduction on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (**Ex. 14**, PNC 10.)

32.     A PNC dunning letter dated August 25, 2020 regarding two "missed payments" on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (**Ex. 15**, PNC 12–13.)

33.     Another PNC dunning letter dated August 10, 2020 regarding a past due payment on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (**Ex. 16**, PNC 14–15.)

34.     Another letter PNC produced, dated September 1, 2020, stated that the Disputed Line of Credit "is no longer linked to an active deposit account" and only listed Senior and Betty and was addressed to 4656 English Oak Ct. (**Ex. 17**, PNC 16–17.)

35.     Plaintiff learned of derogatory credit reporting about the Disputed Line of Credit in

September 2020 while seeking to refinance his mortgage. (**Ex. 18**, PNC 45.)

36.    Plaintiff learned in his communications with PNC that the Disputed Line of Credit belonged to his deceased parents, and although he was under no obligation to do so, he paid the $38.25 on the Disputed Line of Credit in an effort to resolve the issue and proceed with his mortgage refinance. (**Ex. 19**, PNC 27-28; Ex. 20, 1354–55.) The receipt for this payment lists the customer as "Duncan Sr." (**Ex. 20**, PNC 1354.)

37.    Plaintiff then repeatedly disputed the credit reporting of the Disputed Line of Credit to PNC directly, including with the assistance of an attorney, and through the CRAs. (**Ex. 21**, PNC 20–28, 30–41, 43–46, 54–55, 72–90, 92–121, 125–26.)

38.    Plaintiff submitted direct dispute correspondence to PNC on or about August 23, 2021 (the "August 2021 Correspondence"), and PNC received that correspondence on August 30, 2021. (**Ex. 21**, PNC 20–28.) The August 2021 Correspondence was very detailed and explained the nature and basis of Mr. Duncan's dispute and included as enclosures PNC's excerpted credit reporting from Mr. Duncan's Experian credit report, death certificates for Senior and Betty, an account payoff letter from PNC, dated September 11, 2020, addressed to Senior and Betty, and the Disputed Line of Credit payoff receipt listing the customer as "Duncan Sr." (*Id.*) Mr. Duncan expressly challenged the activity on the Disputed Line of Credit:

> attached to this letter. The significance of the dates that they were deceased is the fact that, according to the entries on my credit report (see copy of my credit report attached), there was activity on account ████████████12944 beginning in November, 2019 and possibly even before that date, although I can't tell that from my credit report. How could they have initiated transactions on this account when they were DEAD?!?!? I certainly didn't.....I wasn't even aware of the existence of this account until September, 2020!!!

(*Id.* PNC 20.)

39.    Plaintiff retained counsel, Jason M. Massaro, Esquire, who sent direct dispute correspondence to PNC on or about October 25, 2021 (the "October 2021 Attorney Dispute"), and

PNC received that correspondence on October 29, 2021. (**Ex. 21**, PNC 30–41.) The October 2021 Attorney Dispute was (again) very detailed and explained the nature and basis of Mr. Duncan's dispute and included as enclosures the August 2021 Correspondence and all its enclosures and a copy of a letter from PNC sent in response to the August 2021 Correspondence, which stated, in part:

| Here's what happened: | PNC Bank, N.A., recently received your request to review the information furnished to the consumer reporting agencies regarding your account. |
|---|---|
| | Our investigation has determined that an adjustment of the credit bureau reporting is necessary. We have taken appropriate action to correct the information furnished to the consumer reporting agencies, and we are amending this loan's payment history to remove all references to the disputed delinquenc(ies) on this account. |

(*Id.*) The October 2021 Attorney Dispute unequivocally stated, as to the Disputed Line of Credit: "[m]y client was never involved in opening the Account[5], never used the Account, never received funds from the Account, and was never a beneficiary of the Account" and "[t]he Account has always been owned and associated with" Senior. (*Id.* PNC 30.)

40.    PNC responded to the October 2021 Attorney Dispute with correspondence dated November 1, 2021 (the "November 2021 Authorization Request") stating, in part:

> We have reviewed your dispute on behalf of Ernest L. Duncan & Betty F. Duncan and determined that you have failed to provide a sufficient authorization for us to be able to investigate and provide you adequate information with regard to this dispute.
>
> Please have your client(s), Ernest L. Duncan & Betty F. Duncan, execute the enclosed Authorization and return it to PNC Bank, N.A. . . . .
>
> **AUTHORIZATION**
>
> I, Ernest L. Duncan & Betty F. Duncan, herby authorize PNC Bank, N.A. to disclose, inspect, copy and deliver any and all records, information and reports, concerning my PNC Bank, N.A. Account Number . . . to The Massaro Legal Group,

---

[5] The October 2021 Attorney Dispute defined the Account as "PNC Line of Credit No. ████ 2944."

LLC, 2050 E. 96th Street,
Indianapolis, IN 46240.

(**Ex. 25**, PNC 29.)

41.     In a letter Dated December 7, 2021 (the "December 2021 Attorney Dispute"), Mr.

Massaro, on behalf of Plaintiff, responded to the November 2021 Authorization Request. (**Ex. 42**,

PNC 43–47.) PNC received the December 2021 Attorney Dispute on December 13, 2021. (*Id*.

PNC 43.) The December 2021 Attorney Dispute enclosed the October 2021 Attorney Dispute

(without its enclosures) and the PNC Authorization Request. (*Id*. PNC 43–47.) The December

2021 Attorney dispute stated, in part:

Notably, PNC was informed that the Account was opened by my client's father, Mr. Ernest L. Duncan, Sr., in 1976 and that Mr. Duncan, Sr. died on October 23, 2010. I also explained that my client's stepmother, Mrs. Betty F. Duncan, was also listed on the account and that Mrs. Duncan passed away on January 25, 2009. PNC was, again, made aware that the Account was never associated with my client's social security number.

Prior to my involvement, PNC, on September 11, 2020, sent my client a Payoff Request Form; however, that Form was addressed to my client's deceased father and stepmother and does not go far enough to actually cause the Account to be removed from my client's credit reports.

Then, in response to my letter of October 25, 2021, PNC responded on November 1, 2021, stating in relevant part that my client has somehow "failed to provide a sufficient authorization for [PNC] to be able investigate and provide…adequate information with regard to the dispute." Toward that end, PNC provided an Authorization seeking a signature from both Mr. Duncan, Sr., and Mrs. Duncan who, I remind you again, are both deceased. I have attached PNC's November 1, 2021, letter hereto for your convenience.

We do not feel that PNC needs to have authorization from either Mr. Duncan, Sr. or Mrs. Duncan to rectify PNC sole and exclusive error. We also do not feel that resolution of PNC's error requires the provision of information to my client. The simple fact is that PNC continues to erroneously show the Account as a prior debt obligation of my client when that is simply not accurate.

My client, again, makes demand that PNC take all steps to cause the Account removed, in its entirety from my client's credit reports. My client further makes demand that PNC pay all fees and costs incurred to date. If PNC insists on demanding unneeded and unobtainable Authorizations from individuals who are deceased where such Authorizations are utterly unnecessary to inform all credit agencies that my client is not associated with the Account, my client will have no alternative but to take legal action where my client will seek to recover all his actual damages, attorney's fees and costs, and any and all other available relief. If we do not receive a formal response by close of business, **Monday, December 13, 2021**, my client will be forced to proceed with litigation.

(*Id*. PNC 43–44.)

42.    PNC responded to the December 2021 Attorney Dispute with a demand for a signed authorization from Plaintiff before it would investigate his dispute. (**Ex. 43**, PNC 56.)

43.    Plaintiff, through Mr. Massaro, provided the signed authorization form to PNC on February 1, 2022. (**Ex. 21**, PNC 54–55.)

44.    PNC repeatedly refused to cease reporting the Disputed Line of Credit as Mr. Duncan's responsibility. (**Ex. 22**, PNC 19, 52, 66, 80–83, 92–101, 125–26, 1338–39; **Ex. 44**, PNC 51.)

45.    PNC consistently reported the Disputed Line of Credit as opened on February 23, 1976. (**Ex. 22**, PNC 19, 52, 66, 80–83, 92–101, 125–26, 1338–39.)

46.    PNC reported the account status and history differently in response to different disputes[6]:

---

[6] Accompanying this filing as **Exhibit 23** are pertinent excerpts of the *Credit Reporting Resource Guide* (PNC 381–83, 422–27, 435–38, 454–56) published by the Consumer Data Industry Association (CDIA), which define the codes used by PNC in its dispute responses in Exhibit 22. CDIA describes itself as the "voice of the consumer reporting industry, representing consumer reporting agencies including the nationwide credit bureaus, regional and specialized credit

| Response Date | PNC ACDV Processor | CRA | Furnisher Response re: Account Type, Status, and Payment History | Compliance Condition Code | Bates Nos. |
|---|---|---|---|---|---|
| Mar. 2, 2021 | Valerie Brooks | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 80–81 |
| Mar. 11, 2021 | Derek Geraci | Experian | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 82–83 |
| Apr. 1, 2021 | Milton Azeem | Experian | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 92–93 |
| Aug. 27, 2021 | Sharon Karpinski | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of | None | PNC 94–95 |

bureaus, background check companies, and others." CDIA, *About CDIA*, available at https://www.cdiaonline.org/about/about-cdia/ (last accessed on Oct. 15, 2024.)

| | | | September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | | |
|---|---|---|---|---|---|
| Sept. 13, 2021 | Valerie Brooks | Equifax | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 96–97 |
| May 20, 2022 | Milton Azeem | Equifax | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 (and all other months in payment history profile) | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 98–99 |
| May 20, 2022 | Milton Azeem | Experian | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 100–101 |
| May 20, 2022 | Milton Azeem | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 125–26 |

| Mar. 21, 2023 | Daniel Mackanick | Experian | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of 30–59 days delinquent and account delinquent by 30–59 days in August 2020 but no payment history reported/available for September 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 1338–39 |

47.    In September 2021, PNC did, however, update its credit reporting to remove any delinquency reporting for the Disputed Line of Credit. (**Ex. 22**, PNC 19.) This update provided that the account was closed on September 11, 2020 and was current in August 2020 and no payment history/reported available for September 2020. (*Id.* PNC 19.)

48.    After Mr. Duncan filed suit against PNC, Equifax, Experian, and Trans Union, Experian sent an electronic Automated Consumer Dispute Verification form (ACDV) to PNC, which contained the following dispute information:

| Dispute Code 1: | 002:Belongs to another individual with the same/similar name. Provide or confirm complete ID. |
| Dispute Code 2: | |
| FCRA Relevant Information: | INVOLVED IN LITIGATION CONS CLAIMS THIS BELONGS TO HIS LATE FATHER ERNEST LEE DUNCAN SR |

(**Ex. 22**, PNC 1338 (highlighting added).)

49.    PNC responded by reinserting delinquency reporting for the month of August 2020 and listing the payment rating of the Disputed Line of Credit as 30–59 days delinquent when it was closed on September 11, 2020. (**Ex. 22**, PNC 1338–39.)

50.    PNC's dispute agent, Danielle Mackanick, compared demographic information and payment history from PNC's collection system (CACS) and then regurgitated that same

information to Experian:

> Updated Account:  x          Deleted Account:          No Action Taken:
>
> Rec'd EOSCAR from Ernest/EXP. Disputing acct belongs to another individual with the same/similar name. FCRA Relv Info: INVOLVED IN LITIGATION CONS CLAIMS THIS BELONGS TO HIS LATE FATHER ERNEST LEE DUNCAN SR. No images included. Verified demos - accurate per CACS. Acct updated to 13/1. Updated DC, ACT PAY and DOFD per stmt retrival. GRID - accurate per CACS.

(**Ex. 45**, PNC 1340; **Ex. 27**, PNC 30(b)(6) Dep. Tr. 49:1–8.)

      51.    The 2021 *Credit Reporting Resource Guide* describes the ACDV process as follows:

> In compliance with FCRA section 611 (a) (5) (D)[7], the consumer credit reporting industry maintains an automated dispute resolution system. This system, called e-OSCAR®, is available for use by all data furnishers. . . . Each consumer reporting agency and data furnisher has its own access to e-OSCAR®. When a consumer contacts a consumer reporting agency with a dispute, the agency transmits the disputed information and, if applicable, one or more images of relevant, consumer-provided documentation through e-OSCAR®. The data furnisher accesses e-OSCAR® and retrieves the disputed data and any associated document image(s). . . . The data furnisher researches the disputed account and transmits a response back to the originating consumer reporting agency via e-OSCAR®.

(**Ex. 24**, PNC 665–66.)

      52.    PNC produced a document from its internal systems identifying only Senior and Betty as borrowers on the Disputed Line of Credit. (**Ex. 2**, PNC 30(b)(6) Dep. Tr. 26:17–27:2; **Ex. 26**, PNC 1358–73 at 1371–73.)

---

[7] I.e., 15 U.S.C. § 1681i(a)(5)(D), which provides:

> Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

*Id*.

53.     PNC's LIS system, which "contains some of the documents to basically establish the loan or the history of the loan," including account agreements and outgoing and incoming correspondence, and will show all borrowers on a particular account, *only* listed Senior and Betty as borrowers on the Disputed Line of Credit. (**Ex. 32**, M. Azeem Dep. Tr. 13:12–14:10, 32:23–33:2, 33:17–22, 39:13–15, Ex. 2)

54.     Mr. Azeem processed 30 to 32 disputes per eight hour day, and PNC evaluated him based on his productivity, i.e. number of disputes processed per hour. (**Ex. 32**, M. Azeem Dep. Tr. 19:23–20:22, 23:12–24:8). The guideline provided by PNC is that a dispute should take 10–12 minutes. (*Id*. 26:5–27:14). He never contacts consumers when investigating their disputes, and never looks beyond PNC's systems when investigating consumer disputes. (*Id*. 50:19–21, 51:4–9.) Mr. Azeem may or may not look at images (like consumer letters) attached to ACDVs, and he recalled no training about when to look at such images. (*Id*. 52:2–16, Ex. 8.) There is no "specific training for any specific dispute code" used on ACDVs. (*Id*. 53:8–14.) He had never been provided a Fair Credit Reporting Act (FCRA) Policy by anyone at PNC, much less the FCRA policies produced by PNC in this litigation (or any similar document). (*Id*. 54:4–55:7, Exs. 11–13.) Mr. Azeem did not know what a compliance condition code (CCC)[8] was and did not remember receiving any training about what CCCs "to use when responding to a[n] ACDV." (*Id*. 47:1–22.)

55.     Mr. Geraci processed around 40 indirect credit reporting disputes per day. (**Ex. 36**, D. Geraci Dep. Tr. 14:15–15:1.) He did not know why he left the CCC field blank when he submitted the ACDV response to Experian on March 11, 2021. (*Id*. 17:17–22, 18:16–19, Ex. 1.)

56.     Ms. Brooks processed between 30–40 indirect credit reporting disputes per 8-hour

---

[8] CCCs allow a furnisher like PNC to report, when responding to an ACDV, to report that the consumer disputes its reporting of an account. *Seamans v. Temple Univ.*, 744 F.3d 853, 858–859 (3d Cir. 2014).

day. (**Ex. 31**, V. Brooks Dep. Tr. 9:12–22.) Ms. Brooks was not given any training about when to respond with a CCC when responding to an ACDV with dispute code "002:Belongs to another individual with the same/similar name. Provide or confirm complete ID." (*Id*. 22:20–23:1, Ex. 5.)

57.     PNC evaluated Ms. Karpinski, in part, based on her productivity. (**Ex. 38**, S. Karpinski Dep. Tr. 25:4–17.) In an average 8-hour day, Ms. Karpinski processes 30 indirect credit reporting disputes. (*Id*. 9:14–10:7, 10:13–16.)

Respectfully submitted,

**ERNEST LEE DUNCAN, JR**

By_____*/s/ Drew D. Sarrett*_____
Drew D. Sarrett (*Pro Hac Vice*)
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA  23219
(804)-905-9900 - Telephone
(804) 905-9902 - Facsimile
Email:  drew@clalegal.com

Leonard A. Bennett (*Pro Hac Vice*)
Adam Short (*Pro Hac Vice*)
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: adam@clalegal.com

*Counsel for the Plaintiff*