**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**Pittsburgh Division**

**ERNEST LEE DUNCAN, JR.,**

**Plaintiff,**

**v.** **Civil Action No. 2:22-cv-01717-PLD**

**PNC BANK, N.A. et al.,**

**Defendants.**

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff opposes Defendant PNC Bank N.A.'s Motion for Summary Judgment. As established in Plaintiff's affirmative Motion for Partial Summary Judgment (ECFs 115–118), the record establishes that PNC reported inaccurate information about Plaintiff. Thus, Defendant certainly cannot show an absence of undisputed facts sufficient for the entry of Summary Judgment as to accuracy on its own motion. Additionally, PNC cannot establish, as a matter of law, the reasonableness of its investigation of Plaintiff's repeated disputes, or that its recurrent failure to mark its reporting as disputed and facially inept processing of Plaintiff's disputes was not willful. The Court should deny PNC's Motion.

## I. OVERVIEW

Dueling summary judgment motions are a challenge to litigate, particularly when the Defendant offers a flurry of acts which the record belies. Defendant's own Motion—the one to which this response is made—obfuscates, exaggerates and suggests facts that do not actually apply to the overdraft line of credit (the "Disputed Line of Credit") it falsely reported as Plaintiff's responsibility, much less Defendant's violations of the FCRA. Plaintiff bears no responsibility for the Disputed Line of Credit, and PNC could not truthfully report that he defaulted on that account. Plaintiff disputed PNC's false reporting on more than a dozen occasions, to no avail. PNC conducted nothing that could be considered an "investigation" in response to Plaintiff's disputes, and it recurrently failed to properly note its reporting as disputed despite binding precedent requiring it to do so. A reasonable jury could easily find that PNC clearly and repeatedly violated its FCRA duties, so PNC's Motion should be denied.

## II. STATEMENT OF FACTS

Plaintiff incorporates by reference his Concise Statement of Material Facts ("CSMF") (ECF 116) filed in conjunction with his Motion for Partial Summary Judgment (ECF 115) and his

Response to Defendant's Statement of Material Facts Not in Dispute ("Pl's Resp. PNC CSMF") and Statement of Additional Facts in Support of His Opposition ("Pl's Add'l Facts Supp. Opp. PNC MSJ") filed in conjunction with this Memorandum.

## III. LEGAL STANDARD

Summary judgment shall be granted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, the movant must support its factual position by citation to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A).

The summary judgment standard does not change when parties have filed cross-motions for summary judgment. *Applemans v. City of Phila.,* 826 F.2d 214, 216 (3d Cir. 1987). The court must rule on each party's motion on an individual basis, determining separately for each side whether summary judgment may be entered. *Marciniak v. Prudential Fin. Ins. Co. of Am.,* 184 F.App'x. 266, 270 (3d Cir. 2006). If review of cross-motions reveals no genuine issue of material fact, then judgment may be granted in favor of the party entitled to judgment in view of the law and undisputed facts. *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted). In analyzing the evidence submitted, the court should grant summary judgment when it can conclude that no reasonable trier of fact could find for the nonmovant on the basis of evidence presented in the motion and the response. *Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Under Rule 56(c)(1)(B), the movant may demonstrate that there is no dispute of a material nature, including by showing that a non-movant cannot produce admissible evidence to establish or controvert a fact. This is consistent with the established case law, for example, when the non-moving party will bear the burden of proof at trial, the moving party's burden can be met by "pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. ARGUMENT AND AUTHORITIES

### A. PNC Inaccurately Reported Plaintiff as Responsible for the Disputed Line of Credit.

One of the basic elements of Plaintiff's claim is proof that PNC's credit reporting, parroted by Equifax, Experian, and Trans Union (collectively, the "CRAs"), was inaccurate. As another court previously explained in granting partial summary judgment to the consumer in an FCRA case involving whether it was accurate to report an authorized user as an obligor on a credit card account[1]:

[1] Identity theft results in "'ownership' inaccuracies in consumer [credit] files, i.e., inaccuracies in which a credit account or other item belonging to one person appears in the consumer report of another." National Consumer Law Center, *Fair Credit Reporting*, Ch. 4.3.3.1—Mixed or Merged Files (10th ed. 2022), *updated at* www.nclc.org/library. Another type of "ownership" inaccuracy occurs when "a furnisher . . . attribute[s] the account to a consumer who does not owe the debt. In some cases, the furnisher is incorrectly attributing the 'ownership' of the account to a spouse or authorized user who is not contractually liable on the account.'" *Id*. Ch. 4.3.2.1—Furnisher Provision of Inaccurate Data (citing CFPB, Key Dimensions and Processes in the U.S. Credit Reporting System: A Review of How the Nation's Largest Credit Bureaus Manage Consumer Data 25 (2012), *available at* https://www.consumerfinance.gov.) This is what happened here—PNC incorrectly attributed "ownership" of the Disputed Line of Credit to Plaintiff even though it has never adduced any evidence of his responsibility for that account.

> [T]he resolution of the issue of the accuracy of the information is a question of law that would have to be resolved by the court anyway at some point. Accordingly, the motion will be entertained and granted for the reasons already discussed.
>
> The undisputed facts establish that the Plaintiff was . . . not obligated for the indebtedness. Therefore, the information provided to the credit bureaus . . . was inaccurate.

*Alabran*, 2005 WL 3338663, at *8 (E.D. Va. Dec. 8, 2005). And, as has been frequently stated, "[i]t is not seriously debated, however, that factually incorrect information is 'inaccurate' for purposes of FCRA." *Seamans*, 744 F.3d 853, 865 (3d Cir. 2014).

The undisputed material facts present a straightforward "ownership" inaccuracy question for the Court—did Plaintiff sign and agree to pay an overdraft line of credit that had lain dormant for nearly 9 years before it was "used" to pay a $3.00 "Check Images in Statement Fee" for a checking account that itself had been closed eight years prior? (ECF 116, Pl's CSMF ¶¶ 8–15, 18, 22–26; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 8–18, 22–29.) No, he did not.

As to furnishers[2] like PNC, the Consumer Financial Protection Bureau (CFPB)[3] defines "accuracy" as follows:

> **(a) Accuracy** means that information that a furnisher provide to a consumer reporting agency about an account or other relationship with the consumer correctly:
>
> **(1)** Reflects the terms of and liability for the account or other relationship;
> **(2)** Reflects the consumer's performance and other conduct with respect to the account or other relationship; and
> **(3)** Identifies the appropriate consumer.

12 C.F.R. § 1022.41(a)(1). PNC repeatedly reported and improperly verified as accurate information misreporting Plaintiff as responsible for the Disputed Line of Credit. PNC has a single

---

[2] I.e., "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c).

[3] The CFPB has exclusive rule-writing authority for most provisions of the FCRA (including § 1681s-2(b), which is at issue here). 15 U.S.C. § 1681s(e). The CFPB has interpretive and enforcement authority as to the FCRA. 15 U.S.C. § 1681s(a)–(c).

document signed by Plaintiff as to an account with National City—a checking account signature card (the "Signature Card"), and it makes no mention of a credit line, much less specifies any terms for such an account. PNC has had well over a year to produce a credit line application or account agreement signed by Plaintiff, but it has not done so.

There is no question in this case that PNC's reporting of Plaintiff's as the party responsible for the Disputed Line of Credit was not accurate. It is a simple enough question—does PNC possess a shred of evidence indicating Plaintiff's assent to the terms of a line of credit, as opposed to a checking account signature card, which makes no mention of a credit line? No, it does not. Plaintiff steadfastly denies his responsibility for the Disputed Line of Credit account, and PNC has not produced any evidence establishing that Plaintiff ever applied for or opened that account. All evidence indicates that only his late father and stepmother, Ernest Lee Duncan, Sr. ("Senior") and Betty Duncan ("Betty"), *may* have been obligated on the Disputed Line of Credit. PNC's corporate designee admitted PNC's complete lack of substantiating documentation for the Disputed Line of Credit:

A. PNC has no documents for the checking account, which was opened in February 1976, preceding Signature Card Plaintiff signed on August 25, 2007. (ECF 116, Pl's CSMF ¶¶ 2–3; Pl's Resp. PNC CSMF ¶¶ 1–2, Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 2–3.)
B. There would have been at least one signature card prior to the Signature Card. (ECF 116, Pl's CSMF ¶ 4; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 4.)
C. PNC has no documents that might have been provided to Plaintiff with the Signature Card. (ECF 116, Pl's CSMF ¶ 5; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 5.)
D. There is no documentation reflecting that the checking account included a line of credit. (ECF 116, Pl's CSMF ¶ 7; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 7.)

The correspondence and statements PNC claims to have sent regarding the Disputed Line of Credit are solely addressed to Senior and Betty (or Senior only). (ECF 116, Pl's CSMF ¶¶ 18, 29–34; Pl's Resp. PNC CSMF ¶ 9; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 18, 29–34.) When Plaintiff grudgingly paid $38.25 on the Disputed Line of Credit to proceed with a mortgage

refinance, the payment receipt PNC provided him lists the customer as "Duncan Sr." (ECF 116, Pl's CSMF ¶ 36; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 36.) When Plaintiff's attorney disputed PNC's reporting directly, PNC provided a shallow, almost robotic and comical response: "Please have your client(s), Ernest L. Duncan, Sr. & Betty F. Duncan, execute the enclosed Authorization[.]" (ECF 116, Pl's CSMF ¶ 45; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 40.) PNC's internal systems identify only Senior and Betty as borrowers on the Disputed Line of Credit. (ECF 116, Pl's CSMF ¶ 46, Pl's Resp. PNC CSMF ¶ 21; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 52–53.) The Signature Card itself refutes any assertion of Plaintiff's liability on the Disputed Line of Credit—it makes no mention of a credit line, and PNC has no documentation reflecting that the Checking Account included a line of credit. (ECF 116, Pl's CSMF ¶ 7; Pl's Resp. PNC CSMF ¶¶ 3, 25, Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 2, 7.)

Despite overwhelming evidence to the contrary, PNC stitches together a theoretical possibility of Plaintiff's personal liability for the Disputed Line of Credit. But the purportedly undisputed facts PNC offers are neither undisputed nor facts, as Plaintiff exhaustively detailed in responding to them. (Pl's Resp. PNC CSMF ¶¶ 1–31.) PNC has not adduced a single document (or any admissible evidence) binding Senior and Betty, much less Plaintiff, to the Disputed Line of Credit. (ECF 116, Pl's CSMF ¶¶ 2–5, 7; Pl's Resp. PNC CSMF ¶¶ 1–9, Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 1–8.) PNC's corporate designee completely failed to substantiate any obligation of Plaintiff as to the Disputed Line of Credit:

> **Q.** And am I right that there are not any documents pertaining—well, am I correct that there are not any documents that show the original opening of the checking account in February of 1976.
> **A.** The original document is the consumer signature card, original document. That is—was revised actually in August of 2007.
> **Q.** Okay. But there was a—presumably, there would have been at least one signature card prior to that August 2007 signature card?
> **A.** That's correct. Only have the 2007 revision.

> **Q.** And does PNC have any documents related to the line of credit or the checking account that predate August 2007?
> **A.** We do not.
> **Q.** How then do you know—well, how then does PNC know that the account opened in February of 1976 was a combined checking and line of credit?
> **A.** We're referring to the revision document of August of 2007; that is reflecting that type of an account.
> **Q.** Right. So this has been previously shown to a PNC witness, so it's marked Exhibit 5. Is this the signature card that we've been discussing.
> **A.** Yes.
> **Q.** And how does this signature card tell us that there was both a checking account and a line of credit at National City in August 2007?
> **A.** The actual account, being a preferred 50 plus interest checking, was a package account that was linked with the—the—the cash advance.
> **Q.** Okay. And is there a document that shows that this preferred 50 plus interest checking included a line of credit?
> **A.** There is no additional documentation in addition to this document.

(Pl's Resp. PNC CSMF ¶¶ 1, 9, 11–12, 14, 15; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 3, 7.) Nor has PNC demonstrated that the unsigned "Cash Reserve Line Agreement" it dredged up connects to Plaintiff, Senior and Betty, the Checking Account, or the Disputed Line of Credit—PNC has no internal reference to this document or record of its mailing. (ECF 116, Pl's CSMF ¶ 6; Pl's Resp. PNC CSMF ¶ 1; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 6.) It's a random document that establishes nothing about Plaintiff, the Checking Account, or the Disputed Line of Credit. PNC glosses over all this and never bothers to articulate how Plaintiff bound himself to the "Cash Reserve Line Agreement." PNC addressed statements and correspondence for the Disputed Line of Credit *only* to Senior and Betty (or Senior only) and adduced no evidence any of these documents were ever mailed to anyone. (ECF 116, Pl's CSMF ¶¶ 18, 29–34; Pl's Resp. PNC CSMF ¶ 4–5, 8, 13, 15–17, 22) Similarly, PNC has not produced a shred of evidence that it mailed any statements for the Checking Account to anyone. (Pl's Resp. PNC CSMF ¶¶ 13.) And, Mr. Duncan closed the Checking Account within months of Senior's death in 2010. (ECF 116, Pl's CSMF ¶¶ 9, 16.) Mr. Duncan's disputes in December 2019 and March 2020 change nothing—he

made those disputes because he mistakenly believed that PNC was reporting an old motor vehicle lease from the 1980s. (Pl's Resp. PNC CSMF ¶¶ 18–21.) PNC offers no explanation for how these mistaken disputes obligate him to the Disputed Line of Credit, nor could it. And, after March 2020, he repeatedly submitted direct and indirect disputes of his responsibility for the Disputed Line of Credit, going so far as to retain a lawyer to write to PNC in a futile effort to convince PNC to correct its inaccurate reporting. (Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 37–43.) At bottom, PNC's inferential leaps "based upon a speculation or conjecture [do] not create a material factual dispute sufficient to defeat summary judgment," much less establish that no reasonable trier of fact could find PNC's reporting was inaccurate. *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (cleaned up).

But even absent this evidence contradicting PNC's claim that Plaintiff was responsible for the Disputed Line of Credit, PNC's reporting would still be inaccurate because no evidence it has adduced evinces any personal obligation of Plaintiff on that account. The plain meaning of "accurate" and "accuracy" confirm the correctness of Plaintiff's position. Is it accurate, i.e., "free from error especially as to result of care" or "conforming exactly to truth" to say that Plaintiff was personally obligated on the Disputed Line of Credit in *2019* because he signed the Signature Card, which made no mention of any line of credit, *in 2007*? Accurate, Merriam-Webster Online Dictionary (2024), https://www.merriam-webster.com. Was PNC's reporting of Plaintiff as personally liable for the Disputed Line of Credit "free[] from mistake or error" and in "conformity to truth." Accuracy, Merriam-Webster Online Dictionary (2024), https://www.merriam-webster.com; *see also Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 318, n. 7 (E.D. Pa. 2003) ("We begin, therefore, by presuming that Congress used the word 'accuracy' objectively

throughout the FCRA. An objective understanding of accuracy requires congruence between the legal status of a consumer's account and the status a [furnisher] reports."). Of course not.

The seminal case relating to § 1681s-2(b) in the context of an ownership dispute, *Johnson v. MBNA America Bank, N.A.* bears remarkable resemblance to this case. 357 F.3d 426, 428–29, 431–32 (4th Cir. 2004). In that case, the consumer, Linda Johnson, disputed credit reporting for a credit card because she was an authorized user but the furnisher, MBNA, reported her as a co-obligor on the account. *Id.* MBNA claimed its internal "Customer Information System" demonstrated she was obligated on the account. *Id.* at 431. MBNA also contended that Ms. Johnson was a co-applicant because her last name had been changed on the account after her marriage to the undisputed obligor, Edward N. Slater, and billing statements listed her name. *Id.* MBNA highlighted that, following the bankruptcy filing of the obligor, Ms. Johnson "attempted to set up a reduced payment plan and changed the address on the account to her business address." *Id.* at 431–32. MBNA testified that its "five-year document retention policy" meant that "the original account application was no longer in [its] possession." *Id.* at 432. The Fourth Circuit rejected all MBNA's challenges, holding that its evidence was "equally consistent with Johnson's contention that she was only an authorized user on Slater's account and that, to the extent MBNA's records listed her as a co-obligor, those records were incorrect" and evidence regarding the payment plan and account address change "showed only that Johnson had tried to make payment arrangements even though she had no legal obligation to do so." *Id.* at 431–32.

Plaintiff presents an even stronger inaccuracy claim here because PNC's sole document reflecting Plaintiff's supposed assent to the Disputed Line of Credit conclusively demonstrates *only* assent to depositor status on a checking account. PNC seeks to transmute Plaintiff's agreement to the Signature Card into an open-ended agreement to any credit line documents it dredges up

during discovery. PNC has never described or explained, let alone produced, the application or terms of any credit line agreement. Accordingly, "there are no disputed material facts . . . concerning whether the Plaintiff was or was not obligated on the [Disputed Line of Credit] [b]ecause [PNC] cannot produce the application" for that account. *Alabran v*, 2005 WL 3338663, at *8, n. 10. The best PNC can muster is its subjective "belief" that Plaintiff has personal liability for the Disputed Line of Credit, which cannot "support a reasonable jury finding that [Plaintiff] opened and was responsible for [the Disputed Line of Credit]." *Wood v. Credit One Bank,* 277 F. Supp. 3d 821, 850 (E.D. Va. 2017). PNC's belief regarding Plaintiff's liability cannot establish the accuracy of its reporting on summary judgment, particularly when its internal documents overwhelmingly contradict that belief. (*e.g.* Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 52–53 (confirming that PNC's internal systems *only* identified Senior and Betty as borrowers on the Disputed Line of Credit). In fact, no genuine dispute exists that it inaccurately reported Plaintiff's "ownership" of the Disputed Line of Credit.

PNC's reliance on a *pro se* case to support its position speaks volumes. *Schroeder v. Verizon Pa., Inc.*, 2011 WL 2651107 (M.D. Pa. June 16, 2011). There, the plaintiff testified that Verizon could not furnish, following a dispute, charge off reporting unless it "provide[d] [him] with authenticated evidence admissible at trial" establishing his responsibility for the account. *Id*. at *5. He testified that "[w]hether the debt is valid or not is irrelevant." *Id*. *Schroeder* simply has no relevance to Plaintiff's claims against PNC.

After more than a year of discovery, PNC offers mere speculation about Plaintiff's purported obligation on the Disputed Line of Credit. Accordingly, its request for Summary Judgment on accuracy should be denied, and Plaintiff's request for Partial Summary Judgment that PNC's reporting was inaccurate should be granted.

**B. PNC Inaccurately Reported Plaintiff as Delinquent on the Disputed Line of Credit.**

Even in an alternate reality where PNC adduced evidence binding Plaintiff to the Disputed Line of Credit based on his signature from 2007, PNC's reporting of Plaintiff as delinquent remains inaccurate. PNC repeatedly and falsely asserted that Plaintiff was delinquent on the Disputed Line of Credit by 30–59 days in August and September 2020, before and after it specifically updated its credit reporting to remove any delinquency reporting. (ECF 116, Pl's CSMF ¶¶ 40–41; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 46–50.) PNC's derogatory reporting was inaccurate because it did not "correctly . . . reflect[] [Plaintiff's] performance and other conduct with respect to the [Disputed Line of Credit]." 12 C.F.R. § 1022.41(a)(2). PNC represented to the CRAs that Plaintiff defaulted on the Disputed Line of Credit even though this reporting resulted from a "draw" to cover a "Check Images in Statement Fee" for which he never received notice. At the time this "draw" of the Disputed Line of Credit occurred, that account had lain dormant for nearly nine years while the checking account purportedly incurring the fee had been closed eight years prior. Plaintiff received no notice that PNC intended to assess any fees for the privilege of obtaining "check images" on, at best for PNC, a dormant checking account. PNC cannot establish that it mailed any statements for the Disputed Line of Credit to Plaintiff. The statements it generated in this litigation only reference Senior and Betty. None of the dunning correspondence it generated following the "draw" was directed to Plaintiff. Its exploitative fee harvesting from the checking account (with no notice) and willful ineptitude preclude any reporting that Plaintiff was delinquent on the Disputed Line of Credit.

PNC's reporting of the Disputed Line of Credit as delinquent was misleading in such a way and to such an extent that it could be expected to have an adverse effect Plaintiff. PNC acknowledged as much when it submitted an update to the CRAs in September 2021 specifically stating that the Disputed Line of Credit was current in August 2020 with no payment

history/reported available for September 2020. (ECF 116, Pl's CSMF ¶ 41; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 47.) Unfortunately for Plaintiff, PNC reverted to its prior pattern of false delinquency reporting when, upon receipt of a post-litigation dispute generated by Experian, it reinserted delinquency reporting for the month of August 2020 and listed the payment rating of the Disputed Line of Credit as 30–59 days delinquent when it was closed on September 11, 2020. (ECF 116, Pl's CSMF ¶ 43; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 48–50) But no manufactured explanation by PNC at this juncture will transform its delinquency reporting into a "correct[] . . . reflect[ion] [of] [Plaintiff's] performance and other conduct with respect to the [Disputed Line of Credit]." 12 C.F.R. § 1022.41(a)(2).

**C. A Reasonable Fact Finder Could Conclude that PNC Failed to Conduct a Substantive FCRA Investigation.**

**1. Congress passes the FCRA to ensure fair and accurate credit reporting.**

Congress enacted the Fair Credit Reporting Act in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). At the time of the Act's introduction, far too often, credit reporting agencies "were reporting inaccurate information that was adversely affecting" consumers. *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001). As one of the Act's sponsors observed, with the increasing computerization of personal data, "the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home." *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)). PNC's treatment of Plaintiff confirms the sponsor's fears.

Motivated by these concerns, Congress passed the FCRA to "prevent consumers from

being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517, at 1 (1969). To that end, Congress implemented "a variety of measures designed to insure that [credit reporting] agencies report accurate information." *Dalton,* 257 F.3d at 414–15. It also enabled consumer to sue for willful or negligent noncompliance. 15 U.S.C. §§ 1681n–o.

A quarter century later, Congress amended the statute so that "furnishers"—that is, companies supplying information about consumers to credit reporting agencies—likewise have a duty to ensure that the information they report is accurate. *See* Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208, § 2413, 110 Stat. 3009, 3009-447 (1996) (codified as amended at 15 U.S.C. § 1681s-2); 12 C.F.R. § 1022.41. These amendments sought "to close an identified 'gap in the FCRA's coverage,' whereby even dutiful investigations of consumer disputes by [credit reporting agencies] could be frustrated by furnishers' irresponsible verification of inaccurate information, without legal consequence to the furnishers." *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 35 (1st Cir. 2010) (quoting S. Rep. No. 103-209, at 6 (1993)). The amendments pulled "credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies" into the FCRA's regulatory regime. H.R. Rep. No. 108-263, at 24 (2003).

**2. Furnishers must investigate a consumer's dispute about the accuracy of his furnished information.**

The FCRA imposes two obligations on furnishers like PNC. First, a furnisher may not "furnish any information relating to a consumer to any consumer reporting agency if [it] knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1). Congress, however, limited furnishers' liability under § 1681s–2(a) by prohibiting private suits for violations. *Id.* § 1681s-2(c)(1); *see Sprague v. Salisbury Bank & Tr. Co.*, 969 F.3d 95, 98 (2d Cir. 2020).

Second—and relevant to this case—a furnisher must investigate a consumer's claim that it furnished inaccurate information. To trigger a furnisher's duty to investigate, consumers must file a dispute with a credit reporting agency. *See Sprague*, 969 F.3d at 99; *see* 15 U.S.C. § 1681s-2(a)(8). The credit reporting agency, in turn, must itself investigate the dispute, which includes providing the furnisher with "all relevant information regarding the dispute." 15 U.S.C. § 1681i(a)(2)(A). Once notified by a credit reporting agency, a furnisher must "(A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the consumer reporting agency . . . ; [and] (C) report the results of the investigation to the consumer reporting agency." 15 U.S.C. § 1681s-2(b)(1).

Although the FCRA does not define "investigation," there is agreement that section "1681s-2(b) requires some degree of careful inquiry by furnishers." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302–03 (11th Cir. 2016). That is because the term "investigation" is defined as "a detailed inquiry or systematic examination" or "a searching inquiry." *Johnson*, 357 F.3d at 430 (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000); *Webster's Third New Int'l Dictionary* 1189 (1981)); *Seamans*, 744 F.3d at 865 (following *Johnson*); *see Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155–57 (9th Cir. 2009) (reviewing definitions of "investigation" considered by courts interpreting § 1681s-2(b)).

"The appropriate touchstone for evaluating a furnisher's investigation under [section] 1681s-2(b) is 'reasonableness.'" *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1312 (11th Cir. 2018); *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012) ("If a dispute is filed with the agency . . . the furnisher of that information ha[s] a duty to reasonably investigate and verify that the information is accurate."). And because "what constitutes a 'reasonable investigation' will vary depending on the circumstances of the case," the reasonableness of a

furnisher's investigation is "a factual question" that should "normally be reserved for trial." *Hinkle*, 827 F.3d at 1302–03; *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *see Chiang*, 595 F.3d at 36–37; *Johnson*, 357 F.3d at 429–31. The Courts of Appeals continue to unanimously follow this "reasonable investigation" standard. *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012) ("We join every circuit to have addressed this duty in holding that the investigation an information furnisher undertakes must be a reasonable one.").

**3. Under the FCRA, a furnisher can end its investigation by verifying the disputed information or by determining that the disputed information is inaccurate, incomplete, or cannot be verified.**

Under section 1681s-2(b), a furnisher's statutorily-required investigation can end in one of three ways: first, verification of accuracy; second, a determination of inaccuracy or incompleteness; or, third, a determination that the information "cannot be verified." *See* 15 U.S.C. § 1681s-2(b)(1)(E).

A verification of accuracy occurs when a furnisher investigates, finds reliable evidence confirming the disputed information, and reports to the credit-reporting agency that the information has been verified. As courts have explained, "[v]erification might be accomplished by uncovering documentary evidence that is sufficient to prove that the information is true [or] it might be accomplished by relying on personal knowledge sufficient to establish the truth of the information." *Hinkle*, 827 F.3d at 1302–03; *see Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 782–83 (6th Cir. 2014). "When a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle*, 827 F.3d at 1302–03.

If a furnisher's investigation reaches one of the other two outcomes—that is, it determines that the disputed information is inaccurate, incomplete, or unverifiable—the furnisher must

"modify," "delete," or "permanently block the reporting of that item of information." 15 U.S.C. § 1681s-2(b)(1)(E). Disputed information is "incomplete or inaccurate" under the FCRA when a furnisher discovers evidence indicating that it is "patently incorrect" or "misleading [such that] it can be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163. A conclusion that the information is "unverifiable" occurs when a furnisher "determine[s] that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire." *Hinkle*, 827 F.3d at 1303. That conclusion recognizes that furnishers may no longer have the documentary evidence or resources to "conclusively verify" disputed information. *Johnson,* 357 F.3d at 432. "Having made such a determination, furnishers are entitled to cease investigation and notify [credit reporting agencies] that the information 'cannot be verified.'" *Hinkle*, 827 F.3d at 1303 (quoting 15 U.S.C. § 1681s-2(b)(1)(E)). "When a furnisher reports that disputed information 'cannot be verified,' the question of whether the furnisher complied with [section] 1681s-2(b) will likely turn on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome." *Id.* at 1303–04. Critically, "the appropriate response" to a furnisher's inability to verify its reporting "will be to delete the account or cease reporting it entirely." *Id.* at 1304.

**4. Furnishers can be held accountable for negligent or willful failures to investigate.**

If a furnisher negligently or willfully violates § 1681s-2(b)'s requirements, a consumer may sue for damages. 15 U.S.C. §§ 1681n, 1681o. For negligent violations, the FCRA entitles a plaintiff to "the actual damages sustained by the consumer as a result of the [violation]." 15 U.S.C. § 1681o(a)(1).

A willful violation of the FCRA "occurs when 'the defendant knowingly and intentionally committed an act in conscious disregard for the rights of the consumer[,]'" or "in reckless

disregard of [the defendant's] obligations under FCRA." *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 151, 151 n. 4 (4th Cir. 2008). A consumer injured by a furnisher's willful noncompliance may recover actual damages, statutory damages, 15 U.S.C. § 1681n(a)(1)(A), and/or punitive damages, 15 U.S.C. § 1681n(a)(2). Thus, actual damages (and, therefore, statutory causation) are not a required to sustain a willfulness claim. *See McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 96 (1st Cir. 2022).

**5. PNC's data matching is not a reasonable investigation in cases involving an "ownership" dispute.**

Data matching to "verify" account ownership is not enough, as the prevailing authorities state that to be reasonable, the investigation must be "a detailed inquiry or systematic examination," and "requires some degree of careful inquiry by creditors." *Johnson*, 357 F.3d at 430. Simply comparing disputed information to that contained in PNC's computer systems cannot be reasonable, particularly when the dispute relates to account "ownership." *See, e.g.*, *Burns v. Ford Motor Credit Co. LLC*, 2021 WL 1962856 (E.D. Pa. May 17, 2021); *Hopkins v. I.C. Sys.*, 2020 WL2557134 (E.D. Pa. May 20, 2020); *Horton v. Trans Union, L.L.C.*, 2015 WL 1055776 (E.D. Pa. Mar. 10, 2015); *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599 (E.D. Pa. 2012). But PNC's failures go beyond mere data matching—its internal computer systems *only* associated Senior and Betty with the Disputed Line of Credit. (ECF 116, Pl's CSMF ¶¶ 2–3; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 52–53.) While PNC attempts to justify its slipshod processing of disputes by describing them as reviews of "the information provided with the dispute, PNC's records, and PNC's source documents," such euphemistic descriptions cannot turn a cursory review into something substantive and FCRA-compliant. In their depositions and dispute processing notes, PNC's dispute agents confirmed they merely compared demographic information and payment history from PNC's internal systems and then regurgitated the same information in "verifying"

PNC's reporting. (Pl's Resp. PNC CSMF ¶¶ 25–31, Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 48–50.) No "source documents" exist that substantiate Plaintiff's liability on the Disputed Line of Credit—the Signature Card refutes any assertion of Plaintiff's liability, and PNC's internal computer systems identified *only* Senior and Betty as borrowers on the Disputed Line of Credit. (Pl's Resp. PNC CSMF ¶¶ 25; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 52–53.) PNC's reviews of the disputes were necessarily cabined by the data matching process its dispute agents uniformly performed—no contact with Plaintiff, no review of prior disputes, including detailed letters sent to the CRAs and PNC directly, no review of statements and correspondence for the Checking Account and Disputed Line of Credit, and no effort to even locate the Signature Card on which PNC now rests its (flawed) accuracy defense. (Pl's Resp. PNC CSMF ¶¶ 25–31.)

Not content with merely bending the factual record to suit its defense, PNC cites to numerous cases which either demonstrate the unreasonableness of its investigations or have no application to the facts here. Take, for example, PNC's assertion that the dispute codes contained in ACDVs limit the scope of its investigations. *Van Veen*, 844 F. Supp. at 605. *Van Veen* denied a furnisher's request for summary judgment on willfulness based on disputes far less detailed and facts much less egregious than those presented here. *Id.* at 610.

The specific dispute code in an ACDV in no way limits the scope of a reasonable investigation. While "the notice [of dispute] determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken." *Gorman*, 584 F.3d 1147, n. 11; *see also Boggio*, 696 F.3d at 619–620 (reversing summary judgment for furnisher whose "policy prohibited its employees from performing anything more than a cursory confirmation" of its own records that listed the consumer's disputed status as an obligor on the challenged account because the furnisher "received notice regarding the specific nature of

Boggio's underlying dispute," and therefore "a reasonable investigation under the circumstances would require that USAA review the relevant, underlying documentation"); *Humphrey v. Trans Union L.L.C.*, 759 Fed. Appx. 484 (7th Cir. 2019) (similar); *Thomas v. Merchants Credit Ass'n*, 2020 WL 1445772 (W.D. Wash. Mar. 25, 2020) (similar); *Heard v. Nationstar Mortg. L.L.C.*, 2018 WL 4028116 (N.D. Ala. Aug. 23, 2018) (rejecting furnisher's defense based on CRAs' "vague" notices dispute involved "a specific factual issue" that consumers "had raised many times"; "Even if the credit agencies gave a less than detailed description of the Heards' dispute, this did not relieve Nationstar of its responsibility to review documents in its possession."); *Daugherty v. Equifax Info. Servs., L.L.C.*, 2015 WL 6456572 (S.D. W. Va. Oct. 26, 2015) (denying summary judgment on claim that furnisher engaged in "a mere 'data conformity' review" because it limited itself to "brief reviews of internal records" when it had additional information available for review about potential inaccuracies); *Kim v. BMW Fin. Servs.*, 142 F. Supp. 3d 935 (C.D. Cal. 2015) ("Defendant should have considered information it received directly from Plaintiff" through the earlier § 1681s-2(a)(8) dispute in conducting its § 1681s-2(b) investigation), *aff'd*, 702 Fed. Appx. 561 (9th Cir. 2017); *McDonald v. OneWest Bank*, 2013 WL 858197 (W.D. Wash. Mar. 7, 2013) (similar); *Rogers v. JPMorgan Chase Bank*, 2012 WL 2190900 (W.D. Wash. June 13, 2012) (denying summary judgment because, as result of consumer's earlier oral reports of identity theft to bank branch managers, bank failed to act on information that it had); *Allicon v. Verizon Wireless*, 2012 WL 380147 (D.N.H. Jan. 18, 2012) (furnisher failed to review its own records that confirmed consumer's dispute and revealed defendant's erroneous reporting), *adopted*, 2012 WL 405502 (D.N.H. Feb. 8, 2012); *Watson v. Citi Corp.*, 2008 WL 4186317, at *4 (S.D. Ohio Sept. 5, 2008).

PNC also ignores that in five separate disputes its agents processed, the CRA forwarded Plaintiff's detailed dispute letter with the ACDV. (Pl's Resp. PNC CSMF ¶¶ 27, 31.) And in a

sixth dispute, the ACDV contained a narrative statement from Plaintiff: "[t]his account belong to my deceased parents yet there is apparent fraudulent activity not initiated by my deceased parents AFTER THEY WERE DECEASED." (Pl's Resp. PNC CSMF ¶¶ 29.) And, of course, when PNC processed the May 2022 and March 2023 disputes, it had the benefit of repeated correspondence from Plaintiff, direct and indirect. (Pl's Resp. PNC CSMF ¶ 31; Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 48–50.)

PNC's additional cases fare no better. (ECF 110 at 19.) It cites another *pro se* case, *Bonilla v. American Heritage Federal Credit Union*, which involved facts easily distinguishable from those here—the consumer disputed a credit union's reporting based on her assertion that a fraud reference in her credit file should have been removed "in July 2019 when an assistant district attorney allegedly emailed a motion for *nolle pros* to the state court judge off the record." 2021 WL 679306, at *1 (E.D. Pa. 2021). *Gorman* involved consumer disputes related to a merchant failing to provide goods that were billed to the consumer's credit card, and the dispute over the legitimacy of the charges had already been resolved against the consumer by the credit card company. 584 F.3d at 1159. In *Westra v. Credit Control of Pinellas*, Trans Union forwarded a single dispute indicating that the plaintiff "was disputing the charge on the basis that the account did not belong to him" and no further details. 409 F.3d 825, 827 (7th Cir. 2005). None of the other cases cited by Defendant as bearing on the reasonableness of its "investigations" even merits mentioning. They simply have no relevance to this case.

The record belies PNC's assertion that Plaintiff never disputed the account history. Plaintiff's March 2021 dispute letters (transmitted to PNC by Experian) both noted that PNC was reporting an account that belonged to Senior and showed activity 10 years after Senior's death. (Pl's Resp. PNC CSMF ¶¶ 27.) And Plaintiff's direct dispute from August 2021 noted that

transactions on the Disputed Line of Credit could not have been initiated by Senior and Betty in 2019 because they were both deceased, and that he "certainly didn't" initiate those transactions. Plaintiff's correspondence, to the CRAs and PNC directly, clearly denotes the dispute that account activity should be reporting as to Plaintiff, positive, negative, or otherwise. (Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 38.)

PNC's reliance on its win in *Beachley v. PNC Bank, N.A.* cannot help it in this case. 2011 WL 3705239 (D. Md. 2011). There, the consumer lodged a single dispute with Trans Union as to a PNC tradeline, contesting that she was not responsible for the account. *Id*. at *3. Simultaneously, she disputed another PNC tradeline as inaccurate because it was included in her bankruptcy. *Id*. PNC deleted its reporting of the tradeline disputed as included in bankruptcy but retained its reporting of the tradeline the plaintiff disputed as not her responsibility. *Id*. The plaintiff argued that PNC should have realized both tradelines were included in bankruptcy and deleted reporting of both tradelines. *Id*. In contrast, this case involves more than a dozen direct and indirect disputes to PNC over more than two years, and the disputes contained detailed information and supporting documentation. Nonetheless, PNC repeatedly regurgitated that Plaintiff was liable on the Disputed Line of Credit and delinquent. At best for PNC, its "ownership" and delinquency reporting as to Plaintiff was unverifiable. *See, e.g.*, *Johnson*, 357 F.3d at 432; *Hinkle*, 827 F.3d at 1305-06; *Boggio*, 696 F.3d at 619. A reasonable jury could easily find PNC's "investigations" unreasonable.

**D. PNC Violated § 1681s-2(b) by Failing to Properly Note Its Reporting As Disputed When Responding to At Least Nine ACDVs**

Defendant misstates the law and rewrites the record in arguing that it complied with the FCRA when it repeatedly failed to properly note Plaintiff's ongoing, bona fide dispute in responding to nine separate ACDVs. (Pl's Add'l Facts Supp. Opp. PNC MSJ ¶ 46.) As PNC well knows, *Seamans* held "that a private cause of action arises under 15 U.S.C. § 1681s–2(b) when,

having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed." 744 F.3d at 867. *Seamans* required PNC to note Plaintiff's dispute in its subsequent reporting irrespective of whether it received that dispute directly from Plaintiff or indirectly from the CRAs. *Id.*; *see also Coulter v. Chase Bank USA, N.A.*, 2020 WL 5820700, at *4 (E.D. Pa. 2020) (furnisher must note meritorious dispute in response to indirect dispute under 15 U.S.C. § 1681s–2(b)); *accord Sherman v. Sheffield Fin., L.L.C.*, 627 F. Supp. 3d 1000 (D. Minn. 2022) (granting consumer summary judgment on willfulness claim where furnisher had adopted and followed that "policy of never marking a particular credit line as disputed if it received an indirect dispute through a CRA even if the dispute was bona fide or potentially meritorious" because "no court of appeals to consider this issue has accepted an interpretation consistent with Sheffield's policy. Before Sheffield's actions here, five circuits had rejected Sheffield's interpretation. . . . This policy violated FCRA as a matter of law and was based on an objectively unreasonable interpretation of the statute.")

PNC has no real defense here, so it endeavors to rewrite history—asserting that direct disputes it claims to have "investigated" were, in fact, frivolous, and *required no action on its part at all*. First, as detailed above, PNC's obligation to note Plaintiff's disputes arose whether he submitted those disputes directly to PNC or indirectly to PNC (through the CRAs). And a private right of action accrued in favor of Plaintiff each time PNC failed to properly note its reporting as disputed when responding to an indirect dispute from a CRA. *Seamans*, 744 F.3d at 867. Second, Plaintiff's direct disputes were certainly not "frivolous" or "irrelevant" under Section 1681s-2(a)(8)(F). 15 U.S.C. § 1681s-2(a)(8)(F). Third, PNC cannot now claim that those disputes are "frivolous" or "irrelevant" because it failed to comply with the notice requirements mandated by Section 1681s-2(a)(8)(F):

> (ii) Notice of determination
>
> Upon making any determination under clause (i) that a dispute is frivolous or irrelevant, the person shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the person.
>
> (iii) Contents of notice
> A notice under clause (ii) shall include—
> (I) the reasons for the determination under clause (i); and
> (II) identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

15 U.S.C. § 1681s-2(a)(8)(F)(ii)–(iii). PNC never complied with the consumer notice requirements required when a furnisher deems a dispute "frivolous" or "irrelevant," and it cannot now claim it did so in violation of those notice requirements.

**E. A Reasonable Fact Finder Could Conclude that PNC Willfully Violated Section 1681s-2(b).**

In 2007, the Supreme Court "lowered the bar for what constitutes willful noncompliance," stating that it includes both knowing and reckless violations. *Slantis v. Capozzi & Assocs., P.C.*, 2010 WL 4878846, at *4 (M.D. Pa. Aug. 10, 2010) (citing *Safeco*, 551 U.S. at 56–57). A defendant can willfully violate the FCRA "by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721 (3d Cir. 2010). In FCRA cases, evidence of repeated misconduct suspected of being unlawful "would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dixon-Rollins v. Experian Info. Sols.*, Inc., 753 F. Supp. 2d 452, 465 (E.D. Pa. 2010) (upholding willfulness verdict in CRA case).

Under the FCRA, performing a reasonable investigation requires that a furnisher consider "the notice that [it] had about the nature of [a consumer's] dispute" and to tailor its investigation accordingly. *Boggio*, 696 F.3d at 619; *Johnson*, 357 F.3d at 431; *Seamans*, 744 F.3d at 866;

*Gorman*, 584 F.3d at 1157. As a result, dispute agents' blindly following cookie-cutter investigative procedures—without considering the notice they had about the dispute and tailoring their investigations consistent with that notice—will commonly create a fact dispute over recklessness. *See Seamans*, 744 F.3d at 868 (explaining that a furnisher's reliance on "[b]lanket policies" may "underpin" a jury's finding of recklessness). This is precisely what happened here. PNC's dispute agents uniformly confirmed, in their depositions and dispute processing notes, that they followed the same basic blueprint—they compared demographic information and payment history from PNC's internal systems and then regurgitated the same information in "verifying" PNC's reporting. (Pl's Resp. PNC CSMF ¶¶ 25–31, Pl's Add'l Facts Supp. Opp. PNC MSJ ¶¶ 48–50.)

A reasonable jury could conclude that PNC's de facto data matching approach to the FCRA's investigation requirement is objectively unreasonable and ran a risk of error substantially greater than carelessness. *Safeco*, 551 U.S. at 69. Relying on PNC's internal systems to compare Plaintiff's "demographics" ignored the well-established requirement that PNC must tailor an investigation to the nature of a dispute. Here, that meant PNC's dispute agents never bothered to substantively investigate Plaintiff's disputes. They repeatedly ignored powerful evidence weighing against verification—detailed dispute letters with substantiating documents, including one sworn to before a notary, internal records identifying *only* Senior and Betty as obligated on the Disputed Line of Credit, and repeated ACDVs.

In similar circumstances, courts have routinely recognized that this pattern creates a fact dispute over recklessness. For example, courts have held that, where "three different" investigators followed the same blanket investigative procedure "and each simply confirmed the existing information" on the consumer's account, a fact dispute existed over recklessness. *Burns v. Ford*

*Motor Credit Co. LLC*, 2021 WL 1962856, at *5; *Boggio*, 696 F.3d 611 (similar); *Horton v. Trans Union, LLC*, 2015 WL 1055776, at *10 (similar); *Coulter*, 2020 WL 5820700, at *14 (similar); *see also Gorman*, 584 F.3d at 1156 ("[A]n 'investigation' requires an inquiry likely to turn up information about the underlying facts . . . [R]equir[ing] only a cursory investigation . . . would allow furnishers to escape their obligations by merely rubber stamping").

PNC's de facto blanket policy of failing to properly notate consumer disputes was objectively unreasonable.[4] In *Seamans*, the defendant's policy to never flag accounts as disputed "would appear to be in outright conflict with a furnisher's duties under the FCRA." 744 F.3d at 869. *Seamans* was decided in 2014. As such, PNC was on notice that failing to properly notate consumer disputes was in "outright conflict" with its investigation duties under the FCRA. Therefore, a reasonable jury could find Defendant's conduct willful (assuming the Court declines to enter a directed verdict on this issue).

## V. CONCLUSION

For the foregoing reasons, PNC has failed to show that it is entitled to judgment as a matter of law on Plaintiff's claims. The Court should therefore deny PNC's Motion.

[4] Even in the instances where PNC deigned to include a compliance condition code (CCC) when responding to disputes forwarded by the CRAs, it used the wrong one, "XH," i.e., "[a]ccount previously in dispute; the data furnisher has completed its investigation." The use of this CCC, notwithstanding Plaintiff's continuing and recurrent dispute of PNC's credit reporting, was inaccurate because "[b]y reporting a CCC of XH when [Mr. Duncan] was continuing to dispute the accuracy of [PNC's] reporting, [PNC] 'create[d] a materially misleading impression,' that the [Disputed Line of Credit] was not in dispute." *Wood*, 277 F.Supp.3d at 854 (E.D. Va. 2017).

Dated: November 19, 2024

Respectfully submitted,

**ERNEST LEE DUNCAN, JR.**

By *<u>/s/ Drew D. Sarrett</u>*
Drew D. Sarrett (*Pro Hac Vice*)
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
(804)-905-9900 - Telephone
(804) 905-9902 - Facsimile
Email: drew@clalegal.com

Leonard A. Bennett (*Pro Hac Vice*)
Adam Short (*Pro Hac Vice)*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbenett@clalegal.com
Email: adam@clalegal.com

*Counsel for the Plaintiff*