# EXHIBIT 5

**JAMS ARBITRATION**

| | |
|---|---|
| ERNEST LEE DUNCAN, JR., | |
| Claimant, | |
| v. | JAMS Reference No. 5410000458 |
| EXPERIAN INFORMATION SOLUTIONS, INC., | |
| Respondent | |

**INTERIM AWARD**

I. **Procedural history**

Claimant Ernest Duncan ("Claimant" or "Mr. Duncan") filed a Demand for arbitration on July 12, 2023, after the parties had filed and been granted a joint motion seeking a stay for arbitration in Claimant's ongoing court case against Experian and PNC Bank ("PNC"). The Demand sought actual, statutory, and punitive damages, costs, and attorneys' fees under the Fair Credit Reporting Act ("FCRA").

The FCRA requires that Experian and other consumer reporting agencies ("CRAs") use reasonable procedures to ensure the maximum possible accuracy of the information they report, pursuant to 15 U.S.C. section 1681e(b). If a consumer disputes an item of information, the CRA must reinvestigate the dispute and, if the information cannot be verified, delete it, pursuant to 15 U.S.C. section 1681i.

Respondent Experian, a CRA as defined by 15 U.S.C. section 1681a(f), filed its Answer and Affirmative Defenses on July 26, 2023, in which it denied all liability and sought fees and costs.

1

The Arbitrator was appointed on September 15, 2023, and signed a stipulated protective order on September 18.  The Arbitrator conducted preliminary conference calls by Zoom on October 24, 2023, and November 6, 2023, upon written notice.

Following the conferences and the agreements of the parties, the Arbitrator issued Procedural Order No. 1 on November 8, 2023.  The Order established that the FCRA, as interpreted by United States federal courts, is the substantive law that governs the arbitration, that the JAMS Comprehensive Rules & Procedures, effective June 1, 2021 ("JAMS Rules"), govern the procedures, and that counsel had agreed to file no dispositive motions.  The parties agreed to meet and confer to establish the amount of and schedule for discovery beyond that required by JAMS Rule 17.

Following the procedures for discovery disputes establish by Procedural Order 1, the parties filed letter briefs and met with the Arbitrator remotely for a discovery conference on January 19, 2024.  The briefs and conference resulted in the Arbitrator's second Order, also issued on January 19, 2024, in which the Arbitrator ordered Respondent to produce a list of items, together with the dispute agents who conducted Experian's investigation or reinvestigation.  Another discovery dispute surfaced in February, which was resolved by a Stipulation agreed to by counsel, filed on February 26, 2024.

After the parties complied with all pre-hearing requirements, an in-person hearing was held at JAMS in Washington, DC on March 11 and 12, 2024.  The Arbitrator thanks counsel for their cooperation before, during, and after the hearing.

The parties filed post-hearing briefs on May 2, June 7, and June 25, 2024. Respondent filed a Notice of Supplemental Authority on June 28, 2024 and Claimant its Response on July 3.  The case is now ripe for decision.

## II.    Findings of Fact

For the last ten years Claimant has worked for a chemical distribution company based in Indianapolis, the last seven as its controller.  His job responsibilities include "all matters of finance, both finance and accounting." Claimant's father, Ernest Duncan Sr., died in 2010; his step-mother, Betty, predeceased her husband in 2009.

In mid-2007, while they were living in an assisted living facility in Cincinnati, his parents asked for Claimant's assistance in handling their financial affairs.  In that effort Mr. Duncan was added to Betty and Ernest Sr.'s National City Bank account.  He testified that he "only went with them one time and that was to execute a signature card for the purpose of assisting with their managing funds" that is, to "deposit funds and to negotiate checks, pay bills."  Throughout what became Mr. Duncan's ordeal that engendered this arbitration, PNC has consistently reported to Experian, and Experian has consistently reported to the world that the account in question was "Opened" in February 1976."  When he went to the bank to add himself to his parents' account, Mr. Duncan was not made aware of any "line of credit" associated with the account.  There never was any discussion about it.  Nor has Experian produced any admissible evidence of a line of credit agreed to by Claimant or his parents.  Claimant did not receive any personal funds from or through the account.

In 2011, after his father died, Mr. Duncan wound up his father's financial affairs and closed the account.  He never became aware of any "line of credit account"

associated with his father's checking account.  Claimant testified that the bank account was never used at any time after 2011, because "it had long been closed."

Mr. Duncan first learned of a credit line asserted by PNC when it took over for the National City Bank and reported by Experian, in the Fall of 2020, when he was attempting to refinance his home mortgage.  He was told by the mortgage company that there was a derogatory entry for a PNC Bank on his credit report, which needed to be rectified before he could proceed with the refinancing.

After learning for the first time of the PNC report, Mr. Duncan made at least half a dozen calls to the bank, all of which were unsuccessful.  In order to resolve the problem, Claimant found a PNC Bank location in Indianapolis, where he went to investigate the purpose of the derogatory entry.  He was told that it related to his deceased father and stepmother and was in the amount of $38.  He paid the PNC charge on his father's account at the branch in order to get it removed from his credit account.

Mr. Duncan never had seen any PNC credit line statements.  The "PNC Smart Checking Statements," addressed to his father at Claimant's address in Ohio where he had not lived for many years, reflect "RETRN MAIL" above the name and address lines, and were being returned to sender by the Postal Service, at least as early as the June 2016 statement.  At the time Claimant was living in Indianapolis, and the statements were addressed only to Duncan, Sr. and Betty, both of whom had been dead for at least ten years.

The first document Mr. Duncan ever received about a supposed credit line balance was provided when he searched out the Indianapolis branch to attempt to pay PNC the $38 it claimed his parents owed.  Despite the fact that no document showed

4

that the checking account included a line of credit and the "line of credit" statements list only Ernest Sr. and Betty, Claimant paid the asserted balance, even though he did not want to do so ("I assure you I did not"). He did so in order to "clear this—get this—as a step of getting this item cleared off my credit report and so that I could proceed with the refinance of my mortgage."

In January 2021 Mr. Duncan's credit score dropped 72 points. He did not know why. He learned about the drop in his score after he began monitoring his credit reports, as a result of discovering the PNC entry. For the entire three years of his battle with Experian and PNC, that entry was the only negative item in his credit report. When Mr. Duncan saw his credit score plummet, he went directly to Respondent.

Mr. Duncan wrote to Experian about his credit report on January 21, 2021. Experian did not respond substantively, but mailed Mr. Duncan two letters on February 2 and February 10, 2021, the second of which included his then-current Experian credit report.

Mr. Duncan disputed again to Experian by letter dated February 18, 2021, this time identifying the PNC account and asserting that the account belonged to Sr., not Jr. Experian responded on March 12, 2021, claiming without details that it had confirmed the truthfulness of PNC's reporting.

On March 19, 2021, Mr. Duncan sent a third dispute to Experian, this one more angered than the previous ones. The letter included multiple attachments, including documents showing that the PNC records themselves showed the account to have belonged to Ernest Sr. Claimant testified that he "sent all of this, these attachments, and providing highlighting and emphasis, hoping that somebody at Experian would get

5

the message that this was not my account, that I'm pissed off, please do something about it."

Experian responded first, on March 31, 2021, with another form letter, essentially admitting that its dispute investigation procedure consists entirely of forwarding the dispute to its customer-furnisher (PNC) and then reporting whatever its customer claims to have verified. Two days later, on April 2, 2021, Experian sent another form letter, telling Mr. Duncan that it had again determined he was wrong and that, as PNC claimed, he was the person responsible for the PNC bill.

In each of these communications Experian told Mr. Duncan that he should contact its customer-subscriber (PNC) directly to obtain documents supporting the reported account and to obtain correction of any inaccuracy. Accordingly, Mr. Duncan made dozens of attempts, by mail, in person, and on the telephone, to try to get PNC to correct the inaccuracy. When tax season ended Mr. Duncan asked for some legal advice from an attorney who had done work for his company. As a result, Claimant mailed a detailed letter to PNC on August 23, 2021, and attached his Experian credit report, his parents' death certificates, the PNC letter he had received at the branch, and the payment receipt for the $38. Nothing changed.

Mr. Duncan formally hired and paid an attorney, the Massaro Legal Group in Indiana, again without success. His attorney made at least three attempts to write to PNC and convince it to correct its reporting. PNC's responses were robotic and almost comical: "Please have your client(s), Ernest L. Duncan, Sr. & Betty F. Duncan, execute the enclosed Authorization[.]" "[W]e are unable to adjust or delete this information. … We consider this matter resolved at this time.")

Having failed to obtain correction of his credit by working with Experian's customer directly, Mr. Duncan again reached out to the credit bureau. He requested that Experian place a freeze on his credit report to avoid others' learning of the derogatory information. Then, in May 2022, Mr. Duncan made a fourth written dispute to Experian, this time under oath, sworn and subscribed before a Notary. He again detailed the dispute: "You are incorrectly reporting an account on behalf of PNC Bank. I did not authorize this account and have no responsibility for said account as it belonged to my deceased father and step-mother." Again, he asked Experian to tell him what information he could provide to facilitate the removal of the derogatory information:

> Before you continue to report any further information regarding this matter, please contact me at the above address or telephone number so that I can provide any other information that you need. Also, you may call or write immediately if you need or will accept additional information to support my dispute.

Experian never contacted Mr. Duncan for additional information. It simply mailed another form letter claiming, "The information you disputed has been verified as accurate."

At the hearing, in order to reveal what Experian actually does to reinvestigate after receiving a consumer's dispute, Claimant called as an adverse witness Christina Hamilton, a "senior litigation analyst," whose primary role is to testify in Experian's defense. Ms. Hamilton acknowledged that Experian's policy when it has to do a reinvestigation is to provide the dispute to the furnisher. According to Ms. Hamilton, the only document Experian will accept in order to correct an entry is a "letter from the data furnisher stating that he was not responsible." Ms. Hamilton testified that she could not recall one instance in which a creditor had provided such a letter.

7

> Q. You testified here today that there's nothing that Mr.
> Duncan could have done other than get, essentially, an
> apology letter from PNC?
> A. Correct, and that wasn't provided.

Finally, with Claimant having sued PNC in federal court and the arbitration process underway, Experian reinserted the inaccurate reporting of the negative PNC account, which it had stopped in 2021, back into Mr. Duncan's February 22, 2024, credit report. Experian's witness confirmed that the credit bureau had resumed its reporting of the PNC derogatory account because PNC told it to do so. The reporting was inaccurate. Mr. Duncan had paid off the account and ensured that it was closed.

No other credit bureau continues to report the PNC inaccuracy. Mr. Duncan's credit score at Equifax and TransUnion is 850, while at Experian it is 786. "So," Mr. Duncan testified, "after all these years and after all that I've been through, this thing is still haunting me."

Mr. Duncan takes particular pride in his creditworthiness, testifying that:

> For both personal and practical reasons. Having a great credit
> score means like—can mean a lot of things, it can open a lot
> of doors. And then again, I think that a good credit score says
> something about you as an individual, how you manage—how
> you manage your affairs, how you manage your life.

Claimant and his wife of 21 years, Reetha Duncan, both testified credibly to the emotional effects of Mr. Duncan's losing battle with Experian. Not having asked for his credit score for twelve years, Mr. Duncan started, and continues to this day, obsessively asking for his credit reports almost daily, at 4 or 5:00 am.

The amount of time spent on dealing with this dispute was on top of Claimant's "many responsibilities in his business, professional, and family life." The hearing took place at the peak of tax season. The effect of the experience on Mr. Duncan, a CPA

with responsibility for finances in his job, his church, and his private accounting practice,

"makes me feel like I have no control over my credit report."  As he testified,

> I've always been a hard worker. I've always believed in doing
> things the right way. Those are values and characteristics that
> were instilled in me at a very young age.  I just have a lot of
> personal pride in doing things well and doing things the right
> way, and I think everybody that I interact with and do —
> especially that I do business with should do—should operate
> the same way.

When Mr. Duncan received repeated responses to his credit bureau disputes

telling him that the PNC debt had been "verified," he felt "[a]ngry, frustrated, [and] pissed

off."  He felt this way more strongly than others might, because he took Experian's

response as an attack on his "personal integrity" and "character."  The tone of his letters

obviously showed this increasing frustration, as the effort to recover his credit went from

hours to days, days to months and months to years.

Mr. Duncan's frustration and struggles affected his personal life in a number of

ways.  "I felt like my integrity was being challenged, you know, I was being called, in

essence, a deadbeat.  It caused me to lose focus at work at times, irritability at home at

times, and it was actually quite embarrassing to me personally."  Even having to testify

and publicly explain these events was embarrassing and frustrating and, like the time

spent trying to correct his credit, forced him away from time he could have spent with

his family or completing his work.

According to Mrs. Duncan, the entire experience was "particularly tough on him."

He had no knowledge of a line of credit attached to his parents' account, took the matter

seriously when it was brought to his attention even though he denied that it was his, and

followed all the steps to try to resolve it.  He doesn't like to waste time or money.  As she

9

testified, "I witnessed his frustration over the dinner table," his emotion, anger, and change of demeanor. He was "on guard," often checking his credit score: 'this thing is on there again. .... When is it going away? When is it going to get right?'"

Mrs. Duncan witnessed her husband's sleepless nights, caused by the stress and anxiety, together with elevated blood pressure and challenges with eating and exercising. According to her testimony, "He's a prideful man, and this hit his core," his special relationship with his father, also concerned with fiscal issues, who taught him about the importance of financial responsibility. He saw his doctor, who prescribed a sleep aid for his sleep issues.

None of Experian's rebuttal evidence undercut any of the Duncans' testimony in support of compensatory damages. Both of Claimant's experts, Evan Hendricks and Doug Hollon, qualified by federal courts, testified that a consumer with chronic credit reporting inaccuracies typically suffers the same injuries testified to by Mr. and Mrs. Duncan.

## III.    Analysis

The Federal Credit Reform Act ("FCRA") was enacted in 1970. The two sections most relevant to this dispute, unchanged since the statute's enactment, impose two different requirements. 15 U.S.C. §1681e(b) states that:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates. (Emphasis added.)

The second, 15 U.S.C. §1681i(a)(1), which applies to the dispute in this arbitration, states in relevant part:

10

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly … of such dispute, the agency shall, free of charge, conduct a *reasonable reinvestigation* to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute[.]  (Emphasis added.)

"In order to prevail on a claim under Section 1681e(b), a plaintiff must show, in addition to damages and causation, that (1) the credit report contains inaccuracies; and (2) the CRA did not use reasonable procedures in preparing the report. … In order to prevail on a Section 1681i claim, a plaintiff must show (1) that he disputed the accuracy of an item in his credit file; (2) the CRA failed to conduct a reasonable reinvestigation; and (3) that a reasonable reinvestigation by the CRA could have uncovered the inaccuracy."  *Burk*e v. *Experian Info. Sols.,* 2011 WL 1085874 (E.D.Va March 18, 2011).

Despite Experian's citing of a few outlier cases that argue the contrary, the overwhelming judicial authority holds that the requirement of a reasonable reinvestigation under section 1681(a)(1) is not satisfied by a CRA's simply forwarding a customer's dispute to its furnisher-customer (in this case the PNC Bank) and deferring to its decision on whether to report.  The many federal courts to have ruled against Experian and other CRAs on this point reject what they call the CRA's simply "parroting" whatever the furnisher reports.  *Cushman v. TransUnion Corp.,* 115 F.3d 220 (3rd Cir.1997), the seminal case, cited in nearly every decision since, rejects the argument Experian makes in this arbitration:

> The "grave responsibility" imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a "reinvestigation" that merely

shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute. *Cushman v. Trans Union Corp*., 115 F.3d 220, 225 (3d Cir. 1997).

For forty years, federal circuit courts of appeal have ruled, in cases where Experian (formerly TRW) was a defendant, that Experian's position in this arbitration is not the law.  In 1982 the Sixth Circuit held that, where TRW/Experian knew of a dispute between the consumer and a creditor because the consumer had questioned a credit report, making two telephone calls to the creditor (more than Experian did in the current case) was insufficient to reverify the information contained in the report.  *Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982).  In 1993 the Fifth Circuit rejected TRW/Experian's position, explaining in a case where "TRW contacted the subscribers only through the CDVs" [now "Automatic Consumer Dispute Verification" or "ACDV"], "relied solely on the CDVs," and "relied on the subscribers to tell TRW whether to delete information from [the consumer's] report," that, in performing "a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers."  *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993).

The Eleventh Circuit reached a similar conclusion in *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1331-1333 (11th Cir. 2015). There, Experian used the ACDV process to verify a furnisher's information, but it conducted no independent investigation of the consumer's dispute.  The Eleventh Circuit affirmed that "an issue of material fact remained as to whether Experian's investigation was reasonable when it disregarded the ... information [the consumer] provided and instead relied solely on [the furnisher] to verify the debt." *Id.* at 1333.  Last year the Seventh Circuit rejected Experian's "resort to

the ACDV system alone" and reversed for a trial on whether it willfully violated §1681i(a)(1). *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 817–19 (7th Cir. 2023).

Federal District Court rulings against Experian are too numerous to cite. The parties to this arbitration stipulated that Experian has been sued over two thousand times a year, going back many years. *See, e.g., Sheffer v. Experian Info. Sols., Inc.*, 2003 WL 21710573, at *2 (E.D. Pa. July 24, 2003): "[A]gencies must do more than "merely parrot information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."

*Cf. Norman v Trans Union LLC*, 479 F. Supp. 3d 98, 128 (E.D. Pa. 2020): "The flipping of the cost-benefit calculus when an agency moves from § 1681e procedures to a reinvestigation is best understood as a shifting of the investigatory burden from the consumer to the agency . ...  The burden of reinvestigation … lies with the agency;" *Bradshaw v. BAC Home Loans Servicing, LP, et al*, 816 F. Supp. 2d 1066 (D. Or. 2011): once a "CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation."

In this arbitration Mr. Duncan communicated four disputes to Experian over a multi-year period. Experian claims that his dispute letters failed to prove the inaccuracy. That was not Mr. Duncan's burden. Once he reported the dispute, it became Experian's burden to reinvestigate and delete any inaccuracies from its reporting.

Experian at most compared Mr. Duncan's name and social security number with the information provided by PNC. Experian argues that it was entitled to rely on the

13

trustworthiness of PNC's information.  Yet, strangely, it presented no evidence from a

PNC witness.  Nor did it question the fact that PNC removed its delinquency reporting in

September 2021 and reinserted it after Mr. Duncan filed suit against PNC in federal

court.

Experian asserts PNC's reliability despite the fact that it was sued at least 27

times since 2020 in cases where PNC was a co-defendant and the plaintiff alleged that

Experian failed to reinvestigate a consumer's dispute over a PNC account.  Of course,

there is no requirement in the statute that a CRA, once on notice of a dispute, must

have previous notice of a furnisher's unreliability in order to carry out its responsibility

under § 1681i to reinvestigate.  Experian's witness testified that it had started reporting

the PNC account as derogatory (30 days' delinquent) again in February 2024, the eve of

the arbitration hearing, because PNC had told it to do so.

Christina Hamilton, Experian's corporate representative, a long- time employee

now serving as a senior litigation analyst, admitted that additional information in the

dispute letters or the documents attached to them would have made no difference in the

result.  In fact, she testified that the only document Experian will accept in such dispute

is "a letter from the data furnisher stating that [Mr. Duncan] was not responsible."  When

asked whether she could recall one such letter, she testified that she could not "recall

specifically, no."  Questioned further about whether, other than obtaining a letter from

PNC confessing that its reporting was inaccurate and asking that it be removed from Mr.

Duncan's file, there was anything Mr. Duncan could have done to fix Experian's

reporting of the PNC account, she answered, "In this case, no."  Ms. Hamilton also

testified that, in her long career with Experian, she never once has seen a consumer succeed against its "reinvestigation" procedures.

Experian asserts that it cannot resolve what it labels a "contract dispute" between Mr. Duncan and PNC. But this case involves a factual, not a legal question. There is no contract dispute to resolve. Experian presented no evidence that Mr. Duncan signed or otherwise agreed to pay an overdraft line of credit that lay dormant for nearly nine years before it was "used" to pay a $3.00 "Check Images in Statement Fee," for a checking account that itself was closed eight years prior. Nor did he default in any way that could result in correctly characterizing him as personally delinquent on a line of credit. The account statements listed only Betty and Ernest Sr. Claimant never received the statements because they were sent to a very old address. Not did he receive notice of a "Check Images in Statement Fee," which PNC knew had been returned to sender by the Postal Service.

Courts too numerous to mention have ruled in similar situations that disputes between consumers and CRAs, which the CRAs characterized as "legal" or "contract" disputes, in fact are factual disputes, which juries (or this Arbitrator) may resolve. *E.g., Stevens v. Genesis Credit Mgmt.*, L.L.C., 2017 WL 2695335, at *3 (D. Or. May 2, 2017), *adopted*, 2017 WL 2701841 (D. Or. June 22, 2017) (consumer alleged that debt never existed and was instead assigned to him in error, dispute was not over legal validity); *Wylie v. TransUnion, L.L.C.*, 2017 WL 835205, at *4 (W.D. Pa. Mar. 2, 2017) ("[plaintiff's] primary contention is that he never cosigned the account—in other words, that the account simply does not belong to him. That is a factual question, which can be resolved without any inquiry into whether the debt is valid."); *Edeh v. Equifax Info. Serv.,*

15

*L.L.C.*, 2012 WL 4358646 (D. Minn. Sept. 21, 2012) (rejecting CRA's argument that it

was "merely stuck in the middle of a legal dispute," and noting it did "not absolve

Equifax of its responsibilities under the FCRA"); *Hanson v. Experian Info. Sols., Inc.*,

2012 WL 280706 (N.D. Ill. Jan. 27, 2012) (characterizing CRA's argument that

information was accurate, and that consumer's dispute was legal challenge and

collateral attack, as "a very myopic view of the record").

## IV.    Damages

Experian argues that it caused Mr. Duncan no actual damages because, as the

parties stipulated, he suffered no financial harm due to the derogatory credit rating he

suffered at Experian's hands.  Experian's argument is incorrect.  It is true that he

managed to work around Experian's credit score of 786, as compared to 850 at Equifax

and Trans Union, both of which agreed to remove PNC's derogatory information.

However, the information testified to by Mr. Duncan, fortified by that of his wife,

justifies substantial actual damages.  The bar for recovery of soft damages under the

FCRA is considerably lower than that for conventional personal injury or other tort law,

reflecting Congress' concern for non-economic damages for reputational injury, anxiety,

fear, distress, and embarrassment.  *See, e.g., Cortez v. Trans Union LLC*, 617 F.3d

688, 719 (3d Cir. 2010):

> In allowing suits for damages, Congress certainly intended to
> allow compensation for the very kind of harm that the FCRA
> was intended to prevent. This is not legislation mandating a
> safety standard to prevent physical injury. It is legislation
> designed to facilitate banking and the extension of credit while
> protecting consumers from the kind of injury that will almost
> certainly result when erroneous information is inserted into a
> credit report. Thus, damages for violations of the FCRA allow
> recovery for humiliation and embarrassment or mental

distress even if the plaintiff has suffered no out-of-pocket losses.

The decision-maker also may consider time spent trying to resolve problems with the credit reporting agency. *Stevenson v. TRW Inc.,* 987 F.2d 288, 297 (5th Cir.1993). In the present case that time was considerable, as evidenced by both the testimony and the correspondence.

An injured person's testimony alone may suffice to establish damages for emotional distress, provided that the claimant reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements. *Bach v. First Union Nat. Bank*, 149 F. App'x 354, 361 (6th Cir. 2005) (verdict of $400,000 affirmed upon the plaintiff's sole testimony that the credit injury made plaintiff "feel 'desperate,' 'ashamed,' 'embarrassed,' and 'damn mad.'"). "[A]n FCRA plaintiff need not state her emotional damages with particularity." *Dixon-Rollins*, 753 F. Supp. 2d 452, 461 (E.D. Pa. 2010).

In this case Mr. Duncan's testimony about his emotional distress damages was bolstered by that of his wife, both of whom helped the Arbitrator understand how Claimant's background, personality, and values made the experience of having his creditworthiness attacked particularly harmful to him. His two experts testified that the types of damages Mr. Duncan suffered, both emotional and physical, are typical of those experienced in similar cases. As Mr. Duncan testified at the hearing, "I was pissed off. … "[O]ne more time, despite my best efforts, despite getting – getting [legal] assistance with this matter, doing everything I knew to do, they persisted in still reporting derogatory and incorrect information. … I just believe it's absolutely ridiculous

and absurd that the amount of effort and time and energy that's gone into this thing has—and we're still no further than we are." And finally:

> I've never been in this position before. And, again, as I've said before, you know, my character, my integrity, the extent to which I am meticulous about managing my affairs, you know, business, personal, financial, all of that has been challenged in this, in this whole thing. And it just doesn't make any sense to me. Why am I sitting here talking about this when all people had to do is do their job like I do every day. I don't understand it.

Based on all the credible evidence, the Arbitrator awards $400,000 to Claimant for the damages he has suffered in the past. In addition, due to Experian's renewing its derogatory reporting at PNC's instruction without any attempt to investigate, the Arbitrator awards Claimant another $50,000 a month, for up to a maximum of six months, for each month (starting the date of this Interim Award) Experian continues to report the one derogatory item on his credit report.

## V.  Punitive damages

The Fourth Circuit has recognized that "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. … As Representative Sullivan remarked, 'with the trend toward ... the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause.'" *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001).

An award of punitive damages requires that a violation of the FCRA be willful or reckless. "[A] company [willfully] violates the FCRA when it commits 'not only knowing violations ..., but reckless ones as well.'" *Wood v. Credit One Bank*, 277 F. Supp. 3d

18

821, 848 (E.D. Va. 2017) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 2208, 167 L. Ed. 2d 1045 (2007). *See also* 15 U.S.C. §1681n: "A defendant may demonstrate reckless disregard of its statutory obligations by repeatedly ignoring warning signs that it is violating the law and by failing to take corrective action to prevent future violations." *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 253 (4th Cir. 2017).

Evidence of willfulness may also include evidence of other consumer complaints. Experian has stipulated that it has received over 174,000 consumer complaints from the CFPB alone over the past several years.  It has been sued over 8,000 times.

Mr. Duncan communicated four disputes to Experian over three years.  He has had to hire multiple attorneys, literally tried everything from professional letters to "Get this Shit Fixed" scrawling.  He followed Experian's directions and went directly to PNC. He has tried a credit freeze.  The entire time he did not know that he was dealing with a fully automated process, where Experian's overseas agents were allowed to do nothing other than spending a few seconds reading a letter and clicking "submit."   Experian would not then and apparently will not now correct its credit reporting unless instructed to do so by PNC; in fact, its representative testified that it would continue to report the PNC account in its current derogatory state as long as PNC instructed it to do so.

In *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1263–64 (N.D. Ala. 2011), the District Court found willfulness and sustained a jury's punitive damages verdict of $623,000, in a case in which disputes were handled by an automated process similar to the process Experian has chosen to use.  "In the facts before this court, the

degree of reprehensibility is great, as defendant has stood by its faulty system for years, insisting its procedures are reasonable, in the face of obvious evidence otherwise."

Since 1982 federal courts have warned Experian that its failure to reinvestigate once a consumer disputes a derogatory credit entry is unlawful. Courts have found that repeated violations of the FCRA constitute evidence of a willful violation. *See, e.g., Mattiaccio v. DHA Group, Inc.,* 87F. Supp 3d 169, 182 (D.D.C.2015); *Singleton v. Domino's Pizza, LLC,* No. Civ. 11-1823, 2012 WL 245965, *4 (D. Md. Jan.25, 2012).

Based on all the evidence, the Arbitrator finds Respondent's conduct in this case willful and awards Claimant $700,000 in punitive damages.

## VI.    Conclusion

Respondent Experian is ordered to pay Claimant Duncan for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum of another $300,000. In addition, it shall pay Claimant $700,000 in punitive damages.

The parties shall confer and agree to a briefing schedule for Claimant's petition for attorneys' fees and costs, as a prevailing consumer under the FCRA section 1681n. Once the Arbitrator has ruled on Claimant's entitlement to fees, she will include that decision, together with the foregoing Interim Award, in a Final Award.

Date:  July 16, 2024

Linda R. Singer
Arbitrator