IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH

| | | |
|---|---|---|
| ERNEST LEE DUNCAN JR., | ) | |
| | ) | |
| Plaintiff, | ) | 2:22-CV-01717-MJH |
| | ) | |
| vs. | ) | |
| | ) | |
| PNC BANK, N.A., EXPERIAN INFORMATION SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants, | | |

**OPINION AND ORDER**

This case was referred to the United States Magistrate Judge Patricia L. Dodge for pretrial proceedings in accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(A) and (B), and Rule 72 of the Local Rules for Magistrate Judges.

On May 23, 2025, the Magistrate Judge issued a Report and Recommendation, (ECF No. 178), recommending that Defendant, PNC Bank, N.A.'s ("PNC") Motion for Summary Judgment, (ECF No. 109), be denied. The Report and Recommendation also recommended that Plaintiff's Partial Motion for Summary Judgment, (ECF No. 115), be denied. The parties were given until June 6, 2025, to file any objections to the Report and Recommendation. On June 6, 2025, PNC Bank filed objections to the Report and Recommendation. (ECF No. 179). On June 20, 2025, Plaintiff, Earnest Lee Duncan Jr., filed his Response in Opposition to Defendant's Objections. (ECF No. 182). Plaintiff did not file any objections to the Report and Recommendation. For the

reasons below, and after *de novo* review, the Court will adopt the Report and Recommendation in part and reject it in part.[1]

## I. Statement of Facts

The Magistrate Judge provides a detailed account of the facts in this case in her Report and Recommendation. This Court will adopt the facts as written by the Magistrate Judge. *See* (ECF 178, at 2-10).

1. The National City Account

In 1976, Duncan's father, Ernest L. Duncan, Sr., and stepmother, Betty F. Duncan, opened a "Preferred 50+ Interest Checking" account at National City Bank ("National City"). The last four digits of the account were 2944 ("the National City Account"). *See* (ECF 112-4 at 2). The National City Account included cash advance overdraft protection. As explained by PNC's 30(b)(6) representative:

> This particular account was actually established, as we know, quite a long time ago. And it was established as one account, referred to as a -- a package account where the checking was linked directly to the cash advance overdraft protection account. And as it was opened, it was actually opened with one account number for both components of the account.

(ECF No. 112-7 at 4-5).

PNC introduced into the record National City's "Cash Reserve Line Agreement" that it says would have been distributed to impacted National City customers before the agreement's effective date of January 2, 2008. Under the agreement, a "Cash Reserve Line" is defined as a "line of credit that provides overdraft protection for [a customer's] designated National City

---

[1] Rule 72 of the Federal Rules of Civil Procedure provides in pertinent part: "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b)(3).

checking account." (ECF No. 112-2 at 3). The agreement further states:

> You promise to pay all amounts due on your Line. If your Checking Account is now a joint account or you subsequently add a joint account owner, you and your joint account owner promise to pay and are jointly and individually responsible for all amounts due on the Line. "You" means all joint account owners of the Checking Account. If you let someone else access your Checking Account and thereby use the Line, you and any joint account owner are responsible for all Advances made by that person, whether or not you have notified us that the person will be using your Checking Account and whether or not the amount of the actual use exceeds your permission.

(*Id.*) (emphasis in original). The agreement advises that a "negative credit report reflecting on your credit record may be submitted to a consumer (credit) reporting agency if you fail to fulfill the terms of your credit obligation." (*Id.* at 2). According to PNC, this agreement applied to the Duncans' National City Account.

Duncan testified at his deposition that he became his father's power of attorney sometime in early 2007 and began "assisting with his finances." (ECF No. 137-3 at 6). Prior to this, Duncan knew that his father had an account with National City, but his parents managed their own finances. (*Id.* at 5-6). On August 25, 2007, Duncan and his parents went to a National City branch so that he "could become an authorized signer and negotiate checks on their behalf." (*Id.* at 8). While at the bank, they executed a "Consumer Signature Card" ("the Signature Card") for the National City Account. (ECF No. 112-5 at 8-9). All three parties' signatures are located directly under the heading "SIGNATURES OF ALL DEPOSITORS (Depositors are the account owners only not POA's or beneficiaries)." (ECF No. 112-4 at 2). The Signature Card also states:

> AGREEMENTS; BANK'S RIGHT OF SETOFF. Depositor(s) acknowledge receipt of the Personal Account Agreement, Pricing Schedule, Receipt and Rate Sheet, as applicable, completed relative to the Account and agree to be bound thereby and by any amendments hereafter made.

3

(*Id.*) Duncan testified that he was generally aware of what the Signature Card said prior to signing it, but could not recall whether he had received any of the referenced documents. (ECF No. 112-5 at 10). None of the documents referenced in the Signature Card are in the record.

In August 2007, Duncan lived at 4656 English Oak Court in Mason, OH ("the Mason, OH address"). Although his parents had never resided there, Duncan testified that he regularly received financial and account statements addressed to his parents at the Mason, OH address. He confirmed that this was intentional so that he could keep an eye on his parents' accounts. (*Id.* at 12-13.) While they were at the bank executing the Signature Card, the Duncans also updated the address on file for the National City Account to the Mason, OH address. (ECF No. 137 ¶ 6).

2. Transfer to PNC

In late 2008, National City was acquired by PNC, and as a result, the National City Account was to be transferred to PNC. (ECF Nos. 112 ¶¶ 8-9). Prior to the transfer, the Duncans used the National City Account regularly and often utilized the cash advance overdraft protection feature. (ECF No. 137 ¶ 7). When the National City Account was transferred to PNC in February 2010, there were over $600 in overdraft advances owed. (ECF No. 112-1 at 8).

On February 5, 2010, PNC sent correspondence addressed to Duncan's parents to the Mason, OH address. The letter stated that their National City "Cash Reserve Line"— i.e., the overdraft protection—would be transferred to PNC effective February 22, 2010. The Duncans would begin receiving two separate monthly statements because, under

4

PNC, their account had been reconfigured and was now split into: (1) a checking account ("the Checking Account"); and (2) an associated line of credit account ("the Line of Credit"). The last four digits of the Line of Credit were 2944, the same as the National City Account. (ECF No. 112-6 at 2-3). The letter further stated:

1. The format of your monthly billing statement will change Your Account information will no longer appear on your Checking Account Statement. You will receive a separate, detailed statement ("Monthly Statement") that will be in an easily understood format that complies with applicable disclosure laws, which may not coincide with the date of your Checking Account Statement Period.

2. Your Minimum Monthly Automatic Payment will be due 25 days after we mail your Monthly Statement ("Payment Due Date"). The Payment Due Date will be clearly set forth in your Monthly Statement. Your Minimum Monthly Automatic Payment will no longer be automatically deducted from your Checking Account on the Checking Account Statement Closing Date. Instead, your Minimum Monthly Payment Amount will be automatically deducted from your Checking Account on the Payment Due Date.

3. If your Checking Account is currently charged a monthly fee for the overdraft protection service, this charge will be assessed on the Monthly Statement Closing Date instead of on the Checking Account Statement Closing Date. It will appear on your Checking Account Statement with the description "Cash Reserve Monthly Fee".

4. Your Minimum Monthly Automatic Payment will be computed as follows: Any amount that exceeds your Maximum Credit plus the greater of: (i) 3% of the Balance on your Account Monthly Statement Closing Date; or (ii) $10.00, or a lesser amount if such lesser amount would pay the Balance in full.

5. The minimum overdraft protection transfer will be $50.00. Transfers in excess of $50.00 are rounded to the next whole dollar amount.

6. You may make payments in any amount in excess of the Minimum Monthly Automatic Payment and may pay the entire Balance or any part of it at any time. This will not relieve you of the obligation to make the Minimum Monthly Automatic Payment for any month in which you have a Balance.

5

7. You authorize us to check your credit and employment history on a periodic basis and to obtain credit reports on you from time to time at our discretion while this account is open to protect our interests, and to answer any questions about our experience with you.

8. Any communications by you to us concerning disputed debts, including an instrument tendered as full satisfaction of the account, should be sent to PNC Bank, NA, P.O. Box 1366, Pittsburgh, PA 15230-1366.

9. A negative credit report reflecting on your credit record may be submitted to a consumer (credit) reporting agency if you fail to fulfill the terms of your credit obligations. If you believe that we have information about you that is inaccurate or that we have reported or may report to a credit reporting agency information about you that is inaccurate, please notify us of the specific information that you believe is inaccurate by writing to: PNC Bank, NA, P.O. Box 3180, Pittsburgh, PA 15230-3180.

(*Id*. at 3.)

The Duncans continued using the Checking Account and routinely carried a balance on the Line of Credit. PNC regularly sent monthly statements for both accounts to the Mason, OH address. The Line of Credit account statements listed only Duncan's father and stepmother's names. *See* (ECF No. 116-12). Statements for the Checking Account were addressed to all three Duncans. *See* (ECF No. 116-7).

Duncan's stepmother passed away in 2009, followed by his father in December 2010. (ECF No. 137 ¶ 12). Duncan did not notify PNC. (ECF No. 137-3 at 9-10.) Duncan made several payments on the Line of Credit following his father's death. (ECF No. 112-5 at 15). Duncan testified at his deposition that he closed the account with PNC "several months" later in early 2011. (ECF Nos. 137-2 ¶ 6; 137-3 at 11).

In 2014, Duncan moved to Indianapolis, Indiana. He did not notify PNC that he had moved and he did not have his mail forwarded to his new address. (ECF No. 137-3 at 12). As a result, PNC continued sending all correspondence to the Mason, OH address, as it was the only address associated with the Duncans' accounts. *See*, e.g., (ECF No. 113 at 32, 34, 38; 113-1 at 4).

In June 2019, PNC sent notice to the Mason, OH address that the Checking Account would be converted from a "Smart Checking" to a "Standard Checking" account subject to applicable fees. (ECF No. 137-3 ¶ 15). A $3.00 fee was assessed on the Checking Account in November 2019. Because the Checking Account balance was zero at that time, this triggered the overdraft protection, thereby drawing on the Line of Credit to cover the fee. As a result, the reporting of the Line of Credit reflected account activity beginning in December 2019. (ECF No. 137 ¶¶ 17-18).

According to Duncan, he first learned of a negative PNC account reporting on his credit report when he noticed a drop in his credit score "around October of 2020, September, October, somewhere in that timeframe." (ECF No. 112-5 at 16). At the time, Duncan was attempting to refinance his home. (*Id.*)

3. Indirect Disputes

Duncan filed his first indirect dispute with Trans Union on December 20, 2019, claiming that the PNC account should have a zero balance and be reporting as closed. (ECF No. 113-4). A member of PNC's Credit Bureau Investigation Team subsequently "reviewed the information provided, PNC's records, and source documents to find the Account was reporting accurately." (ECF No. 112 ¶ 19). *See also* (ECF No. 113-5 at 14).

On March 21, 2020, Duncan filed a second indirect dispute, stating: "This account should be zero [sic] I have not used it in decades." (ECF No. 114-1 at 2). PNC assigned a different investigator, who again found that the reporting was accurate. *See* (ECF Nos. 113-5 at 13; 114-2).

In the meantime, the Checking Account was assessed a $3.00 fee each month, thereby ensuring that the cycle continued. No payments were made on the accounts during this time. The Line of Credit became delinquent on July 19, 2020, and PNC began reporting the delinquency to the CRAs. *See* (ECF Nos. 114-3; 114-5 at 16). Duncan paid the balance in full and closed the account on September 11, 2020. (ECF No. 113-3).

Duncan initiated a third indirect dispute on February 28, 2021 on the basis that the account PNC was reporting belonged to another individual with the same/similar name. This was the first time that Duncan challenged ownership of the account. *See* (ECF No. 114-4). According to Duncan, until this point, he "mistakenly believed that PNC was reporting an old motor vehicle lease from the 1980s." (ECF No. 137-2 ¶ 10). A PNC investigator was assigned to review and once again concluded that the reporting was accurate. (ECF No. 113-5 at 12). Duncan initiated two additional indirect disputes on the same basis in March 2021. (ECF Nos. 114-5 at 2, 12). In both instances, PNC investigators reviewed and found the reporting accurate. (ECF Nos. 113-5 at 11; 114-5 at 11).

Duncan initiated additional indirect disputes throughout 2021 and 2022. Throughout these disputes, he consistently denied ownership, maintaining that the account belonged to his deceased parents and claiming that he therefore had no responsibility.

4. Direct Disputes

On August 23, 2021, Duncan sent a letter directly to PNC, informing it that it had been inaccurately reporting him as the owner of the Line of Credit in a "classic case of mistaken identity" between him (Ernest L. Duncan, Jr.) and his late father (Ernest L. Duncan, Sr.). (ECF No. 114-9 at 2). He stated that his parents had opened the account in 1976 and included his father's birthdate and social security. He also attached an excerpt from his credit report showing the disputed Line of Credit (*Id.* at 4-6), a copy of both of his parents' death certificates (*Id.* at 7-8), and copies of the PNC account payoff letter and receipt dated September 11, 2022 (*Id.* at 9-10). He demanded that PNC contact all CRAs to have the account removed from his credit report; "reimburse [him] for $38.25 plus accrued interest for the amount that I paid to settle the fraudulent or clerical error charges made on this account that I, nor [sic] my deceased parents made"; and make a reasonable, fair settlement offer to compensate him for their "egregious error" against him. (*Id.* at 3).

Duncan's former counsel sent a second letter to PNC on October 25, 2021, asserting that the Line of Credit was "utterly not tied to [Duncan's] social security number" and demanding that it be removed from his credit report. (*Id.* at 12.) The letter also stated that in response to Duncan's prior letter, PNC sent "a letter instructing TransUnion and Equifax (but not Experian) to remove any reference to the Account from [Duncan's] credit report," but that it failed to instruct the CRAs to "remove the entirety of the account from his credit report[.]" (*Id.* at 12.)

Soon after, PNC responded by sending Duncan's counsel a letter dated November 1, 2021, that said:

> We are responding to your recent dispute on behalf of Ernest L. Duncan & Betty F. Duncan.
>
> We have reviewed your dispute on behalf of Ernest L. Duncan & Betty F. Duncan and determined that you have failed to provide a sufficient authorization for us to

9

>be able to investigate and provide you adequate information with regard to the dispute.
>
>Please have your client(s), Ernest L. Duncan & Betty F. Duncan, execute the enclosed Authorization and return it to PNC Bank, N.A.

(*Id.* at 11.)

Duncan's counsel sent another letter to PNC on December 7, 2021, again asserting that the Line of Credit "was never associated with [Duncan's] social security number." (*Id.* at 15.) He also reiterated that Duncan's parents were deceased, and thus unable to execute the authorization. (*Id.*)

## II.  Discussion

PNC Bank brings three specific objections to the Magistrate's Report and Recommendation. The objections are as follows:

>(1) PNC objects to the disposition recommended in the R&R suggesting that a genuine and material factual dispute exists concerning the accuracy of PNC's reporting, as Plaintiff did not adduce any record evidence of inaccuracy and the disposition recommended in the R&R impermissibly shifts the burden of proof to the PNC.
>(2) PNC objects to the disposition recommended in the R&R suggesting that a reasonable juror could conclude that PNC's credit reporting investigation was unreasonable, as the R&R omits, misstates, and misinterprets undisputed record evidence and these mistakes were material to the conclusion reached in the R&R.
>(3) PNC objects to the disposition recommended in the R&R suggesting that a genuine issue of material facts exists concerning the issue of willfulness, as no facts are referenced in the R&R or otherwise adduced in discovery supporting a finding of willfulness.

ECF No. 179.

### A. Accuracy of PNC Bank's Reporting

The Magistrate Judge determined that Mr. Duncan had established a genuine issue of material fact that an inaccuracy existed in the reporting of the Line of Credit by PNC. In

reaching this conclusion, the Magistrate Judge noted Mr. Duncan's clear testimony that he did not know about the Line of Credit and the lack of documentation by PNC showing that Mr. Duncan ever expressly agreed to be responsible for the Line of Credit. (ECF No. 178, at 13-14). The Magistrate also acknowledged the evidence presented by PNC, that Mr. Duncan signed the 2007 Signature Card that revised the initial account documents and amended and replaced previous account documents and signature cards. (*Id.* at 14). The Magistrate further noted that, while the 2007 Signature Card does not reference the Credit Line, it incorporated other documents which PNC's 30(b)(6) representative asserts Mr. Duncan would have received at the time he signed the 2007 Signature Card. (*Id.*). Ultimately, the Magistrate Judge concludes that Mr. Duncan's, testimony coupled with the lack of documentation showing that Mr. Duncan ever expressly agreed to be responsible for the Line of Credit, creates a genuine issue of material fact that a jury must resolve at trial. (*Id.*)

PNC objects to the Magistrate Judge's conclusion that a genuine issue of material fact exists over the accuracy of Mr. Duncan's ownership and responsibility for the Line of Credit. (ECF No. 179, at 3-7). PNC argues that Mr. Duncan fails to meet the requisite burden of proof to show that an inaccuracy in the reporting existed regarding Mr. Duncan's responsibility for the Line of Credit. (*Id*). PNC further argues that the Magistrate Judge improperly switched the burden of proof from Mr. Duncan to PNC to show that an inaccuracy in the reporting of the account did not exist. (*Id.*). Mr. Duncan argues that he has produced enough evidence to show that a genuine issue of material fact exists as to whether he is responsible for the Line of Credit. (ECF No. 182, at 6-11).

The regulatory framework established under the FCRA governs CRAs and furnishers of information. *Seamans v. Temple Univ.*, 744 F.3d 853, 860 (3d Cir. 2014). CRAs collect individual consumer credit data from furnishers and organize that information into credit reports that can be used by commercial entities to assess the consumer's creditworthiness. *Id.* The FCRA was enacted to "protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (internal citation omitted). To accomplish this goal, § 1681s-2(a) imposes a general duty on furnishers to report accurate information to CRAs. 15 U.S.C. § 1681s-2(a). Section 1681s-2(b)(1) outlines a furnisher's specific duties once it is notified that a consumer disputes the information it provided to the CRA. 15 U.S.C. § 1681s-2(b)(1). There is no private cause of action against a furnisher for a violation of its general duty, and consumers may only bring suit for violations of the specific duties outlined in § 1681s-2(b*). See Eades v. Wetzel*, 841 F. App'x 489, (3d Cir. 2021) ("§ 1681s-2(b) is the only section that can be enforced by a private citizen seeking to recover damages caused by a furnisher of information.").

To bring a claim against a furnisher, however, a consumer-plaintiff must first make a threshold showing of inaccuracy. *See, e.g., Williams v. Experian Info. Sols., Inc.*, 2024 WL 3439776, at *1 (3d Cir. July 17, 2024) ("[A]n element of [plaintiff's] FCRA claims was the inclusion in his credit report of information that was 'inaccurate.'") (citing *Bibbs v. Trans Union LLC*, 43 F.4th 331, 342-44 (3d Cir. 2022)); *Holland v. Trans Union LLC*, 574 F. Supp. 3d 292, 298, 302 (E.D. Pa. Dec. 7, 2021) ("[T]he Court agrees that there

must be some threshold showing of inaccuracy to make a claim against a furnisher.") (collecting cases); *Johnson v. J.P. Morgan Chase Bank N.A.*, 2025 WL 845910, at *3 (E.D. Pa. Mar. 18, 2025) ("[A]s a 'threshold matter,' the plaintiff must allege facts from which the court can find that the information furnished to the [CRA] and included in his credit report was 'inaccurate.'"). "Information is 'inaccurate' within the meaning of the FCRA if it is incorrect or 'misleading in such a way and to such an extent that it can be expected to have an adverse effect.'" *Holland v. Trans Union LLC*, 574 F. Supp. 3d 292, 298 (E.D. Pa. 2021) (quoting *Seamans v. Temple University*, 744 F.3d 853, 865 (3d Cir. 2014)).

Upon review of the record, the Court agrees with the Magistrate Judge that a genuine issue of material fact exists regarding the accuracy of PNC's reporting of the Line of Credit. Mr. Duncan testified that he was generally aware of the contents of the Signature Card before he signed it but that he did not recall whether he received the incorporated documents indicated therein. (ECF No. 112-5). Mr. Duncan's signature on the 2007 Signature Card acknowledges receipt of the incorporated documents; however, the Signature Card itself makes no mention of the Line of Credit. (ECF No. 112-4). Further, there are no originating documents for the Checking Account or Line of Credit on the record other than the 2007 Signature Card itself. Additionally, correspondence referencing the Line of Credit was addressed to Mr. Duncan's father and stepmother. (ECF No. 166-12, at PNC 127-162). The record evidence shows that there is a genuine issue of material fact as to the accuracy of PNC's reporting of the Line of Credit account. Both parties provide evidence that establish questions of fact relative to the ownership and responsibility for the account. It is not the Court's function to make credibility

determinations or to weigh evidence, such role is reserved for the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

The Court notes PNC's argument that the Magistrate Judge improperly shifted the burden of proof to PNC. However, Mr. Duncan has properly met his burden of proof to show that there exists a genuine issue of material fact as to the accuracy of PNC's information reporting about the Line of Credit. In addition to questions presented by Mr. Duncan's testimony and the lack of originating documentation for the Line of Credit, the Line of Credit correspondence sent by PNC addressed only to Mr. Duncan's father and stepmother also presents questions for the jury. (ECF No. 182, at 8). As such, PNC's Motion for Summary Judgment regarding the accuracy of its reporting of the Line of Credit, will be denied.

### B. Reasonableness of Investigation

PNC also objects to the Magistrate Judge's determination that a reasonable juror could conclude that PNC's credit reporting investigation was unreasonable, because the R&R omits, misstates, and misinterprets undisputed record evidence. (ECF No. 179, at 2, 7-10). PNC contends that the Magistrate Judge "predicated her recommendation as to reasonableness on purported investigative steps that are not consistent with the facts of record and not accurate when taking the facts in the light most favorable to Plaintiff." (*Id.*). The Magistrate Judge characterized PNC's investigative steps as follows:

> The record shows that PNC's investigations consisted of essentially the same procedure for all of Duncan's disputes. Each time, the investigator compared

14

> Duncan's information to that of PNC's internal records and found that the reporting was accurate because his name and prior address were linked to the account and he had seemingly acknowledged ownership in his initial two disputes.

(ECF No. 178, at 16).

PNC argues that the Magistrate Judge's characterization of the investigative steps is incorrect as their reporting investigators testified that they would have reviewed source documents establishing account ownership and not just internal records. (ECF No. 179, at 8).[2] However, this was not the only evidence that the Magistrate Judge discussed in her R&R that related to reasonableness. In the next paragraph of the R&R the Magistrate Judge considered Plaintiff's later dispute, wherein he asserted that the Line of Credit belonged to another individual, his father. The Magistrate Judge concluded that this dispute presented questions of fact for the jury. (ECF No. 178, at 16-17).

While PNC objects to this determination, arguing that "this conclusion is at odds with undisputed record evidence not referenced in the R&R conclusively establishing that this is not a case of mistaken identity but rather a situation where Plaintiff and Duncan, Sr. were both responsible for the underlying account." (ECF No. 179, at 9). PNC argues that the record evidence shows PNC checking account statements were in all three names, but correspondence about the separate PNC line of credit was only to Plaintiff's father and stepmother. (*Id.* at 9-10); (ECF No. 166-12, at PNC 127-162). Given the record evidence, and upon this Court's independent review, genuine issues of material fact exist, and will require a jury determination to answer the question of the reasonableness of PNC's investigations. As such, PNC's Motion for Summary Judgment will be denied.

---

[2] The Court notes that none of the source documents referenced by PNC's reporting investigators are on the record.

### C. Willfulness

PNC objects to the Magistrate Judge's determination that the question of willfulness is a question that should be considered by the jury. PNC argues that the Magistrate Judge's discussion, related to willfulness, is sparce and unclear. (ECF No. 179, at 10-12). PNC further argues that the Magistrate Judge does not point to any record evidence to establish any question as to willfulness. (*Id.*). Plaintiff argues that the Magistrate Judge correctly concluded that a reasonable jury could conclude that PNC's investigative procedures related to Plaintiff were objectively unreasonable, such that they could be considered willful. (ECF No. 182, at 23).

"To show willful noncompliance, a plaintiff must prove that the defendants acted knowingly, intentionally, or recklessly in disregarding the FCRA." *Shannon v. Equifax Information Services, LLC* 764 F. Supp. 2d 714 (E.D. Pa. 2011). The Supreme Court in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69 (2007), stated as follows:

> [A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

The Third Circuit has held that "a furnisher's objectively unreasonable actions with respect to a particular consumer's account can support a jury finding of willfulness." *Seamans v. Temple University*, 744 F.3d 853 (3d Cir. 2014). Although before the Supreme Court's ruling in *Safeco*, the Third Circuit held in *Cushman v. Trans Union Corp* that to justify an award of punitive damages based upon willful conduct, "a defendant's actions must be on the same order as willful concealments or misrepresentations." 115 F. 3d. 220, 227-228 (3d Cir.1997).

Here, The Court agrees with PNC that the Magistrate Judge's R&R does not sufficiently cite to record evidence to establish any questions of material fact that PNC's actions were willful. Upon review of the record and the circumstances in this case, the Court agrees with PNC, there is insufficient record evidence to show that PNC acted willfully in its investigations of Plaintiff's various disputes. PNC posits that their witnesses "testified clearly and unambiguously that each credit dispute is investigated on its own merits, and no testimony suggests that PNC's investigators employed some sort of one-size fits-all investigative formula in responding to these disputes." (ECF No. 179, at 11). PNC's investigators testified that they followed the same procedures to investigate each of the disputes made by Plaintiff, which consists of comparing demographic information and payment history with internal PNC systems in order to verify PNC's reporting, including signature cards if available. (ECF No. 137-5, at 5-9); ECF No. 137-10, at 15-16). Each of the investigators independently investigated each dispute in accordance with their training. Each reached their own respective conclusions. There is no evidence to establish any question that PNC's investigators acted in any way to support a conclusion of "willful concealment or misrepresentation," nor that it would rise to the level of knowingly, intentionally, or recklessly. As such, the R&R as to the issue of willfulness will be rejected. PNC's Motion for Summary Judgment, as to willfulness, will be granted.

### D. Plaintiff's Partial Motion for Summary Judgment

Plaintiff filed no objections to the Magistrate Judge's Report and Recommendation related to his Partial Motion for Summary Judgment. Accordingly, the Magistrate Judges R&R for Plaintiff's Partial Motion for Summary Judgment will be adopted, and the Plaintiff's Partial Motion for Summary Judgement will be denied.

### III. Conclusion

For the reasons above, the Court adopts the Report and Recommendation as to the denial of PNC's Motion for Summary Judgment, based upon questions of fact, as to Plaintiff's claims regarding the accuracy of the reporting of the Line of Credit and of the reasonableness of PNC's investigations of Plaintiff's disputes. PNC's Motion for Summary Judgment as to these claims will be denied. The Court rejects the Report and Recommendation as to Plaintiff's claims of willfulness against PNC. PNC's Motion for Summary Judgment as to willfulness will be granted. The Court also adopts the Report and Recommendation as to denial of Plaintiff's Partial Motion for Summary Judgment. Plaintiff's Partial Motion for Summary Judgment will be denied.

Accordingly, the following Order is hereby entered.

## **ORDER**

AND NOW, this 18th day of December 2025, it is hereby **ORDERED** that the Magistrate Judge's Report and Recommendation, (ECF No. 178), is ADOPTED in part as Opinion of the Court and REJECTED in part.

PNC's Motion for Summary Judgment is DENIED in part and GRANTED in part. PNC's Motion for Summary Judgment as to Plaintiff's claims against PNC, concerning the inaccuracy of the reporting of the Line of Credit and of the reasonableness of the investigations of Plaintiff's disputes, is DENIED. PNC's Motion for Summary Judgment as to Plaintiff's claims of willfulness against PNC is GRANTED.

It is further ORDERED that Plaintiff's Partial Motion for Summary Judgment is DENIED.

BY THE COURT:

_____
Marilyn J. Horan
United States District Court Judge