# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Pittsburgh Division

ERNEST LEE DUNCAN, JR.,
   Plaintiff,

v.              Case No. 2:22-cv-01717-PLD

PNC BANK, N.A.;
EXPERIAN INFORMATION SOLUTIONS, INC.;
TRANS UNION, LLC; and
EQUIFAX INFORMATION SERVICES, LLC,
   Defendants.

---

**DEFENDANT PNC BANK, N.A.'S EXPERT WITNESS DISCLOSURE AND DESIGNATION**

AND NOW, comes Defendant PNC Bank, N.A. ("PNC"), by and through its undersigned

counsel, and hereby discloses the following Expert Witness to testify at the trial of this case:

John Ulzheimer
c/o John Berry, Esq.
1300 Six PPG Place
Pittsburgh, PA 15222
(412) 281-5000

The disclosures required by Fed. R. Civ. P. 26(a)(2) are contained in Mr. Ulzheimer's

report that is being produced herewith.

Respectfully submitted,

**DINSMORE & SHOHL, LLP**

By:   _/s/ John J. Berry_
    John J. Berry, Esquire
    DINSMORE & SHOHL
    Six PPG Place, Suite 1300
    Pittsburgh, PA 15222
    Phone: (412) 288-5854
    Fax: (412) 281-5055
    Email: john.berry@dinsmore.com

    *Counsel for Defendant PNC Bank, N.A.*

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2024, I served the foregoing via electronic mail to

Plaintiff's counsel at the email addresses identified below:

Adam Short (*Pro hac vice*)
Drew D. Sarrett (*Pro hac vice*)
Consumer Litigation Associates, P.C.
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Phone: (804) 905-9904
Fax: (757) 930-3662
E-mail: adam@clalegal.com
E-mail: drew@clalegal.com

/s/ *John J. Berry*
*Counsel for PNC Bank, N.A.*

# Expert Report of John Ulzheimer

**In the Matter of Duncan v. PNC Bank, N.A.**

**United States District Court**
**Western District of Pennsylvania**

**Case No.: 2:22-CV-01717**

**August 12, 2024**

# I.    QUALIFICATIONS

## A.    Employment History

I have worked in the consumer credit industry since November of 1991. I spent ~27 of those years either employed by or as a contractor for Equifax, Experian, FICO, Credit.com, and VantageScore Solutions. A brief overview of each follows below.

At Equifax I was directly responsible for both performing and managing the credit report dispute reinvestigation process. I also managed teams of consumer service agents who also performed the dispute reinvestigation process, including disputes related to fraud/identity theft, mixed files, and those sourced from credit repair companies. My team and I also handled the process of generating the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers.

While at Equifax, I gained a first-hand understanding of how credit file data is compiled, stored, retrieved, and delivered. I also sold various Equifax Credit Marketing Services (CMS) products, which included lists for preapproved credit card offers. I am well-versed regarding how credit reports are used by lenders for marketing, underwriting, and collection practices.

At FICO (formally known as Fair Isaac Corporation and best known for credit scores) I spent an additional seven years gaining a first-hand understanding of credit scoring, including how credit scores are designed, developed, used by lenders, and impacted by the information in consumer credit files. From time to time, I was involved with the development of FICO credit bureau scorecards, which are the heart of credit scores. I am well-versed regarding how credit scores are used for marketing, underwriting, and collection practices.

At Credit.com I was responsible for teaching consumers and the media how the consumer credit system works, including topics such as credit reporting, credit scoring, credit cards, and debt settlement, to name but a few. I designed the company's Credit Report Card, a credit-scoring tool that interprets Trans Union credit data, and then gives the consumer an easy-to-understand summary of their credit risk. The tool won several awards in 2009 when it was released. I also wrote three of my four books while at Credit.com.

At VantageScore Solutions I was responsible for brand exposure to support market adoption, consulting, content creation, media interviews, and speaking engagements on behalf of the company. Like my time at FICO, I gained understanding of how VantageScore's credit scores are designed, developed, used by lenders, and impacted by consumer credit information. The VantageScore 4.0 credit score was approved by the FHFA for use in mortgage lending starting in 2025, along with FICO Score 10T.

At Experian I wrote credit related articles for the Experian website. My engagement included working with Experian's editorial, client services, and internal legal teams to ensure accuracy of my bylined articles, which were eventually published by Experian.

As a former employee or contractor of Equifax, Experian, FICO, Credit.com, and VantageScore Solutions I have worked with, trained, performed quality assurance, and supervised employ-

ees on processes and procedures involved in credit reporting, credit report dispute resolution, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management, and have also written extensively on the same topics.

As part of my former employment, I worked extensively with lenders that used our credit report and credit score tools. As such, I am familiar with underwriting practices, including how prospective lenders consider credit reports, credit scores and how these items are weighed by prospective lenders when determining credit risk. I gained this knowledge from many years of working with lenders during my employment with Equifax and Fair Isaac.

During the first four years of my time at Fair Isaac, I worked extensively with Fannie Mae, Freddie Mac, mortgage brokers, and mortgage bankers to facilitate proper implementation of credit scoring into their automated underwriting systems and policies. At the time, Fannie Mae and Freddie Mac had recently mandated the use of FICO scoring in their respective underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their home-buying customers on the importance of solid credit management.

### B.        Presentations and Academia

I have made countless credit reporting and credit scoring presentations during my time working in the credit industry. These presentations were delivered to consumers, consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities, and were of varying levels of complexity depending on the audience.

For many years I guest lectured about credit reporting and credit scoring at The University of Georgia in Athens, GA, and the Westminster Schools in Atlanta. I have also taught at Emory University's Center for Lifelong Learning, where I was rated by the students as the top instructor in the Personal Finance and Investments category during the 2005-06 term. Since 2016 I've guest lectured to 2nd and 3rd year students at the Emory University School of Law. I have also volunteered my time teaching credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I earned a Bachelor of Science in Criminal Justice from the University of West Georgia in June 1991. I am well-qualified to interpret and discuss the issues at hand in this case. My background and qualifications are set forth in my resume, which is attached as Exhibit A.

### C.        Publications

I am a frequent contributor on consumer credit issues to Associated Press, Consumer Reports, USA Today, The New York Times, The Wall Street Journal, Forbes, Yahoo Finance, CNBC, Kiplinger's, Money Magazine, American Banker, U.S. News and World Reports, Bankrate.com, and other regional business and consumer media outlets.

I have written or contributed to the following on the same or related topics,

- *The Smart Consumer's Guide to Good Credit (with Deanna Templeton)*
- *You're Nothing but a Number*
- *Surviving Identity Theft (with Emily Peters)*
- *The Get Credit Wise ToolKit*
- *The Use of Compliance Condition Codes,* CO Bar Assn. Newsletter *(with Matt Peterson)*
- *Current Trends in Credit-Related Lawsuits*, CCFL, Quarterly Report, Vol.73, No.3

I have been an author since 2004 and have written thousands of articles. I currently write or have written reoccurring articles on credit issues for newsletters, websites, and blogs. Examples include or included a monthly column, "Ask John," for Credit.com's monthly e-newsletter, for Boardroom, Inc.'s monthly newsletter, *BottomLine Personal*, and for CreditBloggers.com, Credit.com, Enloop.com, CNBC.com, IMS Expert Services Newsletter, Mint.com, Smart-Credit.com, CreditSesame.com, the National Foundation for Credit Counseling, Credit Card Insider, Experian, The New York Times, JD Byrider, MagnifyMoney, The Simple Dollar, Zillow, VantageScore Solutions, and The Wall Street Journal Buy Side. More specificity as to my publications can be found at Exhibit D.

### D.    Certifications

Twice, I have been Fair Credit Reporting Act (hereafter, "FCRA") certified by the credit reporting trade association, the Consumer Data Industry Association (hereafter, "CDIA"), and its predecessor, the Associated Credit Bureaus (ACB). The FCRA Certificate Program was developed to prepare consumer reporting agencies and companies that furnish information to the consumer reporting agencies to meet the requirements set forth in the FCRA. The course covers how consumers, credit grantors, and those who use and furnish information to consumer reporting agencies are affected by the FCRA.

### E.    Previous Expert Witness Work and Testimony

I have served as an expert witness since 2005. Since then, I have been retained as an expert in more than 750 lawsuits concerning credit issues, have been qualified and admitted to testify as an expert in both Federal and state courts, and have provided sworn testimony over 130 times in deposition, trial, and arbitration settings.

I have served as an expert for both plaintiffs/claimants and respondents/defendants, and for creditors, consumers, data resellers, insurance companies, credit bureaus, and other types of companies. A list of matters in which I have testified in the last four years is attached as Exhibit B to this Report.

## II.    SCOPE OF WORK

While not intended to be limiting to my opinions, I was retained by counsel for PNC Bank, N.A. (hereafter, "PNC") and asked to provide expert opinions on credit reporting, credit scoring, Plaintiff's allegations of credit related damages allegedly caused by PNC's credit reporting of a Line of Credit account (hereafter, "PNC account"), and to offer rebuttal opinions.

## III.    COMPENSATION

I am being paid $695 per hour for my work. I have no financial interest in the outcome of this matter.

## IV.    DOCUMENTS REVIEWED

A list of documents and other information upon which I have considered and relied in forming my opinions set forth in this Report are attached as Exhibit C.

## V.    SUMMARY OF OPINIONS

Having reviewed the facts and materials in this case and based on my analyses presented in this Report, it is my opinion that:

1. Based on my experience, analysis, and review of the case documents, it's my opinion there is testimony and documentary evidence indicating Plaintiff knew about and was, in fact, a signer/owner on the PNC account, and no contradictory evidence indicating Plaintiff was not a signer/owner. Accordingly, it was in line with credit reporting industry standards for PNC to verify the accuracy of the PNC account in response to Plaintiff's repeated credit reporting disputes indicating the PNC account did not belong to him.

2. Based on my experience, analysis, and review of the case documents, it's my opinion that Plaintiff did not experience credit related financial damages or adverse actions as a result of the PNC account appearing on Plaintiff's credit reports.

3. Plaintiff's expert's legal opinion that PNC failed at a legal duty to report the PNC account as being "disputed" in response to Plaintiff's credit bureau sourced disputes 1) isn't an alleged violation in the Complaint and 2) ignores long-standing industry guidance. For many years furnishers, like PNC, have been directed to not mark their accounts as being "disputed" in response to credit bureau sourced disputes.

## VI.    COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

### A.    Background Regarding the Credit Reporting Industry

#### 1.    Credit Reporting Agency Background

A credit report is a record of an individual's current and past financial liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments, and bankruptcies only), as well as their account history (also called "trade"). There are a number of companies that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, an insurer, or another organization with a right to view such data.

These companies are called credit reporting agencies, consumer reporting agencies, or credit bureaus. They collect and store credit data and then generate and deliver credit reports using that data in response, for example, to requests from lenders or insurance companies who have received an application for credit or to bind insurance. There are three major, commonly recognized credit reporting agencies in the United States: Equifax, Experian, and Trans Union. Equifax, a public company, is headquartered in Atlanta, Georgia. Experian, a public company in the U.K., has its U.S. headquarters in Costa Mesa, California. Trans Union, a public company, is headquartered in Chicago, Illinois. Each of the three companies maintains over 200 million credit files. There are roughly 675 million consumer credit files in circulation.

### 2.    Data Furnisher Background

The information sent to the credit reporting agencies comes from companies formally referred to as "data furnishers." According to the credit reporting industry's trade association, there are ~14,000 data furnishers in the U.S credit market. These companies are almost always going to be a financial services institution (e.g., a bank, credit union, finance company, loan servicer, credit card issuer) or a debt collector. These furnishers will generally send their customer or debtor's account information to the credit reporting agencies once every statement cycle period, which is normally once per month.

The furnisher's information is generally sent to the credit reporting agencies via a system-to-system communication. Once the credit reporting agency receives the furnisher's information, they will load it into their credit file database and include it on a consumer's credit report when requested. Furnishers can also provide information to consumer reporting agencies through the dispute resolution process.

The language furnishers use to communicate their customers' or debtors' information to the credit reporting agencies is called Metro 2. This language is the exclusive industry standard and there is no other reporting format available to furnishers. All consumer data reported by furnishers must be in the specific language and format dictated by Metro 2 for it to be relayed to, and accepted by, the CRAs.

The Metro 2 language represents the entire universe of codes and characters which furnishers can choose from and use to populate the data fields defined by the credit reporting agencies. Once received, the credit reporting agencies process and display this information on their Consumer Disclosures and Authentic Credit Reports their own way without further input from furnishers.

Every year the Consumer Data Industry Association publishes a manual called the Credit Reporting Resource Guide (hereafter, "CRRG") or, informally, the Metro 2 Manual. This manual, which is over 350 pages, contains not only the Metro 2 language field layout but also a comprehensive list of the numerous codes used to furnish information to the credit reporting agencies, and a description of the conditions or scenarios when the codes should be used.

### 3.    Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company, consumer service provider or other requesting party when a consumer applies for some sort of benefit, such as a home loan, auto loan, credit card, subscription service, or insurance. The requestor or lender, referred to by the credit bureaus as a subscriber or user, submits a request for the consumer credit file. Using proprietary search logic, the credit bureau compiles a credit report using its stored data. This process is virtually instantaneous, giving lenders the ability to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. The report and credit score are then used by lenders to determine an individual's credit risk. The information in a consumer credit report is not "real time," meaning it is not updated dynamically.

### 4. Credit Scoring

A credit score is a number that summarizes an individual's credit risk based on a snapshot of their credit report at some point in time. A credit score helps lenders evaluate an individual's entire credit report *by estimating their likelihood of becoming 90 days late or worse on any credit obligation in the 24 months after the score is calculated*.

No one item on a consumer's credit report is the basis for their credit scores. Credit scoring models, instead, consider a wide-ranging universe of credit report attributes including account information, credit inquiries, debt related metrics, the presence or lack of credit experience, and public record information.

The most widely used credit scores are FICO branded scores, which are the credit scores created by FICO (formally known as Fair Isaac Corporation), my former employer. Lenders can buy the various FICO scores from any of the three major credit reporting agencies. The first generation of FICO's credit scores was made available via Equifax in 1989.

FICO develops its scores based on information in the consumer credit files maintained by the credit reporting agencies. A credit score may influence the credit available to the consumer and the terms that lenders offer to the consumer (e.g., interest rate, credit limits). Credit scores can be calculated using different scoring models, although FICO's are the most common in the United States, Canada, and other countries that maintain sophisticated credit reporting systems.

Even under the FICO brand there are dozens of credit scores commercially available and in use in the United States. No consumer has one credit score but rather has hundreds of scores, most of which are credit bureau based scoring systems such as FICO and VantageScore or custom scoring models or pooled scoring models, which are developed by analytics companies for use by one company or a small group of companies.

### a. Factors Affecting Credit Scoring

FICO's commonly used credit-risk scores consider a number of credit report components. Those components that contribute to a FICO credit score and the relative weight of each (expressed as a percentage) are:

35% – **Payment History**: The presence or lack of negative information
30% – **Debt**: How much and what type
15% – **Length of Credit History**: How long an individual has had credit
10% – **Account Diversity**: The variety of credit experiences
10% – **Pursuit of New Credit**: A record of hard inquiries and newly opened accounts

**Payment History** (**35%** contribution on the FICO scale) – A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge-offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category, FICO considers the severity of the negative item (minor derogatory versus major

derogatory), the age of the negative items, and the prevalence of multiple negative items.[1]

**Debt** (**30%** contribution on the FICO scale) – FICO considers the amount and type of debt carried by a consumer. There are three types of debt considered:

> **Revolving debt:** This is credit card, retail card, and some types of gas card debt. While home equity lines of credit have revolving terms, the bulk of debt considered in this category is unsecured revolving debt incurred on "plastic." The most important measurement from this category is called "Revolving Utilization," which is the relationship between the consumer's aggregate credit card balances and available credit card limits, also called "open to buy." The revolving utilization metric does not consider home equity lines of credit, nor does it consider charge cards.
>
> This is expressed as a percentage and is calculated by dividing aggregate credit card balances by aggregate credit limits and multiplying the result by 100, yielding the Revolving Utilization percentage. The higher the percentage, the lower an individual's FICO score likely will be. This is why simply closing credit cards is generally not a good method for improving one's credit score. Closing one or more credit card accounts will reduce an individual's total available credit limit and, in turn, likely increase the individual's Revolving Utilization percentage, unless the cardholder also reduces their outstanding balances as well.
>
> **Installment debt:** This is debt where there is a fixed payment for a set period of time, such as an auto retail installment account requiring the same payment for 36, 48, or 60 months.
>
> **Open debt:** This is the least common type of debt. Open debt must be paid in full each month. A certain variety of credit cards require a consumer to "pay in full" each month. The American Express Green card is a common example.

**Length of Credit History** (i.e., Credit File Age) (**15%** contribution on the FICO scale) – The older an individual's credit report, the more stable it likely is. The credit file "age" is determined by looking at (1) the date the oldest account was opened, and (2) the average age of the accounts in the credit file. The age of the credit file is measured from the oldest account's "date opened" field. The average age is calculated using the "date opened" field on all accounts, whether they are currently open or closed.

**Account Diversity** (**10%** contribution on the FICO scale) – An individual's credit score will benefit from having a diverse set of account types in his or her credit file. Having experience across multiple account types (revolving, auto, mortgage, etc.) benefits an individual's credit score because the individual is proving an ability to manage different types of debt.

---

1. In the FICO and VantageScore scoring systems, a "major" derogatory event is any open and active account that is reported as being currently past due, any account that includes a record of being historically 90 days past due or worse, public records, collection accounts, or any account status or narrative that indicates default or severe delinquency (e.g., repossession, foreclosure, settlement/short sale, collection, charge-offs). Accounts in good standing (formally, "current") with only historical 30 and 60 day delinquencies are considered to be minor derogatory events.

**Pursuit of New Credit** (**10%** contribution on the FICO scale) – While other factors are considered by the metrics in this category (i.e., the number of newly opened accounts and the amount of time since new account openings), most people associate the pursuit of new credit with the so-called "hard" credit inquiry. An inquiry is noted every time a company requests information from a consumer's credit file. There are several kinds of inquiries that may or may not affect credit scores. Inquiries that have no effect on credit scores (including so-called "soft inquiries") can stay on a credit report for as little as 6 months and are never visible to lenders or credit scoring models. There are several types of soft inquiries:

- Prescreening/prequalification or promotional inquiries, where a credit bureau may sell contact information to credit card companies, lenders, or insurers for consumers who meet criteria set by the inquirer. Pre-approved credit card offers are often mailed to consumers identified through a prescreening or promotional inquiry.

- Creditors check current customers' credit files on a periodic basis through an account management, account maintenance, or account review inquiry.

- When a consumer checks his or her own credit report it is referred to as a consumer disclosure inquiry.

- Employment screening inquiries.

- Insurance related inquiries.

- Utility related inquiries.

Other types of inquiries (known as "hard" inquiries) can, but won't always, have an impact on the credit scores of a consumer. These inquiries are visible to lenders and credit scoring models. Hard inquiries generally result from a lender requesting a consumer's credit report when the consumer applies for an extension of credit, or a consumer has provided a personal guarantee for an extension of commercial credit. Again, hard inquiries can, but do not always, affect the borrower's credit score. I repeat that because it is often misrepresented that all hard inquiries lower scores, which is incorrect.

Only information appearing on a consumer's authentic credit report is subject to the credit scoring process. These are the credit reports compiled by the credit reporting agencies in the Metro 2 credit report format. Consumer disclosures, free credit reports and credit report summaries given away on websites, and credit reports sold by compilers are NOT authentic credit reports, are not the basis for credit scores, are not in the Metro 2 credit reporting format, and are never available to users of credit reports, such as lenders.

### b.    Scoring Models

#### i.    Multivariate Systems

Credit scoring models are multivariate, meaning they evaluate a variety of information or combinations of information on a credit report to generate a final score. No single credit item determines an individual's credit score. In fact, the impact of any one item on an individual's credit score is dependent on all of the other items on their credit report and may not have any impact at all.

### ii.        Multi-Scorecard Systems

Credit scoring models are a consolidation of multiple credit scoring systems called score-cards. A scorecard is a credit scoring model designed to evaluate the risk of a group of con-sumers who have certain similarities in their credit file (homogenous populations). For ex-ample, a consumer with a bankruptcy on his credit report is scored using a model or scorecard designed specifically to evaluate the credit risk of consumers who have filed bank-ruptcy. Similarly, a consumer with limited credit information (known as a "thin file") is scored using a model or scorecard designed to evaluate the credit risk of consumers with thin files. Most credit scoring systems have many scorecards, as there are many unique consumer pro-files, each with different risk levels. The selection of the appropriate scorecard is made by the credit scoring system prior to calculating and rendering a final score.

### iii.        Characteristics, Variables, and Weights

Each scorecard contains a series of characteristics, variables, and weights. A characteristic is a question asked of the credit report by the scoring system. Some examples include:[2]

- What is the average age of the consumer's accounts?

- How old is the oldest account on the consumer's credit report?

While these examples are plain English questions, credit scoring systems answer the ques-tions by reading the data embedded in the credit report. Scorecards regularly use at least 12 characteristics, and, in some cases, significantly more.

Each characteristic has what are referred to as variables. Variables are the series of available answers to the characteristics (or questions). The set of potential variables (or answers) to the sample characteristics above might be:

- What is the average age of the consumer's accounts?
  - 6 months to 2 years
  - 2 years to 4 years
  - 4 years to 10 years
  - >10 years
- How old is the oldest account on the consumer's credit report?
  - 6 months to 2 years
  - 2 years to 4 years
  - 4 years to 10 years
  - >10 years

---

[2] These are intended to illustrate the characteristic, variable and weighting process and are not meant to mimic the variable classing or weights of any particular credit scoring systems. This is simply an example.

While these examples are simplistic, most characteristics have a much larger set of available variables. Once the credit scoring system has completed the process of selecting the scorecard and determining the proper variable for each characteristic in that scorecard, the model assigns weights or points to each variable. For example, the model might assign points as follows:

- What is the average age of the consumer's accounts?

    - 6 months to 2 years – 10 points

    - 2 years to 4 years – 20 points

    - 4 years to 10 years – 30 points

    - >10 years – 40 points

- How old is the oldest account on the consumer's credit report?

    - 6 months to 2 years – 10 points

    - 2 years to 4 years – 20 points

    - 4 years to 10 years – 30 points

    - >10 years – 40 points

Once the model has assigned weights or points to each variable, the points are tabulated, resulting in a final credit score. The entire process is computerized and instantaneous. The credit score is usually appended to a credit report and delivered to the lender for use in risk management decisions.

As it pertains to credit scoring, it would be factually inaccurate to suggest that everything on a credit report has an impact on a credit score. Everything that is legal to consider, predictive of risk, and seen by scoring models through their programming <u>might</u> have an impact on a consumer's credit score. It would be patently false to suggest everything that a credit score considers has a measurable impact on a consumer's credit scores.

### 5.    How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users" or "subscribers"). Data users attempt to measure the downside financial risk of doing business with a particular consumer against upside gain if the product being offered to the consumer is priced appropriately. For example, if a consumer presents little risk, a lender can be more aggressive with the interest rate it offers because the consumer's credit score suggests that the consumer will pay on time. If a consumer presents a higher risk, the lender may decline the application or charge a higher interest rate to subsidize the risk posed by extending a loan to that consumer. Credit reports and credit scores have become synonymous with credit risk and risk-based pricing.

### 6.    The Dispute Resolution Process

A consumer can challenge information on a credit report by contacting the credit reporting agencies or furnishing party, although the consumer's rights may be different depending on

what party he contacts. A consumer can file a dispute with the credit reporting agencies on their websites, by U.S. mail, via telephone, or in person.

When a dispute is filed with a credit bureau, several things happen. First the credit bureaus, sometimes with the assistance of trained vendors, review the relevant information sent by the consumer regarding the dispute.  This allows the credit bureau to determine the nature of the dispute, such as whether it be fraud related, a mixed credit report issue, a credit clinic dispute, or some other type of dispute.

Once the nature of the dispute is identified, the credit bureau will either direct it to the appropriate internal group for handling or communicate the consumer's dispute to the furnishing party. Further, consumers may provide supporting documents with their dispute.  When the credit reporting agencies receive such supporting documents, they generally provide copies of said documents to the data furnisher as part of its reinvestigation process.

The item in dispute may, in certain circumstances, be marked on the credit report as being "in dispute" by appending a specific code to the disputed item in the Compliance Condition Code[3] ("CCC") field of the report. One such code is represented by the letters "XB," which signifies that a consumer has lodged a direct dispute of account or tradeline information under the FCRA or a direct or indirect dispute of a collection account under the FDCPA.

When an XB code is associated with a credit report entry, that item is excluded from any credit score characteristics that measure payment history or debt, until the dispute is resolved or closed and the XB code is removed. As it pertains to 3rd party collection accounts, the entirety of the entry is excluded from the scoring process. This allows the credit reporting agencies and data furnishers to conduct the requested investigations without the disputed item impacting the consumer's credit score while the investigation is ongoing.

**Dispute Codes**

When a consumer's dispute is received by the credit reporting agency, they distill the dispute into a three-digit dispute code. These dispute codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID."

There are several dozen such dispute codes, all of which are chosen by the credit reporting agencies based on their understanding of the nature of a consumer's dispute. Dispute codes and other consumer information are then pre-populated to a form called an Automated Consumer Dispute Verification (hereafter, "ACDV") and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR."

---

[3] A Compliance Condition Code ("CCC") is one of the variety of codes in the Metro 2 credit reporting language. According to the Credit Reporting Resource Guide, a CCC allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act, the Fair Credit Billing Act, or the Fair Debt Collection Practices Act.

e-OSCAR allows documents sent by the consumer to the credit reporting agencies to be attached to the ACDV communication and sent to the furnisher of the information. Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute and any attachments.

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to their credit report, or if the disputed item is already reported accurately. Either way, the data furnisher will fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, delete the item due to fraud, or leave the item unchanged.

The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or leave the entry as previously reported.

The credit bureau then sends, or causes to be sent, correspondence, usually by mail, to the consumer with the results of the investigation. Under the FCRA, this entire process must be completed within 30 days[4], although the CDIA reports that the process generally takes less time thanks to automation.

**Credit Repair and Other Forms of Disingenuous Credit Report Disputes**

It is not uncommon for consumers to hire 3rd party companies to attempt to have derogatory information removed from their credit reports.  These Credit Repair Organizations ("CROs"), also known as "credit clinics" and credit "service" organizations, charge fees to file repetitive, duplicative, and often inauthentic disputes of the derogatory information on consumer credit reports to the credit bureaus, the Federal Trade Commission ("FTC"), and the Consumer Financial Protection Bureau ("CFPB"), a process the credit reporting industry's trade association has referred to as "Jamming" and "Gunking."

According to Stuart Pratt (former President of the CDIA), Eric Ellman (current Senior Vice President for Public Policy and Legal Affairs at the CDIA), and Francis Creighton (former President of the CDIA), some 50%[5] of all consumer disputes received by the credit reporting agencies are being submitted by credit repair companies, most of which are frivolous attempts to have accurate but derogatory information removed from credit reports prematurely.

More recently, credit repair organizations have cultivated relationships with plaintiffs' attorneys and serve as lead generators for potential FCRA, FDCPA or other forms of consumer litigation. These relationships are borne out of connections via Facebook groups, as well as via credit repair conventions/trade shows, where plaintiffs' attorneys are commonly present as guest speakers, event sponsors, and/or attendees.[6]

---

[4] The 30-day period may be extended an additional 15 days if the consumer provides supplemental information during the initial 30-day reinvestigation period.

[5] CFPB-FTC Workshop on Accuracy in Consumer Reporting, December 10, 2019.

[6] See Exhibit C.

Additionally, it's also not uncommon for consumers to file false identity theft affidavits with the Federal Trade Commission, false police reports, and false complaints with the Consumer Financial Protection Bureau as a strategy to cause the removal of accurate information from their credit reports under false pretenses.[7]

**The National Consumer Assistance Plan ("NCAP")**

On March 8, 2015, the three credit reporting agencies, Experian, Equifax, and TransUnion, entered into a settlement agreement with Attorneys General of 31 states.  The settlement resulted in changes to credit bureau policies and practices implemented over the subsequent 39 months including,

- Requiring the Date of Birth to be furnished for authorized users of credit card accounts.
- Decommissioning the first generation of the Metro credit reporting language.
- Disallowing the furnishing of medical collection accounts for at least 180 days from the date the medical debt first went delinquent (recently revised to a full year).
- Deleting from credit reports medical collections that have been paid by or are being paid by insurance.
- Requiring debt collectors to include the name of the debtor's original creditor, and the type of creditor they are.
- Implementing processes whereby the credit bureaus may act upon consumer disputes unilaterally based on documentation provided by the consumer, rather than solely depending on a data furnisher's investigation responses.
- Investigating to determine if a consumer has a mixed file and correct the mixed file condition upon receiving notice from another credit bureau that a consumer has a mixed credit file.
- Requiring that civil judgments and tax liens include minimum standards for personally identifiable information. This provision of NCAP resulted in the removal of tax liens and civil judgments from credit reports sold by Equifax, Experian, and TransUnion.
- Monitor data furnishers for adherence to the NCAP credit reporting requirements and take corrective action against noncompliance data furnishers.[8]

### 7.    The Fair Credit Reporting Act, Adverse Action and Score Disclosure Notices, and Credit Reporting Investigations

The FCRA is the federal statute that defines, among other things, when credit reports can be accessed, consumers' rights, obligations of the credit bureaus and the data furnishers to perform reasonable investigations, and various notice requirements.

For example, when a consumer applies for and is denied a loan or credit card because of information on their credit report, including a credit score, the lender is required by the FCRA

---

[7] See Exhibit C.

[8] See Exhibit C.

to provide a notice of adverse action (hereafter, "NOAA"), more commonly referred to as a denial letter. This NOAA form notice is required, meaning the applicant does not have to overtly request the NOAA after they've been denied.

The NOAA form notice must contain certain elements including the principal reason/s for denial, the applicant's credit score, from what credit bureau the lender obtained the credit report, the credit bureau's address, and a notice of a consumer's right to obtain a free copy of their credit report because of the denial.

**NOTE**: It is commonly misrepresented by Plaintiff experts that because the NOAA includes information about credit scores, that credit scores are always a principal reason for denial. This is factually inaccurate. The NOAA form notice requires disclosure of the credit score/s procured by the lender, even if the credit score/s were not the principal reason for the adverse decision.

Further, when a consumer applies for or attempts to get pre-qualified for a mortgage loan secured by one to four pieces of real property, the lender is required by the FCRA to provide a Score Disclosure notice. This form letter, like the adverse action notice, is required. The absence of adverse action or score disclosure notices indicates an applicant was approved or never actually submitted a formal application for credit where a full underwriting occurred.

The FCRA also requires credit bureaus and data furnishers to perform investigations when they've been put on notice that a consumer challenges the accuracy of information on their credit reports.  What is ultimately found to be a "reasonable" investigation will depend on the facts and nature of the consumer's dispute and the actions taken by the furnisher.

Based on my experience, common methods of investigation by furnishers efforting to perform reasonable investigations consist of reviewing the dispute form submitted by the credit bureaus, following the guidance provided by the dispute codes, assigning the investigation to specialty teams, reviewing internal account records or logs, applying company policies and procedures, accessing multiple internal or external systems containing consumer or account related information, discussing internally with peers or higher level associates, reviewing prior dispute results, requesting information directly from the consumer/debtor, and may also have access to review attachments to the dispute forms the consumer may have included with their communication to the credit bureau(s). Steps like these are often part of common investigations performed by a furnisher.

> **Opinion #1 – Based on my experience, analysis, and review of the case documents, it's my opinion there is testimony and documentary evidence indicating Plaintiff knew about and was, in fact, a signer/owner on the PNC account, and no contradictory evidence indicating Plaintiff was not a signer/owner. Accordingly, it was in line with credit reporting industry standards for PNC to verify the accuracy on the PNC account in response to Plaintiff's repeated credit reporting disputes indicating the PNC account did not belong to him.**

Plaintiff alleges he first discovered the PNC account on his credit reports "sometime in 2020." Plaintiff further alleges the PNC account was "inaccurately reporting…as belonging to the

Plaintiff."[9] To be clear, what this means in credit reporting nomenclature is Plaintiff is suggesting there is a PNC account on his credit reports that does not belong to him, to any extent. This allegation is rebutted by Plaintiff's own words and admissions. Accordingly, the core issue in dispute between the Plaintiff and PNC Bank (whether or not Plaintiff is formally associated with the PNC account as an account owner) appears to have been resolved when Plaintiff acknowledged the below series of events.

**2007** – Plaintiff acknowledges going to National City Bank ("NCB") in 2007 with his father, who had a checking account with NCB at the time[10], and signing a signature card with NCB thus becoming an authorized signer and "account owner" on the NCB checking account, and also receiving agreements and pricing schedules regarding the account.[11]

**2008** – PNC acquired NCB in 2008, meaning the Plaintiff became a PNC account customer via acquisition. PNC considers the line of credit/overdraft protection associated with the PNC "DDA" checking account to be the same account, and also that there was not a separate agreement for the checking and line of credit components.[12]

**NOTE**: The ability for a bank or credit union to furnish overdraft protection lines of credit to the credit bureaus is not new. In fact, there is decades-old industry guidance and specific coding for the furnishing of lines of credit.

Accordingly, it's my opinion there is no plausible argument to be made that the PNC account was not "owned" by the Plaintiff and his parents. In 2007 Plaintiff became what has informally been referred to as an "also-signer" on the PNC account, and PNC reported the account as Plaintiff having "Joint contractual liability" to the credit bureaus.[13] Respectfully, there does not appear to be evidence supporting the argument that the Plaintiff is not associated with the PNC account as an account owner/also-signer.

The subsequent credit reporting of a balance to Plaintiff's credit reports comes from fees applied to the PNC account that were drawn from the line of credit associated with the PNC account.[14] The furnishing of balances, whether they be from fees or charges, is a standard.

**PNC's ACDV Responses and AUDs**

Despite Plaintiff's expert's opinion that PNC "failed to adequately investigate the false data disputed by Plaintiff"[15], PNC has record of receiving and responding to 11 ACDVs from the

---

[9] See Complaint at 31-33.

[10] See Duncan deposition at 16-17, 22.

[11] See Duncan deposition at 21-23. See also PNC 1.

[12] See Bevins deposition at 16-18, 39-40. See also Hafner deposition at 24.

[13] For example, see PNC 1338. ECOA Code reported by PNC as "2." ECOA code 2 indicates "Joint contractual liability."

[14] See Bevins deposition at 64-65.

[15] See Hendricks Expert Report at page 4.

credit bureaus.[16] (10 as a result of Plaintiff filing disputes with the credit bureaus and one as a result of Experian sending an ACDV to PNC on their own)

**January 7, 2020 -** PNC responds to an ACDV[17] sourced from Trans Union indicating the Plaintiff disputed the balance and past due balance (although there was no past due balance on the account as this time). There were also no attachments to this ACDV.

PNC verified that the current balance was $41. There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Valerie Brooks) testified that she would look into the demographics of the account, and also look into several of the other PNC systems. She also testified that she could look up underlying loan documents, including signature cards, as per her training.[18]

**April 9, 2020 -** PNC responds to an ACDV[19] sourced from Trans Union indicating the Plaintiff disputed the balance. There were also no attachments to this ACDV.

PNC changed the balance was $63. There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Milton Azeem) testified that he reviewed the line of credit agreement associated with the account, as well as other account documents.[20]

**March 2, 2021 -** PNC responds to an ACDV[21] sourced from Trans Union indicating the account "Belongs to another individual with the same/similar name." There were also no attachments to this ACDV. There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Valerie Brooks) testified that she would look into the demographics of the account, and also look into several of the other PNC systems. She also testified that she could look up underlying loan documents, including signature cards, as per her training.[22]

---

[16] As a reminder, an ACDV or Automated Consumer Dispute Verification form is a credit industry created form used to facilitate credit bureau sourced disputes. These are formally referred to as indirect disputes.

[17] See PNC 68-69.

[18] See Brooks deposition at 11-16, 18. See also PNC 68-69, 80-81, 96-97.

[19] See PNC 70-71.

[20] See Azeem deposition at 35, 40. See also PNC 91.

[21] See PNC 80-81.

[22] See Brooks deposition at 11-16, 18. See also PNC 68-69, 80-81, 96-97.

**March 11, 2021 -** PNC responds to an ACDV[23] sourced from Experian indicating the account "Belongs to another individual with the same/similar name." There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Derek Geraci), who also served as a dispute analyst trainer for PNC, testified that he would respond to a dispute like this by checking their systems and also looking at signatures on documents (signature cards) dependent on the type of account in dispute.[24]

**April 1, 2021 -** PNC responds to an ACDV[25] sourced from Experian indicating the account "Belongs to another individual with the same/similar name." There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Milton Azeem) testified that he reviewed the line of credit agreement associated with the account, as well as other account documents.[26]

**August 27, 2021 -** PNC responds to an ACDV[27] sourced from Trans Union indicating the account "Belongs to another individual with the same/similar name." There were also no attachments to this ACDV. There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

Although the dispute analyst (Sharon Karpinski) doesn't recall her specific steps taken in response to this ACDV, the dispute analyst testified that she reviews the PNC system of record to verify demographics, as well as loan agreements.[28]

**September 13, 2021 -** PNC responds to an ACDV[29] sourced from Equifax indicating the ac-

---

[23] See PNC 82-83.

[24] See Geraci deposition at 8, 15-17. See also PNC 82-83.

[25] See PNC 92-93.

[26] See Azeem deposition at 35, 40. See also PNC 92-93.

[27] See PNC 94-95.

[28] See Karpinski deposition at 12-14, 18, 35. See also PNC 95.

[29] See PNC 96-97.

count "Belongs to another individual with the same/similar name." There were also no attachments to this ACDV. There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Valerie Brooks) testified that she would look into the demographics of the account, and also look into several of the other PNC systems. She also testified that she could look up underlying loan documents, including signature cards, as per her training.[30]

**September 20, 2021** – PNC sends an update to all three of the credit reporting agencies via a credit industry form called an AUD[31] (Automated Universal Dataform), a form used to make off-cycle updates to accounts on credit reports. This AUD indicates Plaintiff has joint contractual liability on the PNC account, and the account has a zero balance and a "current" Account Status.

This AUD was sent to the credit bureaus by Ken Hafner from PNC for the purposes of PNC confirming their credit reporting was accurate.[32] Mr. Hafner also testified that he would look at and consider signature cards[33] and other account documents in cases where the consumer disputes the ownership of the account, similar to how other PNC dispute analysts have testified, indicating consistent application of PNC policy in that respect.

**February 24, 2022** – PNC sends an update to all three of the credit reporting agencies via an AUD.[34] This AUD indicates the account has a zero balance and a "current" Account Status.

This AUD was sent to the credit bureaus by Ken Hafner from PNC. While Mr. Hafner was not examined regarding this AUD, Mr. Hafner testified that he sent a previous AUD (September 20, 2021) for the purposes of PNC confirming their credit reporting was accurate.[35]

**May 20, 2022 -** PNC responds to an ACDV[36] sourced from Equifax indicating the Plaintiff is "not liable for the account." There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

---

[30] See Brooks deposition at 11-16, 18. See also PNC 68-69, 80-81, 96-97.

[31] See PNC 19.

[32] See Hafner deposition at 11-12. See also PNC 18, which is also Exhibit 3 to the Hafner deposition.

[33] See Hafner deposition at 16-17, 21-24, 32-34.

[34] See PNC 52.

[35] See Hafner deposition at 11-12. See also PNC 18, which is also Exhibit 3 to the Hafner deposition.

[36] See PNC 98-99.

The dispute analyst (Milton Azeem) testified that he reviewed the line of credit agreement associated with the account, as well as other account documents.[37]

**May 20, 2022 -** PNC responds to an ACDV[38] sourced from Experian indicating the account "Belongs to another individual with the same/similar name." There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Milton Azeem) testified that he reviewed the line of credit agreement associated with the account, as well as other account documents.[39]

**May 20, 2022 -** PNC responds to an ACDV[40] sourced from Trans Union indicating the account "Belongs to another individual with the same/similar name." There is no dispute of the late payment on this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV.

The dispute analyst (Milton Azeem) testified that he reviewed the line of credit agreement associated with the account, as well as other account documents.[41]

**March 21, 2023** – PNC responds to an ACDV[42] sourced from Experian indicating "Belongs to another individual with the same/similar name." The ACDV further indicated to PNC "Involved in litigation. Belongs to late father…" Notably, there was no reference in the ACDV having anything to do with disputed late payments. There were also no attachments to this ACDV.

Predictably PNC verified that the PNC account did, in fact, belong to the Plaintiff and that he did, in fact, have "Joint contractual liability." There doesn't appear to have been an error by PNC when responding to this ACDV. PNC also added a late payment from August 2020 to the previous payment history of the PNC account. This was done by PNC after the dispute analyst reviewed the dispute, PNC's system of record, documents, the signature card, and PNC's collection system.[43]

---

[37] See Azeem deposition at 35, 40. See also PNC 98-99.

[38] See PNC 100-101.

[39] See Azeem deposition at 35, 40. See also PNC 100-101.

[40] See PNC 125-126.

[41] See Azeem deposition at 35, 40. See also PNC 99.

[42] See PNC 1338-1339.

[43] See Bevins deposition at 88-89.

It is my understanding from conversation with defense counsel that Experian sent this ACDV to PNC on their own and that it was not initiated by a dispute filed by the Plaintiff.

In sum, this type of repetitive disputing of the same item for the same reason mimics garden variety credit repair activity and forced PNC to "ride the investigation merry-go-round"[44] as Plaintiff didn't provide information with the disputes that would indicate the PNC account did not belong to him.

It's worth noting the amount of space in the Complaint dedicated to Plaintiff's criticisms of the credit bureaus relative to Plaintiff's criticisms of PNC. Plaintiff dedicates 5 pages in the Complaint to what he believes the credit bureaus did wrong, and 2 sentences dedicated to what he believes PNC did wrong.[45]

**PNC Conducted Timely Investigations and Relied Upon Their System of Record and Document Retention Systems**

Again, PNC responded to 11 ACDV dispute forms from the various credit reporting agencies. Relying on their system of record and also systems that house core account documents (such as the afore referenced account signature card[46]), PNC responded to each of these ACDVs well-before the Fair Credit Reporting Act Response Due Date imposed by the credit bureaus. Accordingly, while the Plaintiff and his credit expert may not agree with the PNC's responses to the 11 ACDVs, PNC was certainly timely in their responses.

It's been my experience working on behalf of lenders as their retained expert with access to their testimony, discovery responses, and document production that it is so common for a data furnisher, like PNC, to review their system of record and also other systems that house account documents as part of their ACDV-prompted investigations that it would be appropriate and reasonable to call it a "standard" practice.

> **Opinion #2 – Based on my experience, analysis, and review of the case documents, it's my opinion that Plaintiff did not experience credit related financial damages or adverse actions as a result of the PNC account appearing on Plaintiff's credit reports.**

Generally, when a consumer suggests their credit or creditworthiness has been damaged they produce documents meant to indicate they believe they've lost the ability to procure new credit (denials of credit), they've been approved for credit but with less advantageous terms (adverse approvals), they've lost the ability to use an existing account (closure of an existing account), their credit scores and creditworthiness have been adversely impacted, or their account terms have been adversely changed (lower credit limits and/or higher APRs). None of these commonly produced documents reside in the universe of Plaintiff's documents, which is greater than 8,600 pages.

---

[44] This appropriately descriptive phrase comes from a holding in the 11th Circuit. Boyd v Wells Fargo.

[45] See Complaint at pages 7-12 and paras 66-67.

[46] See PNC 1-3.

With respect to the Plaintiff, he suggests he experienced damage because he was stressed about "less favorable mortgage refinance terms."[47] Plaintiff's credit expert also opines that Plaintiff experienced "damaged" creditworthiness as a result of the PNC credit reporting.[48]

**Better Mortgage** – Plaintiff alleges he applied to refinance his mortgage loan in 2020, and this is how he became aware of the subject PNC account on his credit reports. From a timing perspective, Plaintiff acknowledges he had not yet disputed the PNC account at the time of his Better Mortgage application, certainly because the application predates Plaintiff becoming aware of the PNC account.

Accordingly, PNC had not yet been put on notice that Mr. Duncan disagreed with some aspect of their reporting and wanted to file a formal dispute. It's also reasonable to conclude that any reaction Mr. Duncan may have had in response to learning about the presence of the PNC account also predates any disputes to PNC or to the credit bureaus. In fact, Mr. Duncan had also paid off the balance of the PNC account before he filed any disputes of the PNC account.

Finally, Mr. Duncan testified that after he paid the $31 balance associated with the PNC account, he was able to close on his mortgage loan. And, despite Mr. Duncan testifying that he believes his APR was "less favorable" due to the PNC account, Mr. Duncan also testified that his APR on the refinance is 3% over 30 years, which is a historically low mortgage APR. Based on my experience, it does not appear the PNC account had any material impact to Plaintiff's mortgage refinance efforts and, indeed, there are no documents in support of any such "less favorable" mortgage terms.[49]

**Auto Loan** – Mr. Duncan testified that he believes he received less favorable terms on an auto loan in July 2021 as a result of the PNC account but does not recall the terms of any such auto financing and also has no idea what alternate rate was available in the absence of the PNC account. In a credit damage context, this is called speculation.[50]

As of the date of this Expert Report, there are no documents supportive of either the mortgage or auto loan damage allegations.

> **Opinion #3 – Plaintiff's expert's legal opinion that PNC failed at a legal duty to report the PNC account as being "disputed" in response to Plaintiff's credit bureau sourced disputes 1) isn't an alleged violation in the Complaint and 2) ignores long-standing industry guidance. For many years furnishers, like PNC, have been directed to not mark their accounts as being "disputed" in response to credit bureau sourced disputes.**

**Allegation of Failure to Report PNC Account as Disputed…made by Plaintiff's expert.**

---

[47] See Complaint at 70.

[48] See Hendricks Report at page 6.

[49] See Duncan deposition at pages 37-46.

[50] See Duncan deposition at pages 49-53.

To be clear, there is nothing in the Complaint whereby Plaintiff alleges PNC failed at an FCRA imposed duty to report the PNC account as being disputed. However, Plaintiff's credit expert, improperly citing caselaw from three different lawsuits, does allege PNC failed at an FCRA duty to mark the PNC account as being disputed in response to Plaintiff's credit bureau sourced disputes.

While providing legal opinions in rebuttal would be equally as improper as Plaintiff's expert's affirmative legal opinions, PNC (and all other ~14,000 credit data furnishers) is explicitly directed by the credit industry's trade association to **not** mark accounts as being disputed when they receive disputes from one or more of the consumer credit reporting agencies.

In early 2017 the Consumer Data Industry Association ("CDIA") made it known that they would be sending an off-cycle update to their credit reporting industry standards in advance of the publication of their full 2017 Credit Reporting Resource Guide. This off-cycle update directed furnishers of credit information to the credit bureaus, like PNC, to **not** report Compliance Condition Codes[51] when they receive disputes from a credit reporting agency. This guidance has been part of every Credit Reporting Resource Guide published since 2017. Citibank includes a summary of the above guidance almost identically in their written policies as it pertains to credit bureau disputes.[52]

Accordingly, Plaintiff's expert (but not the Plaintiff) is alleging PNC failed at a legal duty because they didn't do something that all furnishers of information to the credit bureaus are directed to **not** do by the credit reporting industry's trade association and their guidelines.

*      *      *      *      *

This Expert Report is based on my 32+ years of experience, and the technical and specialized knowledge I've acquired as a professional in the consumer credit industry, including my time as an employee or contractor of Equifax, FICO, Credit.com, Experian and VantageScore Solutions, on my review of relevant documents produced in this matter, and as a result of my previous expert witness experience. All of my comments are accurate to the best of my knowledge, and are based on my experience, technical and specialized knowledge, and review of the casefile materials at the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty and are a product of reliable application of my knowledge to the facts of this case.

I reserve the right to supplement or amend my opinions and I declare that the foregoing is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

---

[51] A Compliance Condition Code is a Metro 2 credit reporting code used to indicate that a tradeline or collection account is in dispute.

[52] See Citibank 462-463.

Executed this August 12th, 2024
in Atlanta, Georgia



John Ulzheimer

**Exhibit A**

## John Ulzheimer

### The Ulzheimer Group, LLC, President
### 1160 Buckhead Valley Court
### Atlanta, Georgia 30324

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FCRA, FDCPA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is <u>twice</u> FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has over 32 years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and years of concurrent work with a number of consumer credit related companies.

John currently is or was the credit blogger for the New York Times, Mint, CreditSesame, CreditSimple, CreditVersio, Zillow, JD Byrider Systems, Credit.com, Experian, SmartCredit, VantageScore Solutions, The Simple Dollar and the National Foundation for Credit Counseling. John has been published thousands of times on the topic of consumer credit. He has authored or co-authored numerous educational materials on the subject including:

- The book, *The Smart Consumer's Guide to Good Credit*
- The book, *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.*
- The consumer handbook, *Surviving Identity Theft*.
- The consumer handbook, *The Get Credit Wise ToolKit*
- *Use of Compliance Condition Codes,* CO Bar Association Newsletter

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, TransUnion, TransUnion Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, and members of Congress, consumer groups and consumers.

John has appeared multiple times on CNBC, FOX News, CNN and NPR. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, US News and World Reports, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

For many years, John was regular guest lecturer at The University of Georgia and the Westminster Schools. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. In April 2016 John began guest lecturing at Emory University's School of Law. John graduated in 1991 from The University of West Georgia with a B.S. in Criminal Justice.

## Certifications and Awards

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

**Graduate – American Bankers Association School of Bankcard Management held at The University of Delaware – 2000.**

**2014 Consumer Advocate Award – National Foundation for Credit Counseling.**

**Exhibit B**

## Expert Testimony in the Last Four Years

***Melton v Specialized Portfolio Servicing*** – Deposition (USDC Dist of MD., 8:19-cv-209)
***Cagle v Westfield*** – Deposition (Jackson Co Circuit Court, MO., 1816-cv22073)
***Pongsai v American Express*** – Deposition & Trial (USDC Central Dist of CA, CV19-1628)
***Pulipati v Vivint Solar*** – Deposition (Superior CT, State of CA, Alameda Co., RG18891702)
***Murphy v Indiana Finance Company*** – Deposition (USDC, No Dist of IN., 3:19-cv-00270)
***Champagne v CENLAR*** – Trial (58th District Court of Jefferson Co., Texas A-202999)
***Santos v Account Resolution Services*** – Deposition (USDC, So Dist of FL., 1:19-cv-23084)
***Abu-Eid v Discover*** – Deposition (USDC, EDVA, Alexandria Division 1:20-cv-01450)
***Petras v Chase*** – Deposition (USDC, Central Dist of CA 20-cv-874-RFB-BNW)
***In Re: Capital One Consumer Data Security Breach Litigation*** – Deposition (USDC, EDVA, Alexandria Division, MDL No. 1:19md2915-AJT/JFA)
***King v Westlake Services*** – Deposition (USDC, Central Dist of CA 20-cv-530-JLS-JDE)
***Shipley v Hunter Warfield*** – Deposition (USDC, Middle Dist of FL, Tampa 8:20-CV-02285)
***Brinkman v Account Resolution Services*** – Deposition (USDC, Middle Dist of FL, Tampa 8:20-CV-02453)
***Bultemeyer v CenturyLink, Inc.*** – Deposition (USDC, Dist of AZ, 2:14-CV-02530)
***Soler v Nelnet*** – Deposition (USDC, Cent Dist of CA, 2:20-CV-08459)
***CFPB v Progrexion Marketing*** – Deposition (USDC, Dist of UT., 2:19-cv-00298)
***Larios v Specialized Loan Servicing*** – Deposition & Trial – (Sup Ct of CA, LA. 18STCP02482)
***Norman v TransUnion*** – Deposition – (USDC, Eastern Dist of PA, 18-5225)
***Lombardo v Chase*** – Deposition – (USDC, Southern Dist of NY, 7:20-cv-06813-VB)
***Jeffers v FNBO*** – Deposition – (USDC, Central Dist of IL, 2:21-cv-2169)
***Ntam v Paramount Residential Mortgage Group*** – Deposition – (USDC, Dist of Columbia, 1:21-cv-01583)
***Charles Cole, Individually and on behalf of others v Lawrence Kia*** – Arbitration – (District Court of Douglas County, Kansas, 2020-cv-000174)
***Ward v Trans Union, et al.*** – Deposition & Trial – (USDC, Dist of Colorado, 1:21-cv-02597)
***Rubin v HSBC Bank*** – Deposition – (USDC, Eastern Dist of New York, 1:20-cv-04566)
***Gross v CitiMortgage*** – Deposition – (USDC, Dist of Arizona, CV-18-02103)
***Aranda v Nissan Motor Acceptance*** – Deposition – (USDC, Cent Dist of CA, 2:21-CV-03451)
***Chaine v Tesla Energy Operations*** – Arbitration – (JAMS, Orange Co., CA., 1220070972)
***Shiferaw v Nationwide Insurance*** – Deposition, Trial – (Sup Ct of WA, 19-2-03579-32)
***Buckingham v American Express*** – Deposition – (JAMS, Jacksonville, FL., 5460000202)
***Cebrynski v Experian*** – Deposition – (USDC, Dist of AZ., 2:21-cv-01965)
***Smith v Reliable Chevrolet*** – Deposition & Trial – (NM, 2nd Judicial District, D202-cv-2021-00040)
***Lee v JPMorgan Chase*** – Deposition – (USDC, East Dist of NY, 1:22-cv-4789)
***Peters v American Pacific Home Mortgage*** – Trial – (Larimer Co Dist Ct, CO. 22cv30141)
***LaCour v Credit Collection Services and Equifax Information Services*** – Deposition – (USDC, Cent Dist of CA., CV22-65)
***Leslie v Experian Information Solutions*** – Deposition – (USDC, Dist of HI., 1:21-CV-00334)

**Exhibit B - Continued**

***Lopez-Renteria v Clear Investigative Advantage –*** Deposition – (USDC, West Dist of MO., 2216-CV-12542)
***Tashjian v Planet Home Lending –*** Deposition – (USDC, ND of CA, San Jose 5:19-cv-01536)
***Rubin v U.S. Bank –*** Deposition – (USDC, Dist of NJ, 3:22-cv-00906)
***Chong v Experian –*** Arbitration – (AAA, 01-22-0005-0965)
***Root v American Express –*** Arbitration – (JAMS, Las Vegas. 5260000031)
***Johnson v American Express –*** Arbitration – (JAMS, Atlanta. 5390000055)
***Whaley v RentGrow –*** Deposition – (USDC, Dist. of SC. 2:23-cv-1393)
***Tountas and Harnas v Welk Resort Group –*** Arbitration – (JAMS, San Diego. 5240000614)
***Garcia v Synovus Financial Corp –*** Trial – (USDC, Middle Dist of FL, Tampa. 8:22cv1987)
***Scudder v Sofi Lending and LVNV Funding –*** Trial – (USDC, Middle Dist of FL, Jacksonville, 3:21-cv-741

**Exhibit C**

## Documents Received

First Amended Complaint
Answer and Affirmative Defenses
Plaintiff's and Defendant's Discovery Responses
PNC 1-1418
Plaintiff's 1-8630
Documents Labeled with Prefix "Plaintiff_CRAs_Furnisher"
Expert Report of Evan Hendricks
Depositions: Bevins, Duncan, Azeem, Karpinski, Brooks, Hafner, Geraci

## Citations to Materials or Sources Generally Considered

Adverse Action Notice Citations:

https://www.consumerfinance.gov/rules-policy/regulations/1002/9/#a-1-iii

https://www.ftc.gov/business-guidance/resources/using-consumer-reports-credit-decisions-what-know-about-adverse-action-risk-based-pricing-notices

https://www.consumerfinance.gov/about-us/newsroom/cfpb-acts-to-protect-the-public-from-black-box-credit-models-using-complex-algorithms/

https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-on-credit-denials-by-lenders-using-artificial-intelligence/

Credit Repair Citations:

https://www.nytimes.com/2023/06/07/magazine/bad-credit-repair.html

"There were booths staffed by lawyers looking for referrals that might lead to lawsuits against the credit bureaus." Mya Frazier, New York Times, June 7, 2023, in regards to attendees of the 2023 CreditCon credit repair conference in New Orleans.

https://www.americanbanker.com/news/surge-in-credit-report-lawsuits-has-banks-credit-agencies-scrambling

"Consumers trying to get out of debt are filing lawsuits in droves disputing information on credit reports, encouraged by what critics say is a proliferation of credit repair firms posting videos on TikTok, Instagram and social media" and "more people are willing to execute false declarations claiming to be the victim of identity theft."

https://www.ftc.gov/news-events/news/press-releases/2022/05/ftc-acts-shut-down-credit-game-running-bogus-credit-repair-scheme-fleeced-consumers

"In some cases, the (credit repair) company's "services" included filing (thousands of) false identity theft reports with the FTC and encouraging actions that were unlawful."

https://www.experian.com/blogs/ask-experian/beware-of-credit-repair-companies-filing-false-police-reports/

"In some cases, the (credit repair) companies suggest clients break the law or use clients' information to illegally file fraudulent identity theft or police reports."

National Consumer Assistance Plan Citation:

http://web.archive.org/web/20220319174759/http://nationalconsumerassistance-plan.com/highlights/

https://www.consumerfinance.gov/about-us/blog/removal-public-records-has-little-effect-consumers-credit-scores/

FICO Score Metrics Citation:

https://www.myfico.com/credit-education/whats-in-your-credit-score

Mortgage Loan APR Citation:

https://www.rocketmortgage.com/learn/historical-mortgage-rates-30-year-fixed

The lowest historical mortgage rates in history for 30-year FRMs were more recent than you might think. December 2020 saw mortgage rates hit 2.68%, according to Freddie Mac, due largely to the effects of COVID-19. The same goes for the lowest average, with an annual rate of 3.11% for 2020.

https://money.usnews.com/loans/mortgages/articles/historical-mortgage-rates#

"The average 30-year fixed rate reached an all-time record low of 2.65% in January 2021"

**Exhibit D**

## Publications

For over 20 years, I have been a frequent contributor regarding consumer credit issues to the media including U.S. News and World Report, Consumer Reports, Yahoo!, NerdWallet, USA Today, The New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, Money Magazine, American Banker, SmartMoney, MarketWatch, FOX, CNN, MSNBC, Bankrate, and other regional business and consumer media outlets.

I have been an author since 2004 and have written thousands of articles. I currently write or have written articles and create content about credit issues for newsletters, websites, blogs and vlogs. My former or current clients include Credit.com,  Boardroom, Enloop, Digital Brands, CreditVersio, InfoUp Publications, CNBC, IMS Expert Services, Mint/Intuit, Smart-Credit, CreditSesame, the National Foundation for Credit Counseling, Credit Card Insider, Tradeline Supply Company,  Credit Simple, Experian, The New York Times, JD Byrider, MagnifyMoney, The Simple Dollar,  Zillow, Digital Brands, VantageScore Solutions, and the Wall Street Journal.

I do not maintain a comprehensive list of, or the locations of, my writings, which are all owned either by my clients or a publishing house and are published and/or unpublished at their sole discretion. The most comprehensive list of my authorships can be found using Google under the search terms "John Ulzheimer" and "John Ulzheimer Credit."[53]

I have written the following traditional hardcopy books on credit related topics:

*You're Nothing but a Number* (2007),

*The GetCreditWise Tool Kit* (2007),

*Surviving Identity Theft* (2007, with Emily Peters),

*The Smart Consumer's Guide to Good Credit: How to Earn Good Credit in a Bad Economy* (2012, with Deanna Templeton).

I have also written or contributed to the following articles:

In 2018, I contributed to the following article: *The Use of Compliance Condition Codes,* CO Bar Association Newsletter.

In 2019 I authored *Current Trends in Credit-Related Lawsuits*, Conference on Consumer Finance Law, Quarterly Report, Vol.73, No.3.

---

[53] My articles are periodically subjected to publisher edits. Accordingly, I cannot affirm that my published articles will contain solely my originally drafted content, or now contain content with which I fully agree.