**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH**

ERNEST LEE DUNCAN, JR.,

               Plaintiff,

      v.

PNC BANK, N.A., *et al.*,

               Defendants.

Case No. 2:22-cv-1717
Hon. Marilyn J. Horan

**PLAINTIFF'S PRETRIAL STATEMENT**

Pursuant to the Court's Pretrial Scheduling Order (ECF No. 209) and Local Rule 16.1.C.1 of the Western District of Pennsylvania, Plaintiff Ernest Lee Duncan, Jr. ("Mr. Duncan"), by and through undersigned counsel, submits the following pretrial statement.

As discussed in greater detail below, the evidence in this case establishes that Defendant PNC Bank, N.A. ("PNC") engaged in conduct that violated the Fair Credit Reporting Act, victimizing Mr. Duncan by repeatedly maligning him as a deadbeat.

**I.      STATEMENT OF MATERIAL FACTS.**

      **A.      PNC Lacks Any Documents Establishing Plaintiff's Obligations on Any Line of Credit.**

Sometime in 1976, Mr. Duncan's late father and stepmother, Ernest Lee Duncan, Sr. ("Senior") and Betty Duncan ("Betty"), opened a checking account (the "Checking Account"). (P-1, PNC 1-2; PNC 30(b)(6) Dep. Tr. 13:9–11 (pertinent excerpts).) The only document containing Plaintiff's signature that relates to the Checking Account is a signature card dated August 25, 2007 (the "Signature Card"), which makes no mention of a credit line. (P-1, PNC 1-2.) PNC has no documents pertaining to the Checking Account which predate the Signature Card. (PNC 30(b)(6) Dep. Tr. 17:8–18:3.)

1

There would have been at least one signature card prior to the Signature Card. (PNC 30(b)(6) Dep. Tr. 17:19–22.) PNC has no documents that might have been provided to Mr. Duncan with the Signature Card. (PNC 30(b)(6) Dep. Tr. 35:6–36:19.) PNC produced a document titled "Cash Reserve Line Agreement" which states "Effective 1/2/08" but has no internal reference to this document or record of its mailing. (P-2, PNC 181–82; PNC 30(b)(6) Dep. Tr. 32:25–33:20, 37:10–39:2.) There is no documentation reflecting that the Checking Account included a line of credit. (PNC 30(b)(6) Dep. Tr. 18:22–25, 34:2–36:19, 39:3–12.) Mr. Duncan does not recall whether he was provided any documents referenced in the Signature Card on August 25, 2007. (Plaintiff's Dep. Tr. 23:15–21.) Senior passed in 2010, and Betty in 2009. (P-3, PNC 37; P-4, PNC 38.)

**B.     Mr. Duncan Paid the Disputed Line of Credit in Full, After Which It Sat Dormant for Nearly Nine Years.**

PNC produced a payment history for the line of credit it reported to consumer reporting agencies (CRAs) (the "Disputed Line of Credit") titled "History Card Report" with a "Loan Num 567112212944." (P-5, PNC 169–80.) This payment history shows that the Disputed Line of Credit was paid in full in December 2010, leaving a $0 balance. (P-5, PNC 173; PNC 30(b)(6) Dep. Tr. 67:11–68:11.). In fact, there was an overpayment on the Disputed Line of Credit, resulting in "$36.72 being deposited to the" Checking Account. (P-5, PNC 173; PNC 30(b)(6) Dep. Tr. 67:21–68:2.) The "History Card Report" shows "Statement Produced" on December 24, 2010 and January 25, 2011. (P-5, PNC 173.)

These statements show an overpayment of $36.72 on the Disputed Line of Credit in December 2010, which was then transferred out by the end of December 2010. (P-6, PNC 137–40.) The "History Card Report" shows no payment or debit activity or issuance of a statement on the Disputed Line of Credit from February 28, 2011 through October 28, 2019. (P-5, PNC 173–

77.) When PNC questioned Plaintiff about whether he closed the Checking Account after Senior and Betty died, he testified unequivocally that he had done so:

> **Q.** So looking back at Exhibit C[1], looking at the section titled summary of account activity, does this account statement dated for late 2010, reflect that the balance owed on this account was paid off?
> **A.** Yes.
> **Q.** And that nothing was due at that point?
> **A.** Yes.
> **Q.** Do you have any recollection of closing any bank accounts that your father and stepmother had after [they died]?
> **A.** Yes.
> **Q.** And you had mentioned to me that you were just aware of the one bank account; correct?
> **A.** Yes.
> **Q.** So it's your recollection, as you sit here today, that you closed out the account that they held with National City that became PNC?
> **A.** Yes.
> **Q.** When do you recall doing that, sir?
> **A.** It was several months after the fact. After my dad had, after he died.
> **Q.** So several months, early 2011? Is your recollection?
> **A.** Yes.

(Pl's Dep. Tr. 33:15–34:17.)

There was no activity on the Checking Account from March 17, 2016 through September 18, 2019. (P-7, PNC 183–203; PNC 30(b)(6) Dep. Tr. 64:9–18.)

> **C.**    **PNC Reopened the Accounts Through Improper Internal Linking and Fee Harvesting and Then Furnished Derogatory Reporting Regarding Mr. Duncan to the CRAs.**

PNC produced a letter dated February 5, 2010 addressed only to Senior and Betty, the latter having passed a year earlier, advising that the "transfer of your National City Cash Reserve Line to PNC Bank" would be "effective February 22, 2010." (P-8, PNC 219–20.) This letter also advised of a "change in terms." (*Id.*) National City merged into PNC Bank, effective November 6, 2009. (P-9, FDIC Merger Info, available via search at https://banks.data.fdic.gov/bankfind-suite/.)

---

[1] Referring to P-6, PNC 137.

PNC produced "PNC Smart Checking" statements for the Checking Account. (P-7, PNC 183–203.) These statements show no activity——no balance, no debits, no credits. (*Id*.) The "PNC Smart Checking Statements" reflect "RETRN MAIL" above the name and address lines, so they were designated as being returned to sender by USPS, at least as early as the June 2016 statement:

(*Id*. at PNC 183 (highlighting added).) The "RETRN MAIL" notation means that at some point prior to this statement, PNC had received returned mail of a statement. (PNC 30(b)(6) Dep. Tr. 53:14–54:18.) PNC claims its practice would have been to continue to send statements to the wrong address "until a current address or—or a correct address is provided." (PNC 30(b)(6) Dep. Tr. 54:19–25.) The Checking Account and Disputed Line of Credit Account only stayed open for years following December 2010 because "of the linking of the two accounts . . . . the [Disputed Line of Credit] account is basically what—the link to that account is what kept it outside of the—the normal closed process." (PNC 30(b)(6) Dep. Tr. 50:18–52:6.) In 2019, PNC converted the Checking Account from a "Smart Account" into a "Standard Account" and began charging service fees. (P-10, PNC 221; P-11, PNC 222–255.) PNC testified about this change as follows:

> Q. Why was the account changed from smart checking to standard checking?
>
> A. It was an internal PNC project. I believe it was deemed a simplification project where the company reviewed the needs of the customers and revamped the products that were offered—or actually, on the on the books and going forward then, felt the—the business decision better suited moving to a—from the smart account to the standard checking account.
>
> Q. Okay. And—and the smart checking account, did—well, what was the difference in fees between smart checking and standard check?

4

A. Well, this account being a smart checking account had some built in waivers for fees. So this account was not, actually, generating any fees because it had the built-in fee waivers. And one of the differences was that the standard checking no longer had some of the fee waivers.

(PNC 30(b)(6) Dep. Tr. 52:20–53:13.)

PNC's letter regarding the change to "Standard Checking," dated August 5, 2019, is addressed to the same address noted by PNC as resulting in returned mail for at least three years, i.e., 4656 English Oak Ct., Mason, OH, 45040-2570 ("4656 English Oak Ct"). (P-7, PNC 183; P-10, 221; PNC 30(b)(6) Dep. Tr. 53:14–54:18, 57:1–7, 57:20–24.) PNC then assessed fees on the Checking Account but not because of any activity by Mr. Duncan. (PNC 30(b)(6) Dep. Tr. 63:5–15, 64:1–8.) There were no checks written on the Checking Account, but PNC charged $3.00 for "Check Images in Statement Fee" on November 19, 2019 and again on December 17, 2019. (P-11, PNC 204–205.) All statements for the Disputed Line of Credit only listed Senior and Betty and were addressed to 4656 English Oak Ct. (P-6, PNC 127–162; P-7, PNC 183.)

A letter providing "Important information regarding your PNC Bank Personal Line of Credit Account Number [XXXXXXXXXXXX2944]" only listed Senior and Betty and was addressed to 4656 English Oak Ct. (P-12, PNC 4.) A PNC letter dated July 22, 2020 regarding a "returned payment" and removal of automatic payment deduction on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (P-13, PNC 10.) A PNC dunning letter dated August 25, 2020 regarding two "missed payments" on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (P-14, PNC 12–13.) Another PNC dunning letter dated August 10, 2020 regarding a past due payment on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. (P-15, PNC 14–15.) Another letter PNC produced, dated September 1, 2020, stated that the Disputed Line of Credit "is no longer linked to an active deposit account" and only listed Senior and Betty and was addressed to 4656

English Oak Ct. (P-16, PNC 16–17.)

Plaintiff learned of derogatory credit reporting about the Disputed Line of Credit in September 2020 while seeking to refinance his mortgage. (P-17, PNC 20–21.) Plaintiff learned in his communications with PNC that the Disputed Line of Credit belonged to his deceased parents, and although he was under no obligation to do so, he paid the $38.25 on the Disputed Line of Credit to resolve the issue and proceed with his mortgage refinance. (P-17, PNC 27-28; P-18, 1354–55.) The receipt for this payment lists the customer as "Duncan Sr." (P-18, PNC 1354.)

Plaintiff then repeatedly disputed the credit reporting of the Disputed Line of Credit to PNC directly, including with the assistance of an attorney, and through the CRAs. (P-17, PNC 20–28; P-19, PNC 30–41; P-20, PNC 43–46; P-21, PNC 54–55; P-22, PNC 72–79, P-23, PNC 84–90; P-33, PNC110–16; P-34, PNC 102–09; P-35, PNC 117–21.) PNC repeatedly refused to cease reporting the Disputed Line of Credit as Mr. Duncan's responsibility. (P-26, PNC 80–81; P-27, PNC82–83; P-28, PNC 91; P-29, PNC92–93; P-30, PNC94–95; P-31, PNC96–97; P-32, PNC 98–99; P-36, PNC100–01; P-37, PNC 125–26; P-38, PNC122; P-39, PNC123; P-40, PNC124.) PNC consistently reported the Disputed Line of Credit as opened on February 23, 1976. (P-26, PNC 80–81; P-27, PNC82–83; P-28, PNC 91; P-29, PNC92–93, P-30, PNC94–95; P-31, PNC96–97; P-32, PNC 98–99; P-36, PNC100–01; P-37, PNC 125–26; P-42, PNC1338–39.)

**D.    PNC Furnished Nonsensical Credit Reporting to the CRAs in Response to Mr. Duncan's Disputes, and Reinserted Delinquency Reporting After He Filed Suit.**

PNC reported the account status and history differently in response to different disputes (P-46, PNC 381–83, 422–27, 435–38, 454–56 (defining dispute response codes)):

6

| Response Date | PNC ACDV Processor | CRA | Furnisher Response re: Account Type, Status, and Payment History | Compliance Condition Code | Bates Nos. |
|---|---|---|---|---|---|
| Mar. 2, 2021 | Valerie Brooks | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 80–81 |
| Mar. 11, 2021 | Derek Geraci | Experian | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 82–83 |
| Apr. 1, 2021 | Milton Azeem | Experian | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 92–93 |
| Aug. 27, 2021 | Sharon Karpinski | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 1, 2020 with a date of last payment of September 11, 2020 and payment rating of current but | None | PNC 94–95 |

7

| | | | simultaneously delinquent by 30–59 days in August 2020 | | |
|---|---|---|---|---|---|
| Sept. 13, 2021 | Valerie Brooks | Equifax | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current but simultaneously delinquent by 30–59 days in August 2020 | None | PNC 96–97 |
| May 20, 2022 | Milton Azeem | Equifax | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 (and all other months in payment history profile) | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 98–99 |
| May 20, 2022 | Milton Azeem | Experian | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 100–101 |
| May 20, 2022 | Milton Azeem | Trans Union | Line of credit (account type) paid or closed/zero balance as of September 11, 2020 with a date of last payment of September 11, 2020 and payment rating of current and account current in August 2020 | XH (account previously in dispute; the data furnisher has completed its investigation) | PNC 125–26 |
| Mar. 21, 2023 | Daniel Mackanick | Experian | Line of credit (account type) paid or closed/zero balance as of September | XH (account previously in dispute; the | PNC 1338–39 |

8

| | | | 11, 2020 with a date of last payment of September 11, 2020 and payment rating of 30–59 days delinquent and account delinquent by 30–59 days in August 2020 but no payment history reported/available for September 2020 | data furnisher has completed its investigation) | |
|---|---|---|---|---|---|

In September 2021, PNC did, however, update its credit reporting to remove any delinquency reporting for the Disputed Line of Credit. (P-47, PNC 19.) This update provided that the account was closed on September 11, 2020 and was current in August 2020 and no payment history/reported available for September 2020. (*Id.*) After Mr. Duncan filed suit against PNC, Equifax, Experian, and Trans Union, Experian sent an electronic Automated Consumer Dispute Verification form (ACDV) to PNC, which contained the following dispute information:

| Dispute Code 1: | 002:Belongs to another individual with the same/similar name. Provide or confirm complete ID. |
|---|---|
| Dispute Code 2: | |
| FCRA Relevant Information: | INVOLVED IN LITIGATION CONS CLAIMS THIS BELONGS TO HIS LATE FATHER ERNEST LEE DUNCAN SR |

(P-42, PNC 1338 (highlighting added).)

PNC responded by reinserting delinquency reporting for the month of August 2020 and listing the payment rating of the Disputed Line of Credit as 30–59 days delinquent when it was closed on September 11, 2020. (*Id.*) The 2021 *Credit Reporting Resource Guide* describes the ACDV process as follows:

In compliance with FCRA section 611 (a) (5) (D)[2], the consumer credit reporting

---

[2] I.e., 15 U.S.C. § 1681i(a)(5)(D), which provides:

Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers

industry maintains an automated dispute resolution system. This system, called e-OSCAR®, is available for use by all data furnishers. . . . Each consumer reporting agency and data furnisher has its own access to e-OSCAR®. When a consumer contacts a consumer reporting agency with a dispute, the agency transmits the disputed information and, if applicable, one or more images of relevant, consumer-provided documentation through e-OSCAR®. The data furnisher accesses e-OSCAR® and retrieves the disputed data and any associated document image(s). . . . The data furnisher researches the disputed account and transmits a response back to the originating consumer reporting agency via e-OSCAR®.

(P-46, PNC 665–66.)

When Plaintiff's attorney disputed PNC's reporting directly, PNC responded with correspondence dated November 1, 2021 stating, in part:

We have reviewed your dispute on behalf of Ernest L. Duncan & Betty F. Duncan and determined that you have failed to provide a sufficient authorization for us to be able to investigate and provide you adequate information with regard to this dispute.

Please have your client(s), Ernest L. Duncan & Betty F. Duncan, execute the enclosed Authorization and return it to PNC Bank, N.A. . . . .

**AUTHORIZATION**

I, Ernest L. Duncan & Betty F. Duncan, herby [sic] authorize PNC Bank, N.A. to disclose, inspect, copy and deliver any and all records, information and reports, concerning my PNC Bank, N.A. Account Number . . . to The Massaro Legal Group, LLC, 2050 E. 96th Street,
Indianapolis, IN 46240.

(P-49, PNC 29.)

PNC produced a document from its internal systems identifying only Senior and Betty as borrowers on the Disputed Line of Credit. (PNC 30(b)(6) Dep. Tr. 26:17–27:2; P-55, PNC 1358–73 at 1371–73.)

---

of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

*Id.*

Indeed, this Court has said itself, "[g]iven the record evidence, and upon this Court's independent review, genuine issues of material fact exist, and will require a jury determination to answer the question of the reasonableness of PNC's investigations." (ECF No. 204 at 15.)

## II.  STATEMENT OF DAMAGES (a statement of all damages claimed, including the amount and the method of calculation of all economic damages).

Mr. Duncan has identified and supported his damages through documentary evidence, sworn testimony, and expert opinion addressing the real-world harm caused when PNC furnished and then repeatedly "verified" derogatory credit information as belonging to him. *See, e.g.*, Plaintiff's Rule 26(a)(1) disclosures identifying (i) credit reports, (ii) communications with PNC and the CRAs, and (iii) fact witnesses with knowledge of credit impacts and emotional distress.

### A.  Reputational Harm.

The record reflects Mr. Duncan first became aware of the negative PNC reporting when he noticed a detrimental drop in his otherwise stellar credit score in September 2020, while he was attempting to refinance his home. Plaintiff's expert (Evan Hendricks) further explains the predictable ways such derogatory reporting impacts consumers seeking mortgage or refinance credit, including that past-due/charged-off reporting is a major derogatory and is flagged by prospective creditors, materially impairing a consumer's credit eligibility and credit terms. Mr. Duncan, a CPA managing finances for a large chemical distributor, prides himself on his financial responsibility, which he learned from Senior. Mr. Duncan seeks unliquidated damages for reputational harm inflicted by PNC's false, derogatory reporting. These types of damages do not lend themselves to a statement of calculation but may be subject to an award of damages. *Dalton v. Capital Assoc. Indus.*, 257 F.3d 409, 418 (4th Cir. 2001) (damages for loss of reputation available under FCRA); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("The term 'actual damages' has been interpreted to include recovery for emotional distress

11

and humiliation."); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 719 (3d Cir. 2010) ("In allowing suits for damages, Congress certainly intended to allow compensation for the very kind of harm that the FCRA was intended to prevent. This is not legislation mandating a safety standard to prevent physical injury. It is legislation designed to facilitate banking and the extension of credit while protecting consumers from the kind of injury that will almost certainly result when erroneous information is inserted into a credit report."); *Williams v. Trader Pub. Co.,* 218 F.3d 481, 486-487 (5th Cir. 2000) (compensatory damages for emotional distress allowable based on testimony of plaintiff alone in Title VII case); *see also Burrell v. Crown Central Petroleum, Inc.*, 177 F.R.D. 376, 386 (E.D. Tex.1997) (no computation of "mental anguish" required "under Rule 26(a)(1)(C) since the trier of fact must determine compensatory damages" for such damages).

### B.        Time, Effort, and Expense Caused by PNC's Reporting.

The record also establishes Mr. Duncan's extensive efforts to resolve PNC's inaccurate, disparaging reporting. Mr. Duncan's damages include the considerable time, effort and expense required to attempt to force statutory compliance, including engaging counsel to assist with written disputes and spending substantial personal time attempting to force PNC to comply with its accuracy and investigative obligations under the FCRA. Plaintiff's disclosures specifically identify communications to/from PNC and to/from the CRAs as part of the damages record. Mr. Duncan expended time, effort, and money as a foreseeable consequence of PNC's inaccurate furnishing and failed dispute handling. And they are compensable as actual damages under the FCRA where they reflect the real burden imposed on a consumer forced to attempt to recapture his good name and credit.

Mr. Duncan estimates he spent at least 100 hours disputing the inaccurate reporting, which includes preparing and sending dispute letters, engaging and conferring with an attorney, Jason M. Massaro, Esquire, to assist him in disputing PNC's credit reporting, and reviewing and following

up on his dispute correspondence and the status of PNC's credit reporting. Assuming such time is worth $20 per hour, Mr. Duncan's lost time amounts to approximately $2,000. Mr. Duncan paid Mr. Massaro approximately $1,500.00 to assist with disputing the credit reporting after his individual efforts failed. Mr. Duncan expended approximately $35.00 in postage expenses associated with his disputes of PNC's credit reporting. Mr. Duncan intends to calculate these damages by addition and will seek approximately $3,535.00 in such damages.

### C. Emotional Distress.

Mr. Duncan seeks actual damages for emotional distress in multiple forms, including mental anguish, humiliation, embarrassment, anger, frustration, loss of self-esteem, and anxiety around future credit applications. These harms are supported not only by Plaintiff's own testimony, but will be corroborated by Retha Duncan, Plaintiff's wife. As explained above, these recoverable damages are not amenable to mathematical computation and the appropriate compensation for such harms will be determined by the jury.

### D. Attorneys' Fees and Costs

Plaintiff seeks recovery of his reasonable attorneys' fees and costs as permitted under the FCRA.

## III. CONTACT INFORMATION OF WITNESSES AND POTENTIAL WITNESSES.

### A. Fact Witnesses

1. Ernest Lee Duncan, Jr. (Liability and Damages)
   9229 Crystal River Drive
   Indianapolis, IN 46240
   Phone: (317) 669-2994*
   Plaintiff expects to present this witness. Live testimony expected.

2. Retha Duncan (Damages)
   9229 Crystal Driver Drive
   Indianapolis, IN 46240
   Phone: (513) 550-1596*
   Plaintiff expects to present this witness. Live testimony expected.

3.    Michael Bevins, Corporate Representative (Liability)
       c/o John J. Berry
       Dinsmore & Shohl, LLP
       301 Grant St. Suite 2800
       Pittsburgh, PA 15219
       Phone: (412) 288-5854
       Plaintiff expects to present this witness. Live testimony expected.

4.    Sharon Karpinski (Liability)
       c/o John J. Berry
       Dinsmore & Shohl, LLP
       301 Grant St. Suite 2800
       Pittsburgh, PA 15219
       Phone: (412) 288-5854
       Plaintiff expects to present this witness. Live testimony expected.

5.    Milton Azeem (Liability)
       c/o John J. Berry
       Dinsmore & Shohl, LLP
       301 Grant St. Suite 2800
       Pittsburgh, PA 15219
       Phone: (412) 288-5854
       Plaintiff expects to present this witness. Live testimony expected.

6.    Valerie Brooks (Liability)
       c/o John J. Berry
       Dinsmore & Shohl, LLP
       301 Grant St. Suite 2800
       Pittsburgh, PA 15219
       Phone: (412) 288-5854
       Plaintiff expects to present this witness. Live testimony expected.

7.    Derek Geraci (Liability)
       c/o John J. Berry
       Dinsmore & Shohl, LLP
       301 Grant St. Suite 2800
       Pittsburgh, PA 15219
       Phone: (412) 288-5854
       Plaintiff expects to present this witness. Live testimony expected.

8.    Ken Hafner (Liability)
       c/o John J. Berry
       Dinsmore & Shohl, LLP
       301 Grant St. Suite 2800
       Pittsburgh, PA 15219

Phone: (412) 288-5854
Plaintiff expects to present this witness. Live testimony expected.

9. Jason M. Massaro, Esquire (Liability and Damages)
The Massaro Legal Group, LLC
2050 E. 96th Street
Indianapolis, IN 46240
Phone: (317) 669-2994
May call by live testimony or trial deposition testimony if the need arises.

10. Records custodians necessary to authenticate documents produced in this case, expressly including records custodians to authenticate documents produced in this litigation by co-Defendants Trans Union, Experian, and Equifax.
c/o Counsel of record for each respective co-Defendant in this case.
Mr. Duncan reserves the right to supplement if it becomes necessary to call any records custodians from any other entity.

**B.    Expert Witness**

1. Evan Hendricks (Liability and Damages)
P.O. Box 302
Cabin John, MD 20818
Telephone: (301) 229-7002*
Live testimony expected.

**\*These witnesses may be contacted through the undersigned counsel of record for Plaintiff.**

**IV.    DESIGNATION OF WITNESS TESTIMONY.**

Plaintiff proposes to designate the deposition testimony of several witnesses in addition to, or in lieu of, live testimony. The proposed designations are provided in the attached **Exhibit A**.

**V.    EXHIBIT LIST.**

The Bates numbers, exhibit numbers, and descriptions of all evidence Plaintiff expects to offer are provided in the attached **Exhibit B**.

**VI.    LIST OF LEGAL ISSUES TO BE ADDRESSED AT THE FINAL PRETRIAL CONFERENCE.**

Plaintiff expects that the legal issues addressed in the Parties' forthcoming motions in *limine*, voir dire, and jury instruction disagreements not yet due will need to be addressed at

15

the final pretrial conference. (ECF No. 209.)

Additionally, Mr. Duncan submits that the Court should decide the following legal issues at the Final Pretrial Conference:

1.      Whether PNC inaccurately reported the Disputed Line of Credit to the CRAs, given the lack of any admissible evidence of accuracy based on personal knowledge from any PNC witness identified in its Pretrial Statement (ECF No. 210)? The answer is no.

2.      Whether the Signature Card on which PNC rests its entire accuracy defense could ever provide a basis to deem Mr. Duncan liable on the Disputed Line of Credit? The answer is no.

3.      Whether reporting Mr. Duncan as delinquent on the Disputed Line of Credit could ever be accurate under the FCRA? The answer is no.

4.      Whether following the same flawed procedure on numerous occasions to "investigate" Mr. Duncan's disputes complied with 15 U.S.C. § 1681s-2(b)? The answer is no.

5.      Whether PNC's failure to notate its credit reporting and dispute responses with any compliance condition code (CCC), and later, an improper CCC, violates 15 U.S.C. § 1681s-2(b) as a matter of law under *Seamans v. Temple University*, 744 F.3d 853, 869 (3d Cir. 2014)? The answer is yes.

6.      Whether the Court's decision to grant PNC summary judgment as to willfulness (ECF No. 204 at 16–17) can be reconciled with the holdings[3] in *Seamans*? Respectfully, the answer is no.

---

[3] *E.g.*, "Beyond that, Seamans points to evidence that undertrained ACS representatives spent, on average, only 15 minutes investigating each dispute, and that the policy of ACS was to *never* flag accounts as disputed or to report dates of first delinquency. If true, these policies would appear to be in outright conflict with a furnisher's duties under FCRA." 744 F.3d at 869 (vacating dismissal of willfulness claim for punitive damages).

## VII.   LIST OF EXPERT DISCLOSURES.

Plaintiff has disclosed the expert report and rebuttal expert report of Evan Hendricks in this litigation pursuant to Rule 26(a)(2), copies of which are attached hereto as **Exhibit C**.

## VIII.   RESERVATION OF RIGHTS.

Plaintiff reserves the right to supplement this Pretrial Statement up to and including the time of trial in accordance with the Federal Rules of Civil Procedure and with Local Rules of Court.

Plaintiff reserves the right at the time of trial to call as a witness any person, and to introduce any exhibit or testimony identified or referred to in the pleadings, discovery, deposition transcripts, expert disclosures, and/or Pretrial Statement filed in this action. Plaintiff reserves the right to call any individual or representative listed in the Defendant's Pretrial Statement prior to or during trial.

Plaintiff reserves the right to call as a witness anyone whom he becomes aware of through any form of discovery or inquiry into any matter up to and including at the time of trial.

Dated: March 2, 2026

Respectfully submitted,
**ERNEST LEE DUNCAN, JR.**

By____*/s/ Drew D. Sarrett*_____
Drew D. Sarrett (admitted *pro hac vice*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, VA  23219
(804)-905-9900
drew@clalegal.com

Leonard A. Bennett (admitted *pro hac vice*)
Adam Short (admitted *pro hac vice*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
(757) 930-3660
lenbennett@clalegal.com
adam@clalegal.com

Matthew W.H. Wessler (admitted *pro hac vice*)
**GUPTA WESSLER LLP**
2001 K St. NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

Jessica Garland (admitted *pro hac vice*)
**GUPTA WESSLER LLP**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
jessie@guptawessler.com

*Counsel for the Plaintiff*

18