# EXHIBIT C

**PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT**

I, Evan Hendricks, provide the following Expert Report on behalf of the Plaintiff, Ernest Lee Duncan, Jr. ("Plaintiff" or "Mr. Duncan") pursuant to Federal Rule of Civil Procedure 26(a)(2) in connection with the action entitled ***Ernest Lee Duncan, Jr. v. PNC Bank, N.A., Experian Information Solutions, Inc.; Trans Union, LLC, and Equifax Information Services, LLC;*** U.S. District Court for the Western District of Pennsylvania [Pittsburgh Division] (Case 2:22-cv-1717).

**Part 1** of this report addresses issues that are specific to this case, including how Defendant PNC Bank, N.A.'s ("PNC" or "Defendant") credit reporting was inaccurate and/or incomplete, how and why PNC failed to adequately investigate Plaintiff's disputes of inaccurate/ incomplete information, and how the inaccurate reporting harmed Plaintiff's creditworthiness and reputation. This section of the report also includes a context and history that robustly put Defendant on notice of the importance of investigating and correcting inaccurate and incomplete information, and how it had repeatedly failed to do so due to defects in its routine practices and actions. This section also describes relevant accuracy- and completeness-related standards which are well-known in the credit reporting industry.

**Part 2** includes opinions on and descriptions of credit scores and credit reports, my qualifications, list of prior cases in which I have testified and my fee. I reserve the right to supplement this report at a future date.

**Presumed Facts**

Sometime in 1976, Mr. Duncan's late father and stepmother, Ernest Lee Duncan, Sr. ("Senior") and Betty Duncan ("Betty"), opened a checking account (the "Checking Account"). PNC 1-2, 181–82, PNC 30(b)(6) Dep. Tr. 13:9–11. The only document containing Plaintiff's signature that relates to the Checking Account is a signature card dated August 25, 2007 (the "Signature Card"), which makes no mention of a credit line. PNC 1-2. The Signature Card was signed with National City. PNC 1–2, PNC has no documents pertaining to the Checking Account which predate the Signature Card. PNC 30(b)(6) Dep. Tr. 17:8–18:3. PNC has no documents that might have been provided to Mr. Duncan with the Signature Card. PNC 30(b)(6) Dep. Tr. 35:6–36:19. PNC produced a document titled "Cash Reserve Line Agreement" which states "Effective 1/2/08" but has no internal reference to this document or record of its mailing. PNC 181–82; PNC 30(b)(6) Dep. Tr. 32:25–33:20, 37:10–39:2. Mr. Duncan does not recall whether he was provided any documents referenced in the Signature Card on the date he signed the Signature Card. Plaintiff's Dep. Tr. 23:15–21.

Senior passed in 2010, and Betty in 2009. PNC 37–38. PNC produced a payment history titled "History Card Report" with a "Loan Num 567112212944."[1] PNC 169–80. This payment history shows that the Disputed Line of Credit was paid in full in December 2010, leaving a $0 balance. PNC 173; PNC 30(b)(6) Dep. Tr. 67:11–68:11. In fact, there was an overpayment on the Disputed Line of Credit, resulting in "$36.72 being deposited to the" Checking Account. PNC 173;

---

[1] I refer to the purported "Line of Credit" reported to consumer reporting agencies (CRAs) by PNC as the "Disputed Line of Credit."

PNC 30(b)(6) Dep. Tr. 67:21–68:2. The "History Card Report" shows "Statement Produced" on December 24, 2010 and January 25, 2011. PNC 173. These statements show an overpayment of $36.72 on the Disputed Line of Credit in December 2020, which was then transferred out by the end of December 2020. PNC 137–40. The "History Card Report" shows no payment or debit activity or issuance of a statement on the Disputed Line of Credit from February 28, 2011 through October 28, 2019. PNC 173–77. There was no activity on the Checking Account from March 17, 2016 through September 18, 2019. PNC 183–203; PNC 30(b)(6) Dep. Tr. 64:9–18.

PNC produced a letter dated February 5, 2010 addressed only to Senior and Betty, the latter having passed a year earlier, advising that it had received transfer of "your National City Cash Reserve Line." PNC 219–20. PNC and National City merged. The letter also advised of a "change in terms." PNC 219–20. PNC produced "PNC Smart Checking" statements for the Checking Account, which were purportedly mailed after Senior and Betty had passed. The statements showed no activity—no balance, no debits, no credits. PNC 183-203. The "PNC Smart Checking Statements" reflect "RETRN MAIL" above the name and address lines, so they were designated as being returned to sender by USPS, at least as early as the June 2016 statement:



PNC 183. The "RETRN MAIL" notation means that at some point prior to this statement, PNC had received returned mail of a statement. PNC 30(b)(6) Dep. Tr. 53:14–54:18. PNC claims its practice would have been to continue to send statements to the wrong address "until a current address or—or a correct address is provided." PNC 30(b)(6) Dep. Tr. 54:19–25.

The Checking Account and Disputed Line of Credit Account only stayed open for years following December 2010 because "of the linking of the two accounts . . . . the [Disputed Line of Credit] account is basically what—the link to that account is what kept it outside of the—the normal closed process." PNC 30(b)(6) Dep. Tr. 50:18–52:6.

In 2019, PNC converted the Checking Account from a "Smart Account" into a "Standard Account" and began charging service fees. PNC 221–255. PNC testified about this change as follows:

Q. Why was the account changed from smart checking to standard checking?

A. It was an internal PNC project. I believe it was deemed a simplification project where the company reviewed the needs of the customers and revamped the products that were offered—or actually, on the on the books and going forward then, felt the—the business decision better suited moving to a—from the smart account to the standard checking account.

2

Q. Okay. And—and the smart checking account, did—well, what was the difference in fees between smart checking and standard check?

A. Well, this account being a smart checking account had some built in waivers for fees. So this account was not, actually, generating any fees because it had the built-in fee waivers. And one of the differences was that the standard checking no longer had some of the fee waivers.

PNC 30(b)(6) Dep. Tr. 52:20–53:13.

PNC's letter regarding the change to "Standard Checking," dated August 5, 2019, is addressed to the same address noted by PNC as resulting in returned mail for at least three years, i.e., 4656 English Oak Ct., Mason, OH, 45040-2570 ("4656 English Oak Ct"). PNC 183, 221; PNC 30(b)(6) Dep. Tr. 53:14–54:18, 57:1–7, 57:20–24. PNC then assessed fees on the Checking Account but not because of any activity by Mr. Duncan. PNC 30(b)(6) Dep. Tr. 63:5–15, 64:1–8.

There were no checks written on the Checking Account, but PNC charged $3.00 for "Check Images in Statement Fee" on November 19, 2019 and again on December 17, 2019. PNC 205; PNC 30(b)(6) Dep. Tr. 64:19–65:24. All statements for the Checking Account continued to be addressed 4656 English Oak Ct. PNC 205–18.

All statements for the Disputed Line of Credit only listed Senior and Betty and were addressed to 4656 English Oak Ct. PNC 127–162, 183. A letter providing "Important information regarding your PNC Bank Personal Line of Credit Account Number 5003567112212944" only listed Senior and Betty and was addressed to 4656 English Oak Ct. PNC 4. A PNC letter dated July 22, 2020 regarding a returned payment and removal of automatic payment deduction on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. PNC 10. A PNC dunning letter dated August 25, 2020 regarding two missed payments on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. PNC 12–13. Another PNC dunning letter dated August 10, 2020 regarding a past due payment on the Disputed Line of Credit listed Senior only and was addressed to 4656 English Oak Ct. PNC 14–15. PNC produced another letter, dated September 1, 2020, stating that the Disputed Line of Credit "is no longer linked to an active deposit account" only listed Senior and Betty and was addressed to 4656 English Oak Ct. PNC 16–17.

Mr. Duncan learned of derogatory credit reporting about the Disputed Line of Credit in September 2020 while seeking to refinance his mortgage. PNC 45. Mr. Duncan learned in his communications with PNC that the Disputed Line of Credit belonged to his deceased parents, and although he was under no obligation to do so, he paid the $38.25 on the Disputed Line of Credit in an effort to resolve the issue and proceed with his mortgage refinance. PNC 27-28, 1354–55. The receipt for this payment lists the Customer as "Duncan Sr." PNC 1354.

Mr. Duncan then repeatedly disputed the credit reporting of the Disputed Line of Credit to PNC directly, including with the assistance of a lawyer, and through the CRAs. PNC 20–28, 30–41, 43–46, 54–55, 72–90, 92–121, 125–26. PNC sent a letter to Mr. Duncan's lawyer asking Senior and Betty to sign a form authorizing disclosure of information about the Disputed Line of

3

Credit to the lawyer. PNC 29. PNC repeatedly refused to cease reporting the Disputed Line of Credit as Mr. Duncan's responsibility. PNC 18–19, 51–53, 65–71, 80–83, 91–101, 122–26, 1338–51. In September 2021, PNC did, however, update its credit reporting to remove any delinquency reporting for the Disputed Line of Credit. PNC 19. After Mr. Duncan filed suit against PNC, Equifax, Experian, and Trans Union, Experian sent an electronic Automated Consumer Dispute Verification form (ACDV) to PNC, which contained the following dispute information:

| Dispute Code 1: | 002:Belongs to another individual with the same/similar name. Provide or confirm complete ID. |
| Dispute Code 2: | |
| FCRA Relevant Information: | INVOLVED IN LITIGATION CONS CLAIMS THIS BELONGS TO HIS LATE FATHER ERNEST LEE DUNCAN SR |

PNC 1338 (highlighting added). PNC responded by reinserting delinquency reporting for the month of August 2020. PNC 1339. PNC believed that it subsequently adjusted this reporting to report no past due balance and its corporate designee was surprised upon viewing a recent credit report from Experian showing a delinquency in August 2020. Plaintiff_Duncan_8703, 8726–27; PNC 30(b)(6) Dep. Tr. 89:21–90:12, 91:5–9.

## Opinions

- Plaintiff's case involves a major, well-known and long-standing cause of credit report inaccuracy—namely, the furnishing of erroneous data by furnishers such as PNC.[2]

- Adding to the probability that PNC would furnish inaccurate data was the fact that Plaintiff was being confused with his father, Ernest Lee Duncan, Sr., to whom the account actually belonged.

- Additionally, the merger process between National City and PNC, including converting accounts previously maintained at National City to PNC systems, heightened the likelihood of inaccuracy. PNC lacks key documents relating to the Disputed Line of Credit. It has no documentation from National City substantiating any of the terms of the Disputed Line of Credit that were provided to Plaintiff, much less agreed to by Plaintiff

- PNC failed to adequately investigate the false data disputed by Plaintiff. Despite the fact that the notices sent to it by the CRAs, which are known as ACDVs, and the relevant information they contained, and/or were attached to them, made it plain that the account belonged to Plaintiff's deceased father and stepmother, PNC merely did a

---

[2] Knowledge of and consensus about this problem was so widespread that in 1996, Congress amended the Fair Credit Reporting Act ("FCRA") to place duties on furnishers such as PNC (1) to report accurate information to CRAs, and (2) to investigate consumers' disputes of inaccurate and/or incomplete data that were forwarded to furnishers by CRAs, and (3) to correct and/or delete inaccurate/or incomplete data or information that cannot be verified.

cursory check of its own records, and essentially disregarded the compelling information that Plaintiff provided. The compelling information Plaintiff provided came from Plaintiff directly, his attorney, and the disputes and dispute letters he submitted to the CRAs, which were forwarded to PNC.

● Even though giving due regard to the detailed information provided by Plaintiff would have been a fundamental step in conducting an adequate investigation, PNC failed to do so in relation to Plaintiff's dispute. This was integral to PNC's failure to conduct an investigation which was reasonably calculated to determine whether the disputed information was inaccurate, incomplete and could not be verified.  A fundamental reason why the Defendant's responses to Plaintiff's disputes were inadequate was because they did not constitute sufficiently detailed or searching inquiries that were concerned with all of the facts relevant to Plaintiff's case, and which contradicted the inaccurate information PNC was furnishing to CRAs. Basically, at most, PNC continually returned to the same Signature Card from National City that associated Plaintiff with the Checking Account but provided no evidence that Plaintiff had any obligation on the Disputed Line of Credit. Based on the existence of the Signature Card, PNC repeatedly "confirmed" Plaintiff's responsibility for the Line of Credit even though the Signature Card contained no information or terms regarding the Disputed Line of Credit and PNC internal information and documents contradicted Plaintiff's supposed responsibility for the Account.

● In other words, Plaintiff's direct and indirect disputes provided to PNC "on a silver platter" the relevant information it needed to investigate his dispute and determine the information should be deleted from Plaintiff's CRA files. But this did not happen because PNC, at most, engaged in a superficial reviews of the Signature Card that were not reasonably calculated to determine whether PNC possessed any information or documentation establishing Plaintiff's responsibility for the Disputed Line of Credit.

● Upon receiving Plaintiff's direct disputes, PNC repeatedly failed to notate the tradeline as "disputed by consumer" when it furnished information to CRAs. This in turn led to yet another PNC miscue, namely its failure to notate the tradeline as "disputed by consumer" on the ACDVs it returned to CRAs in response to Plaintiff's disputes forwarded to PNC by CRAs. The proper way for PNC to notate a tradeline as "disputed by consumer" is to mark it with the Metro 2 "XB Code." But PNC did not do this. Had PNC done this, it would have mitigated the harm to Plaintiff's creditworthiness that the inaccurate tradeline was causing. Even when PNC used a compliance condition code (CCC), it used the wrong one, "XH," i.e., "Account previously in dispute; the data furnisher has completed its investigation." PNC 455, 814. The use of "XH," in the face of Mr. Duncan's ongoing and repeated dispute of his responsibility for the Disputed Line of Credit, because "[b]y reporting a CCC of XH when [Mr. Duncan] was continuing to dispute the accuracy of [PNC's] reporting, [PNC] 'create[d] a materially misleading impression,' that the [Disputed Line of Credit] was not in dispute." *Wood v. Credit One Bank*, 277 F.Supp.3d 821, 854 (E.D. Va. 2017); *see also Seamans v.*

5

*Temple Univ.*, 744 F.3d 853, 866–67 (3d Cir. 2014); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008).[3]

- PNC's failures to adequately investigate Plaintiff's disputes, which resulted in inaccurate, derogatory, data remaining in Plaintiff's credit files, reflected its serious disregard for established standards of accuracy, and for fairness, and privacy, and for robust notice regarding them from FCRA enforcement authorities.

- PNC's inaccurate reporting damaged Plaintiff's creditworthiness and reputation in at least two ways:

  First, by reporting a derogatory "status" of delinquent by 30 days rendered Plaintiff unlikely to obtain credit on terms commensurate with his otherwise sterling credit history.

  Second, the wrongful association of Plaintiff with the Disputed Line of Credit misrepresented Plaintiff's responsibility for that account.

- It is well known in the field of credit reporting and credit scoring that victims of chronic credit report inaccuracy are subjected to and endure a common pattern of problems. This meant that the kinds of problems PNC inflicted upon Plaintiff, which were consistent with those experienced by previous victims of chronic credit report inaccuracy, were or should have been foreseeable to PNC.

### Plaintiff's Case

As mentioned above, Plaintiff's disputes, as conveyed to PNC by CRAs, provided PNC with compelling information that the PNC tradeline was inaccurate. It was inaccurate to report any association of Plaintiff with the Disputed Line of Credit. It was doubly inaccurate to report that Plaintiff was delinquent as to the Disputed Line of Credit. Even if Plaintiff was responsible for the Disputed Line of Credit, any purported delinquency was entirely the result of PNC's mishandling of the Checking Account and the Disputed Line of Credit and its repeated failure to provide any notice to Plaintiff of his supposed responsibility for the Disputed Line of Credit, the ongoing open status of the Checking Account, the fees supposedly assessed to the Checking Account, or the potential that these fees would result in charges assessed to the Disputed Line of Credit.

Had PNC conducted an adequate investigation that was actually designed to determine the accuracy or completeness of the disputed information, PNC would have found a plethora of information contradicting its credit-reporting, starting with the Signature Card that provided no basis to deem Mr. Duncan liable on the Disputed Line of Credit. There were also no bills for the Disputed Line of Credit directed to Mr. Duncan. The Disputed Line of Credit had been fully paid following the deaths of Senior and Betty, and there was no activity on the Disputed Line of Credit

---

[3] I quote from and cite to cases not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers like PNC of the specific requirements imposed upon them by 15 U.S.C. § 1681s-2(b).

for nearly nine years, until PNC caused the Checking Account to overdraft when it charged $3.00 for "Check Images in Statement Fee" on November 19, 2019. Even after this activity, all of the statements for the Disputed Line of Credit listed Senior and Betty as the accountholders. They were addressed to 4656 English Oak Ct. None of the dunning correspondence for the Disputed Line of Credit listed Mr. Duncan as an accountholder. And, to the extent PNC mailed any of that correspondence, it knew it was sending it to an incorrect address. There was also never any notice of the "Check Images in Statement Fee" to Plaintiff or that the Checking Account terms had been altered to impose such fees.

The presumed facts set forth above demonstrate the lack of any connection between Mr. Duncan and the Disputed Line of Credit or that he was ever delinquent on that account.

Instead, PNC repeatedly verified Plaintiff's responsibility for the Disputed Line of Credit with no basis to do so. These verifications resulted from cursory investigations and ignored the ample contradictory evidence and information provided by Mr. Duncan and the contradictory information and documents in PNC's own systems. PNC's "investigations" sometimes verified that the account had been delinquent and then changed course and removed the delinquency reporting. Even after PNC's investigator Kenneth Hafner determined that no delinquency should be reported as to Plaintiff regarding the Disputed Line of Credit, when PNC was sued and Experian sent another ACDV, PNC's "investigation" resulted in a reversal of the elimination of the derogatory payment history from August 2020.

PNC repeatedly failed to note Plaintiff's dispute of its credit reporting through the use of an appropriate CCC, and when it did employ a CCC, it used the wrong one. This occurred despite the notice to furnishers provided by the Third Circuit in *Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014) that once a consumer submits a meritorious dispute of credit reporting to a furnisher, directly or indirectly through the CRAs, the furnisher must notate that tradeline as disputed by consumer.

The summaries of PNC's dispute investigations recorded by its investigators demonstrate the inadequacy of its investigations:

7

**Date**: 4/1/2021

**Account**: 5003567112212944
**Maker**: ERNEST L DUNCAN Junior
**Co-Maker**:
**Authorized User**: N/A

**Updated Account** ___X___

**Deleted Account** ____          **No Action Taken** ____

**COMMENT**: Recvd eoscar from Ernest disp Belongs to another individual with the same/similar name. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, pymt rating, cond stat, port type, int type, terms, date clsd, act pymt. Grid accur. acct pif. 0 bal. exp.

**COMPLIANCE CONDITION CODE USED**:

Letter Sent to Consumer:          Yes ___          No ___X___
(Please attach a copy of the letter)

Name of Processor: Milton Azeem

PNC 91.

8

**Date**: 5/20/2022

**Account**: 5003567112212944
**Maker**: ERNEST L DUNCAN Junior
**Co-Maker**:
**Authorized User**: N/A

**Updated Account** __X__

**Deleted Account** ____          **No Action Taken** ____

**COMMENT**: Recvd eoscar from Ernest disp Not liable for account. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, manner of pymt, int type, doai, dolp, date clsd. Grid accur. acct pif. efx.

PNC 122.

**Date**: 5/20/2022

**Account**: 5003567112212944
**Maker**: ERNEST L DUNCAN Junior
**Co-Maker**:
**Authorized User**: N/A

**Updated Account** __X__

**Deleted Account** ____          **No Action Taken** ____

**COMMENT**: Recvd eoscar from Ernest disp Belongs to another individual with the same/similar name. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, pymt rating, cond stat, port type, int type, terms, date clsd, act pymt. Grid accur. acct pif. exp.

PNC 123.

Date:  5/20/2022

Account: 5003567112212944
Maker:  ERNEST L DUNCAN Junior
Co-Maker:
Authorized User: N/A

**Updated Account** __X__

**Deleted Account** ____          **No Action Taken** ____

**COMMENT**: Recvd eoscar from Ernest disp Belongs to another individual with the same/similar name. imgs show disp ltr disp the same. Revwd cacs, lis, xnet. Updtd demos, comp code, int type. Grid accur. acct pif. tun.

PNC 124.

Date: 03/21/2023

Account#:   5003567112212944

Maker:       ERNEST DUNCAN
Co-Maker:

Authorized User:

Updated Account:  x          Deleted Account:          No Action Taken:

Rec'd EOSCAR from Ernest/EXP. Disputing acct belongs to another individual with the same/similar name. FCRA Relv Info: INVOLVED IN LITIGATION CONS CLAIMS THIS BELONGS TO HIS LATE FATHER ERNEST LEE DUNCAN SR. No images included. Verified demos - accurate per CACS. Acct updated to 13/1. Updated DC, ACT PAY and DOFD per stmt retrival. GRID - accurate per CACS.

Name of Processor: Danielle Mackanick

PNC 1340.

10

```
It is also important for the client to identify the information believed
to be incorrect and provide, if possible, the name of the credit bureau
involved and/or a copy of the credit report.
Comments: 2021-09-13 08:51:10 BROOKS,VALERIE A
         RECD E OSCAR FROM ERNEST DISPUTING BELONGS TO ANOTHER NO IMA
         BES REVWD LIS CASC ACLS ACCT IS REPORTING ACC AS PD CLOSED WITH
 0 BAL
         UPDATED DOAI DOLP DATE LCOSED DEMOS MATCH GRID UPDATED ( EQU)
```

PNC 1346.

```
Comments: 2021-09-13 08:44:38 BROOKS,VALERIE A
         RECD EOSCAR FROM ERNEST DISPUSTING BELONGS ANOTHER NO IMAGES
          REVWD LIS CACS ACLS ACCT IS REPORTING ACC AS PD CLOSED WITH
 0BAL
         UPDATED DOAI DOLP DATE CLOSED DEMOS MATCH GRID UPDATED ( EQU)
```

PNC 1347.

```
   Comments: 2021-08-27 09:09:29 KARPINSKI,SHARON L
         RECD EOSCAR DISP FROM ERNEST CLAIMS BELONGS TO ANOTHER INDV
         NO IMAGE ADDED BELONGS TO DECEASED PARENTS REVD CACS LIS ACLS
     ACCT PD
         CLSD UPDATED PYMT AMT SCH ZERO ALL OTHER DATES AMTS ACCURATE
     GRID
         ACCURATE (TRANSU)
```

PNC 1349.

```
  Comments: 2021-03-11 09:58:35 GERACI,DEREK
         RCVD EOSCAR DISPUTE FROM ERNEST DISPUTES NOT THEIRS WITH IMA
         GES RVWD CACS LIS ACLS ACCOUNT IS ACCURATE PAID CLOSED UPDATED
 DOAI
         SCHED AMOUNT GRID IS ACCURATE DEMS MATCH ACCURATE IS THEIRS EXP
 DISP
```

PNC 1350.

```
  -....... ..., .. . ...,. .. ... ...... ......
  Comments: 2021-03-02 13:35:46 BROOKS,VALERIE A
         RECD E OSCAR FROM ERNEST DISPTUING BELONGS TO ANOTHER NO IMA
         GES REVWD LIS CACS ACLS ACCT IS REPORTING ACC AS PD CLSOED WITH
 0 BAL
         UPDATED DOAI FDOD SMP DEMOS MATCH GRID ACC ( TU)
```

PNC 1351.

Thus, PNC's responses to Plaintiff's ACDV disputes were woefully inadequate because:

(1) PNC did not investigate the essence of Plaintiff's dispute—namely, that he had never obligated himself to the Disputed Line of Credit and could not have been delinquent on an account that had activity long after the death of Senior and Betty.

11

(2) PNC disregarded information in its possession that supported his disputes, and

(3) PNC disregarded industry standards for accuracy. (See below.)

### PNC & The "ACDV-Exchange"

Participants in the credit reporting industry system rely on the ACDV-exchange, operated through an industry-created system known as "e-OSCAR," as the principal means of responding to a consumer's dispute.  When relied on exclusively and operated defectively, as PNC did in Plaintiff's case, the ACDV-exchange has been widely criticized for being inadequate to reasonably investigate disputes such as Plaintiff's that require careful consideration and the goal of determining whether the disputed information is accurate and complete. To be clear, the problem is not that PNC exchanges ACDVs with CRAs. The problem is that PNC does so without conducting an adequate investigation of the disputed data.

The ACDV-exchange essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs).  When a consumer sends his dispute to the CRA, the CRA populates the ACDV form with the disputing consumer's identifying information (name, address, city-state-zip, SSN, sometimes previous address),[4] and a digital code that cryptically describes the dispute and instructs a furnisher like PNC to investigate what aspects of the account can be verified.

Upon receipt of the ACDV, a furnisher such as PNC is supposed to conduct an investigation with respect to the disputed information, and review all relevant information, including that provided by the CRA.

The Webster's New Collegiate Dictionary defines "investigate" as, "v.  To observe or study by close examination and systematic inquiry. Systematic—adj.  Marked by thoroughness and regularity."  For the reasons I described above, PNC's responses to Plaintiff's disputes were neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

The sections above describe Plaintiff's detailed dispute and the compelling information PNC had supporting these disputes.

But PNC failed to give due regard to this compelling information. Instead, PNC's ACDV department not only did not consider this information, it did not even consider doing so.

In response to ACDVs, PNC was not even concerned with determining whether its documents and information confirmed Plaintiff's responsibility for the Disputed Line of Credit. At most, its investigators cursorily reviewed the Signature Card and confirmed that Plaintiff's name and information on that Signature Card (for a Checking Account) confirmed he was responsible for the Disputed Line of Credit. None of the documents I have reviewed show any specific terms of the Disputed Line of Credit, much less that Mr. Duncan signed anything agreeing

---

[4] The CRAs often refer to identifiers as "indicative data."

to any unknown terms related to the Disputed Line of Credit. This underscored the inadequacy of PNC's responses to Mr. Duncan's disputes because since PNC failed to diagnose that Plaintiff's was a dispute about liability for the Disputed Line of Credit based on the details provided in Mr. Duncan's disputes and dispute letters. PNC then also did not investigate or confirm Plaintiff actually agreed to the Disputed Line of Credit, received any notice of its terms, received any statements, or had any ability to understand why PNC claimed he was responsible for the Disputed Line of Credit. PNC could not realistically claim that the information it was furnishing to CRA's regarding Plaintiff was "verified" or "accurate."

**Accuracy & Completeness**

**Opinions:** Possibly the most important standard in consumer credit reporting is accuracy. If consumer report information is inaccurate, then it can harm consumers, financial institutions, users of credit reports, and even the economy as a whole.

Another important standard in credit reporting coinciding with accuracy is completeness. Thus, in order to achieve credit reporting accuracy and completeness, it would be necessary for a creditor-furnisher to portray the tradeline in its proper context.

**Basis For Opinion**

This point was driven home during the 2003 Congressional hearings on the FCRA, when Senator Richard Shelby (R-AL), Chairman of the Senate Banking Committee opened the July 10, 2003 hearing, which was entitled, "The Accuracy of Credit Report Information and the Fair Credit Reporting Act," by stating, "This morning, we take up one of the most important issues, if not the most important, associated with the FCRA: the accuracy of the information contained in consumer credit reports. Changes in our financial services industries have made accuracy more important than ever. Credit report information is increasingly used as the key determinant of the cost of credit or insurance… With the rewards for good credit so meaningful, and the penalties for bad credit so severe, it is absolutely critical that credit reports accurately portray consumers' true credit histories."[5]

The importance of accuracy is emphasized throughout the consumer credit reporting industry through such common items as the subscriber contracts and user agreements between consumer reporting agencies and creditors. (Creditors typically are both "furnishers" of consumer data, and users of CRAs' data in the form of credit reports.)

Moreover, in the Consumer Data Industry Association's ("CDIA") "2015 Credit Reporting Resource Guide ®," (also known as the "CDIA Manual"), which sets forth the industry standards for participants in the credit reporting industry, and which Experian was intimately involved in establishing and publishing, accuracy is the first standard addressed:

---

[5] "The Accuracy of Credit Report Information and the Fair Credit Reporting Act," Senate Banking Committee; July 10, 2003.

Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required. Federal and state laws already regulate certain aspects of credit reporting. In order to protect your ability to conduct business without the further intervention of external forces, you must participate in the accuracy process.

Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories. This can only be accomplished if the provider of consumer data understands the tools that are available and adheres to the standards for credit reporting.

The above-mentioned CDIA Manual, the creation of which directly involved the CRAs, is designed to assure compliance with the accuracy standards set forth by the federal and state credit reporting statutes. And the CDIA is the trade organization created to represent the interests of Experian, Equifax and Trans Union, and is the principal source of nearly all of the industry-created implementation standards for consumer credit reporting in the credit reporting industry.

On the issue of "accuracy," the CDIA manual sets forth the following standards.

**[Beginning of Excerpt from CDIA Manual]**

**ACCURACY AND INTEGRITY DEFINITIONS**

The 2010 FACT Act Data Furnisher rules define the term "Accuracy" to mean that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:

☐ Reflects the terms of and **liability** for the account or other relationship;
☐ Reflects the **consumer's performance and other conduct** with respect to the account or other relationship; and
☐ Identifies the appropriate consumer. [Emphasis added.]

**[End of Excerpt from CDIA Manual]**

The CDIA adopted and published these standards after they were first established by the FTC[6] pursuant to its authority under the FCRA.

The FTC rules also stated that information should be:

---

[6] Federal Trade Commission, 16 CFR Part 660. "Procedures To Enhance the Accuracy and Integrity of Information Furnished to Consumer Reporting Agencies Under Section 312 of the Fair and Accurate Credit Transactions Act; Final Rule; Guidelines for Furnishers of Information to Consumer Reporting Agencies.

14

- Substantiated by the furnisher's records at the time it is furnished.

- Furnished in a form and manner that is designed to minimize the likelihood that the information may be incorrectly reflected in a consumer report

Applying these standards listed above, we can see that the PNC tradeline was not accurate in PNC's ACDV responses because:

(1)    It did not reflect Plaintiff's liability in relation to the Disputed Line of Credit.

(2)    It did not reflect Plaintiff's performance and other conduct with respect to the Disputed Line of Credit.

(3)    It was not substantiated by PNC's records at the time it was furnished.

### Consequence of Wrongfully 'Parking' Debt in Consumer's Credit Files

It should be noted that it is conceivable that a creditor can have an economic incentive to err on the side of reporting to CRAs all debts that might or might not be owed. This is because if a consumer seeks to obtain credit, but has an unpaid debt showing on his/her credit report, the creditor typically will require the consumer to resolve the matter before the creditor will agree to approve the consumers' application for credit. One simple and straightforward way for consumers to resolve such a debt is to pay it off so that the other creditor mis-reporting the debt will then instruct the CRAs to show the debt as paid with a zero balance.

In other words, creditors know that if they "park" a debt on a consumer's credit report, odds are that said consumer eventually will have to pay off that debt.

Accordingly, furnishers such as PNC know or should know that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms."[7] As I wrote in my book, "Credit Scores and Credit Reports":

… Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Pg. 31 – 3rd Ed.]

However, at least in part because of creditors' economic incentive to err on the side of reporting to CRAs all debts that might or might not be owed, the problem has persisted.

---

[7] Such explicit notice, for example, was provided in (*Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993)). I cite this court case solely because it goes to notice, not to express legal opinions or conclusions.

**PNC's Credit Reporting Harmed Plaintiff's Creditworthiness**

PNC's inaccurate reporting damaged Plaintiff's creditworthiness and reputation. For example, by reporting a delinquent "status," the PNC tradeline lowered his FICO scores. Mr. Duncan's credit was stellar but for the false, derogatory reporting by PNC.

**Areas of Testimony: Problems Known & Common to Victims
of Unreasonable Credit Report Inaccuracy**

In my opinion, Plaintiff became a victim of "unreasonable credit report inaccuracy" because of Defendant's actions.

It is important that the jury understands that victims of unreasonable credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts. The primary purpose of the following section is to provide the jury with a methodology and/or guidance for identifying and assessing the kinds of problems and/or damages Plaintiff experienced because of the inaccuracies wrongly inflicted upon him by PNC's failures.

I first published the categories and factors listed below in my Congressional testimony (Senate and House) in 2003, and in the First Edition of my book, "Credit Scores and Credit Reports," in 2004, as well as the Second and Third Editions (2007). In fact, my book is one of the few books – it not the only book – with an entire chapter dedicated to examining the typical problems experienced by consumers who are victims of unreasonable credit report inaccuracy. (See Chapter 20, "Damage and Damages.")

These categories are based upon the specialized knowledge which I have accumulated since 1978, including, but not limited to, reading, listening to or otherwise becoming aware of consumers describing what it is like to become a victim of unreasonable credit report inaccuracy, which I define as being unable to correct inaccuracies in one's credit reports within a reasonable period of time.

I was able to read, listen to or otherwise become aware of consumers describing what it was like to become a victim of unreasonable inaccuracy through a myriad of channels, including research studies and surveys, Congressional and state legislative testimony, media reports, both print and electronic, conferences, attorneys, and through the hundreds of cases in which I have been retained as an expert in which consumers have described their experiences and damages. (See, for example, the attached CV.)

Despite some minor refinements in special cases, these categories and factors have withstood the test of time in understanding the nature of problems for consumers typically arising from unreasonable credit report inaccuracy. Importantly, they also demonstrate that such damages are foreseeable to companies involved in credit reporting that are responsible for causing a consumer to become a victim of unreasonable credit report inaccuracy.

To be clear, that apart from harm to Plaintiff's creditworthiness, on which I am qualified and expect to opine, I want to emphasize my understanding that most, if not all, of the testimony regarding Plaintiff's specific actual damages will come from fact witnesses.

However, the trier of fact still could be helped by expert testimony in this area in understanding the context and the foreseeability of Plaintiff's problems and experiences.

Importantly, as stated above, the analysis below helps the jury put Plaintiff problems and experiences in the proper context, and is relevant for several reasons, including the foreseeability of the types of problems that PNC knew or should have known it would inflict on Plaintiff if, as happened in his case, it made him a victim of unreasonable credit report inaccuracy.

Moreover, if the trier of fact determines that Plaintiff was damaged, then the Factors listed below the Categories could help the jury evaluate the severity of Plaintiff's damages.

**Some Categories of Typical Negative Impacts of Unreasonable Credit Report Inaccuracy**

It is important that the trier of fact understands that victims of unreasonable credit report inaccuracy often experience a series of several known and common types of problems or negative impacts.

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit or employment because of inaccurate data, or only able to obtain credit at less favorable rates, or only able maintain employment status upon facing unfavorable scrutiny.
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

**Key Factors To Consider When Assessing Severity of Negative Impact**

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

17

**Plaintiff's Problems Were Consistent with Other Victims of Credit Report Inaccuracy**

In my opinion, the problems Plaintiff experienced were consistent with other victims of unreasonable credit report inaccuracy. His experiences touched on many of the eight categories cited above.

In addition to the categories above, it is important for the trier of fact to understand that victims of unreasonable inaccuracy state that it can be very distressful not knowing everyone who may have associated them with highly derogatory credit data. They also state it can be difficult to maintain constructive personal relationships under stress,[8] and it can be difficult to perform adequately at one's job.

**PNC Harmed Plaintiff's Privacy Interests**

In addition to the problems described above, PNC harmed Plaintiff's privacy interests— both by making him a victim of unreasonable inaccuracy, and by forcing Plaintiff to repeatedly dispute the inaccurate information.

As the U.S. Supreme Court has recognized, "To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." (See *U.S. Dept. Of Justice v. Reporters Committee*, 489 U.S. 749 [1989].)

And, as the Supreme Court also has recognized, "… the concept of personal privacy … is not some limited or 'cramped notion' of that idea." (See *Favish v. National Archives & Records Administration*, 541 *U.S.* 157 [2004].)

These are some of well-known, long-standing ***privacy interests*** of Plaintiff that PNC harmed:

- The Right To Be Let Alone – The Right To Protection of Private Life
- Reasonable Control Over Personal Information
- Intrusion upon seclusion or solitude, or into private affairs
- Public disclosure of embarrassing private facts
- Publicity which places a person in a false light in the public eye

Again, this section on harm to Plaintiff's privacy is not intended to express legal opinion or conclusions, but to identify, according to a consensus among privacy experts, the kinds of ***privacy interests*** that are relevant to Plaintiff's case.

---

[8] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifies its use of credit reports in setting insurance rates. (See comments of Allstate Insurance General Counsel Steven Sheffey, "Credit Scores and Credit Reports," *op cit.*)

18

**PNC Knew or Should Have Known Its Actions Would Have Negative Impact**

The history of credit reporting cited above, which includes years of congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, made it abundantly clear to PNC that failing to prevent Plaintiff from becoming a victim of unreasonable inaccuracy would have a highly negative impact on him.

**FCRA Enforcement Authorities Provided Notice of What Constituted Inadequate Investigations to Furnishers Like PNC**

Opinion: The FCRA has various and several enforcement authorities. Some of the FCRA's very important enforcement authorities have unequivocally put furnishers such as PNC on notice that the type of cursory ACDV-Exchange-and-ID/data-comparison conducted by a furnisher in response to an ACDV dispute—as PNC conducted in Plaintiff's case—did not amount to a reasonable investigation under the FCRA.

The remainder of this section of the report is to provide the basis for this opinion. I quote at length from the following five opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers like PNC regarding the need to carefully evaluate—and probably change—its ACDV investigation procedures.

**Notice – Fourth Circuit's Opinion in *Johnson v. MBNA***

Opinion: The FCRA's enforcement authorities have put furnishers such as PNC on notice that they need to conduct a reasonable investigation in response to ACDV disputes, and that the kind of superficial, data comparison exercise that PNC conducted in Plaintiff's case was not acceptable because it did not constitute a reasonable investigation.

The following provides the bases for this opinion:

Notably two federal courts—U.S. District Court for the Eastern District of Virginia and the U.S. Court of Appeals for the Fourth Circuit—issued opinions[9] that held unequivocally that the type of ACDV-Exchange-and-ID-data-comparison conducted by a furnisher did not amount to a reasonable investigation under the FCRA. I quote at length from these two opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers like PNC regarding the need to carefully evaluate—and probably change—its ACDV investigation procedures.

---

[9] I quote from these cases, not to express any legal opinions or conclusions, but because, in my expert opinion, this very important court rulings provided important notice to furnishers such as PNC that they must conduct reasonable investigation in response to ACDV disputes, and that the kind of superficial, data comparison exercise that PNC conducted in Plaintiff's case was not acceptable because it did not constitute a reasonable investigation.

By way of background, the FCRA lawsuit stemmed from an MBNA MasterCard opened by Linda Johnson's ex-husband, Edward Slater, in 1987—four years before he married her. They had since divorced. Johnson said she was only an authorized user, which meant she was not responsible for paying the account. In December 2000, Slater filed for bankruptcy, and MBNA promptly removed his name from the account. That same month, MBNA contacted Johnson and informed her that she was responsible for the approximately $17,000 balance on the account. After obtaining copies of her credit report from Experian, Equifax, and Trans Union, Johnson disputed the MBNA account with each of them. Experian and Trans Union sent automated consumer dispute verifications (ACDVs) to MBNA specifically indicating Johnson's claim that she was not a co-obligor on the account.

MBNA agents responded by conducting the ACDV-Exchange, comparing the disputed data with the account information contained in MBNA's computerized Customer Information System (CIS). Since the two were identical, MBNA "verified" that the disputed information was correct. In other words, MBNA did nothing more than confirm that it indeed reported the original (inaccurate) data. The CRAs continued to report it on Johnson's credit report.

Tricia Furr, an MBNA credit reporting specialist, confirmed that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN. Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported." Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[10]

Reading from MBNA's internal records, MBNA Vice President Edward Hughes quoted an MBNA employee's communication to a customer's attorney: "It would be up to (c)ard holder to prove MBNA was reporting wrong, not MBNA proving right."

The jury disagreed with MBNA's argument that its actions did not violate the FCRA, and awarded Johnson $90,300 in damages.

Judge Richard Williams affirmed the jury verdict. "According to [MBNA], the duty to investigate means that any investigation is sufficient, no matter how cursory. Such a construction is illogical. There would be no point in having the statute, and the requirement of an investigation, if there was no qualitative component to the investigation. The statute itself does impose a qualitative component to the [MBNA's] negligence," Judge Williams said.[11]

MBNA appealed Judge Williams' decision. But on February 11, 2004, a three-member panel of the U.S. Court of Appeals for the Fourth Circuit affirmed, finding that MBNA's standard response to consumer disputes did not amount to a true "investigation" under the FCRA.

---

[10] The depositions of MBNA personnel were taken in the case, *Linda Johnson v. MBNA America Bank, N.A.*, Slip Op. No. 3:02 cv 523, U.S. District Court for the Eastern District of Virginia (Richmond Division).

[11] *Johnson v. MBNA America Bank*, op. cit., bench ruling February 24, 2003

"MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkins. "Stated differently, MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."[12]

"The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.'  Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA.  It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors.  We therefore hold that § 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."

MBNA also tried to argue that its investigation in Johnson's case was reasonable.  But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

*"The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications.  Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably* in failing to verify the accuracy of the information contained in the CIS," Judge Wilkens wrote. [Emphasis added.]

When read in conjunction with the Third Circuit's opinion in *Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014), which held that furnishers must conduct reasonable investigations of consumer credit disputes, *Johnson* should have made it perfectly clear to PNC that it needed to conduct a true, qualitative investigation in response to Plaintiff's disputes.

### Notice—Ninth Circuit's Opinion in *Gorman v. Wolpoff & Abramson*

In my opinion, *Johnson* provided important notice to participants in the credit reporting system like PNC of adequate standards for conducting reasonable investigations, in my opinion. Additional important notice was provided by the U.S. Court of Appeals for the Ninth Circuit in

---

[12] *Johnson v. MBNA America Bank*, 357 F.3d 426 (4th Cir. 2004).

*Gorman v. Wolpoff & Abramson,* 584 F.3d 1147 (9th Cir. 2009). Here are some relevant excerpts from that opinion:

**[1]** The text of the FCRA states only that the creditor shall conduct "an investigation with respect to the disputed information." § 1681s-2(b)(1)(A). MBNA urges that because there is no "reasonableness" requirement expressly enunciated in the text, the FCRA does not require an investigation of any particular quality; *any* investigation into a consumer's dispute — even an entirely unreasonable one — satisfies the statute.

**[2]** This court has not addressed MBNA's contention about the FCRA's investigation requirement. But, MBNA made — and lost — the same argument before the Fourth Circuit. *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 429-31 (4th Cir. 2004). Concluding that the statute includes a requirement that a furnisher's investigation not be unreasonable, the Fourth Circuit first noted that the plain meaning of the term "investigation" is a "'detailed inquiry or systematic examination,'" which necessarily "requires some degree of careful inquiry." *Id.* at 430 (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000)). Second, the Fourth Circuit reasoned that because the purpose of the provision is "to give consumers a means to dispute — and, ultimately, correct — inaccurate information on their credit reports," *id.* at 430-31, a "superficial, *un*reasonable inquir[y]" would hardly satisfy Congress' objective. *Id.* at 431. The Seventh Circuit, without discussing the issue, has also found an implicit reasonableness requirement. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) ("Whether a defendant's investigation [pursuant to § 1681s-2(b)(1)(A)] is reasonable is a factual question normally reserved for trial."); *see also Johnson,* 357 F.3d at 430 n.2 ("[D]istrict courts that have considered the issue have consistently recognized that the creditor's investigation must be a reasonable one."

**[3]** The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute. Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." *Nelson*, 282 F.3d at 1060. A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry …

As we have noted, the term "investigation" on its own force implies a fairly searching inquiry.

Nevertheless, MBNA urges that "Congress intended to impose a more rigorous duty of investigation on CRAs than on furnishers of information." But MBNA does not tell us why Congress would mandate shoddy or superficial

furnisher investigations, not calculated to resolve or to explain the actual disagreement or to aid in the CRA's "reasonable reinvestigation."

Indeed, as the statute recognizes, ***the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt*** than the CRA does on reinvestigation. With respect to the accuracy of disputed information, the CRA is a third party, lacking any direct relationship with the consumer, and its responsibility is to "*re*investigate" a matter once already investigated in the first place. §1681i(a)(1) (*emphasis added*). It would therefore make little sense to impose a more rigorous requirement on the CRAs than the

furnishers. Instead, the more sensible conclusion is that, if anything, the "reasonable" qualifier attached to a CRA's duty to reinvestigate limits its obligations on account of its third-party status and the fact that it is repeating a task already completed once. Requiring furnishers, on inquiry by a CRA, to conduct at least a reasonable, non-cursory investigation comports with the aim of the statute to "protect consumers from the transmission of inaccurate information about them." *Kates v. Crocker Nat'l Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985).

**[5]** We thus follow the Fourth and Seventh Circuits and hold that the furnisher's investigation pursuant to § 1681s-2(b)(1)(A) may not be unreasonable.

In *Johnson*, the CRA's notice to MBNA read: "CONSUMER STATES BELONGS TO HUSBAND ONLY;" "WAS NEVER A SIGNER ON ACCOUNT. WAS AN AUTHORIZED USER." *Id.* at 429. The underlying facts were that Johnson's future husband opened an MBNA credit card account. Some years later, after they were married, Johnson's husband filed for bankruptcy, and MBNA told Johnson she was responsible for the balance, maintaining that she was a co-applicant, and therefore a co-obligor, on the account. *Johnson*, 357 F.3d at 428-29. Johnson argued that she was merely an authorized user. *Id.* In response to the notice to the CRAs, MBNA only confirmed Johnson's identifying information and confirmed that its internal computer system indicated she was the sole responsible party on the account. *Id.* at 431. At no time did MBNA try to ascertain whether Johnson's information — that she had not signed the application form — was correct.

The Fourth Circuit held this investigation was unreasonable:

> The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS [MBNA's internal computer system] and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS. *Id.*

**[13]** In contrast to *Johnson*, in Gorman's case MBNA did review all the pertinent records in its possession, which revealed that an *initial* investigation had taken place in which MBNA contacted both Gorman and the merchant. Thus, unlike in *Johnson*, MBNA had — albeit earlier — gone outside its own records to investigate the allegations contained in the CRA notice, and on reading the notice, did consult the relevant information in its possession. *Johnson* does not indicate that a furnisher has an obligation to repeat an earlier investigation, the record of which is in the furnisher's records.

[End of Excerpt *Gorman v. Wolpoff & Abramson*.]

**Notice—Eleventh Circuit's Opinion in *Hinkle v. Midland***

In my opinion, *Johnson* and *Gorman* provided important notice to participants in the credit reporting system like Defendant of adequate standards for conducting reasonable investigations. Additional important notice was provided by the U.S. Court of Appeals for the Eleventh Circuit in *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F. 3d 1295 - Court of Appeals, 11th Circuit, (2016). **Here are some relevant excerpts from that opinion**:

Should the investigation determine that the disputed information is inaccurate or incomplete or cannot be verified, the furnisher must as appropriate, based on the results of the reinvestigation promptly modify, delete or permanently block the reporting of that information to CRAs. *§ 1681s-2(b)(1)(E)* …

*Section 1681i(a)* imposes a duty to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer. Given the interrelated nature of *§§ 1681s-2(b)* and *1681i(a)*, reasonableness is an appropriate touchstone for evaluating investigations under *§ 1681s-2(b)* …

Dictionary definitions of "verify" and "investigation" support the conclusion that *15 U.S.C.S. § 1681s-2(b)* requires some degree of careful inquiry by furnishers of information.

In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, *§ 1681s-2(b)* requires the furnisher to seek out and obtain such evidence before reporting the information as verified. A claim for failure to investigate is properly raised when a particular credit report contains a factual deficiency or error that could have been remedied by uncovering additional facts. The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses.

*15 U.S.C.S. § 1681s-2(b)* does not impose an unduly burdensome investigation requirement on furnishers of information; rather, it presents them with a choice regarding how they handle disputed information. The first option is to satisfy *§1681s-2(b)* by conducting an investigation, verifying the disputed

24

information, and reporting to the credit reporting agencies that the information has been verified. Verification might be accomplished by uncovering documentary evidence that is sufficient to prove that the information is true. Or it might be accomplished by relying on personal knowledge sufficient to establish the truth of the information. *Fed. R. Civ. P. 56(c)(4)* (summary judgment affidavit); *Fed. R. Evid. 602* (trial testimony).

When a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved for trial.

A second way for a furnisher of information to satisfy *15 U.S.C.S. § 1681s-2(b)* is to conduct an investigation and conclude, based on that investigation, that the disputed information is unverifiable. Furnishers can avail themselves of this option if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire. Having made such a determination, furnishers are entitled to cease investigation and notify the credit reporting agency that the information cannot be verified. *15 U.S.C.S. § 1681s-2(b)(1)(E)*. When a furnisher reports that disputed information cannot be verified, the question of whether the furnisher complied with *§ 1681s-2(b)* will likely turn on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome. The final way to satisfy *§ 1681s-2(b)* is to conduct an investigation and conclude that the disputed information is inaccurate or incomplete. *§ 1681s-2(b)*.

By characterizing *15 U.S.C.S. §1681s-2(b)* as presenting a furnishers of information with a choice, the U.S. Court of Appeals for the Eleventh Circuit does not mean to suggest that furnishers have complete discretion to cease investigation and report accounts as cannot be verified.

The framework of the Fair Credit Reporting Act reflects the fact that *15 U.S.C.S. § 1681s-2(b)* is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information. When a furnisher of information determines that disputed information is false or cannot be verified, the furnisher must notify the credit reporting agencies (CRAs) of this result pursuant to *§ 1681s-2(b)(1)*. The furnisher must also as appropriate, based on the results of the reinvestigation promptly modify, delete or permanently block the reporting of that information to CRAs. *§ 1681s-2(b)(1)(E)*. What the results of the reinvestigation require may vary depending on the nature of the disputed information. But when a furnisher is unable to verify the identity of an alleged debtor, the U.S. Court of Appeals for the Eleventh Circuit is persuaded by the parallel structure of *15 U.S.C.S. §§ 1681s* and *1681i* that the appropriate response will be to delete the account or cease reporting it entirely. …

25

Although whether an investigation is reasonable under the Fair Credit Reporting Act will depend on what the furnisher of information knows about the dispute, the U.S. Court of Appeals for the Eleventh Circuit rejects the proposition that a furnisher may truncate its investigation simply because the credit reporting agency (CRA) failed to exhaustively describe the dispute in its *15 U.S.C.S. § 1681i(a)(2)* notice. Although the notice determines the nature of the dispute to be investigated it does not cabin the scope of the investigation once undertaken. When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly.

[End of Excerpts from *Hinkle*.]

### Notice—Fourth Circuit's Opinion in *Saunders v. BB&T*

It also noteworthy that the U.S. Court of Appeals has ruled that a furnisher like PNC, when responding to an ACDV, must report to the CRA that the consumer previously had disputed the tradeline directly to the furnisher.

**Again, I quote from this case, *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008), not to express any legal opinions or conclusions, but because, in my expert opinion, this very important court ruling provided important notice to furnishers like PNC that after a consumer previously had disputed directly to the furnisher its credit reporting of a tradeline, the furnisher must notate that tradeline as disputed by consumer. Here's an excerpt:**

BB&T would have us create a *per se* rule that furnishers are never obliged to report affirmative defenses or consumer disputes, regardless of how meritorious the dispute may be. Such a rule would be ill advised. Certainly, if a consumer has a meritorious dispute — as the jury concluded Saunders did here — the consumer's failure to pay the debt does not reflect financial irresponsibility. Moreover, some courts have concluded that a disputed debt differs materially from an undisputed debt even if the consumer would not succeed at a trial of the dispute. *See, e.g.*, *Alexander*, 553 F. Supp. at 954 (arguing that consumer's dispute of default on debt, even predicated upon an invalid legal defense, is relevant if the underlying default is relevant). The *per se* rule suggested by BB&T would result in numerous reports with omissions that are "misleading in such a way and to such an extent that [they] can be expected to have an adverse effect." *Dalton*, 257 F.3d at 415 (quotations and modifications omitted).

Nor do we find persuasive BB&T's contention that a furnisher's reporting of an ongoing dispute of a debt is superfluous once a consumer has filed a dispute with any CRA. Among other things, when a furnisher reports a dispute, its report confirms that the consumer has actually contacted the furnisher and explained that the consumer believes he does not owe the debt. Moreover, Saunders presented evidence that, in the course of business, CRAs do not consider the furnisher's

reporting of a dispute superfluous. For instance, when a furnisher responds to a dispute verification form and relates an ongoing dispute, Trans Union records the dispute in the credit report and does not include the derogatory information in assessing the credit score.

In sum, given the evidence before it, the jury could reasonably conclude that BB&T's decision to report the debt without *any* mention of a dispute was "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Id.* (quotations and modifications omitted). The district court did not err in so holding.

BB&T next contends that, even if it violated its duties under § 1681s-2(b), Saunders failed to present sufficient evidence of intent to establish a *willful* violation under § 1681n. BB&T argues that, because Saunders did not provide evidence of the kind of investigation BB&T conducted in response to the dispute verification form, the jury could not conclude that BB&T violated its duties willfully. This argument has force only if Saunders presented no other evidence of intent. But, in fact, Saunders did present other evidence of intent. Specifically, Saunders presented evidence that (1) BB&T's records reflected the ongoing dispute over the debt, (2) BB&T's reports to the CRAs did not reflect that ongoing dispute, and (3) BB&T *intended* not to report that ongoing dispute. Saunders offered the *admission* of BB&T officer Holben that BB&T intended to report Saunders' loan *without mentioning* Saunders' communications or the ongoing dispute reflected throughout BB&T's records. Moreover, evidence at trial revealed that BB&T had *never* updated the report to reflect the dispute.

[End of Excerpt *Saunders v. Branch Banking & Trust Co. of Va.*]

### Notice—Third Circuit's Opinion in *Seamans v. Temple University*

It is also noteworthy that the Third Circuit, nearly ten years ago, reiterated the obligation of furnishers like PNC to conduct "reasonable" investigations in response to consumer credit disputes and "conclude[d] that a private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed." *Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014).

**Again, I quote from this case, *Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014), not to express any legal opinions or conclusions, but because, in my expert opinion, this very important court ruling to furnishers in the Third Circuit, like PNC provided important notice to furnishers like PNC that (1) once a consumer submits a meritorious dispute of credit reporting to a furnisher (directly or indirectly through the CRAs, the furnisher must notate that tradeline as disputed by consumer and (2) confirming its adoption of the reasonableness standard for furnishers set forth in *Johnson v. MBNA America Bank*, 357 F.3d 426 (4th Cir. 2004). Below are important excerpts:**

27

We now address whether Seamans has raised a genuine issue of material fact regarding his claim that Temple negligently failed to conduct a reasonable post-dispute investigation and thereafter failed to correct inaccurate and incomplete reporting as to the Loan. Section 1681o[6] authorizes consumers to bring suit for damages caused by a furnisher's negligent breach of its duties to consumers under 15 U.S.C. § 1681s–2(b).[7] *See SimmsParris v. Countrywide Fin. Corp.,* 652 F.3d 355, 358 (3d Cir.2011). Although furnishers such as Temple are obligated to provide complete and accurate information to CRAs even in the first instance, *i.e.,* before a dispute, under 15 U.S.C. § 1681s–2(a), FCRA explicitly precludes private suits for failure to comply with that statutory duty, 15 U.S.C. § 1681s–2(c), and instead provides for enforcement of that provision by federal and state officials, 15 U.S.C. § 1681s–2(d). The claims here are thus predicated solely on Temple's conduct *after* it was informed of Seamans's dispute by TransUnion.

We have previously held that a furnisher's post-dispute investigation into a consumer's complaint must be "reasonable," *SimmsParris,* 652 F.3d at 359, but did not expound upon what that standard requires. We have recognized, though, that CRAs also are required to follow "reasonable procedures" with respect to the accuracy of consumer data under FRCA, *see* 15 U.S.C. § 1681e(b),[8] and in that similar context we have explained that a reasonable procedure is one " 'that a reasonably prudent person would undertake under the circumstances.' " *Cortez,* 617 F.3d at 709 (quoting *Philbin v. Trans Union Corp.,* 101 F.3d 957, 963 (3d Cir.1996)). That issue "is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Id.* (quotation marks omitted).

We also stated in *Cortez* that when assessing reasonableness, the factfinder must balance "the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Id.* The Court of Appeals for the Fourth Circuit has explicitly defined a furnisher's duty in similar terms. *See Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 432–33 (4th Cir.2004) (holding that the reasonableness of a furnisher's investigation involves weighing "the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information" (quotation marks omitted)); *see also Van Veen v. Equifax Info.,* 844 F.Supp.2d 599, 605 (E.D.Pa.2012) (applying *Johnson* ). We join our sister Circuit in holding that the same balancing test we applied in *Cortez* with respect to the reasonableness of a CRA's procedures applies to investigations conducted by furnishers as well.

Other Courts of Appeals have evaluated the reasonableness of a furnisher's investigative procedure as it relates to the content of the notice of dispute sent by the CRA to the furnisher.[9] For instance, where a given notice contains only scant or vague allegations of inaccuracy, a more limited investigation may be warranted. *See Boggio v. USAA Fed. Sav. Bank,* 696 F.3d 611, 616–17 (6th Cir.2012); *Chiang v. Verizon New England Inc.,* 595 F.3d 26, 38–41 (1st Cir.2010); *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1157–61 (9th Cir.2009); *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir.2005). Likewise, "[i]f a CRA

28

fails to provide 'all relevant information' to a furnisher, then the consumer has a private cause of action against the CRA, 15 U.S.C. §§ 1681i(a)(2)(A), 1681n–o, but not against the furnisher." *Chiang,* 595 F.3d at 38. We agree that this too is an important factor in assessing the reasonableness of a furnisher's investigation.

[6] The relevant portion of § 1681*o*(a) states:

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
(1) any actual damages sustained by the consumer as a result of the failure; and
(2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

[7] The relevant portion of § 1681s–2(b)(1) states:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a [CRA], the person shall—
(A) conduct an investigation with respect to the disputed information;
(B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title;
(C) report the results of the investigation to the [CRA];
(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
(i) modify that item of information;
(ii) delete that item of information; or
(iii) permanently block the reporting of that item of information.

[8] The relevant portion of 15 U.S.C. § 1681e(b) states: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

[9] As we explained in *SimmsParris,* "a consumer must first alert the [CRA] that reported the allegedly erroneous information of a dispute. It is then up to the [CRA] to inform the furnisher of information that there has been a dispute, thereby triggering the furnisher's duty to investigate...." 652 F.3d at 359. Such notice "cannot come directly [to the furnisher] from the consumer." *Id.* at 358.

*Seamans v. Temple Univ.*, 744 F.3d 853, 864–65 (3d Cir. 2014)

Along with Seamans's claim that Temple was obligated to correct its reporting of his account's collections history and date of first delinquency, he contends that Temple violated FCRA by failing to flag his account as disputed in its later reporting to TransUnion and other CRAs. FCRA imposes an explicit duty on furnishers of credit information to report a dispute to all CRAs to whom it provides the information as part of a reasonable investigation. 15 U.S.C. § 1681s–2(a)(3).[10] Private enforcement of that obligation, however, as with other duties arising under § 1681s–2(a), is not permitted. *Id.* § 1681s–2(c)(1). The question presented is whether a furnisher's continuing failure to flag an account as disputed also constitutes a violation of 15 U.S.C. § 1681s–2(b), which as discussed above, requires complete and accurate post-dispute reporting of debts, and is privately enforceable by virtue of § 1681o.

The two Courts of Appeals to have considered this question have both answered it in the affirmative. In *Saunders v. Branch Banking,* discussed *supra,* the Fourth Circuit considered the interaction of § 1681s–2(a), which requires complete and accurate pre-dispute reporting of loan data, and is not privately enforceable, with § 1681s–2(b), which imposes investigative and corrective duties on furnishers, and is privately enforceable. 526 F.3d at 148–50. The panel noted that "[n]o court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s–2(b) by arguing that it should have *already* reported the information accurately under § 1681s–2(a)." *Id.* at 149–50. In other words, the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s–2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s–2(b). *See also Gorman,* 584 F.3d at 1163 (explaining that where a dispute is bona fide, "the omission of the disputed nature of a debt could render the information sufficiently misleading so as to be 'incomplete or inaccurate' within the meaning of [§ 1681s–2(b) ]"); *Van Veen,* 844 F.Supp.2d at 606 (applying *Saunders* and *Gorman* ).

We agree with this assessment, and conclude that a private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed.[11] We further find that a genuine issue of material fact exists as to whether Temple violated that duty here. The District Court held that Temple was under no obligation to report Seamans's dispute because that dispute "was not *bona fide* given the status of [the Loan] under the HEA." For the reasons already stated, however, we find that Seamans's dispute appears to have merit, and the failure to report that dispute may constitute a material inaccuracy on Seamans's credit report.

Accordingly, we will vacate the District Court's order granting summary judgment for Temple on Seamans's claims under § 1681o insofar as they are predicated upon an alleged violation of § 1681s–2(b) for failure to report the disputed nature of the Loan.

[10] 15 U.S.C. § 1681s–2(a)(3) states:

> If the completeness or accuracy of any information furnished by any person to any [CRA] is disputed to such person by a consumer, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer.

[11] Temple argues that our holding in *SimmsParris* supports the opposite conclusion. We disagree. That decision simply clarifies that before a consumer can bring a private claim against a furnisher for failure to provide accurate information to CRAs, he must first notify the CRA, who then notifies the furnisher and thereby triggers the furnisher's duty to undertake a reasonable investigation and corrective measures if warranted. *SimmsParris,* 652 F.3d at 359.

*Seamans v. Temple Univ.*, 744 F.3d 853, 866–67 (3d Cir. 2014)

[End of Excerpts]

**Notice: NCLC Study On ACDV-Exchange Defects**

In 2009, the National Consumer Law Center ("NCLC") released the study, "Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking To Fix Errors in Their Credit Reports," which stated:

> As if the automated and perfunctory nature of the e-OSCAR system were not bad enough, furnishers contribute to the problem by conducting inadequate investigations. Often, furnishers will merely verify the existence of disputed information, instead of actually investigating the dispute. They will not actually research the underlying dispute, review documents, or speak to consumers about the dispute. Instead, these furnishers simply confirm that the information in the ACDV matches their computer records, and then verify the disputed information to the credit bureaus.

**Context—Inaccuracy & Furnishers**

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from furnisher practices and policies, are long-standing and well-known problems. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[13] Accordingly, I provide a brief history. An important theme emerging from this

---

[13] *Kirkpatrick v. Equifax*, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the

history is that Defendant was consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies.  This history also put Defendant on notice of the potential problems it would cause to a consumer like Plaintiff if it wrongly reported erroneous information into the CRA file of an innocent consumer, and also if it failed to correct it.

### History of Significant Inaccuracy Problems

To understand the extent and nature of PNC's failures in Plaintiff's it is necessary to put his case in the proper context.

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data.  Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of  inaccuracy, and that can potentially be detrimental to the credit system as well.[14]

congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury."  (January 18, 2005; Transcript available upon request.)

[14] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me?  The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" ConsumerReports.org, July 2000.

The steady rise in complaints and heightened public attention to credit report inaccuracy and mixed files resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding/preventing mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

In 1991, TRW, (Experian's predecessor) signed separate but similar "Consent Orders" with the Federal Trade Commission and a myriad of State AGs in which the first problem identified, and the one which TRW pledged to improve its performance in preventing, was mixed files. For example, the Consent Order stated:

---

Consumer Federation of America and National Credit Reporting Association, Credit Score Accuracy and Implications for Consumers, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," Federal Reserve Bulletin, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

Turner, Michael A., Robin Varghese, and Patrick D. Walker, Policy and Research Council (PERC), "U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts." (2011).

Jill Riepenhoff & Mike Wagner, ""Credit Scars: Mixed and marred. When credit-reporting agencies blend your files with others', the financial damage can be devastating;" *Columbus Dispatch*, May 7, 2012. "… About six percent of nearly 21,500 consumers who complained to the FTC during a 30-month period beginning in 2009, and nearly 8 percent of 1,842 who complained to state attorneys general in 2009 and 2010, said their credit reports had been mixed with another person's. Consumers' files had been merged with those of their mothers, fathers, brothers, sisters, in-laws and neighbors. They were mixed with strangers with the same name, a similar name, a similar Social Security number or no known similarities whatsoever." www.dispatch.com/content/stories/local/2012/05/07/mixed-  and-marred.html

Federal Trade Commission, "Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003." (December 2012)

"40 Million Mistakes: Is your credit report accurate? : A government study indicates as many as 40 million consumers have a mistake on their credit report and Steve Kroft finds it's hard to get them fixed." (http://www.cbsnews.com/news/40-million-mistakes-is-your-credit-report-accurate-25-08-2013/) (August 25, 2013)

Continuing its current efforts to improve its information gathering, storing, and generating systems to reduce the occurrence of Mixed Files, though modification of its software system to enable such system to accommodate and use, or matching and identification purposes, a Consumer's Full Identifying Information …

In 1992, TU signed a Consent Order with 17 State AGs in which the first problem identified, and the one which TU pledged to improve its performance in preventing, was mixed files. Like the consent agreements signed by TRW and Equifax, TU pledged to use Full Identifying Information. "Full Identifying Information" was defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA to improve protections for accuracy, fairness and privacy.

This history is covered in Chapter 10 of my book, "Credit Scores and Credit Reports."

### History: Increased Attention on Role of Furnisher

This history is relevant because it provided the foundation for the 1996 Amendments to the FCRA, which was the first major strengthening of the Act's consumer protections, and which was the first to impose duties on furnishers like PNC and to create a private right of action for consumers when furnishers violated the new investigation requirements.

As the April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary:

Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.*** [Emphasis Added]

Thus, PNC has been expected since 1997 to comply with the FCRA provisions that are relevant in this case.

All of the above sections on "context" are relevant for several reasons, including foreseeability,[15] in my opinion.

**Notice: 2003 FACT Act Amendments, Congressional Testimony**

In fact, Congress re-visited the FCRA, devoting all of 2003 to extensive hearings and concluding with sweeping amendments to bolster consumers' rights to accuracy and fairness.

---

[15] See *Eric R. Drew v. Equifax Information Services, LLC*: USDC-N.D. Calif. – No. C 07-00726 SI, "Order Denying Defendant's Renewed Motion For Judgment As A Matter Of Law And Alternative Motion For A New Trial," Judge Susan Illston, writing, "Plaintiff's expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case. As part of his testimony, and over defendant's objection, Mr. Hendricks discussed a 1995 consent order between defendant and the Federal Trade Commission and a 1992 "Agreement of Assurances" between defendant and a number of states." …

"Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them. Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft. As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency. *See* TR 621:5–621:15. This shows that the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness." …

"Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record.

A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged account simply by asking the bank to reconfirm the account, without even indicating that the consumer has reported that his identity was stolen. Such a conclusion would be particularly reasonable in this case, where fraud alerts were placed on the account and other credit cards had been deleted." …

"Defendant is not entitled to JMOL on the question of willfulness."

In a footnote, Judge Illston added, "Defendant argues that it is being punished for earlier, dissimilar acts that were the subject of the FTC order and the Agreement of Assurances about which Mr. Hendricks testified. Any danger that defendant was punished for the actions that were subject to the FTC order and the Agreement of Assurances is outweighed by the relevance of the documents and Mr. Hendricks's testimony to the question of foreseeability and thus willfulness, which are properly considered by a jury when calculating punitive damages."

Included in the amendments were new provisions that strengthened the duty on furnishers like PNC to ensure the accuracy of the information they furnish to CRAs. Below is the original standard from the 1996 Amendments, which is then followed by the 2003 strengthened, amended provision, which Congress felt was necessary because furnishers like PNC continued to be a consistent source of inaccuracy:

**§ 623. Responsibilities of furnishers of information to consumer reporting agencies**   [15 U.S.C. § 1681s-2]

(a) Duty of Furnishers of Information to Provide Accurate Information
(1) Prohibition
(A) *Reporting information with actual knowledge of errors.* A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

In the 2003 FCRA Amendments, known as the FACT Act, Congress tightened this standard by replacing the rather weak "knows or consciously avoids knowing" standard with the "knows or has reasonable cause to believe" standard.

During the 2003 House hearings on the FACT Act Amendments, several witnesses testified about some furnishers' consistent failure to live up to their accuracy duties, both in furnishing and in responding to consumer disputes.

Also in the 2003 FACT Act Amendments, the following new provision was added to promote accuracy:

(8) Ability of Consumer to Dispute Information Directly with Furnisher

(A) *In general.* The Federal banking agencies, the National Credit Union Administration, and the Commission shall jointly prescribe regulations that shall identify the circumstances under which a furnisher shall be required to reinvestigate a dispute concerning the accuracy of information contained in a consumer report on the consumer, based on a direct request of a consumer.

The federal agencies named in the paragraph above issued regulations further notifying furnishers like PNC of the importance of conducting reinvestigations when a consumer directly disputes the accuracy of information furnished to CRAs.

Leonard Bennett, a consumer attorney specializing in FCRA cases who previously had sued other furnishers over inadequate investigations, was sharply critical of their "investigations" procedures in his 2003 House testimony, stating that these furnishers "confessed to a policy of automated investigations in which the consumer has almost no hope of obtaining relief. The furnishers merely proofread the form from the CRA and match it to the data within their computer's account screen." (Testimony Leonard Bennett before the Subcommittee on Financial Institutions And Consumer Credit of the Committee on Financial Services, Regarding, "Fair Credit

Reporting Act: How it Functions for Consumers and the Economy;" June 4, 2003. http://financialservices.house.gov/media/pdf/060403lb.pdf)

## Areas of Testimony: General Issues, Context

### A. Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union, are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

In sum, maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans, and credit cards. The website of Fair Isaac Corp., www.myfico.com,[16] gives the following example of the difference that credit scores make in terms of interest and monthly payments on a $500,000, 30-year, fixed-rate mortgage:

| FICO® Score | Interest Rate | Monthly Payment | Total Interest Paid |
|---|---|---|---|
| 760 – 850 | 6.595 % | $3,192 | $648,991 |
| 700 – 759 | 6.817 % | $3,265 | $675,504 |
| 680 – 699 | 6.994 % | $3,324 | $696,819 |
| 660 – 679 | 7.208 % | $3,397 | $722,794 |
| 640 – 659 | 7.638 % | $3,543 | $775,639 |
| 620 – 639 | 8.184 % | $3,733 | $843,937 |

---

[16] https://www.myfico.com/credit-education/calculators/loan-savings-calculator/ (visited Feb. 19, 2024).

37

A similar chart exists for auto loans.  Moreover, major credit card companies will reduce their cardholders' credit limits if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.

1.     The precise workings of the FICO score are highly proprietary and therefore closely guarded.  However, the general parameters are publicly available:[17]

**What categories are considered when calculating my FICO Score?**

**Payment history (35%)**
**The first thing any lender wants to know is whether you've paid past credit accounts on time. This helps a lender figure out the amount of risk it will take on when extending credit. This is the most important factor in a FICO Score.**
**Learn more about payment history**

**Amounts owed (30%)**
**Having credit accounts and owing money on them does not necessarily mean you are a high-risk borrower with a low FICO Score. However, if you are using a lot of your available credit, this may indicate that you are overextended—and banks can interpret this to mean that you are at a higher risk of defaulting.**
**Learn more about amounts owed**

**Length of credit history (15%)**
**In general, having a longer credit history is positive for your FICO Scores, but is not required for a good credit score.**
**Learn more about length of credit history**

**Your FICO Scores take into account:**
- **How long your credit accounts have been established, including the age of your oldest account, the age of your newest account and an average age of all your accounts**
- **How long specific credit accounts have been established**
- **How long it has been since you used certain accounts**
**Learn more about length of credit history**

**Credit mix (10%)**
**FICO Scores will consider your mix of credit cards, retail accounts, installment loans, finance company accounts and mortgage loans. Don't worry, it's not necessary to have one of each.**
**Learn more about credit mix**

**New credit (10%)**

---

[17]  These parameters are published in Chapter 1 of both Editions of "Credit Scores and Credit Reports," op. cit. They are available at https://www.myfico.com/credit-education/whats-in-your-credit-score.

**Research shows that opening several credit accounts in a short amount of time represents a greater risk—especially for people who don't have a long credit history. Learn more about new credit**

2.      It is important to understand that consumers derogatory payments in the recent past affect consumer credit scores more severely:

- **Get/stay current on missed payments.** The older a credit problem, the less it counts toward your credit score. So the longer you pay your bills on time, even after having late payments, the more potential for your FICO Scores to increase. https://www.myfico.com/credit-education/credit-scores/payment-history

What are the different categories of late payments and how does your FICO® Score consider late payments?

Your FICO Score considers late payments using these general criteria; how recent the late payments are, how severe the late payments are, and how frequently the late payments occur. So this means that a recent late payment, could be more damaging to your score than a number of late payments that happened a long time ago . . . .

It's important to always stay on top of all of your bills; your payment history is the largest factor in your FICO score – 35%. https://www.myfico.com/credit-education/faq/negative-reasons/late-payments

It is important to understand that consumers are most severely penalized when they have derogatory reporting within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a greater negative impact, while a major delinquency several years-old has a lesser negative impact.

**Previous credit performance**



Copyright © 2003 Fair Isaac Corporation. All rights reserved.                    1

39

## B. Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs)—Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors—banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.
(2)     A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.
(3)     If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.
(4)     A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid his credit card on time would be "R1." Here are the numeric codes:

40

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries.  It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness.  This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants.  Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit.  Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness.  This is known as an "Account Review."  Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers.  Some employers use consumer reports to evaluate job applicants.  Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

## Methodology

As a specialized knowledge expert, a fundamental methodology that I employ and follow is to apply my experience with, and specialized knowledge of, such relevant matters as (1) the credit reporting and credit scoring systems and industries and standards associated with them, and (2) information privacy, to the facts at hand.

The application of my experience- and specialized knowledge-based methodology has several important purposes. One purpose is to put the case in its proper context, particularly

41

regarding well-known, decades-old standards of credit reporting accuracy, and the problem of systemic inaccuracy which spurred their creation and evolution. Providing this context is intended to help the trier of fact evaluate whether Defendant failed to adhere to these standards – or even disregarded them – and my opinions related to such. Additional opinions and analysis is intended to help the trier of fact understand the logistics of inaccuracy in Plaintiff's case.

Another purpose is to help the trier of fact evaluate how Defendant's actions damaged Plaintiff's creditworthiness under long-standing, well-known industry standards. Still another important purpose in providing the proper context is to help the trier of fact evaluate if the damages which Defendant inflicted on Plaintiff were foreseeable (provided that the trier of fact determines Plaintiff was damaged).

### Background & Qualifications (Curriculum Vitae Attached)

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that for 33 years covered credit reporting, Fair Information practices and related matters;

(2) Author of the book Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Edition, (Privacy Times 2007), and co-author of a book with a chapter on credit reporting.

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation.

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regard to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and who has appeared on or been quoted by major news media.

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and

42

415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

From 1998 – 2006, I served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues. (Please consult the attached CV for additional information.)

*Evan D. Hendricks*
CURRICULUM VITAE
Professional Activities

**1981- December 2013          Editor/Publisher** of *Privacy Times*

From 1981 to December 2013, I was Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present          Expert Witness**

Qualified by the federal courts in FCRA cases and cases involving credit reporting, credit scoring, privacy, and identity theft. (Complete list attached). I have  read extensive deposition testimony by credit bureau and credit grantor personnel. This is  significant because CRAs and credit grantors do not openly discuss or publish information on  their procedures and practices for handling personal data, and the best (and possibly only)  sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in  relation to credit reporting data are the depositions of CRA and credit grantor employees in  FCRA litigation.

**May 2014 – Present     Member, Board of Directors, Privacy Rights Clearinghouse**

**2005 – 2009          Consultant, ID Watchdog**

**1998 – 2006    Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**
Along with other Council members, I provide an outsider's view on credit reporting,  marketing and other privacy issues.

**July – October 2002  Consultant to U.S. Postal Service**
Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks          P.O. Box 302  Cabin John, MD 20818**
**(202) 365-0947          (301) 229 7002  evan@privacytimes.com**

---

45

**Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on  Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and   Consumer Credit Hearing, March 24, 2010.

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006.

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005.

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005.

**"**Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[24] Senate Banking Committee, March 15, 2005.

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003.

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003.

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003.

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003.

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do  [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

<u>Former Secrets: Government Records Made Public Through The Freedom of Information Act</u>
(Campaign For Political Rights, 1982)

## International Lectures

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales –
Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne –
Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and
Privacy Commissioner of Australia.

## Presentations/Instruction At CLE & Professional Seminars

"NCLC & NACA Spring Training: FCRA Track." April 11-14, 2024. Atlanta, Georgia

"Key Privacy Statutes - FCRA and Background Check Problems," Conference on Effective
Consumer Privacy Enforcement, Univ. of California-Berkeley Samuelson Law, Technology &
Public Policy Clinic. Oct. 13-14, 2011. Berkeley, Calif.

"Annual FCRA Conference," National Association of Consumer Advocates. May 20-21, 2011.
Memphis, Tenn.

"91st Annual New York Meeting," Commercial Law League of America (CLLA)
November 12, 2010

"2010 NCLC Consumer Rights Litigation Conference," National Consumer Law Center.
November 13, 2010.  Boston, Mass.

"26th Annual Consumer Bankruptcy Course," State Bar of Texas. June 3, 2010. Dallas.

"Consumer Protection Law Comm. Representing Main Street: A Consumer Law Primer"  Florida
Bar Association; June 26, 2009.  Orlando.

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in
the Information Society," Presenter, "Credit Report Cases – Effective Remedies?"  Center on
Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)

47

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed?  The George Washington University Law School, Washington, DC, June 12-13, 2008.

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,  February 28-March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

### Professional Societies

Past President & Board Member, American Society of Access Professionals [www.accesspro.org](www.accesspro.org)

### Industry Certification

FCRA Certification, National Credit Reporting Association ([www.ncrainc.org](www.ncrainc.org)).

### Media

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New  York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim  Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News,  CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey  Show and Geraldo, regarding these issues as well.

### Education

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

48

**Expert Testimony**

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies.  Expert report, deposition, trial testimony. Judge Lourdes Baird presiding.  The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures.  (See 225 F.3d 1063 (2000)).

Julie Miller v. Equifax Credit Information Services, LLC: U.S. District Court for the District of Oregon.  Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge Anna J. Brown rejected Equifax's Daubert motion to exclude me from testifying.

Alexandra Hustedt-Mai v. Hunter Warfield, Inc.: State of Indiana, In the Circuit Court of Tippecanoe County: Cause Nos.: 79C01-1908-CT-000114; 79C01-2106-CT-00084. Trial Testimony (2024). Judge Sean M. Persin presiding.

Attakora v. Huntley Square Condominium: In the Circuit Court for Prince George's County. No. CAL21–01277. Judge Pamela J. White presiding. Trial Testimony. (2024)

Lee v. KBR, Inc., et al.: Alameda County Unlimited Sup. Ct. Case No. RG12660482. Trial Testimony. (2024)

Justin Peters v. American Pacific Mortgage Corporation:  District Court, Larimer County, Colorado. Case No. 2022CV030141. Deposition. Trial Testimony. (2023)

Steve Collins v. Milliman, Inc.: U.S. District Court for Western District of Washington. (Case No. 2:22-cv-00061-RAJ.) Deposition. Trial Testimony. (2023)

Blake Ferrin v. Experian Information Solutions, Inc.: U.S. District Court for the District of Minnesota. No. 0:20-cv-00841-NEB-TNL. Deposition. Trial Testimony. (2023)

Shuthima Pongsai v. American Express Company, et al.: U.S. District Court for the Central District of California.] (Case No. CV19-1628 DOC (JDEx).) Deposition. Trial Testimony. (2021)

Matthew Sponer v. Equifax Information Services, LLC, Wells Fargo Bank N.A.: U.S. District Court for the District of Oregon. [Portland Div.] (No. 3:17-cv-2035-HZ). Expert Report. Deposition. Trial Testimony. (2019)

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition. Trial Testimony. Judge Daniel Gaul rejected Ford Motor Credit's motion to exclude me from testifying. (2019)

49

Richard Alexander Williams v. First Advantage LNS Screening Solutions, et al.: U.S. District Court Northern District of Florida [Gainesville Div.]. (Case No. 1:13-cv-00222-MW-GRJ). Judge Mark E. Walker rejected Equifax's Daubert motion to exclude me from testifying.

Rachael Macik v. JP Morgan Chase, N.A., et al.: U.S. District Court for the Southern District of Texas (Case 3:14-cv-44). Expert report and affidavit. Trial Testimony. Judge George C. Hanks, Jr. presiding.

David M. Daugherty v. Equifax Information Services, Ocwen Loan Servicing, et al.: U.S. District Court for the Southern District of West Virginia (Beckley Div.); No.: 5:14-cv-24506. Deposition. Trial Testimony. In rejecting Ocwen's Daubert motion to exclude me from testifying, Judge Irene C. Berger ruled:

> I find that he has experience, related experience, counsel, and that he should be allowed to give expert testimony … I find that that testimony could be helpful to the jury …
>
> I specifically find that in order for him to have specialized knowledge that's useful to the jury, it is not necessary that he have first-hand experience with working with one of the credit reporting agencies.

In rejecting Ocwen's motion to overturn the jury's $2.5 million punitive damages verdict against Ocwen, the U.S. Court of Appeals for the Fourth Circuit wrote:

> Ocwen next argues that the district court should have excluded the testimony of Daugherty's expert witness, Evan Hendricks, on two bases. Ocwen contends that Hendricks' expert witness report was too vague to provide the basis for, or the substance of, his expert opinion. Additionally, Ocwen argues that the district court improperly permitted Hendricks to testify about the legal standard to which furnishers of credit information are held under the FCRA. We disagree with Ocwen's arguments.
>
> First, we conclude that Hendricks' expert witness report provided adequate notice to Ocwen concerning the substance of his anticipated testimony. His report disclosed that he relied on "Bates-Stamped documents produced by Defendant Equifax" in forming his expert opinion. His examination of these documents led him to conclude in his report that "Ocwen did nothing more than engage in the superficial [exchange of dispute verification requests], reflecting its disregard of the history and context that clearly put it on notice" that its investigation was not reasonable for a dispute of this nature. Thus, Hendricks' expert report provided sufficient notice that he was prepared to testify about Ocwen's inadequate responses to particular dispute verification requests. Additionally, Hendricks' report placed Ocwen on notice that the content of the dispute verification requests would be

50

central to Hendricks' opinion that comprehensive investigation procedures were required under the circumstances but were not undertaken by Ocwen.

We also are not persuaded by Ocwen's argument that Hendricks improperly provided legal conclusions during his testimony. We recognize the general rule that expert witnesses are not permitted to "state[ ] a legal standard or draw [ ] a legal conclusion." United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011) (quoting United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006)). However, Hendricks' testimony did not violate this general rule. Reasonableness is a subject on which experts routinely testify. See United States v. Barile, 286 F.3d 749, 761 (4th Cir. 2002) (holding that an expert could properly give his opinion whether certain actions by the defendant were "reasonable" in light of the defendant's legal obligations under section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k)). Here, Hendricks' testimony addressed the reasonableness of Ocwen's conduct in light of the regulatory framework of the FCRA. This testimony did not draw legal conclusions but was offered as an explanation why Ocwen's cursory investigation in response to the dispute verification requests was deficient. Therefore, we conclude that the district court did not abuse its discretion in permitting Hendricks to testify regarding the reasonableness of Ocwen's investigations.

Rateb M. Abu-Eid v. Discover Products, Inc.:  U.S. District Court for the Eastern District of Virginia. (No. 1:20-cv-01450-TSE-IDD) Expert Report. Deposition. (2021). Judge T.S. Ellis, III rejected Discover's motion to exclude me from testifying, writing:

Discover finally argues that Hendricks' conclusions that Discover's policies were not reasonable under the FCRA should not be excluded because these conclusions usurp the function of the jury. This argument is precluded by binding Fourth Circuit precedent involving the testimony of the same expert witness (Hendricks) in a case involve the same statute (the FCRA). In permitting Hendricks to testify as to the reasonableness of a furnisher's policy in light of the FCRA, the Fourth Circuit explained that "[r]easonableness is a subject on which experts routinely testify." *Daugherty*, 701 Fed. App'x at 255. Further, the Fourth Circuit explained that Hendricks' testimony in that case, as in this case, "addressed the reasonableness of the [defendant's] conduct in light of the regulatory framework of the FCRA" and thus "did not draw legal conclusions." *Id.*  Accordingly, Hendricks will be permitted to testify as to the reasonableness of the procedures Discover implemented to investigate allegations of fraudulent credit card activity.

Francisco Joel Rivera, on behalf of himself and all others similarly situated: U.S. District Court for the Northern District of Georgia (Case No.: 1:18-cv-04639-AT-CCB). Expert Report. Deposition. (2020). In granting class certification, Judge Amy Totenberg wrote,

In this connection, Plaintiff has presented expert evidence that inaccurate hard inquiries harm consumers because they lower credit scores, misrepresent credit histories, and can be a reason credit is denied. (See Expert Report of Evan

Hendricks, Doc. 75-11 at 1-2, 8, 10). See also Steed v. Equifax Info. Srvcs., LLC, 2016 WL 7888039 at *3-4 (N.D. Ga. Aug. 31, 2016)(explaining that Equifax itself admitted that unauthorized credit inquiries can misstate a consumer's credit history because they can wrongly lead someone reading the credit report to believe that the consumer sought credit, and also explaining that "[c]onsumer's credit scores are negatively impacted by fraudulent or inaccurate credit inquiries, and creditors are provided with an inaccurate portrait of the consumer's credit history. The only entity that benefits is Equifax, which does not have to expend resources reinvestigating disputed credit inquiries")

Richard and Kristin Zabriskie v. Federal National Mortgage Association, et al: U.S. District Court for the District of Arizona – (No. 2:13-cv-02260-DKD). Expert Report. Trial Testimony (2016). Deposition. (2015). Judge Susan Bolton rejected Defendant "Fannie Mae's" Daubert motion to exclude me from testifying.

April K. Barnett v. Chase Bank (USA) N.A. et al.: U.S. District Court for the Northern District of Alabama [Eastern Div.] (1:12-CV-1745-VEH). Expert disclosure and report. Deposition. Judge Virginia Emerson Hopkins rejected Chase's Daubert motion to exclude my testimony.

Eric Robert Drew vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No. CV 07-00726-SI. Trial testimony. Expert report, deposition. Judge Susan Illston presiding.

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Laura Jones v. Capital One: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony. Judge Brian F. Kenney presiding, said from the bench:

"Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr. Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Trial Testimony. Judge Jerald Bagley presiding.

52

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No. 11-18143 (MBK). Deposition, Trial Testimony. (I was retained by MicroBilt counsel Bruce Luckman, who in previous years as counsel for TransUnion, unsuccessfully opposed me with a Daubert challenge in the Sandra Cortez case (see below).

Vernon Singleton v. Universal Credit Services, et al.: U.S. District Court for the Eastern District of Pennsylvania; 2:14-cv-06380. Expert report, Trial Testimony.

Rowan DeSantis v Willard Merkel: Multnomah County Circuit Court. Trial Testimony.

In Re: Residential Capital, LLC, et al.: U.S. Bankruptcy Court for the Southern District of New York; Case No. 12-12020 (MG). Expert report, Trial Testimony. Judge Martin Glenn presiding.

Alison Bastek v. Comenity Bank, et al: Superior Court for the State of California, County of San Diego; No. 37-2016-17012-CU-BC-CTL. California Credit Reporting Act. Deposition. Trial Testimony. Judge Richard E.L Strauss presiding.

Roger Chang, Thomas Wong v. Hamni Bank: Superior Court of the State of California, County of Santa Clara. (110CV181546) Expert report, deposition. Trial Testimony. Judge Joseph Huber presiding.

Steven W. Haberman v. PNC Mortgage Company, et al.: U.S. District Court for the Eastern District of Texas [Sherman Div]. Case No. 4:11cv126. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Magistrate Judge Amos L. Mazzant presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO. FCRA Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05–cv-05684-JF. FCRA. Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial, and rejected the Trans Union motion to exclude me filed by attorney Bruce Luckman.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D. FTC Section 5. Expert Report. U.S. Magistrate Judge William C. Beaman rejected Defendants' motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia: No. 4:04CV82. FCRA. Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD. FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Fairness hearing testimony. Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

54

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.  FCRA. Expert report, deposition, trial testimony.  Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition.  Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr.  v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendants' motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony.  Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22.  Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

William Munson, and Sharon Munson, Claimants, v. San Diego County Credit Union, Respondent, American Arbitration Association, Case No.:  01-19-0001-2485. Testimony (2020)

In Re Arbitration – James Ellis Neal, Claimant, v. Nationstar Services, LLC, Respondent, JAMS, JAMS Ref. No. 1110019867. Testimony (2018)

Evan Besenger v. San Diego County Credit Union. JAMS Arbitration Case No. 5240000256. Deposition. (2023).

Victor Estrada v. Conn's Appliances, Inc.: American Arbitration Association, 01-21-0003-7369. Expert Report. Deposition. Hearing Testimony. (2023).

Zavian Allen v. Experian Information Services, Inc., et al., U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:22-cv-00128-ALM). Jointly with, Eunice Hernandez v. Experian Information Services, Inc., et al., U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:22-cv-00455-SDJ-KPJ). Expert Report. Deposition. (2023).

55

Bureau of Consumer Financial Protection and the Commonwealth of Massachusetts ex rel. Maura Healey, Attorney General, v. Commonwealth Equity Group, LLC (d/b/a Key Credit Repair); Nikitas Tsoukales (a/k/a Nikitas Tsoukalis): U.S. District Court for the District of Massachusetts Civil Action No. 1:20-cv-10991. Expert Report. Deposition. (2023).

Anthony Sunseri v. Experian Information Solutions, Inc.: U.S. District Court for the Central District of California. No. 0:20-cv-00841-NEB-TNL. Expert Report. Deposition. (2023).

Marco A. Fernandez v. Corelogic Credco, LLC: U.S. District Court for the Southern District of California. Civil Action No.  3:20-cv-1262-JM-AGS. Expert Report. Deposition. (2023).

Virginia Abrogina, as an individual, and on behalf of the putative class, v. Kentech Consulting, Inc., BackgroundChecks.com: U.S. District Court for the Southern District of California; No 16-CV-0662-DMSWVG. Expert Report. Deposition. (2023).

Ashley Leslie v. Experian Info. Sols., Inc.: U.S. District Court for the District of Hawaii, Case No. 1:21-cv-00334-JMS-RT. Expert Report. Deposition. (2023).

Angela Wiskur v. Equifax Information Services LLC: U.S. District Court for the Eastern District of Virginia (Case 1:22-cv-01256-MSN-WEF). Expert Report. Deposition. (2023).

Jaime Paul Lopez-Renteria v. Clear Investigative Advantage, LLC: U.S. District Court Western District of Missouri. (Case No. 4:22-569) Expert Report. Deposition. (2023).

Tescher v. Santander Bank, N.A., Experian Information Solutions, Inc. et al: U.S. District Court for the Southern District of New York. (Case No. 7:21-cv-2266) Expert Report. Deposition. (2023).

Khalil McCollum v. Trans Union LLC and Equifax Information Services, LLC: U.S. District Court for Eastern District of North Carolina [Western Div.] (Case No. 5:21-cv-476) Expert Report. Deposition. (2022).

Andre Grant, v. RentGrow, Inc. and TransUnion Rental Screening Solutions, Inc.: U.S. District Court Western District of Texas [San Antonio Div.] No. 5:21-cv-1172. Expert Report. Deposition. (2022).

Mayra Aranda v. Nissan Motor Acceptance Corporation, et al.:  U.S. District Court for the Central District of California. (Case No 2:21-cv-03451-CBM-PD). Expert Report. Deposition. (2022).

Shara Lynn Bailey v. Experian Information Solutions, Inc.: United States District Court for District of Idaho, Civil Action No. 1:21-cv-00465-BLW. Expert Report. Deposition. (2022).

Joseph and Adam Smith v. Result Matrix, Inc., d/b/a/ Straight Arrow Screening, et al: U.S. District Court for Western District of Washington [at Tacoma] (Case No. 3:21-cv-5380)

56

Expert Report. Deposition. (2022).

Lisa Lombardo v. Equifax Information Services LLC, JP Morgan Chase Bank, N.A., et al.; Case No. 7:20-cv-06813. (U.S. District Court the Southern District of New York.) Expert Report. Deposition. (2022).

Duane E. Norman, on behalf of himself and all others similarly situated, v. Trans Union: U.S. District Court for the Eastern District of Pennsylvania (Case No.: 18-cv-05225-GAM). Expert Report. Depositions. (2022 & 2019)

Edward Coleman v. Experian Information Solutions, Inc. et al., pending in the United States District Court for the Northern District of Georgia, Civil Action No. 1:21-cv-01095-CAP-CMS. Expert Rebuttal Report. Deposition. (2022).

Reylene Sanchez v. JP Morgan Chase Bank, N.A..: U.S. District Court for the District of Arizona [Phoenix Div.] (Case No.  2:21-cv-00896-JAT.) Expert Report. Deposition. (2022).

Marcus Anthony Forslund and Melissa Carrigan Forslund v. Experian Information Solutions, Inc. et al., United States District Court for District of Minnesota, Civil Action No. 0:21-cv-00731. Expert Rebuttal Report. Deposition. (2022).

Virgil Campbell v. Experian Information Solutions, Inc. et al.: United States District Court for District of Minnesota, Civil Action No. 0:21-cv-00731. Expert Rebuttal Report. Deposition. (2022).

Maurice Konig, v. Trans Union, LLC, Equifax Information Services, LLC, and Bank of America, N.A.: U.S. District Court for the Southern District of New York. (No. 6:18-cv-1599-Orl-41LRH) Expert Report. Deposition. (2021).

Cynthia Soler v. Nelnet Inc., et al.: U.S. District Court for the Central District of California. (Case No. 2:20-cv-08459). Expert Report. Deposition. (2021).

Fred Ponder v. Ocwen Loan Servicing, LLC: Case No. 1:16-cv-04125-ODE-LTW (U.S. District Court the Northern District of Georgia.) Expert Report. Deposition. (2021).

Michael Sosa v. Greater Alliance Federal Credit Union; Trans Union LLC: U.S. District Court for the District of New Jersey. (Case No. 2:20-cv-00818-CCC-ESK.) (2021).

Helen Swan, et al v. Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and United Consumer Financial Services Company: U.S. District Court for Middle Dist. of Florida [Tampa Div.] Nos. 20-cv-01540.) Expert Report. Deposition. (2021).

Duane A. Hines v. Equifax Information Services LLC, Case No. 1:19-cv-06701-RPK-RER (E.D.N.Y.). Expert Report. Deposition. (2021).

Mike Brinkman v. Account Revolution Services, LLC: U.S. District Court for the Middle District of Florida. [Tampa Div.] (Case No. 8:20-cv-02453-VMC-AAS.) Expert Report. Deposition. (2021).

Steele Bray v. Santander Bank, N.A., Experian Information Solutions, Inc.: U.S. District Court for the District of Connecticut. (Case No. 3:19-CV-01759)  Expert Report. Deposition. (2021).

David Gross v. Chase Bank USA, N.A..: U.S. District Court for the District of New Jersey. (Case No. 3:19-cv-19125.) Expert Report. Deposition. (2021)

Christopher Petras v. NFCU, Chase Bank USA, N.A., Experian Information Solutions, Inc., et al.:  U.S. District Court for the District of Nevada. (No. 20-cv-00874) Expert Report. Deposition. (2021)

David Harris v. Nelnet Inc., et al.: U.S. District Court for the District of New Jersey. (Case No. 2:20-cv-788.) Expert Report. Deposition. (2021)

Elizabeth and Jonathan Perez v. El Paso Area Teachers Federal Credit Union; Equifax Information Services LLC, et al.: U.S. District Court for the Western District of Texas [. (No. 3:19-cv-00218.) Expert Report. Deposition. (2021)

Omar Santos and Amanda Clements on behalf of themselves and all others similarly situated v. Healthcare Revenue Recovery Group, LLC d/b/a ARS Account Resolution Services and Experian Information Solutions, Inc.: U.S. District Court for the Southern District of Florida, Miami Division, (Civil Action No. 1:19-cv-23084-KMW) Expert Report. Deposition. (2021)

Christa L. Peterson v. Experian Information Solutions, Inc.: U.S. District Court for the District of Minnesota. No. 0:20-cv-00606. Expert Report. Deposition. (2021)

Gia Sessa v. Linear Motors, LLC d/b/a Curry Hyundai Subaru, Hudson Valley Federal Credit Union, Trans Union, LLC, et al.: U.S. District Court for the Southern District of New York, Case No.: 19-cv-9914(KMK) Expert Report. Deposition. (2021)

Lisa Bettcher, et al v. Experian Information Solutions, Inc.: U.S. District Court for the District of Minnesota. Nos. 20-cv-00319-WMW-HB.) Expert Report. Deposition. (2021)

Georgina C. Sandoval and Todd M. North, et al. v. Midland Funding, LLC and Midland Credit Management, Inc.: U.S. District Court for the District of New Jersey. No.: 2:18-cv-09396-SDW-LDW. Expert Report. Deposition. (2021)

Kevin Joseph Kelly and Karriem Bey v. RealPage, Inc., d/b/a On-Site and RP On-Site, LLC: U.S. District Court Eastern District of Pennsylvania; No. 2:19-cv-01706-RK. Expert Report. Deposition. (2021)

Angel Fernandez v. Trans Union, Great Lakes Educational Loan Services, Inc.:

58

U.S. District Court for the Eastern District of Pennsylvania. (Case No. 5:18-cv-144.)
Expert Report. Deposition. (2020)

Mark Sofiev v. Trans Union, LLC, JPMorgan Chase Bank, N.A.: U.S. District Court for the Southern District of Calif. (No. 1:20-cv-00697-GHW). Expert Report. Deposition. (2020)

Stevan L. Denenberg v. Citibank, N.A.: U.S. District Court for the Southern District of California. Civil Action No. 3:19-cv-02063-MMA-NLS. Expert Report. Deposition. (2020)

Vasudev Pulipati vs. Vivint Solar: Superior Court for the State of Calif., For the County of Alameda – Northern Division. Case No. RG18891702. Expert Report. Deposition. (2020)

Andres Romero v. Monterey Financial Services, LLC; Equifax Information Services, LLC, et al.: U.S. District Court for the Southern District of California. (No. 3:19-cv-01781-JM-KSC) Expert Report. Deposition. (2020)

Francisco Joel Rivera, on behalf of himself and all others similarly situated: U.S. District Court for the Northern District of Georgia (Case No.: 1:18-cv-04639-AT-CCB). Expert Report. Deposition. (2020)

Velma Melton v. Select Portfolio Servicing, et al.: District of Maryland [Greenbelt Div.] (Case No.  8:19-cv-209.) Expert Report. Deposition. (2020)

Scott J. Huffman, v. JP MorganChase Bank, N.A., and Experian Information Solutions, Inc.: U.S. District Court for the Northern District of California. Civil Action No.: 3:19-cv-07408-JSW. Expert Rebuttal Report. Deposition. (2020)

Jacob Fowles v. Equifax Information Services, LLC: U.S. District Court for District of Oregon. [Portland Div.] (Case No. 3:18-CV-00164-HZ) Expert Report. Deposition. (2020)

The Estate Of James C. Rennick, Sr. vs. Universal Credit Services, LLC: U.S. District Court for the Eastern District of Pennsylvania. (No. 3:18-CV-00819-MPS.)  Expert Report. Deposition. (2020)

Jose R. Perez v. General Information Services, Inc., et al.: U.S. District Court Central District of California. (Case No. 2:19-cv-05184)  Expert Report. Deposition. (2020)

Thomas Hayworth v. 1st Financial Bank USA, Equifax Information Services, LLC: U.S. District Court for the District of Colorado. (No. 1:18-cv-03106-RM-KLM.) Expert Report. Deposition. (2019)

Marshall Gross v. CitiMortgage Incorporated: U.S. District Court for the District of Arizona. (CV-18-02103-PHX-ROS). Expert Report. Deposition. (2019)

Toland v. Nationstar Mortgage LLC, et al.: U.S. District Court for the Northern District of California. (Case 17-cv-02575-JD). Expert and Rebuttal Report. Deposition. (2019)

59

Christine Droney and Timothy Droney v. vs. Vivint Solar: U.S. District Court for the District of New Jersey (Case 1:18-cv-00849-RBK-KMW). James Reilly v. vs. Vivint Solar: U.S. District Court for the District of New Jersey. (Case 1:16-cv-09446-NLH-JS).  Expert Reports. Deposition. (2019)

Richard M. Salazar vs. ABC Automotive Investments, LLC, d/b/a Las Vegas Mitsubishi: U.S. District Court for the District of Nevada. (Case 2:19-cv-00039). Expert Report. Deposition. (2019)

Al Savage v. Chase Bank (USA) N.A. et al: U.S. District Court for the Northern District of Georgia. [Atlanta Div.] (Case No. 17-cv-02901-MLB-RGV). Expert Report. Deposition. (2019)

William Franklin Jennings Crouch v. Equifax Information Services, LLC: U.S. District Court for the Eastern District of Kentucky. [Central Div. – Lexington] (Case No. 5:18-cv-00643-JMH-EBA) Expert Report. Deposition. (2019)

Catherine Nichols v. Credit Union 1, Experian Information Solutions, Inc.: U.S. District Court for the District of Nevada. Civil Action No.:  2:17-cv-02337-APG-GWF. Expert Report. Deposition. (2019)

William Franklin Jennings Crouch v. Equifax Information Services, LLC: U.S. District Court for the Eastern District of Kentucky. [Central Div. – Lexington] (Case No. 5:18-cv-00643-JMH-EBA) (2019)

Paula Williams v. Midland Funding LLC, et al.:  U.S. District Court for the Eastern District of Kentucky [Lexington Div.] (Case 5:18-cv-00530-JMH.) Expert Report. Deposition. (2019)

Douglas Littlejohn vs. Vivint Solar: U.S. District Court for the District of New Jersey (Case 1:16-cv-09446-NLH-JS).

Phyllis Sandigo v. Ocwen Loan Servicing, LLC: U.S. District Court for the Northern District of California  (Case 5:17-cv-02727-BLF-NC.) Expert Report. Deposition. (2019)

Chandra Shekar v. Accurate Background, Inc.: U.S. District Court Eastern District of Wisconsin [Milwaukee Division]; No. 2:17-cv-00585. Expert Report. Deposition. (2019)

James C. Rennick, Sr. and Michele Malverty v. Equifax Information Services, LLC: U.S. District Court for the Middle District of Florida. (Case No. 8:17-cv-01617-JDW-AAS.) Expert Report. Deposition. (2018)

James Banneck v. Federal National Mortgage Association, et. al: U.S. District Court for the Northern District of California – (No. Case No. 3:17-cv-04657-WHO). Expert Report. Deposition. (2018)

60

John Ashcraft and all similarly situated individuals, v. Experian Information Solutions, Inc., et al.: U.S. District Court for the District of Nevada. (Case No.:  2:16-cv-2978-JAD-NJK.) Expert Report. Deposition. (2018)


David E. Slattery, Jr. v. Trans Union, LLC and Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (Case No. 2:17-cv-01486-JAT) Expert Report. Deposition. (2018)

David Leoni and all similarly situated individuals, v. Experian Information Solutions, Inc., et al.: U.S. District Court for the District of Nevada. Civil Action No.:  17-cv-1486-APG-PAL. Expert Report. Deposition. (2018)

Carol Mainor v. Acctcorp of Southern Nevada, Ocwen Loan Servicing & Experian Information Solutions, Inc., et al.: U.S. District Court for the District of Nevada. Civil Action No.:  2:16 -cv- 00183 -RFB –PAL. Expert Report. Deposition. (2018)

Antonio A. Lopez v. Pre-Employ.com Inc.: U.S. District Court Eastern District of California (Case No. 2:16-cv-02205-TLN-KJN). (2018)

Sharon Barnum, et al. v. Equifax Information Services, LLC, U.S. District Court District of Nevada. (Case No. 3:16-cv-02807-GPC-WVG)  Expert Report. Deposition. (2018)

David W. Banks v. Employment Background Investigations, Inc.: U.S. District Court Western District of Missouri. (Case No. 17-CV-01005 DGK) Expert Report. Deposition. (2018)

Lee C. Kamimura, individually, and all others similarly situated v. Ditech Financial LLC, formally, known as Green Tree Servicing, LLC: United States District Court for the District of Nevada; Case No. 2:16-cv-00783-APG-CWH). Expert Report. Deposition. (2018)

Thomas Foskaris and all similarly situated individuals, Defendant Experian Information Solutions, Inc.: U.S. District Court for the District of Nevada. Civil Action No.: 17-cv-506-KJD-GWF. Expert Report. Deposition. (2018)

Brandon Walsh v. Federal National Mortgage Association, et al: U.S. District Court for the District of Arizona – (No. 2:15-cv-00761-JJT). Expert Report. Deposition. (2018)

Richard C. Merz v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 3:16-cv-00259-PGS-LHG. Expert Report. Deposition. (2017)

Camila S. Ruvalcaba, v. Ocwen Loan Servicing, LLC., Prospect Mortgage LLC., People's Escrow Inc., Equity Title Company, and Dennise Gurfinkiel: U.S. District Court for the Southern District of California; Case No. 15-CV-00744-BAS-DHB. Expert Report. Deposition. (2017)

61

Ahmed S. Adan v. Insight Investigations, Inc., et al.: U.S. District Court Southern District of California. (Case No. 3:16-cv-02807-GPC-WVG) Expert Report. Deposition. (2017)

Lisa Brancato v. Specialized Loan Servicing, LLC: U.S. District Court for the District of New Jersey; No. 16-cv-05504-PGS-LHG.) Expert Report. Deposition. (2017)

Thomas Black v. General Information Services, LLC: U.S. District Court for the Northern District of Ohio [Eastern Div.] 1:15-cv-01731. Expert Report. Deposition. (2017)

Foley Ma v. Equifax Information Services, LLC: U.S. District Court for the Northern District of Georgia [Atlanta Div.]. (Case No. 1:16-cv-01055-LMM-CMS.) Expert Report. Deposition. (2017)

Cynthia Todd v. AT&T Corp., Equifax Information Services, LLC, National Consumer Telecom and Utilities Exchange, Inc., ("NCTUE"), et al.: U.S. District Court for the Northern District of California. (Case No. 3:16-cv-03357-EDL.) Expert Report. Deposition. (2017)

Tammy Brown v. Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC: U.S. District Court for the Middle District of North Carolina [Durham Div.]. (Case No. 1:16-cv-00488-LCB-JLW.) Expert Report. Deposition. (2017)

Angela Anderson v. Equifax Information Services, LLC: U.S. District Court for the District of Kansas. (Case No. 2:16-cv-02038). Expert Report. Deposition. (2016)

Kirk McDonough v. JPMorgan Chase Bank, N.A., Trans Union LLC, et al., in the U.S. District Court for the Eastern District of Missouri [Eastern Div.]; No. 4:15-cv-00617-JCH. Expert Report. Deposition. (2016). Judge Jean C. Hamilton rejected Chase's Daubert motion to exclude me from testifying. (Case settled shortly thereafter.)

Jim M. Peckey v. Bank of America, et al.: U.S. District Court for the District of Maryland [Baltimore Div.]; No.: 1:14-cv-00433- RDB. Expert Report. Deposition. (2016)

Marci Curliss, v. Ocwen Loan Servicing, LLC: U.S. District Court for the Western District of Missouri [Western Div.]; Case No. 4:14-cv-00428-SRB. Expert Report. Deposition. (2016)

Robert James Anthony v. Experian Information Solutions: U.S. District Court for the Eastern District of California (No. 2:14-cv-01230-MCE-EFB). Expert Report. Deposition. (2016)

Peter Blasi, Jr., et al., v. United Debt Services, LLC, et al.,: U.S. District Court for the Southern District of Ohio [Eastern Div.]; (Case No.: 2:14-cv-0083). Expert Report. Deposition. (2016)

Henry L. Farrin, Jr., et al. v. Ocwen Loan Servicing, LLC, in the United States District Court for the District of New Hampshire (Case No. 1:15-cv-00145-JL) Expert Report. Deposition. (2016)

62

Karen Duell v. First National Bank of Omaha; and, The Dunning Law Firm: U.S. District Court for the Southern District of California; No.: 14-cv-2774 WQH (JLB). Expert Report. Deposition. (2016)

Debra B. Croft v. Bayview Loan Servicing, LLC: in the United States District Court for the District of South Carolina [Columbia Div.] (Case No. 3:14-cv-04630-MGL). Expert Report. Deposition. (2015)

Carlos A. Vasquez-Estrada v. Collecto Inc.: U.S. District Court for the District of Oregon [Portland Div.]; No. 3:14-CV-01422-ST. Expert Report. Deposition. (2015)

Charles Edward Steed, on behalf of himself and all others similarly situated, and Amy Summers, on behalf of herself and all others similarly situated: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (Case 1:14-cv-00437-SCJ-ECS). Expert Report. Deposition. (2015)

Johnnie Teresa Marchisio & Adrian Marchisio v. Carrington Mortgage Services, LLC: in the United States District Court for the Southern District of Florida (Case # 14-cv-14011-KAM). Expert Report. Deposition. (2015)

Elizabeth Roberts v. Vincent St. John & Safeco Insurance Co. of America: In the District  Court of Oklahoma County, State of Oklahoma (Case No. CJ-2012-1051). Expert Report. Deposition. (2015)

Roy Jack Williams v. Allstate Fire & Casualty Co., U.S. District Court for the Eastern District of Oklahoma (Case No. 5:13-cv-00828-D). Expert Report. Deposition. (2015)

John Mark Cowan v. GE Capital Retail Bank, et al.: U.S. District Court for the Northern District of California [San Jose Division]; 5:13-cv-3935-BLF-PSG. Expert Report. Deposition. (2015)

Martin Kevin Sammy v. Equifax Information Services, LLC: U.S. District Court for  the Eastern District of Pennsylvania. (Case No. 2:14-cv-00307-BMS) Expert Report. (2014)  Deposition. (2014)

Richard G. Beck, et al. v. Eric K. Shinseki, et al.: U.S. District Court for the District of South Carolina [Columbia Div.] (No. 3:13-cv-999-TLW). Expert Report. Deposition. (2014)

Roberto Sevi v. Experian Information Solutions, Inc., Trans Union LLC & Nationstar Mortgage, LLC.: U.S. District Court for the Middle District of Florida [Orlando Div.]; No. 6:13-cv-1433-Orl-37KRS. Expert Report. Deposition. (2014)

Jean Gardy Lacroix v. Equifax Information Services, LLC: U.S. District Court for the Southern District of Florida. (Case No. 9:14-cv-80334) Expert Report. Deposition. (2014)

Thanh Cham Thi Thach v. Virginia. U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 3:14-cv-00070-HEH)  Expert Report. Deposition. (2014)

Lee Pele v. Pennsylvania Higher Education Authority, Inc., U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 1:13-cv-01531-JCC-TRJ)  Expert Report. Deposition. (2014)

Anthony Peck v. Equifax Information Services, LLC, Experian Information Solutions, Inc., & DTE Energy Co.: U.S. District Court for the District of Colorado (No. 13-cv-02924-PAB-CBS).  Expert Report. Deposition. (2014)

Timothy Lawrence v. National Grid USA Service Co., National Recovery Agency, et al.: U.S. District Court for the Eastern District of New York (13 CV 4979 – CBA/VMS).

Rockwell Scharer III v. OneWest Bank, Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC, et al.,: U.S. District Court for the Central District of California; No.: 2:13-cv-00080-DSF-AGR.  Expert report. Deposition. (2014)

Ronald A. Jackson, et al. v. Equifax Information Services, LLC, et al.: U.S. District Court for the Southern District of Florida. 1:13-cv-21691-DLG

James A. Davenport v.  Sallie Mae, Inc., et al.: U.S. District Court for the District of Maryland; PJM 12-1475. Expert report. Deposition. (2014)

Steven Strong v. Collecto, et al., Experian Information Solutions, LLC: U.S. District Court for the Northern District of Texas [Dallas Div.]; No. 3-12-cv-05115-P. Expert report. Deposition. (2014)

Kovalerchik v. Experian Information Solutions, LLC: U.S. District Court for the Central District of California (No. 2:13-cv-05419 – GHK-FFMx).  Expert report. Deposition. (2014)

Michael Dreher v. Experian Information Solutions, Inc., et al.: U.S. District Court for the Eastern District of Virginia (Case 3:11-cv-00624-JAG). Expert report. Deposition. (2014)

Gary Wright v. Equifax Information Solutions, LLC, et al: U.S. District Court for the District of Colorado (No 1:12-cv-3268). Expert Report. Deposition. (2013)

Patriot General Insurance Company v. Lisa Krebs and Carmen McReynolds: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (1:12-CV-0997-RWS). Expert Report. Deposition. (2013)

Courtney Douglass v. Convergent Outsourcing.  (U.S. District Court for the Eastern District of Pennsylvania; Civil No. 2-12-cv-01524). Expert Declaration. Deposition. (2013)

Amanda Ellis v. Experian Information Solutions, Inc., Trans Union LLC, Equifax Information Services, LLC &: U.S. District Court for the Northern District of Alabama [Middle Div.]; No.: 4:12-cv-02779 RBP.  Expert report. Deposition.

64

Denese Toliver v. Experian Information Solutions, Inc., Trans Union LLC, et al.: U.S. District Court for the Southern District of Texas [Houston Div].  No. 4:12-cv-02436; Expert report. Expert rebuttal report. Declaration. Deposition.

David Osada, et al. v. Experian Information Solutions, Inc.: U.S. District Court for the Northern District of Illinois (Eastern Division), No. 11-CV-02856. Expert report. Deposition.

Kathleen Jane Ferguson v. Asset Acceptance Services, LLC, et al.: U.S. District Court for the District of Missouri [Eastern Div.]. (4:11-cv-00425--AGF).  Expert report. Deposition.

Arin A. Bovay, et al. v. Sears, Roebuck, and Co.: U.S. Circuit Court of Cook County, Illinois [County Dept., Chancery Div.]; Case No. 01-CH-18096; consolidated with Case Nos. 02-CH-4693 & 03-CH-07605. Expert report. Deposition.

Mary Perkins White v. Green Tree Servicing LLC, GMAC Mortgage LLC, Trans Union LLC, Equifax Information Services, LLC & Experian Information Solutions, Inc.,: U.S. District Court for the Western District of Washington [Tacoma Div.]; No.: 3:11-CV-005439RBL  Expert report. Deposition.

Ilene Modica v. American Suzuki Financial Services, TransUnion, LLC, & Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (2:11-CV-02183-PHX-DGC) Expert report. Deposition.

Denise Acquafredda v. Experian Information Solutions, et. al: U.S. District Court for the District of Arizona – (No. CV 2011-054368).  Expert report. Deposition.

Jose Calderon v. Experian Information Solutions: U.S. District Court for the District of Idaho (No. 1:11-cv-00386-EJL).  Expert report. Deposition.

First Carolina Banks v. Charles S. McCue, et al.:  In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort.  Civil Action No: 07-CP-07-03027. Expert report. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.:  U.S. District Court for the Northern District of California [Oakland Div.]  C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699).  Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ).  Expert report. Deposition.

Serena Beachley v. PNC Bank N.A..: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C,,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).  Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx).  Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC).  Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR.  Expert report. Deposition.

James Parker Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina Case No.: 3:09-cv-00609-JFA [Columbia Div.]. FCRA, mixed file. Expert report, deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211.  Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450.  FCRA.  Expert reports.  Consolidated deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD).  Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit.  Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.:  Superior Court of the State of California, County of Los Angeles.  Case No. BC390593397636.  Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA).  Expert report, declaration. Deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO).  Expert report, deposition.

66

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

Stacy Fiano v. Experian Information Solutions, et al., U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555. Expert report, deposition.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM. Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332. Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA. Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662. Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F. FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA. Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588. Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE. Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc.: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE.    FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.


## FEE

My fee for this report is $5,000. Going forward my fee is $400 per hour for preparation and for consulting; $500 per hour, or a minimum of $1,500 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

**Exhibits That Will Be Used to Summarize or Support Opinions**

I may use the documents that I have reviewed or mentioned, as identified in this Report, as well as graphs, charts and tables in this Report, as exhibits.

**Materials Considered**

In addition to the material cited in this report, in specific preparation for this case, I have reviewed the following:

Plaintiff's Complaint
PNC's Answer
Bates-stamped documents produced by Plaintiff, PNC, Trans Union, Experian, and Equifax
Depositions of PNC (30(b)(6)) and PNC's dispute investigators
Plaintiff's and PNC's Discovery Responses

I also generally rely upon:

The Fair Credit Reporting Act
Fair Credit Reporting Act, National Consumer Law Center, 2013 – 8th Edition (Boston)
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement, National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007),
 "Credit Reporting Resource Guide ®," published by the Consumer Data Industry Association's ("CDIA") [2015-2018]

My opinions in this case are also based on my 41-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 14th Day of June 2024 in Bethesda, Maryland**


**/s/  Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

69

### PLAINTIFF'S EXPERT WITNESS REBUTTAL REPORT
### OF EVAN HENDRICKS

I, Evan Hendricks, provide the following Rebuttal Expert Report pursuant to Federal Rule of Civil Procedure 26(a)(2) in connection with the action entitled ***Ernest Lee Duncan, Jr. v. PNC Bank, N.A., Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC***; U.S. District Court for the Western District of Pennsylvania [Pittsburgh Division] (Case 2:22-cv-1717).

This Rebuttal Expert Report incorporates the opinions expressed in my Expert Report, dated June 14, 2024.

### Introduction

I was retained by counsel for Plaintiff Ernest Lee Duncan, Jr. ("Plaintiff") in the above-referenced case to review and evaluate the "Expert Report" of John Ulzheimer (the "Ulzheimer Report"), offered by Defendant, PNC Bank, N.A., and to respond as appropriate. I also offer an amendment to my prior report to redress a typo in a date in the presumed facts.

### AMENDMENT TO PRESUMED FACTS

In the second paragraph of the "Presumed Facts" section of my Expert Report, I stated, "These statements show an overpayment of $36.72 on the Disputed Line of Credit in December 2020, which was then transferred out by the end of December 2020." I referenced PNC 137–40 for this statement. I meant to state: "These statements show an overpayment of $36.72 on the Disputed Line of Credit in December **2010**, which was then transferred out by the end of December **2010**." The reference to PNC 137–40 remains correct for this amended statement.

### REBUTTAL OF THE "EXPERT REPORT" OF JOHN ULZHEIMER

Mr. Ulzheimer overlooks the fact that accuracy is crucial in consumer credit reporting and disregards CFPB regulations that define "accuracy" as follows:

**(a) Accuracy** means that information that a furnisher provide to a consumer reporting agency about an account or other relationship with the consumer correctly:
   **(1)** Reflects the terms of and liability for the account or other relationship;
   **(2)** Reflects the consumer's performance and other conduct with respect to the account or other relationship; and
   **(3)** Identifies the appropriate consumer.

12 C.F.R. § 1022.41(a)(1). PNC's reporting misses the mark on all three components of "accuracy" articulated in 12 C.F.R. § 1022.41(a)(1). PNC repeatedly reported and improperly verified as accurate information about Plaintiff that misidentified him as responsible for the Disputed Line of

1

Credit[1] and, even if one were to incorrectly assume Plaintiff's liability on the Disputed Line of Credit, PNC misrepresented Plaintiff's "performance and other conduct with respect" to that account. "Accuracy is not defined in the [FCRA], but it has long been understood that, when it comes to the FCRA, "accurate" means more than just "technically correct." *Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800, 812 (7th Cir. 2023). With a few keystrokes, PNC could have easily corrected its inaccurate reporting, but it continued to report that Plaintiff owed it money when he did not, clearly failing to "[r]eflect the terms of and liability for the account" and his "performance . . . with respect to the account." 12 C.F.R. §§ 1022.41(a)(1)–(2).

The bulk of Mr. Ulzheimer's opinions hinge on his contention that "there is no plausible argument to be made that the PNC account was not 'owned' by the Plaintiff and his parents" Ulzheimer Report at 16. This foundational contention for Mr. Ulzheimer's opinions rests on the premise that PNC correctly "verified," in response to Plaintiff's repeated disputes, that "the PNC account did, in fact, belong to the Plaintiff and that he did, in fact have 'Joint contractual liability.'" (*Id*. at 18.) But these responses were inaccurate, as they falsely stated that Plaintiff was obligated on the Disputed Line of Credit when PNC has a single document containing Plaintiff's signature that relates to the Checking Account, which makes no mention of a credit line. PNC 1-2. No other document produced by PNC reflects any agreement by Plaintiff to account terms with National City or PNC, much less to the Disputed Line of Credit. At best, PNC lacked any grounds to verify that Plaintiff had any liability on the Disputed Line of Credit.

As noted in *Hinkle v. Midland Credit Management, Inc.*[2],

Section 1681s–2(b) contemplates three potential ending points to reinvestigation: verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that the information "cannot be verified." *See* 15 U.S.C. § 1681s–2(b)(1)(E). Midland argues that once it compared the information the CRAs possessed with its own internal records and confirmed a match, it was entitled to report the accounts as having been "verified." Hinkle argues that the records Midland possessed were insufficient to verify the accounts and that, absent additional proof, Midland should have reported the results of its reinvestigation as "cannot be verified." We agree with Hinkle that Midland is not entitled to summary judgment under § 1681s–2(b) on the facts of this case.

Our analysis begins with the plain text of § 1681s–2(b), which requires furnishers of information to either "verif[y]" disputed information by means of "investigation," or inform the CRAs that the information "cannot be verified." *Id.* As the FCRA does not define "verify" or "investigation," we must look to the ordinary meaning of those terms. *See United States v. Santos*, 553 U.S. 507, 511, 128 S.Ct. 2020, 2024, 170 L.Ed.2d 912 (2008) ("When a term is undefined, we give

---

[1] Where appropriate, I employ the same abbreviated terms (e.g. "Disputed Line of Credit") used in my Expert Report.

[2] I quote from and cite to cases not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers like PNC of the specific requirements imposed upon them by 15 U.S.C. § 1681s-2(b).

it its ordinary meaning."); *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) ("To ascertain ordinary meaning, courts often turn to dictionary definitions for guidance."). The ordinary meaning of "verification" is: (1) "evidence that establishes or confirms the accuracy or truth of something"; (2) "the process of research, examination, etc., required to prove or establish authenticity or validity"; (3) "a formal assertion of the truth of something, as by oath or affidavit"; and (4) "a short confirmatory affidavit at the end of a pleading or petition." *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 782-83 (6th Cir. 2014) (quoting *Random House Unabridged Dictionary* 2113 (2d ed.1993)). "Verify" has a similar meaning in the legal context. *See Black's Law Dictionary* 1793 (10th ed. 2014) ("**verify** vb. (14c) **1.** To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate. **2.** To confirm or substantiate by oath or affidavit; to swear to the truth of."). Finally, the term "investigation" is defined as "[a] detailed inquiry or systematic examination" or "a searching inquiry." *Johnson*, 357 F.3d at 430 (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000); *Webster's Third New Int'l Dictionary* 1189 (1981)).

These definitions support the conclusion that § 1681s–2(b) requires some degree of careful inquiry by furnishers of information. In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s–2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as "verified." *See id.* at 431 (reversing summary judgment because a reasonable jury could find a violation of § 1681s–2(b) where the furnisher "d[id] not look beyond the information contained in the [internal data file] and never consult[ed] underlying documents such as account applications"); *cf. Cahlin*, 936 F.2d at 1160 (observing that a claim for failure to investigate "is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts"). The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses. For instance, a debt buyer with account-level documentation or more comprehensive warranties from its predecessor debt buyer might be in a completely different position than Midland.

Section 1681s–2(b) does not impose an unduly burdensome investigation requirement on furnishers; rather, it presents them with a choice regarding how they handle disputed information. The first option is to satisfy § 1681s–2(b) by conducting an investigation, verifying the disputed information, and reporting to the CRAs that the information has been verified. Verification might be accomplished by uncovering documentary evidence that is sufficient to prove that the information is true. *See Johnson*, 357 F.3d at 431. Or it might be accomplished by relying on personal knowledge sufficient to establish the truth of the information. *See* Fed. R. Civ. P. 56(c)(4) (summary judgment affidavit); Fed. R. Evid. 602 (trial testimony). When a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved

3

for trial. *See Westra*, 409 F.3d at 827 ("Whether a defendant's investigation is reasonable is a factual question normally reserved for trial.").

The second way for a furnisher to satisfy § 1681s–2(b) is to conduct an investigation and conclude, based on that investigation, that the disputed information is unverifiable. Furnishers can avail themselves of this option if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire. Having made such a determination, furnishers are entitled to cease investigation and notify the CRAs that the information "cannot be verified." *See* 15 U.S.C. § 1681s–2(b)(1)(E). When a furnisher reports that disputed information "cannot be verified," the question of whether the furnisher complied with § 1681s–2(b) will likely turn on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome.[8] The final way to satisfy § 1681s–2(b) is to conduct an investigation and conclude that the disputed information is "inaccurate or incomplete." *Id.*

This framework reflects the fact that § 1681s–2(b) is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information.[9] When a furnisher determines that disputed information is false or "cannot be verified," the furnisher must notify the CRAs of this result pursuant to § 1681s–2(b)(1). The furnisher must also "as appropriate, based on the results of the reinvestigation promptly ... modify[,] ... delete [or] permanently block the reporting" of that information to CRAs. *Id.* § 1681s–2(b)(1)(E). What "the results of the reinvestigation" require may vary depending on the nature of the disputed information. But when a furnisher is unable to verify the identity of an alleged debtor, we are persuaded by the parallel structure of §§ 1681s and 1681i that the appropriate response will be to delete the account or cease reporting it entirely. *See id.* § 1681i(d) ("Following any *deletion* of information which is found to be inaccurate *or whose accuracy can no longer be verified* [the CRA shall] furnish notification that the item has been deleted ... to any person specifically designated by the consumer ...." (emphasis added)). Similarly, when a CRA receives notice that an account is unverifiable, it must "promptly delete that item of information from the file of the consumer." *See id.* § 1681i(a)(5)(A)(I). Lest this result appear too strict, we hasten to observe that even though a furnisher that ends an investigation without verifying a disputed account must cease reporting the account to CRAs, § 1681s–2(b) does not require the furnisher to cease dunning or otherwise attempting to collect the debt. The requirement to delete or modify the offending information is limited to the credit-reporting context. *See id.*

We are not the only circuit court to recognize this framework. In *Johnson*, the Fourth Circuit considered whether a bank reasonably investigated a dispute alleging that the consumer was not a co-obligor but merely an authorized user on a credit card account. 357 F.3d at 431. The bank investigated whether the consumer was a co-obligor by "(1) confirming that the name and address listed on the [dispute] were the same as the name and address contained in [its computerized data file], and (2) noting that [the data file] contained a code indicating that [the consumer] was the

4

sole responsible party on the account." *Id.* The bank "d[id] not look beyond the information contained in the [data file] and never consult[ed] underlying documents such as account applications." *Id.* The Fourth Circuit held that "[b]ased on this evidence, a jury could reasonably conclude that [the bank] acted unreasonably" when it reported to the CRA that the disputed information was "verified." *Id.* The bank argued that its reliance on computerized data was reasonable because it had destroyed any account-level documentation pursuant to a document retention policy. *Id.* at 432. But the court rejected this argument, explaining that a reasonable jury could find that the bank should have "at least informed the credit reporting agencies that [it] could not conclusively verify" the disputed information. *Id.*

The reasoning of *Johnson* is doubly persuasive in the case of a down-the-line buyer like Midland. Faced with a mistaken-identity dispute, Midland investigated the dispute by confirming that the identifying information possessed by the CRAs was the same as the identifying information contained in its internal data files. The information contained in the data files was obtained from AIS and DRS—not from the original creditors—and was the same information Midland had reported to the CRAs in the first place. Midland did not attempt to consult account-level documentation to confirm that the "Terri Hinkle" and "Teri Hinkle" who incurred the debts in 2005-2006 were the same "Teri Lynn Hinkle" it was dunning six years later. A reasonable jury could find that such a cursory investigation was unreasonable on the facts of this case. A jury could find that the documentation Midland reviewed was insufficient to prove that the GE/Meijer and T-Mobile accounts belonged to Hinkle and that Midland therefore had a duty to report the accounts as "cannot be verified." *See* 15 U.S.C. § 1681s–2(b)(1)(E). A jury could also find that because Midland retained the right to seek account-level documentation through its agreements with AIS and DRS, Midland behaved unreasonably when it reported the accounts as "verified" without first exercising those rights.

[8] The present case involves a report of "verified" and thus does not require us to delineate a standard for cases involving a report of "cannot be verified." We emphasize, however, that by characterizing § 1681s–2(b) as presenting a furnisher[] with a "choice" we do not mean to suggest that furnishers have complete discretion to cease investigation and report accounts as "cannot be verified."

[9] Any other reading would render meaningless the "cannot be verified" option in § 1681s–2(b)(1)(E). *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1204 (11th Cir. 2007) ("[W]e must construe [a] statute to give effect, if possible, to every word and clause.").

827 F.3d 1295, 1302–05 (11th Cir. 2016).

PNC repeatedly verified its unverifiable reporting. Mr. Ulzheimer's sole documentary basis for Plaintiff's liability on the Disputed Line of Credit is the Checking Account Signature Card. The only other basis Mr. Ulzheimer points to for Plaintiff's liability on the Disputed Line of

5

Credit is deposition testimony from this case. This deposition testimony in no way establishes Plaintiff's liability on the Disputed Line of Credit—Mr. Ulzheimer's summary of the testimony are inaccurate. And, of course, PNC's dispute investigators were not reviewing deposition transcripts from this case when processing Plaintiff's repeated disputes.

**Mr. Ulzheimer opines**:

**Opinion #1 – Based on my experience, analysis, and review of the case documents, it's my opinion there is testimony and documentary evidence indicating Plaintiff knew about and was, in fact, a signer/owner on the PNC account, and no contradictory evidence indicating Plaintiff was not a signer/owner. Accordingly, it was in line with credit reporting industry standards for PNC to verify the accuracy on the PNC account in response to Plaintiff's repeated credit reporting disputes indicating the PNC account did not belong to him.**

Plaintiff alleges he first discovered the PNC account on his credit reports "sometime in 2020." Plaintiff further alleges the PNC account was "inaccurately reporting…as belonging to the Plaintiff."[9] To be clear, what this means in credit reporting nomenclature is Plaintiff is sug-gesting there is a PNC account on his credit reports that does not belong to him, to any extent. This allegation is rebutted by Plaintiff's own words and admissions. Accordingly, the core issue in dispute between the Plaintiff and PNC Bank (whether or not Plaintiff is formally as-sociated with the PNC account as an account owner) appears to have been resolved when Plaintiff acknowledged the below series of events.

2007 – Plaintiff acknowledges going to National City Bank ("NCB") in 2007 with his father, who had a checking account with NCB at the time[10], and signing a signature card with NCB thus becoming an authorized signer and "account owner" on the NCB checking account, and also receiving agreements and pricing schedules regarding the account.[11]

2008 – PNC acquired NCB in 2008, meaning the Plaintiff became a PNC account customer via acquisition. PNC considers the line of credit/overdraft protection associated with the PNC "DDA" checking account to be the same account, and also that there was not a separate agreement for the checking and line of credit components.[12]

NOTE: The ability for a bank or credit union to furnish overdraft protection lines of credit to the credit bureaus is not new. In fact, there is decades-old industry guidance and specific coding for the furnishing of lines of credit.

Accordingly, it's my opinion there is no plausible argument to be made that the PNC account was not "owned" by the Plaintiff and his parents. In 2007 Plaintiff became what has infor-mally been referred to as an "also-signer" on the PNC account, and PNC reported the account as Plaintiff having "Joint contractual

6

liability" to the credit bureaus.[13] Respectfully, there does not appear to be evidence supporting the argument that the Plaintiff is not associated with the PNC account as an account owner/also-signer.

The subsequent credit reporting of a balance to Plaintiff's credit reports comes from fees applied to the PNC account that were drawn from the line of credit associated with the PNC account.[14] The furnishing of balances, whether they be from fees or charges, is a standard.

[9] See Complaint at 31-33.

[10] See Duncan deposition at 16-17, 22.

[11] See Duncan deposition at 21-23. See also PNC 1.

[12] See Bevins deposition at 16-18, 39-40. See also Hafner deposition at 24.

[13] For example, see PNC 1338. ECOA Code reported by PNC as "2." ECOA code 2 indicates "Joint contractual liability."

[14] See Bevins deposition at 64-65.

**Rebuttal Response:**

I will not fully revisit the "Presumed Facts" or opinions detailed in my Expert Report. However, I will reiterate that PNC lacks key documents relating to the Disputed Line of Credit. It has no documentation from National City substantiating any of the terms of the Disputed Line of Credit that were provided to Plaintiff, much less agreed to by Plaintiff. At most, PNC continually returned to the same Signature Card from National City that associated Plaintiff with the Checking Account but provided no evidence that Plaintiff had any obligation on the Disputed Line of Credit. Based on the existence of the Signature Card, PNC repeatedly "confirmed" Plaintiff's responsibility for the Line of Credit even though the Signature Card contained no information or terms regarding the Disputed Line of Credit and PNC internal information and documents contradicted Plaintiff's supposed responsibility for the Account.

The Signature Card speaks for itself, making no mention of a line of credit or overdraft protection.

PNC's corporate designee admitted PNC's complete lack of substantiating documentation for the Disputed Line of Credit:

- PNC has no documents for the Checking Account, which was opened in February 1976, preceding the signature card. PNC 30(b)(6) Dep. Tr. 17:8–18:3.
- There would have been at least one signature card prior to the Signature Card. *Id.* 17:19–22.

7

- There is no documentation reflecting that the Checking Account included a line of credit. *Id.* 18:22–25, 34:2–36:19, 39:3–12.

Also, as noted in my Expert Report,

There were also no bills for the Disputed Line of Credit directed to Mr. Duncan. The Disputed Line of Credit had been fully paid following the deaths of Senior and Betty, and there was no activity on the Disputed Line of Credit for nearly nine years, until PNC caused the Checking Account to overdraft when it charged $3.00 for "Check Images in Statement Fee" on November 19, 2019. Even after this activity, all of the statements for the Disputed Line of Credit listed Senior and Betty as the accountholders. They were addressed to 4656 English Oak Ct. None of the dunning correspondence for the Disputed Line of Credit listed Mr. Duncan as an accountholder. And, to the extent PNC mailed any of that correspondence, it knew it was sending it to an incorrect address. There was also never any notice of the "Check Images in Statement Fee" to Plaintiff or that the Checking Account terms had been altered to impose such fees.

Hendricks Expert Report at 7.

**Mr. Ulzheimer opines**:

In sum, this type of repetitive disputing of the same item for the same reason mimics garden variety credit repair activity and forced PNC to "ride the investigation merry-go-round"[44] as Plaintiff didn't provide information with the disputes that would indicate the PNC account did not belong to him.

**PNC Conducted Timely Investigations and Relied Upon Their System of Record and Document Retention Systems**

Again, PNC responded to 11 ACDV dispute forms from the various credit reporting agencies. Relying on their system of record and also systems that house core account documents (such as the afore referenced account signature card[46]), PNC responded to each of these ACDVs well-before the Fair Credit Reporting Act Response Due Date imposed by the credit bureaus. Accordingly, while the Plaintiff and his credit expert may not agree with the PNC's responses to the 11 ACDVs, PNC was certainly timely in their responses.

It's been my experience working on behalf of lenders as their retained expert with access to their testimony, discovery responses, and document production that it is so common for a data furnisher, like PNC, to review their system of record and also other systems that house account documents as part of their ACDV-prompted investigations that it would be appropriate and reasonable to call it a "standard" practice.

8

[44] This appropriately descriptive phrase comes from a holding in the 11th Circuit. Boyd v Wells Fargo.

[46] See PNC 1-3.

**Rebuttal Response:**

Mr. Ulzheimer makes gratuitous reference to "credit repair activity" which has nothing to do with this case. He then attempts to excuse PNC's failures to investigate on Plaintiff's supposed failure to provide information to PNC indicating that the Disputed Line of Credit did not belong to him. Of course, he did provide such information to PNC, even though nothing in the FCRA requires Mr. Duncan to prove a negative, i.e., that he never agreed to the Disputed Line of Credit. PNC 20–28, 30–41, 43–46, 54–55, 72–90, 92–121, 125–26. As noted in *Hinkle*, there is

> nothing in the FCRA that permits a furnisher to shift its burden of 'reasonable investigation' to the consumer in the case of a § 1681s–2(b) dispute. And even if there were a scenario in which burden shifting were appropriate, that result would make little sense in a case like this one—a mistaken-identity dispute in which the furnisher is in a far better position than the alleged debtor to confirm the actual owner of the account.

*Id.* at 1306. PNC's internal documentation demonstrated that Plaintiff was never an "owner" of the Disputed Line of Credit and certainly afforded no basis to PNC to "verify" Plaintiff's "ownership" of that account.

Mr. Ulzheimer is correct that credit reporting furnishers like PNC routinely perform superficial reviews of their internal systems in "investigating" consumer credit disputes and then regurgitate back to the CRAs the data they previously reported. These cursory, "data conformity" reviews cannot qualify as actual investigations of Plaintiff's disputes. Mr. Ulzheimer refers to PNC's inadequate reviews of its internal data as "standard." Mr. Ulzheimer is correct that PNC's employees followed PNC's practice/policy and/or procedure ("PPP") for "investigating" consumer credit disputes. He ignores that such superficial investigations have been deemed unacceptable by multiple United States Courts of Appeal.

Mr. Ulzheimer is or should still be aware of the utter and foreseeable futility of PNC's PPP of responding to ACDV disputes with superficial, data-comparisons.

This is how he described the process when he presumably was not being paid by PNC:

**The "so-called" investigation**

> The FCRA gives each of us the right to challenge information in our credit files. If the information cannot be verified in a timely manner, it must be removed or changed in favor of the consumer. This process is called "investigation" and must be completed within 30 days from when the credit bureaus receive the dispute from the consumer.

9

**You'd think, as important as credit reports are to so many people, that the system of investigating would be sophisticated. Once again, you'd be very disappointed.** The process starts when consumers notice something on their credit reports that they don't recognize or that they disagree with. They contact the credit reporting agencies via mail, email or telephone – and challenge the information. The credit reporting agencies spring into action and make a notation on the consumer's credit file that the information is under investigation.

**What do you think happens next? Is it assigned to a team of investigation who will spend time researching the information, interviewing people, or even looking at clues, all in an effort to determine the validity of the disputed account? Hardly. In what can only be categorized as "What a joke," the credit bureaus will send a letter back to the same lender who reported the disputed item, asking them to either verify that it is being reported correctly or change it.**

**Remember: This is the same exact company that reported the information (possibly incorrectly) in the first place. All the credit bureau is doing is essentially asking the lender if what it already reported is correct. That's not an investigation. All that is being verified is what the lender already has in its database, which might very well be incorrect. It the lender confirms that what they already sent is correct, then the information stays on file regardless it is correct or no. What a joke.**

**It seems to me that the true meaning of an investigation would be for the credit bureaus to ask the lender to do some sort of research into the validity of the information.** Was a payment posted incorrectly, was a credit issues, was a bill sent to the wrong address? Information can be incorrect for a dozen different reasons. If you simply look in your "system" just to see if you have the same data that was sent to the credit bureaus, you're not doing the consumer justice. …

… And, finally**, whenever I challenge something on my credit report, the investigation should be more than just the simple verification process that is done today. It's simply not good enough. The investigation should be more of an exploratory into the validity of the consumer data. Don't we deserve at least that much?** ("You're Nothing But a Number - Why Achieving Great Credit Scores Should Be on Your List of Wealth Building Strategies" (Credit.com, 2007).) [Emphasis added.]

Unlike many of the opinions regarding FCRA/ACDV investigations expressed by Mr. Ulzheimer in his expert report, I agree with many of the opinions he expressed in his book. Clearly, these opinions are not consistent with many of those in his report. To summarize my areas of agreement with Mr. Ulzheimer's previous (book) opinions as they pertain to this case:

10

- Remember: PNC is the same exact company that reported the information (possibly incorrectly) in the first place. PNC is only telling the CRA if what it already reported is "correct." That's not an investigation. All that is being verified is essentially what PNC already has in its database, which might very well be incorrect. When PNC confirmed what it already sent was correct, then the information stayed on file regardless if it was correct or not. What a joke.

- The true meaning of an investigation would be for PNC to do some sort of research into the validity of the information.

- Whenever I (or other consumers) challenge something on my (their) credit report(s), the investigation should be more than just the simple verification process that is done today. It's simply not good enough. The investigation should be more of an exploratory into the validity of the consumer data. Don't we deserve at least that much?

**Mr. Ulzheimer opines**:

**Opinion #2 – Based on my experience, analysis, and review of the case documents, it's my opinion that Plaintiff did not experience credit related financial damages or adverse actions as a result of the PNC account appearing on Plaintiff's credit reports.**

**Rebuttal Response:**

Irrespective of the mortgage approval, which Plaintiff acknowledges, the reporting of a delinquent account harms a consumer's creditworthiness. Plaintiff was not rendered ineligible for all credit by PNC's false reporting, but it nonetheless damaged his creditworthiness, as Mr. Ulzheimer's report notes that payment history, i.e., the presence or lack of negative information, contributes 35% to a FICO credit score, and how much and what type of debt a consumer has contributes 30% to a FICO credit score. PNC's false reporting was the only derogatory account on Plaintiff's credit file. He maintained a sterling credit history.

At bottom, Mr. Ulzheimer's opinion seems to be that the existence of a derogatory account reported by PNC had no effect on Plaintiff's otherwise sterling credit report. Common sense, the facts demonstrating Plaintiff's before-and-after credit scores, and his own publications rebut this opinion: "Look, nobody blames anyone for trying to get a better FICO score. We all want great scores, right? But, I have a much better 'score improvement' idea…earn great scores by paying your bills on time and staying out of credit card debt and you won't have to try and beat the system."[3] Plaintiff meticulously monitored his credit, honored his financial obligations, and stayed out of excessive debt, only to face PNC's steadfast refusal to properly investigate numerous credit reporting disputes of a phantom line of credit account it misattributed to him because he assisted his elderly father and stepmother with their finances.

---

[3] Smartcredit, *What Happens to My FICO Score When I Dispute Credit Report Information?* (Jan. 5, 2011), available at https://blog.smartcredit.com/2011/01/05/disputing-credit-report-information-what-happens-to-my-fico-scores-during-the-dispute/ (last accessed on Nov. 28, 2022).

**Mr. Ulzheimer opines:**

<u>**Opinion #3**</u> **– Plaintiff's expert's legal opinion that PNC failed at a legal duty to report the PNC account as being "disputed" in response to Plaintiff's credit bureau sourced disputes 1) isn't an alleged violation in the Complaint and 2) ignores long-standing industry guidance. For many years furnishers, like PNC, have been directed to not mark their accounts as being "disputed" in response to credit bureau sourced disputes.**

**Allegation of Failure to Report PNC Account as Disputed…made by Plaintiff's expert.**

To be clear, there is nothing in the Complaint whereby Plaintiff alleges PNC failed at an FCRA imposed duty to report the PNC account as being disputed. However, Plaintiff's credit expert, improperly citing caselaw from three different lawsuits, does allege PNC failed at an FCRA duty to mark the PNC account as being disputed in response to Plaintiff's credit bureau sourced disputes.

While providing legal opinions in rebuttal would be equally as improper as Plaintiff's ex-pert's affirmative legal opinions, PNC (and all other ~14,000 credit data furnishers) is ex-plicitly directed by the credit industry's trade association to **not** mark accounts as being disputed when they receive disputes from one or more of the consumer credit reporting agencies.

In early 2017 the Consumer Data Industry Association ("CDIA") made it known that they would be sending an off-cycle update to their credit reporting industry standards in advance of the publication of their full 2017 Credit Reporting Resource Guide. This off-cycle update directed furnishers of credit information to the credit bureaus, like PNC, to **not** report Com- pliance Condition Codes[51] when they receive disputes from a credit reporting agency. This guidance has been part of every Credit Reporting Resource Guide published since 2017. Citi- bank includes a summary of the above guidance almost identically in their written policies as it pertains to credit bureau disputes.[52]

Accordingly, Plaintiff's expert (but not the Plaintiff) is alleging PNC failed at a legal duty be-cause they didn't do something that all furnishers of information to the credit bureaus are directed to **not** do by the credit reporting industry's trade association and their guidelines.

**Rebuttal response:**

Mr. Ulzheimer states that "there is nothing in the Complaint whereby Plaintiff alleges PNC failed at an FCRA imposed duty to report the PNC account as being disputed." Ulzheimer Report at 23. I will be generous in response to this statement and assume that Mr. Ulzheimer mixed up his cases. The Complaint specifically alleges:

12

**COUNT IV**
**Violation of § 1681s-2(b)(1)(C) and (D) of the FCRA – against PNC**

125. The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

126. On one or more occasions within the past two years, by example only and without limitation, PNC violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with Experian, Trans Union and Equifax in response to his disputes without also including a notation that the debt was disputed and by failing to correctly report results of an accurate investigation to Experian, Trans Union and Equifax.

127. On information and belief, Plaintiff alleges that PNC rarely if ever adds the notation that the account is disputed when it responds to the e-Oscar ACDVs.

128. Plaintiff's disputes were, at minimum, bona fide.

129. As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: less favorable credit terms, decreased credit scores, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

130. As a result of PNC's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

131. PNC's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, PNC was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

132.    PNC was aware of the *Saunders v. Branch Banking & Trust* and *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009) FCRA decisions by the Fourth Circuit and Ninth Circuit, respectively, when it followed the ACDV procedures used regarding Plaintiff's disputes.

133.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that PNC intended its employees or agents to follow.

134.    On information and belief, Plaintiff alleges that PNC's employees or agents did not make a mistake in the way they followed PNC's procedures when they received, processed and responded to Experian, Trans Union and Equifax's ACDVs and did not include any notation that the account was disputed.

Compl. ¶¶ 125–134.

Further, court after court has declined to allow FCRA Defendant's to use the CRRG as a shield against FCRA liability. *Coulter v. Chase Bank USA, N.A.*, 2020 WL 5820700, at *12 (E.D. Pa. 2020); *Florence v. Cenlar Fed. S&L*, 2018 WL 1145804, at *7 (D. Nev. Mar. 1, 2018); *Burrows v. Experian Info Sols., Inc.*, 2017 WL 1046973, at *7 (N.D. Cal. Mar. 20, 2017); *Luft v. WebBank*, 2023 WL 2669055, at *5 (E.D. Wash. 2023); *Jackson v. Ray Klein, Inc.*, 2021 WL 3566592, at *3 (N.D. Ill. 2021). The Consumer Data Industry Association, the self-proclaimed "voice of the consumer reporting industry," publishes the Credit Reporting Resource Guide (CRRG) for the benefit of furnishers and CRAs, not consumers seeking to enforce their rights under the FCRA. CDIA, *About CDIA*, available at https://www.cdiaonline.org/about/about-cdia/. And the Third Circuit ruled over a decade ago that once a consumer submits a meritorious dispute of credit reporting to a furnisher, directly or indirectly through the CRAs, the furnisher must notate that tradeline as disputed by consumer. *Seamans v. Temple Univ.*, 744 F.3d 853, 866–67 (3d Cir. 2014).

As to my so-called "affirmative legal opinions," when I do opine on issues of reasonableness as it relates to FCRA investigations, including those by furnishers, an important FCRA enforcement authority (the U.S. Court of Appeals for the Fourth Circuit), disagrees with Mr. Ulzheimer, as the Fourth Circuit ruled that I do so in a manner that is appropriate for expert witnesses.

Ocwen next argues that the district court should have excluded the testimony of Daugherty's expert witness, Evan Hendricks, on two bases. Ocwen contends that Hendricks' expert witness report was too vague to provide the basis for, or the substance of, his expert opinion. Additionally, **Ocwen argues that the district court improperly permitted Hendricks to testify about the legal standard to which furnishers of credit information are held under the FCRA. We disagree with Ocwen's arguments.**

14

First, we conclude that Hendricks' expert witness report provided adequate notice to Ocwen concerning the substance of his anticipated testimony. His report disclosed that he relied on "Bates-Stamped documents produced by Defendant Equifax" in forming his expert opinion. His examination of these documents led him to conclude in his report that "Ocwen did nothing more than engage in the superficial [exchange of dispute verification requests], reflecting its disregard of the history and context that clearly put it on notice" that its investigation was not reasonable for a dispute of this nature. Thus, Hendricks' expert report provided sufficient notice that he was prepared to testify about Ocwen's inadequate responses to particular dispute verification requests. Additionally, Hendricks' report placed Ocwen on notice that the content of the dispute verification requests would be central to Hendricks' opinion that comprehensive investigation procedures were required under the circumstances but were not undertaken by Ocwen.

**We also are not persuaded by Ocwen's argument that Hendricks improperly provided legal conclusions during his testimony**. **We recognize the general rule that expert witnesses are not permitted to "state[ ] a legal standard or draw [ ] a legal conclusion."** United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011) (quoting United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006)). **However, Hendricks' testimony did not violate this general rule. Reasonableness is a subject on which experts routinely testify**. See United States v. Barile, 286 F.3d 749, 761 (4th Cir. 2002) (holding that an expert could properly give his opinion whether certain actions by the defendant were "reasonable" in light of the defendant's legal obligations under section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k)). **Here, Hendricks' testimony addressed the reasonableness of Ocwen's conduct in light of the regulatory framework of the FCRA. This testimony did not draw legal conclusions but was offered as an explanation why Ocwen's cursory investigation in response to the dispute verification requests was deficient. Therefore, we conclude that the district court did not abuse its discretion in permitting Hendricks to testify regarding the reasonableness of Ocwen's investigations**. (David Daugherty v. Ocwen Loan Servicing, LLC, Court of Appeals for the Fourth Circuit, Case No. 16-2243.) [Emphasis added.]

Mr. Ulzheimer likewise ignores the U.S. District Court for the Eastern District of Virginia's more recent recognition of the import of *Daugherty* for the propriety of my testimony regarding reasonableness:

Discover finally argues that Hendricks' conclusions that Discover's policies were not reasonable under the FCRA should be excluded because these conclusions usurp the function of the jury. This argument is precluded by binding Fourth Circuit precedent involving the testimony of this same expert witness (Hendricks) in a case involve the same statute (the FCRA). In permitting Hendricks to testify as to the reasonableness of a furnisher's policy in light of the FCRA, the Fourth Circuit explained that "[r]easonableness is a subject on which experts routinely testify."

15

*Daugherty*, 701 Fed. App'x at 255. Further, the Fourth Circuit explained that Hendricks' testimony in that case, as in this case, "addressed the reasonableness of [defendant's] conduct in light of the regulatory framework of the FCRA" and thus "did not draw legal conclusions." *Id.* Accordingly, Hendricks will be permitted to testify as to the reasonableness of the procedures Discover implemented to investigate allegations of fraudulent credit card activity.

*Abu-Eid v. Discover Prod., Inc.*, 589 F. Supp. 3d 555, 565 (E.D. Va. Mar. 8, 2022)

## FEE

My fee for this report is $4,000. My fee going forward is $400 per hour for preparation, consulting trial testimony, plus reasonable travel time, plus travel costs and expenses; $500 per hour, or a minimum of $1,500 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

## Materials Considered

I reviewed the material cited in this report and my previous report.

**Executed This The 11th Day of September 2024, in Phoenix, Arizona.**

**/s/  Evan D. Hendricks**_____
**Evan D. Hendricks**

16